**Docket Nos. 2023-1864, 2023-1940**

*In the*

# United States Court of Appeals

*For the*

# Federal Circuit

SHOCKWAVE MEDICAL, INC.,

*Appellant,*

v.

CARDIOVASCULAR SYSTEMS, INC.,

*Cross-Appellant.*

*Appeal from the United States Patent and Trademark Office Patent Trial and Appeal Board in Case No. IPR2019-00405 · Richard Marschall, Administrative Patent Judge Avelyn Marie Ross, Administrative Patent Judge · Mitchell G. Weatherly, Administrative Patent Judge.*

## OPENING BRIEF OF APPELLANT SHOCKWAVE MEDICAL, INC.

MICHAEL R. FLEMING, ESQ.
IRELL & MANELLA LLP
750 17th Street NW, Suite 850
Washington, District of Columbia. 20006
(202) 777-6500 Telephone
mfleming@irell.com

DAVID C. MCPHIE, ESQ.
STEPHEN M. PAYNE, ESQ.
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, California 92660
(949) 760-0991 Telephone
dmcphie@irell.com
spayne@irell.com

W. COOK ALCIATI, ESQ.
GARDELLA GRACE P.A.
80 M Street SE, 1st Floor
Washington, District of Columbia. 20003
(703) 556-9600 Telephone
calciati@gardellagrace.com

*Attorneys for Appellant Shockwave Medical, Inc.*

COUNSEL PRESS INC. · (213) 680-2300 PRINTED ON RECYCLED PAPER

## <u>EXEMPLARY CLAIM FROM U.S. PATENT NO. 8,956,371</u>

1. An angioplasty catheter comprising:

   an elongated carrier sized to fit within a blood vessel,

   said carrier having a guide wire lumen extending there through;

   an angioplasty balloon located near a distal end of the carrier with a distal end of the balloon being sealed to the carrier near the distal end of the carrier and with a proximal end of the balloon defining an annular channel arranged to receive a fluid therein that inflates the balloon; and

   an arc generator including a pair of electrodes,

   said electrodes being positioned within and in non-touching relation to the balloon,

   said arc generator generating a high voltage pulse sufficient to create a plasma arc between the electrodes resulting in a mechanical shock wave within the balloon that is conducted through the fluid and through the balloon and wherein the balloon is arranged to remain intact during the formation of the shock wave.

# CERTIFICATE OF INTEREST

Counsel for Appellant Shockwave Medical, Inc. certifies the following:

1. The full name of every party represented by me is:

   Shockwave Medical, Inc.

2. The names of the real parties in interest represented by me are:

   Not applicable.

3. All parent corporations and any publicly held companies that own ten percent (10%) or more of the stock of the parties represented by me are:

   Blackrock, Inc.
   Vanguard Group, Inc.

4. The names of all law firms and the partners or associates that appeared for the parties represented by me in the trial court or are expected to appear in this Court are:

| | |
|---|---|
| IRELL & MANELLA LLP<br>Michael R. Fleming<br>David C. McPhie<br>Stephen M. Payne | GARDELLA GRACE P.A.<br>Greg H. Gardella<br>Natalie J. Grace<br>Ruth G. Davila<br>W. Cook Alciati |
| MORRISON & FOERSTER<br>Mehran Arjomand<br>Michael Stallman<br>Anna Yuan<br>Jean Nguyen | |

5. Other than the originating case, any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

   None.

6. Organizational Victims and Bankruptcy Cases:

Not applicable.

Dated: September 20, 2023

Respectfully submitted,

By: */s/ David C. McPhie*
David C. McPhie

David C. McPhie
Stephen M. Payne
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Phone: 949-760-0991

Michael R. Fleming
IRELL & MANELLA LLP
750 17th Street NW
Washington, D.C. 20006
Phone: 202-777-6500

W. Cook Alciati
GARDELLA GRACE P.A.
80 M Street SE, 1st Floor
Washington, D.C. 20003
Phone: 703-556-9600

*Counsel for Appellant*
*Shockwave Medical, Inc.*

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES .... 1

STATEMENT OF JURISDICTION .... 1

STATEMENT OF ISSUES .... 2

STATEMENT OF THE CASE .... 3

I. Shockwave Invents A Groundbreaking New Approach For Treating Cardiovascular Disease .... 3

II. The Patent Office Grants The ’371 Patent In Recognition Of Shockwave’s Innovations .... 9

III. CSI Seeks To Have The Board Cancel Shockwave’s Patent Claims Based on AAPA .... 11

IV. The Board Initially Finds Claims 1-4 and 6-17 Unpatentable Based on AAPA .... 12

V. On Rehearing, the Board Affirms Its Use of AAPA, and Rejects Shockwave’s Motion for Additional Discovery Based on CSI’s New Statements Praising IVL .... 14

SUMMARY OF ARGUMENT .... 16

ARGUMENT .... 18

I. The Board Improperly Relied on AAPA as a Basis for the Petition .... 18

A. AAPA Cannot Be a “Basis” For a Finding of Unpatentability in IPR Proceedings .... 18

B. Both CSI And the Board Improperly Relied on AAPA As a Basis For the Petition .... 19

C. The Board’s Attempt to Rely on Healy and Hayes For This Element on Rehearing Was Improper .... 25

**Page**


II. The Board Erred In Construing the Term "Angioplasty Balloon" ..... 28

A. The Claims Specifically Require an "Angioplasty" Balloon ..... 28

B. The Board Misunderstood What "Angioplasty" Is ..... 30

C. The Board's Construction Ignored and Contradicted the Intrinsic Record ..... 31

D. The Board Identified No Proper Support For Its Extremely Broad Construction of Angioplasty ..... 33

E. The Board Erred in Rejecting Shockwave's Construction ..... 34

F. Levy Does Not Disclose an "Angioplasty Balloon" as Properly Construed ..... 36

G. The Board Identified No Proper Motivation to Combine the Angioplasty Balloon of AAPA With Levy ..... 37

III. The Board Identified No Proper Evidence of Motivation to Introduce a Guidewire Lumen into Levy ..... 38

IV. Levy Does Not Disclose Shockwaves And There is No Motivation to Combine to Supply this Missing Element ..... 43

A. Levy Does Not Disclose Use of Shockwaves ..... 44

B. Levy '227's Dental Device Does Not Support Obviousness ..... 46

C. The Board's Attempt to Rely on Other References As Disclosing Shockwaves Fails Because the Board Identified No Motivation to Combine These References With Levy ..... 49

**Page**


V. The Board Improperly Disregarded the Objective Indicia of Non-Obviousness and Improperly Denied Shockwave's Motion for Additional Discovery ........ 50

A. Shockwave Introduced Substantial Objective Evidence of Non-Obviousness ........ 51

B. The Board Failed to Properly Consider the Objective Indicia Evidence ........ 53

C. The Board Improperly Denied Additional Discovery into CSI's Reversal of Position on IVL During Rehearing ........ 59

CONCLUSION ........ 63

CERTIFICATE OF COMPLIANCE ........ 64

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arendi S.A.R.L. v. Apple, Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) ....................................................................40

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*,
4 F.4th 1370 (Fed. Cir. 2021) ......................................................................56

*Dell Inc. v. Acceleron, LLC*,
818 F.3d 1293 (Fed. Cir. 2016) ....................................................................27

*FanDuel, Inc. v. Interactive Games LLC*,
966 F.3d 1334 (Fed. Cir. 2020) ......................................................18, 40, 41, 49

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
383 F.3d 1352 (Fed. Cir. 2004) ....................................................................32

*Huawei Device Co., Ltd. v. Optis Cellular Tech., LLC*,
Case IPR2018-00816, slip op. (PTAB Jan. 8, 2019).......................................27

*Intelligent BioSys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................................................................38

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012) ..............................................................*passim*

*Koninklijke Philips N.V. v. Google LLC*,
948 F.3d 1330 (Fed. Cir. 2020) ....................................................................24

*LiquidPower Specialty Prods. Inc. v. Hughes*,
749 F. App'x 965 (Fed. Cir. 2018)............................................................50, 51

*Lochner Techs., LLC v. Vizio, Inc.*,
567 F. App'x 931 (Fed. Cir. 2014).................................................................32

*Microsoft Corp. v. IPA Techs. Inc.*,
2022 WL 989403 (Fed. Cir. Apr. 1, 2022).......................................................27

*Personal Web Techs., Inc. v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ......................................................................38

*Personalized Media Commcn's, LLC v. Apple, Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) ....................28

*Polaris Industries, Inc. v. Artic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ....................40, 54

*Qualcomm Incorporated v. Apple Inc.*,
24 F.4th 1367 (Fed. Cir. 2022) ....................16, 19, 25

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*,
856 F.3d 1019 (Fed. Cir. 2017) ....................37

*In re Rudy*,
956 F.3d 1379 (Fed. Cir. 2020) ....................25

*SAS Inst., Inc. v. Iancu*,
138 S. Ct. 1348 (2018) ....................24

*Springs Window Fashions LP v. Novo Indus., L.P.*,
323 F.3d 989 (Fed. Cir. 2003) ....................32

*In re Stepan Co.*,
868 F.3d 1342 (Fed. Cir. 2017) ....................47

*TQ Delta, LLC v. Cisco Sys.*,
942 F.3d 1352 (Fed. Cir. 2019) ....................40

*Uber Technologies, Inc. v. X One, Inc.*,
799 F. App'x 868 (Fed. Cir. 2020) ....................35, 36

*Ultratec, Inc. v. Captioncall, LLC*,
872 F.3d 1267 (Fed. Cir. 2017) ....................51, 62

*VirnetX v. Apple Inc.*,
931 F.3d 1363 (Fed. Cir. 2019) ....................18

*Volvo Penta of the Am., LLC v. Brunswick Corp.*,
--- F. 4th ---, 2023 WL 5440530 (Fed. Cir. Aug. 24, 2023) ....................55, 56, 57, 59

*Yeda Research v. Mylan Pharmaceuticals Inc.*,
906 F.3d 1031 (Fed. Cir. 2018) ....................21

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ........................................................................................1

35 U.S.C. § 311(b) ................................................................................................*passim*

35 U.S.C. § 314(b) ...................................................................................................24

**Other Authorities**

37 C.F.R. § 42.104(b)(4).............................................................................................26

## STATEMENT OF RELATED CASES

Shockwave Medical, Inc. is not aware of any other case pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. No other appeal from the same proceeding has previously been before this or any other appellate court.

## STATEMENT OF JURISDICTION

The Board issued a final decision on rehearing in the underlying IPR on February 2, 2023, and Shockwave's request for director review was denied on March 30, 2023. Shockwave timely filed its notice of appeal on May 15, 2023. This Court has jurisdiction over Shockwave's appeal pursuant to 28 U.S.C. § 1295(a)(4)(A).

There is no jurisdiction over CSI's cross-appeal due to lack of standing. Shockwave has not filed any litigation against CSI on the '371 Patent (or any other patent), there is no CSI product currently on the market that has been accused of infringing any claim of the '371 Patent, and CSI has not identified any concrete product design to be released in the future that could be properly evaluated for purposes of any such infringement claim. Shockwave raised these issues in its motion to dismiss CSI's cross-appeal (Dkt. 16), which this Court denied without prejudice with instructions to address the matter in merits briefing.

## STATEMENT OF ISSUES

1. Did the Board err in using AAPA as a basis for unpatentability in IPR proceedings contrary to 35 U.S.C. § 311(b) and this Court's precedent?

2. Did the Board err in construing the term "angioplasty balloon" to encompass balloons lacking structural features necessary to perform "angioplasty," despite the express prosecution history disclaiming such non-angioplasty balloons?

3. Did the Board err in finding there was motivation to combine an angioplasty balloon and a guidewire lumen with the Levy reference based solely on conclusory statements that these elements were "known" and/or a "design choice"?

4. Did the Board err in concluding that Levy discloses shockwaves as claimed in the '371 Patent where the only embodiment allegedly disclosing shockwaves was in the context of a dental application and not an angioplasty balloon?

5. Did the Board err in its analysis of objective indicia of non-obviousness where its final decision (i) ignored and mischaracterized key aspects of the factual record; (ii) assigned "vague weights" to the evidence and did not "explain its overall summation," contrary to this Court's precedent, and (iii) denied discovery into statements made by CSI during rehearing that contradicted CSI's earlier assertions that the Board's final decision relied upon?

## STATEMENT OF THE CASE

This appeal arises from a final order upon rehearing of a final written decision of the Patent Trial and Appeal Board ("Board"), which found unpatentable claims 1-4 and 6-17 of U.S. Patent No. 8,956,371 ("the '371 Patent"), and found claim 5 patentable. Appx1-97. Patent Owner Shockwave Medical, Inc. ("Shockwave") seeks reversal of the Board's decision as to claims 1-4 and 6-17, which made a number of legal errors including impermissible use of Applicant Admitted Prior Art ("AAPA") as a basis for unpatentability, incorrect construction of "angioplasty balloon," and failure to provide even a basic evidentiary showing for certain claim elements and motivation to combine, among other errors. The Board also erred in evaluating Shockwave's substantial evidence of objective indicia of non-obviousness, including by disregarding statements made by the petitioner Cardiovascular Systems, Inc. ("CSI") during rehearing that directly contradicted CSI's representations during the main IPR proceedings that the Board relied upon in its final decision. Shockwave does not seek review of the Board's decision finding claim 5 patentable.

### I. Shockwave Invents A Groundbreaking New Approach For Treating Cardiovascular Disease

Atherosclerosis is a serious health condition associated with the build-up of plaque, which can calcify and form hardened deposits in blood vessels. Appx8757-8758. These calcified deposits narrow the lumen of the artery, restricting blood flow

and potentially leading to dangerous complications such as heart attack or heart failure. *Id.*

Historically a variety of treatments were attempted to treat atherosclerosis. One such treatment is a procedure called "angioplasty." Appx7429-7430. Angioplasty involves inserting a specialized "angioplasty balloon" into the blood vessel and inflating it to high pressures of 10-30 atmospheres. *Id.* The pressure of the balloon pressing against the calcified deposit breaks up the plaque and displaces it into the vessel wall. *Id.* As discussed in the '371 Patent, traditional angioplasty techniques can result in serious complications. For example, "[a]s the pressure builds a tremendous amount of energy is stored in the balloon until the calcified lesion breaks or cracks. That energy is then released and results in the rapid expansion of the balloon to its maximum dimension and may stress and injure the vessel walls." Appx198 (1:31-36).

Another prior art technique for treating atherosclerosis is "atherectomy," which attempts to remove plaque by drilling or scraping away the calcified deposits using a specialized drill, cutter, or laser (e.g., a "roto-rooter" approach). Appx8694. This procedure presents greater risks of damage to soft tissue (e.g., perforation or dissection of vasculature), and further creates a significant risk of embolism, as the bits of calcium broken away could flow through the artery only to obstruct it at another point. Appx7535-7536.

These prior art procedures for treating atherosclerosis, in addition to having significant risks, were unable to effectively treat certain patients, such as those with calcified deposits extending from the lumen of the artery into the medial layer of the arterial wall. Appx8693-8694. As surgeons who have collectively performed tens of thousands of cardiovascular procedures testified in the IPR proceedings, neither angioplasty nor atherectomy are effective in breaking up this deeper medial plaque. Appx8694-8695; *see also* Appx8758-8759, Appx8769-8770, Appx8801-8803, Appx8871-8872. And because the deep plaque remained untreated, it would prevent opening of the arterial lumen to the desired width or would re-narrow the arteries after these prior art treatments were attempted. Appx8694-8695.

Shockwave was founded in 2009 with the goal of developing new treatments for atherosclerosis to overcome the limitations of existing therapies. One of Shockwave's innovations was a modified angioplasty balloon catheter equipped with electrodes within the balloon, shown in the following figure from the '371 Patent:

FIG. 2




Appx190.

The Shockwave catheter includes "a lumen 29 through which a guidewire (not shown) may be inserted to guide the catheter into position" inside the blood vessel. Appx199 (4:32-34). Once positioned apposite the calcified deposit, the surgeon inflates the balloon with a saline solution and activates the high-voltage pulse generator to send electric pulses through the electrodes, creating a "plasma arc of electric current" between the electrodes. Appx199 (4:42-53). The high energy of that electrical arc causes fluid within the balloon to temporarily vaporize into steam bubbles. *Id*. The rapid expansion and subsequent contraction of these bubbles generates powerful shockwaves capable of cracking nearby calcified deposits (including deep calcium in the arterial wall) to permit expansion of the vessel and promote blood flow—all without harming the surrounding soft tissue. *Id*.

Shockwave's novel approach, which doctors in the field now refer to as "intravascular lithotripsy," or simply "IVL," has proven to be a clinical success for more than 400,000 patients to date. It is also simpler, safer, and more effective than prior treatments. As numerous surgeons testified to the Board, IVL is "a simple balloon-based procedure"—the surgeon need only position the catheter apposite the calcified lesion, inflate the balloon, and press a button to generate the shockwaves, and then the device does the rest. Appx8692-8693, Appx8765, Appx8877-8878. This simple procedure has also proven extremely effective, as clinical trials for Shockwave's IVL system reported procedural success rates of up to 95%. Appx7535-7536, Appx8031-8032, Appx8037. Shockwave's approach also proved far more successful at clearing blockages, clearing on average 88-92% of the vessel, as compared to an average of just 66-67% for angioplasty and atherectomy. *Id*. On top of this improved efficacy, IVL has also proven safer than prior art treatments and results in substantially fewer severe complications. Appx7536.

IVL has also expanded treatment to patients with previously untreatable deep plaque. IVL sends shockwaves not only into the lumen itself, but also into the arterial wall to reach deeper medial plaque. Numerous cardiovascular surgeons testified in the IPR proceedings that Shockwave IVL was "the first, and remains the only, effective treatment for medial calcified lesions." Appx8694-8695; *see also* Appx8758-8765, Appx8770-8776, Appx8803, Appx8871-8879. One doctor was

quoted in the press referring Shockwave's technology as "a game changer" and "space-age technology." Appx5308, Appx9920. A medical journal similarly declared that Shockwave IVL would "transform the market" and "revolutionize" the treatment of heart disease, including because it solved the inability of prior art treatments to reach "deep-seated calcium." Appx8067. And in 2019, the FDA designated Shockwave's IVL system as a "Breakthrough Device," awarded to new technologies that offer "significant advantages over existing approved or cleared alternatives." Appx7537-7538, Appx7990-7991. Even one of CSI's own witnesses admitted during his deposition that Shockwave offered a "novel technology" and was "a technology we [] haven't previously had." Appx10382-10383. CSI's CEO likewise acknowledged that CSI was "most definitely seeing [Shockwave's] IVLs expand the market … to a completely different customer group" and that "the vessel preparation market is growing very rapidly because of the success of IVLs." Appx10674; Appx10702.

Shockwave's novel approach has also been a significant commercial success. The Shockwave IVL system (which is Shockwave's only product) received FDA approval in 2016, and by 2019 Shockwave realized over $40 million in revenue and had grown to $1 billion in market capitalization. Appx7556, Appx8885, Appx8670. Sales of Shockwave's IVL system have continued to grow exponentially since,

exceeding $489 million in 2022—representing over 10x growth in three years—and are projected to exceed $700 million in 2023.

## II. The Patent Office Grants The ’371 Patent In Recognition Of Shockwave’s Innovations

Shockwave sought patent protection for its breakthrough IVL treatment, including by filing the application that became the ’371 Patent on June 11, 2009. Appx187-201. The claims in this application did not originally require an “angioplasty balloon,” instead merely reciting “a balloon.” Appx3089. The examiner issued an office action rejecting these claims over prior art references including Mantell, which allegedly disclosed use of a “balloon” within “veins or arteries.” Appx2255-2257. In response to the rejection, Shockwave amended the claims to require “an ***angioplasty*** balloon.” Appx2242-2243. Shockwave’s accompanying remarks explained that this amendment distinguished the invention from Mantell and other balloon prior art that lacked the unique structure of an angioplasty balloon: “For example, there are at least several types of balloons advanceable through the vasculature (e.g., Swan-Ganz catheter balloons, embolectomy catheter balloons, wedge pressure balloons, occlusive balloons, etc.) ***that are functionally and structurally distinct from an angioplasty balloon***.” Appx2247 (emphasis added). The examiner found these arguments “persuasive,” withdrew the obviousness rejection, and ultimately allowed the claims. Appx2187, Appx1966-1967.

The ’371 Patent issued on February 17, 2015. Appx187. Claim 1 of the ’371 Patent is exemplary. It recites:

> 1. An angioplasty catheter comprising:
>
> an elongated carrier sized to fit within a blood vessel,
>
> said carrier having a guide wire lumen extending there through;
>
> an angioplasty balloon located near a distal end of the carrier with a distal end of the balloon being sealed to the carrier near the distal end of the carrier and with a proximal end of the balloon defining an annular channel arranged to receive a fluid therein that inflates the balloon; and
>
> an arc generator including a pair of electrodes,
>
> said electrodes being positioned within and in non-touching relation to the balloon,
>
> said arc generator generating a high voltage pulse sufficient to create a plasma arc between the electrodes resulting in a mechanical shock wave within the balloon that is conducted through the fluid and through the balloon and wherein the balloon is arranged to remain intact during the formation of the shock wave.

Appx200. The other independent claim, claim 15, is similar. Appx201. The dependent claims of the ’371 Patent recite additional features, including (for example) claim 5, which recites a specific configuration of electrodes vis-à-vis the guide wire lumen. Appx200 (“The catheter of claim 2, wherein the pair of electrodes is disposed adjacent to and outside of the guide wire lumen.”).

## III. CSI Seeks To Have The Board Cancel Shockwave's Patent Claims Based on AAPA

CSI is a medical device company that makes equipment for atherectomy procedures, i.e., the prior art "roto-rooter" technique described above. Shockwave has not asserted any of its IVL patents against CSI or its products, and CSI does not have any IVL product on the market. Nevertheless, on December 7, 2018, CSI filed a Petition requesting *inter partes* review of all claims of the '371 Patent.

CSI's Petition did not make any argument based on anticipation, but instead asserted 15 obviousness grounds. Appx337-338. Every one of these alleged obviousness grounds relied on purported Applicant Admitted Prior Art ("AAPA"), either in combination with European Patent Application EP 0571306 A1 ("Levy") or German Patent Application No. DE 3038445 A1 ("Willneff"). *Id*.

In arguing obviousness, the Petition treated AAPA as if it were a prior art reference. The Petition pointed to AAPA as disclosing an "angioplasty balloon" and relied ***solely*** on AAPA as disclosing the element of a "guidewire lumen." Appx354-356 (contending "[t]he '371 patent admits that the prior art discloses an angioplasty catheter having an elongated carrier sized to fit within a blood vessel and having a guidewire lumen therethrough"). The Petition did not contend in either case that AAPA was merely evidence of background knowledge—rather, it argued AAPA disclosed specific claim elements and would be combined as part of an obviousness combination.

By contrast, Levy does not disclose an angioplasty balloon or a guidewire lumen, does not have electrodes or voltage pulses, and does not advocate use of shockwaves in the vasculature. At most, Levy describes using lower-power "cavitation" bubbles generated by a laser to "remove deposits" in blood vessels by "erosion" or "disintegration." Appx1735-1736, Appx1738. This disclosure differs markedly from that of an earlier Levy patent (U.S. Pat. No. 5,116,227) ("Levy '227"), describing a dental application where "[c]leaning of [tooth] canal 1 is achieved by shock waves." Appx3657 (3:39-40). Notably, the named inventor of both Levy and Levy '227 is a dentist. Appx7632.

## IV. The Board Initially Finds Claims 1-4 and 6-17 Unpatentable Based on AAPA

The Board instituted IPR proceedings on CSI's Petition on July 9, 2019. Appx535-562. During those proceedings, Shockwave argued the Board could not consider AAPA as part of an obviousness ground because AAPA is not "a patent nor a printed publication" under 35 U.S.C. § 311. Appx657-658. Shockwave also identified a number of other deficiencies in the Petition, including that (1) CSI's proposed construction of "angioplasty balloon" was incorrect, (2) the Petition failed to identify any evidence of motivation to combine the angioplasty balloon or guidewire lumen from AAPA with Levy, (3) Levy did not disclose shockwaves, and (4) the Petition failed to account for the extensive objective indicia demonstrating non-obviousness, among other arguments.

The Board issued a Final Written Decision on July 8, 2020 ("Original FWD"), finding claims 1-4 and 6-17 of the '371 Patent unpatentable and claim 5 patentable. Appx184. The Board rejected Shockwave's argument that AAPA could not supply a statutory "basis" for unpatentability, instead ruling that AAPA qualified as "prior art consisting of patents" under 35 U.S.C. § 311(b). Appx133. The Board then proceeded to rely on AAPA in combination with Levy to find claims 1-4 and 6-17 obvious. Appx132-135. (The Board did not rely upon Willneff for any aspect of its final decision, Appx79-80, and thus Willneff is not discussed further here.)

As part of its analysis, the Board adopted CSI's proposed construction of "angioplasty balloon": "an inflatable sac that is configured to be inserted into a blood vessel for use in a medical procedure to widen narrowed or obstructed blood vessels." Appx16. The Board's decision did not analyze or even mention the prosecution history disclaiming balloons used for procedures other than angioplasty.

The Board's decision also largely rejected Shockwave's evidence that its IVL product had provided a new and successful treatment and other objective evidence of non-obviousness. The Board stated that "whether IVL is more meaningfully effective than prior methods of treating arteries with complex coronary artery calcification remains an open question." Appx154. The Board further relied on CSI's expert for the premise that "orbital atherectomy was a successful method of treating heavily calcified plaque that included medial plaque," and that IVL was less safe

than existing treatments, contending "certain of those treatments, such as orbital atherectomy, were at least as safe, and perhaps safer, as evidenced by fewer complications." Appx146-147, Appx759-760.

### V. On Rehearing, the Board Affirms Its Use of AAPA, and Rejects Shockwave's Motion for Additional Discovery Based on CSI's New Statements Praising IVL

On August 19, 2020, after the Board's decision, the Patent Office issued new guidance holding that AAPA "do[es] not qualify as 'prior art consisting of patents or printed publications.'" The guidance document specifically cited the Board's decision in this case as an improper approach to AAPA. Appx1079-1081. Accordingly, on August 27, 2020 the Board ordered rehearing "to reconsider the issue of how AAPA should be considered in its final written decision." Appx1081.

Following the Board's order for rehearing, the Parties submitted additional briefing regarding use of AAPA. While rehearing was pending, CSI issued a public press release on January 13, 2022, which answered the Board's purported "open question" concerning the efficacy and safety of IVL. Specifically, CSI announced it had started development work on its own IVL product, asserting that IVL "has been used successfully for many years" (a reference to Shockwave's existing products) and would "enable CSI to offer products that effectively treat a broader range of calcific coronary lesions." Appx10649. CSI went on to state that IVL would "expand its treatable patient population" and "greatly expand patient access to care."

Appx10649-10650. CSI further stated that it was "most definitely seeing [Shockwave's] IVLs expand the market … to a completely different customer group" and that an IVL device would allow CSI to reach "a completely different customer group that historically, maybe has not treated calcium in the past." Appx10674, Appx10702. Thus, after having persuaded the Board that it was an "open question" whether IVL was safe and effective and filled a long felt need to treat previously unreached patients, CSI reversed positions and argued in the marketplace that IVL was extremely successful and would expand CSI's treatment options.

CSI failed to disclose to the Board its new positions regarding IVL. Accordingly, Shockwave promptly filed a motion seeking targeted additional discovery focused on the basis for CSI's public statements that contradicted CSI's earlier representations to the Board. Appx1231.

The Board issued a Final Written Decision on rehearing ("Rehearing FWD") on February 2, 2023. Appx1-97. This decision reached the same result as the Original FWD, again concluding that claims 1–4 and 6–17 are unpatentable and claim 5 was patentable. Appx6. With respect to AAPA, the Board held that "Petitioner's use of AAPA" was a "proper use of evidence demonstrating the background knowledge of an ordinarily skilled artisan," and then proceeded to rely on the AAPA in the same manner as the original decision where it had been treated

as a reference. Appx31-32. For example, the Board continued to rely on AAPA as a prior art reference disclosing the "guide wire lumen" limitation. *Compare* Appx132-135, *with* Appx38-41. The Board did not revisit its claim construction or analysis of motivation to combine.

Moreover, although the Rehearing FWD issued some thirty-one months after the Board had raised an "open question" about the efficacy and safety of IVL, the Board denied Shockwave's motion for additional discovery seeking to show CSI's recent admissions had now answered that question. The Rehearing FWD did not even consider CSI's striking change in position in its analysis of the objective indicia evidence. Appx91.

## SUMMARY OF ARGUMENT

The Board's conclusion of obviousness suffers from at least five critical defects, any one of which provides an independent basis for reversal or remand.

First, the Board committed legal error in using AAPA as a basis for unpatentability—an approach that runs directly contrary to 35 U.S.C. § 311(b) and this Court's decision in *Qualcomm Incorporated v. Apple Inc.*, 24 F.4th 1367 (Fed. Cir. 2022). Although the Board attempted on rehearing to frame its decision as merely relying on AAPA as "background knowledge," this was nothing more than an untimely rewriting of CSI's original theory and was nowhere argued or supported with evidence or citations in the Petition itself.

Second, the Board misconstrued "angioplasty balloon," incorrectly concluding the term encompassed any balloon that could be used in a "medical procedure to widen narrowed or obstructed blood vessels." This outcome fundamentally miscomprehends what "angioplasty" is and fails to account for the structural characteristics that make an "angioplasty balloon" distinct from other kinds of balloons. Indeed, the applicant clearly disclaimed such other balloons during prosecution, yet the Board's claim construction analysis does not even mention that important intrinsic evidence.

Third, the Board's decision failed to establish any proper motivation to incorporate an angioplasty balloon or a guidewire lumen into Levy. The Board merely cited conclusory statements that these elements were "known" or a "design choice," which do not come close to satisfying CSI's burden to show that this would have been an obvious modification to Levy.

Fourth, the Board clearly erred in finding that Levy disclosed "shock waves" in an angioplasty balloon as claimed in the '371 Patent. Levy's only alleged disclosure of shockwaves is in the context of a dental application involving hard tooth surfaces. Levy pointedly avoids mentioning shockwaves in its embodiments involving the soft tissues of the human vasculature, and there is no evidence of any motivation to even attempt such an approach.

Finally, the Board improperly disregarded Shockwave's substantial objective evidence of non-obviousness. The Board's analysis regarding nexus failed to consider at least some of Shockwave's claim chart evidence directed to its own product, and mischaracterizes other supporting evidence. Indeed, the Board's decision employs a legally infirm mode of analysis that vaguely assigns weights to each category of evidence in a vacuum and then fails to provide any rationale for its ultimate conclusion that the combined effect of this admittedly "voluminous" evidence is "largely weak." And the decision ultimately fails to account for CSI's striking change of heart regarding the efficacy and safety of IVL during the rehearing phase, all of which should have been fairly considered as part of the analysis—or at least permitted as a topic for further discovery.

# ARGUMENT

## I. The Board Improperly Relied on AAPA as a Basis for the Petition

"Statutory interpretation is an issue of law" that this Court reviews "de novo." *VirnetX v. Apple Inc.*, 931 F.3d 1363, 1369 (Fed. Cir. 2019). This Court will "hold unlawful and set aside agency action … not in accordance with law." *FanDuel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1339 (Fed. Cir. 2020).

### A. AAPA Cannot Be a "Basis" For a Finding of Unpatentability in IPR Proceedings

35 U.S.C. § 311(b) provides that "[a] petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that

could be raised under section 102 or 103 and ***only on the basis of prior art consisting of patents or printed publications***" (emphasis added). In *Qualcomm*, 24 F.4th at 1375, this Court held that "AAPA contained in the challenged patent is not 'prior art consisting of patents or printed publications.'" The Court therefore held that "§ 311(b) does not permit AAPA in this case to be the basis of a ground in an inter partes review, because it is not contained in a document that is a prior art patent or prior art printed publication." *Id.* at 1375. This Court further explained that AAPA can only be used for limited purposes in an IPR such as "establishing the background knowledge possessed by a person of ordinary skill in the art." *Id.* at 1376.

Following remand and a subsequent adverse Board decision, the patent owner in *Qualcomm* has now filed a follow-on appeal (Fed. Cir. No. 23-1208), which squarely seeks to confirm that § 311 "prohibits grounds that are not based only on prior art patents or printed publications." Fed. Cir. No. 23-1208, Dkt. 11 (Opening Brief). That case is fully briefed and pending, and the Court's ultimate decision in that appeal may be informative here. However, this case can be decided independently of any forthcoming decision in *Qualcomm* because the Board's use of AAPA in its final decision clearly exceeded the bounds set by Congress.

### B. Both CSI And the Board Improperly Relied on AAPA As a Basis For the Petition

This case is resolved by a straightforward application of the plain language of the Patent Act. Section 311(b) states that a proposed ground of unpatentability

presented in an IPR petition must be "***only*** on the basis of prior art consisting of patents or printed publications." The use of the word "only" makes clear that the limitation to "prior art consisting of patents or printed publications" is exclusive, i.e., an IPR may be based "***only***" on prior art "consisting of" these materials. Therefore, an IPR ground based either alone or in part on a reference that is not "prior art consisting of patents or printed publications"—such as AAPA—is not permitted by the statute.

Here, as discussed above, AAPA was cited as a basis for every single ground in CSI's Petition. Appx337-338. This is shown in the table below from CSI's Petition listing its asserted grounds, all of which expressly included AAPA:

| Ground | Reference(s) | Challenged Claims |
|---|---|---|
| 1 | § 103 Levy as modified by AAPA in combination with Mantell, Uchiyama or Willneff | 1-6,11, 14-16 |
| 2 | § 103 Levy as modified by AAPA in combination with Mantell, Uchiyama or Willneff, and in further view of Hayes | 7, 12 |
| 3 | § 103 Levy as modified by AAPA in combination with Mantell, Uchiyama or Willneff, and in further view of Duchamp | 8, 12 |

| | | |
|---|---|---|
| 4 | § 103 Levy as modified by AAPA in combination with Mantell, and in further view of Naimark | 9 |
| 5 | § 103 Levy as modified by AAPA in combination with Mantell, and in further view of Beyar | 10 |
| 6 | § 103 Levy as modified by AAPA in combination with Mantell, and in further view of Bhatta | 13 |
| 7 | § 103 Levy as modified by AAPA in combination with Mantell, and in further view of Schultheiss | 17 |
| 8 | § 103 Willneff as modified by AAPA in combination with Levy or Mantell | 1-4, 6, 11, 15-16 |
| 9 | § 103 Willneff as modified by AAPA in combination with Levy or Mantell, and Uchiyama | 5, 14 |
| 10 | § 103 Willneff as modified by AAPA in combination with Levy or Mantell, and Hayes | 7, 12 |
| 11 | § 103 Willneff as modified by AAPA in combination with Levy or Mantell, and Duchamp | 8, 12 |
| 12 | § 103 Willneff as modified by AAPA in combination with Levy or Mantell, and Naimark | 9 |
| 13 | § 103 Willneff as modified by AAPA in combination with Levy or Mantell, and Beyar | 10 |
| 14 | § 103 Willneff as modified by AAPA in combination with Levy or Mantell, and Bhatta | 13 |
| 15 | § 103 Willneff as modified by AAPA in combination with Levy or Mantell, and Schultheiss | 17 |

Appx337-338.

CSI's use of AAPA as a basis for every ground in its Petition is dispositive of this appeal, as this exceeded what is permitted by § 311(b). The fact that CSI purported to combine the AAPA with one or more prior art publications is irrelevant, as the statute allows grounds "***only*** on the basis of prior art consisting of patents or printed publications." An IPR ground is not based "only" on these materials if it is also based on materials excluded by the statute. *See Yeda Research v. Mylan Pharmaceuticals Inc.*, 906 F.3d 1031, 1041 (Fed. Cir. 2018) (non-prior-art evidence,

such as publications that post-date the patent, "cannot be applied, independently, as teachings separately combinable" with other prior art in an IPR).

The substance of the Petition further makes clear that AAPA was a "basis" for CSI's challenge and not simply used for some lesser permissible purpose, such as evidence of background knowledge. Neither the Petition nor CSI's expert anywhere claimed that the AAPA was merely evidence of the general knowledge of a POSA, nor did they assert any combination of the other references with general knowledge. Yet the Board ignored the actual grounds in CSI's Petition, contending that "Petitioner's reliance on AAPA is not the 'basis' of its challenges. Rather, we determine that Petitioner has relied upon AAPA as demonstrating the background knowledge possessed by a person of ordinary skill in the art." Appx31. In other words, the Board simply rewrote the Petition to re-label AAPA as "background," which is ***not*** how the Petition or CSI's expert described it in either form or substance.

The fact that the Board rewrote the Petition is evident from a comparison between the Original FWD and the Rehearing FWD. For example, with respect to the "guide wire lumen" element, the Board attempted to reframe its earlier (improper) analysis as follows (green text showing additions to Rehearing FWD):

> Petitioner relies upon Figure 1 of the '371 patent and its accompanying text as constituting AAPA **reflecting the background knowledge of an ordinarily skilled artisan at the time of the invention**. Pet. 23–25 (citing Ex. 1001, 3:65–4:2, Fig. 1; Ex. 1002 ¶

*Compare* Appx39 *with* Appx133.

> For all the reasons identified by Petitioner above and the testimony by Dr. Jensen, we find that Petitioner has proven by a preponderance of evidence that an ordinarily skilled artisan would have had motive to combine teachings of Levy ~~and~~**with the background knowledge reflected in the** AAPA to arrive at the claimed configuration of the balloon sealed near the distal end of a carrier through which a guidewire extends.

*Compare* Appx41 *with* Appx135.

As shown above, the Board's positions in its Original FWD and Rehearing FWD cannot be reconciled with each other. The Board was clear in its initial decision that the Petition was relying on AAPA as a basis. The Board then shifted gears upon rehearing and claimed the Petition was relying on AAPA only as "background knowledge." Yet the ***substance*** of the Petition's and the Board's arguments did not change between these two decisions. The Board simply inserted references to "background knowledge" throughout its decision in a way that was never asserted in the Petition. And despite inserting the words "background knowledge," the Board continued to rely substantively on the AAPA as a basis just as it had before, as a combination reference with Levy. Appx38-41.

The Board's attempt to rewrite the Petition to cure the improper reliance on AAPA as a basis for unpatentability did not fix the problem and was plainly improper as a procedural matter. The Supreme Court has held that "in an *inter partes* review the petitioner is master of its complaint" and that the Board's review must

proceed "in accordance with" and "pursuant to" the Petition as presented. *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (quoting 35 U.S.C. § 314(b)). The Board failed to comply with that principle here.

This Court's decision in *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1336 (Fed. Cir. 2020) is directly on point. There, the Board had instituted IPR with an obviousness ground that it described as a combination of two prior art references: "SMIL 1.0" and "Hua." *Id*. at 1335. However, the petition had relied on Hua ***solely*** as "evidence of the knowledge of a person [of] ordinary skill in the art" and had ***not*** asserted Hua as a ***reference*** in any obviousness ground. *Id*. at 1334. This Court held that the Board "erred by instituting [IPR] based on a combination of prior art references not advanced in Google's petition." *Id.* at 1335. This Court explained that "it is the petition, not the Board's 'discretion,' that defines the metes and bounds of an [IPR]" and that the "Board does not 'enjoy[] a license to depart from the petition and institute a different [IPR] of [its] own design.'" *Id*. at 1336.

The Board in this case made the same mistake in basing its final decision on grounds falling outside the scope of what was articulated in the Petition. In *Philips*, the Board improperly invoked Hua as a ***reference*** where the petition had only used Hua as ***background knowledge***. Similarly, in this case, the Board improperly invoked AAPA as ***background knowledge*** where the Petition only used AAPA as a

***reference***. In both cases, the Board exceeded its statutory authority by attempting to rewrite the grounds that the petitioner actually presented in the first instance.

The Board also stated in its decision that it was applying the Patent Office's "Updated AAPA Guidance" ("Guidance"). Appx31. This Court does not need to address the Guidance because it "is not, itself, the law," "does not carry the force of law, and is not binding" on the Court. *In re Rudy*, 956 F.3d 1379, 1382 (Fed. Cir. 2020). Moreover, the Board did not elaborate on its reasoning beyond simply quoting portions of the Guidance that refer to *Qualcomm*. Appx31. In any event, to the extent the Guidance is read as permitting ***any*** use of AAPA in an IPR so long as it is used in combination with patents or printed publications, that simply is not consistent with the statute. Section 311(b) grants no "combination" exception to the limits on what prior art may be used in an IPR. In fact, it states exactly the opposite: that IPR may be based "***only*** on the basis of prior art consisting of patents or printed publications."

### C. The Board's Attempt to Rely on Healy and Hayes For This Element on Rehearing Was Improper

The Rehearing FWD also tried to improperly expand the use of AAPA contemplated in the Petition in at least one other respect. The Board stated for the first time on rehearing that the claimed "guide wire lumen" was disclosed in references called Healy and Hayes, which it characterized as consistent with AAPA. Appx31-32. But the Board acknowledged that CSI "did not provide the specific

citations to Healy and Hayes in the Petition." Appx31. Rather, the Petition merely mentioned Healy and Hayes in passing and did not even cite the exhibit numbers, much less identify where in them the element was allegedly found. Appx24. CSI's expert likewise made no reference to Healy or Hayes as allegedly disclosing the "guidewire lumen" element. Appx1642-1643. He considered the "admitted prior art" to only consist of Figure 1 of the '371 Patent: "The angioplasty catheter as depicted in Figure 1 is referred to as the 'admitted prior art.'" Appx1642.

IPR petitions are legally required to "specify where each element of the claim is found in the prior art patents or printed publications relied upon." 37 C.F.R. § 42.104(b)(4). This includes identifying "[t]he exhibit number of the supporting evidence relied upon to support the challenge and the relevance of the evidence to the challenge raised, including identifying specific portions of the evidence that support the challenge." *Id.* § 42.104(b)(5). These requirements are designed to ensure there is specific notice of the basis for the petitioner's challenge and provide patent owners with a fair opportunity to respond.

CSI's Petition failed to comply with these requirements with respect to Healy and Hayes. The Petition did not cite to any alleged disclosure of a "guidewire lumen" in Healy and Hayes. Nor did CSI submit expert evidence pointing to Healy and Hayes for this element, or indicate it was relying on them in the trial proceedings. CSI did not even cite the exhibit numbers of these references in its discussion of this

element. It was not until its opening brief ***on rehearing*** that CSI first attempted to identify specific portions of Healy and Hayes as allegedly disclosing the "guide wire lumen" element. Appx32. At that point, Shockwave had no meaningful opportunity to respond, put in responsive evidence, or challenge CSI's alleged evidence. This Court has held that "failure to meet the particularity requirements for what must be in the petition … cannot be left to be filled in on reply," *Microsoft Corp. v. IPA Techs. Inc*., 2022 WL 989403, at *6 (Fed. Cir. Apr. 1, 2022), and it stands to reason that CSI's attempt to introduce this information even later in the proceeding (i.e., during rehearing) cannot be proper.

The Board's decision cannot stand in view of its reliance on CSI's untimely disclosures regarding Healy and Hayes. The Board cannot rely on evidence and argument submitted in violation of the IPR regulations (as cited above), and cannot consider new evidence on rehearing absent a showing of good cause. *See Huawei Device Co., Ltd. v. Optis Cellular Tech., LLC*, Case IPR2018-00816, slip op. at 4 (PTAB Jan. 8, 2019). CSI did not even attempt to argue there was good cause for introducing new evidence on rehearing, nor did the Board find good cause existed. Indeed, the Board's reliance on new factual assertions that Shockwave had no opportunity to address during the trial violated Shockwave's due process rights. *See Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1301 (Fed. Cir. 2016) ("the Board denied Acceleron its procedural rights by relying in its decision on a factual assertion

introduced into the proceeding only at oral argument, after Acceleron could meaningfully respond").

## II. The Board Erred In Construing the Term "Angioplasty Balloon"

The second reversible error in the FWD is its construction of "angioplasty balloon." This Court "review[s] de novo the Board's ultimate claim constructions." *Personalized Media Commcn's, LLC v. Apple, Inc.*, 952 F.3d 1336, 1339 (Fed. Cir. 2020).

### A. The Claims Specifically Require an "Angioplasty" Balloon

The claims of the '371 Patent do not require simply a "balloon," but rather an "***angioplasty balloon*** located near a distal end of the carrier with a distal end of the balloon being sealed to the carrier." Appx200. There are many types of surgical balloons that can be used for procedures in blood vessels, and which have different structures. These include angioplasty balloons, Swan-Ganz catheter balloons, embolectomy catheter balloons, wedge pressure balloons, occlusive balloons, and others. Appx7465, Appx2247. By contrast, the claims here specifically require the structure of an "angioplasty balloon."

As discussed above, angioplasty is a procedure that attempts to treat calcified lesions by positioning the balloon adjacent to the lesion, and then inflating it to high pressures to break up the plaque and press it into the vessel wall. Appx7429-7430. The parties did not dispute that this is what angioplasty is. CSI's expert conceded

that "[b]alloon angioplasty involves the use of a guiding catheter placed in the peripheral artery and passing a balloon catheter through the guiding catheter to the section of the artery to be treated. Once the balloon is located at the location of the stenotic lesion, the balloon is inflated to disrupt or push aside the obstruction to improve blood flow." Appx1621-1622. Similarly, CSI's then-expert (now its Chief Medical Officer) testified that "[a]ngioplasty is blowing up a balloon in the artery [] in an attempt to expand the lumen, expand the artery." Appx10192.

Angioplasty balloons have a different structure from other types of surgical balloons, as they are designed to be able to handle the angioplasty procedure (including inflation under high pressure to break-up plaque and expand the vessel). This is confirmed by the prosecution history. As discussed above, the claims of the application originally recited only "a balloon." Appx3089. The examiner rejected the claims over prior art references including Mantell. Appx2255-2257. In response to the rejection, the applicant amended the claims to require "an ***angioplasty*** balloon" Appx2242-2243. The remarks accompanying the amendment explained that "angioplasty" balloons were structurally distinct from Mantell and other prior art balloons that might be used in a blood vessel:

> Mantell does not disclose or suggest an angioplasty catheter with an angioplasty balloon and an arc generator within the balloon. . . . For example, there are at least several types of balloons advanceable through the vasculature (e.g., Swan-Ganz catheter balloons, embolectomy catheter balloons, wedge pressure balloons, occlusive balloons, etc.) ***that are functionally and structurally distinct from an***

> ***angioplasty balloon***. Mantell does not provide any guidance or suggestion as to how a lithotripsy probe may be configured for use within a dilating angioplasty balloon, and does not disclose that the encapsulating member is configured for vessel dilation.

Appx2247 (emphasis added). The examiner allowed the amended claims on the basis of applicant's argument. Appx2187, Appx1966-1967.

### B. The Board Misunderstood What "Angioplasty" Is

The Board failed to give proper meaning to the word "angioplasty" in construing the claim. In adopting CSI's construction, the Board effectively concluded that "angioplasty" encompasses ***any*** procedure in which "the balloon widens a narrowed or obstructed vessel." Appx14. The conclusion that ***any*** type of procedure that widens obstructed blood vessels and includes a balloon in some capacity is "angioplasty" is far too broad. Even CSI did not make this claim. To the contrary, as noted in the IPR proceedings, there are several procedures that use a balloon and may widen obstructed vessels but definitely do not qualify as angioplasty. For example, the balloon disclosed in Mantell (which was disclaimed during prosecution) includes a lithotripsy probe that widens the vessel using pressure waves. Appx1776. Another example is Levy, which uses "cavitation" to "caus[e] erosion of the deposit" within the vessel and thereby widen the previously obstructed lumen. Appx1735. As another example, occlusive and embolectomy balloons are inserted into arteries during procedures to clear obstructed blood vessels (thereby widening the lumen), but are merely used to block flow downstream from the

surgical site; they are not themselves expanded against the calcified deposit to disrupt plaque. Appx7467-7468. Yet another example is atherectomy, which CSI's expert described as widening obstructed blood vessels by "clear[ing] an occlusion with abrasion or cutting features," and may include a cutting balloon. Appx1624-1625, Appx8238. The Board's construction fails to distinguish between angioplasty and these different types of procedures used to clear arterial blockages that are ***not*** angioplasty.

### C. The Board's Construction Ignored and Contradicted the Intrinsic Record

The prosecution history further confirms that the Board's construction fails to give proper meaning to the term "angioplasty." In its arguments to the Board, Shockwave cited the claim amendment adding the term "angioplasty" to overcome Mantell as supporting its construction, explaining that this was "a clear disclaimer under which the structure of Mantell cannot be an angioplasty balloon as claimed." Appx602-603. The Board failed to consider this prosecution history—including the specific disclaimer of Mantell's balloon—and did not give it any effect in construing the claim. The FWD does not cite or discuss the prosecution history ***at all*** in its analysis of intrinsic evidence, and does not engage with (or even mention) the claim amendment adding the term "angioplasty" to distinguish the claim over the prior art. Appx11-14. The Board's failure to consider the prosecution history at minimum requires vacating the FWD and remanding for a proper claim construction analysis.

*See, e.g.*, *Gemstar-TV Guide Int'l*, *Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1376 (Fed. Cir. 2004) (court "must consider statements made in the prosecution history 'because it may demonstrate that ... the patentee disclaimed or disavowed subject matter, narrowing the scope of the claim terms.'"); *Lochner Techs., LLC v. Vizio, Inc.*, 567 F. App'x 931, 940 (Fed. Cir. 2014) (vacating and remanding for new claim construction where court "failed to properly consider … the statements Lochner made over the course of the prosecution history").

Alternatively, this Court can reject CSI's claim construction as a matter of law on appeal and reverse, because the applicant, by distinguishing an angioplasty balloon as structurally distinct from other surgical balloons (including Mantell), was clearly indicating that (1) the other enumerated types of balloons (including Mantell's balloon) were not "angioplasty" balloons, and (2) the claims did not cover those non-angioplasty balloons. *See Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003) ("By distinguishing the claimed invention over prior art, an applicant is indicating what the claims do not cover.").

The Board's construction not only failed to give effect to this disclaimer, but also swept right back into the claims the exact balloons the applicant stated were ***not*** claimed. For example, Mantell discloses a balloon used in a procedure to widen the lumen of the artery by "breaking up concretions that are at least semi-annular or disrupting tissue of a body organ." Appx1776. But what Mantell does not disclose

is an ***angioplasty*** balloon that is structurally configured to be inflated under high pressures to break up calcified deposits and displace plaque into the vessel walls. The Board ignored this critical distinction.

### D. The Board Identified No Proper Support For Its Extremely Broad Construction of Angioplasty

The Board identified no intrinsic evidence supporting its conclusion that angioplasty can be construed so broadly as to encompass ***any*** procedure that involves a balloon and widens an obstructed blood vessel. To the contrary, the Board's cited evidence confirms that angioplasty is a specific procedure that inflates a balloon under high pressure to disrupt plaque. For example, the Board discussed two references cited on the face of the '371 Patent ("O'Boyle" and "O'Connor") as intrinsic evidence. Appx13-14. O'Boyle states that "[b]alloon angioplasty requires the insertion into the blood vessel and through the stenosis of a deflated balloon, which is hydraulically inflated to stretch and compact the stenosis material against the wall of the artery." Appx7640 (1:32-37). O'Connor similarly describes a "balloon angioplasty arrangement in which the balloon, when inflated as shown by the dashed lines, significantly opens the occluded part of the artery by pressing the thrombus against the internal wall of artery." Appx7652 (3:8-12).

The Board likewise identified nothing in the extrinsic evidence supporting its construction that any procedure including a balloon that widens an obstructed artery is angioplasty. Once again, the Board's cited evidence establishes the opposite,

confirming that angioplasty contemplates inflating a balloon to high pressure to disrupt calcified lesions. *See, e.g.*, Appx5561 (dictionary definition of "angioplasty" stating "the balloon is inflated to compress the fatty matter into the artery wall and stretch the artery open to increase blood flow"), Appx5568 ("doctor inflates the balloon to push the plaque outward against the wall of the artery"), Appx5564 ("inserting a balloon into the narrowed section and inflating it").

**E. The Board Erred in Rejecting Shockwave's Construction**

In addition to adopting an incorrect construction, the Board also erred in rejecting Shockwave's proposed construction of "a balloon that displaces the plaque into the vessel wall to expand the lumen of the vessel." Appx11. As discussed above, all of the intrinsic and extrinsic evidence confirmed that angioplasty is a procedure in which the balloon is placed adjacent to the calcified lesion and then inflated to high pressure, which displaces the plaque (i.e., presses it) into the vessel wall. Shockwave's proposed construction correctly limits the claim to require an angioplasty balloon (i.e., one with the structure to perform angioplasty), as opposed to other types of surgical balloons. *See also* Appx809 ("angioplasty balloon" is "a balloon that is configured to perform angioplasty").

The Board, in rejecting Shockwave's construction, appears to have fixated on a sub-portion of the construction stating that angioplasty displaces plaque "into" the vessel wall. Appx11-16. The Board disagreed that displacement "into" the vessel

wall was required, finding this was "unduly narrow." Appx14. But the Board does not appear to have identified any substantive issue with the word "into." At most, the Board cited evidence stating angioplasty presses plaque "against" the vessel wall, but this is merely a different word to describe the same thing. Appx15. And even if the Board were found to be correct on this point (despite the contrary evidence cited above), that does not make CSI's overly broad construction correct by default. The Board is obligated is to correctly construe the claim and cannot simply adopt CSI's incorrect construction because it quibbles with the phrasing of Shockwave's. *See, e.g.*, *Uber Technologies, Inc. v. X One, Inc.*, 799 F. App'x 868, 837 (Fed. Cir. 2020) (finding "neither party's construction is correct," adopting proper construction not proposed by either party, and remanding to the Board).

The Board also appears to have misunderstood Shockwave's proposed construction as requiring that the plaque remain in the vessel wall after it is pressed, precluding (for example) "breaking and redistributing plaque within a vessel wall," or that the plaque must not move elsewhere after it has been displaced. Appx12-13. But Shockwave's proposed construction has no such limitations. It merely requires that the balloon have the structure to displace plaque into the vessel wall to expand the lumen, which will happen in every angioplasty procedure when the balloon is inflated inside the vessel and presses against the plaque. It imposes no restriction that the plaque remain there permanently.

For these reasons, Shockwave submits this Court should reverse the Board's construction and adopt Shockwave's proposed construction, or at minimum vacate and remand for new claim construction proceedings.

### F. Levy Does Not Disclose an "Angioplasty Balloon" as Properly Construed

The Board concluded that Levy disclosed the "angioplasty balloon" element. Appx28-29. However, this finding was based on the Board's erroneous claim construction. Appx28. The Board found that because Levy describes "erosion" and "disintegration" of plaque using cavitation waves, this could be considered a form of widening the vessel. The Board therefore held this fell within its overbroad construction of "angioplasty" as encompassing any procedure that uses a balloon and widens the vessel. *Id.* ("widening through ablation is within the scope of 'angioplasty balloon' as we have interpreted the term").

If this Court reverses or vacates the Board's claim construction of "angioplasty balloon," then the Board's conclusion that Levy discloses this element likewise cannot stand. Levy does not disclose or imply any angioplasty balloon or procedure. Levy does not use the word "angioplasty," nor does it describe a balloon that can be inflated under high pressure to break up calcified deposits. To the contrary, Levy discloses a different structure for its balloon, stating that its balloon "need not produce significant expansion of the vessel" and is inflated "without producing a substantial force that would cause a radial expansion of the vessel."

Appx1737. This is the opposite of an angioplasty balloon, which is inflated under high pressure to compress plaque and expand the vessel. Levy also goes on to describe a completely different treatment mechanism from balloon angioplasty, specifically, using a laser to generate "cavitation" within the catheter and "cause[] the disintegration of the deposit." Appx1738. CSI's own expert admitted that, in contrast, "angioplasty does not remove plaque." Appx10228.

### G. The Board Identified No Proper Motivation to Combine the Angioplasty Balloon of AAPA With Levy

The Board alternatively relied on AAPA for the "angioplasty balloon" element. This was error because (as discussed above) the Patent Act prohibits use of AAPA as the basis for an IPR ground.

But even assuming arguendo the Board could use AAPA as a basis for its obviousness combination, here the Board identified no evidence or reasoning ***at all*** of any motivation to combine the "angioplasty balloon" of AAPA with Levy, or any reason why a POSA would expect success in doing so. The FWD merely states the limitation is "described" in AAPA. This is insufficient to establish obviousness as a matter of law. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012) ("a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."). Moreover, the Board's rationale fails to satisfy its obligation to identify the evidence and reasoning supporting its conclusion. *See Rovalma, S.A. v. Bohler-*

*Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1025–26 (Fed. Cir. 2017) (vacating Board's finding of obviousness that did not "adequately explain why a person of ordinary skill in the art would have been motivated to" combine the references).

## III. The Board Identified No Proper Evidence of Motivation to Introduce a Guidewire Lumen into Levy

A third reversible error in the Rehearing FWD is its failure to identify any proper evidence of motivation to modify Levy to include a "guide wire lumen." The Board is required to show whether a petitioner satisfies its "burden" of proving that a POSA would have been "motivated to combine the teachings of the prior art references to achieve the claimed invention." *Intelligent BioSys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367-68 (Fed. Cir. 2016). The Board's "ultimate determination of obviousness" is question of law that is reviewed "de novo," with any underlying factual determinations reviewed for "substantial evidence." *Personal Web Techs., Inc. v. Apple, Inc.*, 848 F.3d 987, 991 (Fed. Cir. 2017).

All claims of the '371 Patent require an angioplasty catheter "having a guide wire lumen extending therethrough." Appx200-201. The "guide wire lumen" is a passage running lengthwise through the catheter "for receiving a guide wire." Appx198 (1:64-65). The surgeon can insert the guide wire into the blood vessel to be treated, and then use it to "guide[] the catheter into the body lumen along the guide wire." Appx198 (2:54-56).

The Board did not find any disclosure of a guidewire lumen in Levy. Appx38-41. CSI's expert did not even attempt to assert Levy included any guidewire. *See* Appx10071. Rather, the Board relied on a combination of Levy and AAPA for this element, finding that "an ordinarily skilled artisan would have had motive to combine teachings of Levy with the background knowledge reflected in the AAPA to arrive at the claimed configuration of the balloon sealed near the distal end of a carrier through which a guidewire extends." Appx41. However, because this reliance on AAPA was improper for the reasons discussed above in Section I, the Board's finding regarding the "guide wire lumen" element must also be reversed.

Moreover, even if this Court were to find the Board's reliance on AAPA was permissible here, the Board's ultimate conclusion of obviousness was still deficient as a matter of law because there was no evidence of motivation to combine such AAPA with Levy. The primary argument for motivation to combine put forward by CSI (and adopted by the Board) was a conclusory statement that "it was known to an ordinarily skilled artisan to use a guidewire extending through an elongated bore to assist a physician to navigate the catheter to reach the area for treatment." Appx39. As alleged support, the Board cited only a single conclusory paragraph from CSI's expert declaration asserting that the use of a guidewire in an "angioplasty catheter" for "angioplasty procedures" was allegedly "well known." Appx1643. This single (conclusory) expert statement is insufficient to support a finding of a motivation to

combine AAPA with a non-angioplasty device such as Levy. *See, e.g.*, *Arendi S.A.R.L. v. Apple, Inc.*, 832 F.3d 1355, 1366 (Fed. Cir. 2016) (reversing Board's finding of patentability relying on "conclusory statements and unspecific expert testimony"); *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1361-63 (Fed. Cir. 2019) (same).

The only other alleged motivation to combine identified by the Board for this element was an assertion that this would be an obvious "design choice" because a guidewire lumen was supposedly "so well known." Appx40-41. However, the Board again identified no evidence supporting this assertion other than the conclusory say-so of CSI's expert. *Id.*; Appx1644-1645, Appx1664-1665 (claiming in identical paragraphs that "angioplasty balloon with guidewire lumens were the most common and widely used type of angioplasty catheter" and therefore constituted a "routine design choice").

The conclusory assertion of CSI's expert that it would be a "design choice" to implement the guidewire lumen of AAPA in Levy is not sufficient to establish a motivation to combine. "[M]erely stating that a particular placement of an element is a design choice does not make it obvious." *Polaris Industries, Inc. v. Artic Cat, Inc.*, 882 F.3d 1056, 1069 n.4 (Fed. Cir. 2018). "Instead, [Petitioner] must explain why a person of ordinary skill in the art would have selected these components for combination in the manner claimed." *Id.*; *Fanduel*, 966 F.3d at 1344 ("simply calling

the addition … 'an obvious design choice'" insufficient to establish obviousness). And again, the mere assertion that a feature is known (or even "well known") does not suffice to show obviousness absent evidence of a motivation to combine. *See Fanduel*, 966 F.3d at 1343-44 (fact that technical feature was "well known" did not constitute substantial evidence of motivation to combine); *Kinetic Concepts*, 688 F.3d at 1369.

The Board's failure to establish a motivation to combine was particularly striking here, where the existing structure of Levy was utterly incompatible with a guidewire lumen. Levy, and all other prior art lithotripters identified by CSI, use a closed balloon that is sealed on both ends of the catheter, as shown in the figure below. Appx836, Appx7518-7522:



Placing a "guidewire lumen extending there-through" (i.e., a tunnel to accept a guidewire running through the entire length of the device) would require fundamentally changing the existing design and piercing the balloon at the end of the device. CSI and the Board identified no explanation for why, even assuming a

guidewire lumen was well known for ***other*** types of devices, a POSA would incorporate one into a reference like Levy with a fundamentally different structure.

In any event, even if the "evidence" cited by the Board were taken at face value despite lacking proper support, it still would not suffice to demonstrate obviousness. CSI's expert at most offered the conclusory assertion that guidewire lumens were allegedly common in "angioplasty catheter[s]" used in "angioplasty procedure[s]." Appx1643, Appx1644-1645, Appx1664-1665. However, as discussed above, this supplies no motivation to modify Levy to use a guidewire lumen, because ***Levy is not an angioplasty device and is not used for "angioplasty procedures***." *See* Section II above.

Finally, the Board's finding regarding the guidewire element cannot be sustained based on any alleged disclosure from Healy or Hayes. As discussed above in Section I.C, CSI and the Board's attempt to rely on Healy and Hayes for the first time on rehearing was improper. But even if CSI were permitted to introduce new evidence and argument regarding Healy and Hayes on rehearing, that still would not support the conclusion of obviousness, because neither CSI nor the Board identified any motivation to modify Levy to incorporate any alleged guidewire lumen disclosed in Healy or Hayes. Even if the Board's conclusory assertions of motivation as to AAPA could be construed to apply to Healy or Hayes (which the Board

specifically did not state), those rationales would fail for Healy and Hayes for the same reasons they fail as to AAPA.

## IV. Levy Does Not Disclose Shockwaves And There is No Motivation to Combine to Supply this Missing Element

A fourth defect in the Board's decision is the failure to present evidence showing that any of the claimed combinations discloses generating a "shock wave" within the angioplasty balloon—a requirement in all claims of the '371 Patent. For example, claim 1 requires the angioplasty catheter to include "an arc generator including a pair of electrodes … said arc generator generating a high voltage pulse sufficient to create a plasma arc between the electrodes resulting in a mechanical ***shock wave*** within the balloon." Appx200. The patent explains that the electrical arc "generate[s] a gas bubble at the surface of the electrode causing a plasma arc of electric current to jump the bubble and create a rapidly expanding and collapsing bubble, which creates the mechanical shock wave in the balloon." Appx199 (4:48-52).

There was no dispute before the Board that there are multiple types of waves that can be generated using an energy source to create cavitation bubbles in a fluid, depending on the amount of power applied. These range from low-power acoustic or hydraulic waves (which are not shockwaves), to high-power shockwaves that are over 100 times faster and more powerful. Appx7447. This was well-understood in the art at the time. For example, the de la Torre reference explained that, for certain

lower-power laser pulses, "no shock wave is created" but rather "[o]nly a hydraulic or acoustic wave is formed, which is on the order of 100 times slower than a shock wave generated by a laser-induced breakdown." Appx7628 (3:27-38). "The physical characteristics of this macroscopic hydraulic or acoustic wave are ***significantly different from a microscopic shock wave***." *Id.* (emphasis added).

**A. Levy Does Not Disclose Use of Shockwaves**

The Board identified no disclosure of generating shockwaves in Levy itself. Appx29-31. At most, Levy describes using "pulsed laser radiation" to create low-power "cavitation" within a fluid, resulting in "vigorous agitation." Appx1735. As Shockwave's expert explained, "a POSITA would understand that this reference suggests using the laser to create weaker acoustic waves that cause 'vigorous agitation' as opposed to substantially stronger, plasma-induced shockwaves." Appx7498-7499.

Lacking any disclosure in Levy itself, the Board instead relied on the disclosures of a different Levy reference ("Levy '227") that the Board found was incorporated at least in part into Levy. Appx29. Levy '227 describes three different embodiments: (1) a dental device for treatments "in a tooth canal"; (2) an industrial device for cleaning "materials such as ceramics, plastics and metals"; and (3) a device that can be used "in the medical field for cleaning vessels, such as blood vessels." Appx3656-3657 (2:37-38, 4:40-41, 4:64-65). This is shown in the figures,

with Fig. 1 and Fig. 2 illustrating the dental device for use in "tooth 2 having a dental or radical canal," and Fig. 3 showing a device that "is inserted into a blood vessel." Appx3657-3658 (3:24-35, 5:3-6). Notably, Levy '227 describes using shockwaves ***only*** for the dental embodiment in the tooth canal, which states that "[c]leaning of [tooth] canal 1 is achieved by shock waves." Appx3657 (3:39-40). The blood vessel embodiment of Figure 3 is ***not*** described as using shockwaves. Instead, it is described as using a low-power "cavitation action." Appx3658 (5:16-17).

Thus, the Board's reliance on this cited passage of Levy '227 was error, as it indisputably fails to disclose (as required by the claims) an "angioplasty balloon" including "electrodes" and an "arc generator generating a high voltage pulse sufficient to create a plasma arc between the electrodes resulting in a mechanical shock wave within the balloon." The only reference to shockwaves in Levy '227 is as part of a dental treatment device that is not used for angioplasty or even in blood vessels at all.

The Board acknowledged Shockwave's position that "Levy '227 describes using shockwaves only within a tooth canal and not within a blood vessel" and stated that it "disagree[d]" with this position. Appx29. But the Board's decision never provides any evidentiary basis for this disagreement, and it never identifies any disclosure in Levy '227 of using shockwaves within a blood vessel. The only passages of Levy '227 that the Board cited as allegedly disclosing shockwaves were

2:12-33, 3:39-42, 3:58-61, and 4:37-5:2. Appx29-30. But of these, 2:12-33 does not discuss shock waves at all, and both 3:39-42 and 3:58-61 are expressly discussing the ***dental*** embodiment of Figures 1 and 2. Appx3656-3657. The passage starting at 4:37 does not even relate to treatment of human patients, rather, it relates to the industrial device for "clean[ing] and enlarge passages ***in materials*** such as ceramics, plastics and metals." Appx3657 (emphasis added). The Board seems to have missed that this was describing a device used for materials and not a human, citing this passage as relating to "clean[ing] blood vessels." Appx30. The only portion of Levy cited by the Board that actually relates to the blood vessel embodiment is 4:64-5:2, but that passage says nothing about shockwaves. To the contrary, it states that "the technique can also be employed in the medical field for cleaning vessels, such as blood vessels" but that in this case, "the parameters of the radiation pulses are selected on the basis of the nature of the vessel and its diameter." Appx3657-3658. In other words, this passage actually undermines the Board's conclusion, as it makes clear the vessel embodiment does not use the same shockwaves but rather different "pulses are selected on the basis of the nature of the vessel." *Id*.

### B. Levy '227's Dental Device Does Not Support Obviousness

Nor can Levy '227's discussion of shockwaves for dental treatment support the Board's conclusion of obviousness. First, the claims of the '371 Patent relate to an "angioplasty catheter" and require generation of shockwaves within the

"angioplasty balloon." A dental treatment device is not an angioplasty catheter or angioplasty balloon, and neither CSI nor the Board argued otherwise. Second, the dental device of Levy '227 is a distinct embodiment, and proof of motivation to combine and expectation of success is required where there is an assertion of obviousness based on two embodiments in the same reference. *See In re Stepan Co.*, 868 F.3d 1342, 1346 n.1 (Fed. Cir. 2017) ("Whether a rejection is based on combining disclosures from multiple references [or] combining multiple embodiments from a single reference … there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful, otherwise a skilled artisan would not arrive at the claimed combination.").

The Board did not identify any motivation to combine the shockwaves used in the dental embodiment of Levy '227 with the vessel embodiment of Levy, nor did it even discuss the issue. The Board similarly failed to identify (or even discuss) any alleged expectation of success.

Further, there was substantial evidence in the record that a POSA would not have been motivated to apply shockwaves used to clean the hard bone of a tooth to the soft tissue of a blood vessel, because the art at the time taught this would present unacceptable safety risks to the patient. For example, Chernenko, a lithotripsy device that CSI claimed could be used for treatment in blood vessels, specifically taught

***against*** using powerful shockwaves in proximity to soft tissue such as blood vessels. Appx7386 ("Since the generated during electro-hydraulic lithotripsy treatment shock waves are of sufficient force the probe must not be used 5 mm or closer to soft tissues otherwise severe damage will result."). Other references taught the same. *See, e.g.*, Appx7615 ("[P]lasma from the EHL is known to cause severe damage … Hence, extreme caution is needed when using the EHL."); Appx7617 ("The unshielded EHL caused perforation of the bladder after only two pulses … The damage produced by the EHL is probably the result of both the direct effect of the plasma as well as the resultant stress wave."); Appx7627 (de la Torre) (use of low power "hydraulic or acoustic waves" offers "advantages includ[ing] greater safety by preventing damage to the blood vessel walls by the wave generator"); Appx7628-7629 ("essentially no shock wave is created according to the invention" and that use of low-power hydraulic waves avoids "loss of structural or endothelial integrity of arterial walls"); Appx1776 (teaching "EHL spark and subsequent pressure wave" causes "a rupturing or disrupting of the walls" and "blockage" within a body lumen). The lack of any motivation is further confirmed by Levy '227 itself, which clearly knew how to describe using shockwaves where intended (e.g. for cleaning teeth), but ***avoided*** describing the use of shockwaves in its blood vessel embodiment.

### C. The Board's Attempt to Rely on Other References As Disclosing Shockwaves Fails Because the Board Identified No Motivation to Combine These References With Levy

The Board alternatively attempted to rely on other references (Mantell, Uchiyama, and Willneff) as allegedly disclosing generation of shockwaves within a balloon. Appx30. Any supposed disclosure of shockwaves in these references is unavailing, as none of them disclose shockwaves in an angioplasty balloon as claimed in the patent, and the Board did not identify any sufficient motivation to incorporate the shockwaves in these references into Levy, or any reason a POSA would expect success in doing so. *See Fanduel*, 966 F.3d at 1343-44; *Kinetic Concepts*, 688 F.3d at 1369.

The Board addressed motivation to combine these references with Levy only in the context of a different dispute about whether there would have been a motivation to replace the laser of Levy with electrodes. Appx32-38 (addressing whether a POSA would be "motivated to incorporate the EHL probes of Mantell, Uchiyama, or Willneff into Levy's balloon"). This analysis is directed to a different part of the claims that requires "an arc generator including a pair of electrodes, said electrodes being positioned within and in non-touching relation to the balloon" Appx200. The claims go on to further require using electrodes to generate "a high voltage pulse sufficient to create a plasma arc between the electrodes resulting in a

mechanical ***shock wave*** within the balloon," *id*., as opposed to a low-power acoustic or hydraulic wave that could be generated by applying lower power to the electrodes.

The Board essentially ignored Shockwave's argument that there was no evidentiary basis for modifying Levy so that it was capable of producing shockwaves in an angioplasty balloon. Rather, the Board's motivation analysis on this issue was limited to repeating the incorrect assertion that Levy itself disclosed the generation of shockwaves. Appx34 ("Levy generates shockwaves within an angioplasty balloon using a laser rather than electrodes"). In other words, because the Board believed that Levy already disclosed shockwaves, it concluded that there was no need to identify any motivation to incorporate shockwaves into Levy. But as discussed above, Levy does ***not*** disclose the generation of shockwaves, and thus the entire premise of the Board's motivation analysis was incorrect. In any event, as discussed above, the record was replete with evidence a POSA would not have been motivated to attempt this combination due to safety risk to the patient.

## V. The Board Improperly Disregarded the Objective Indicia of Non-Obviousness and Improperly Denied Shockwave's Motion for Additional Discovery

Fifth and finally, the Board failed to properly analyze objective indicia of non-obviousness, which itself is ample basis for reversing a finding of obviousness. *See LiquidPower Specialty Prods. Inc. v. Hughes*, 749 F. App'x 965, 968–69 (Fed. Cir. 2018). This Court "review[s] the Board's legal determinations de novo and its

factual findings for substantial evidence." *Id*. at 967. This Court reviews the Board's denial of discovery and refusal to consider evidence for abuse of discretion. *Ultratec, Inc. v. Captioncall, LLC*, 872 F.3d 1267, 1271-72 (Fed. Cir. 2017) (Board abused discretion by refusing to consider "sworn inconsistent testimony" by petitioner's expert).

### A. Shockwave Introduced Substantial Objective Evidence of Non-Obviousness

Shockwave presented significant objective evidence of non-obviousness for the inventions of the '371 Patent. For example, Shockwave demonstrated that there was a long-felt need for a device that could treat medial calcified lesions within an arterial wall, and that prior treatments such as atherectomy and angioplasty had failed to treat this type of deep plaque. Appx662-672. Among other evidence, Shockwave submitted sworn testimony from five cardiovascular surgeons who have collectively performed tens of thousands of vascular surgeries (including angioplasty, atherectomy, and IVL), attesting that the innovative IVL treatment of the '371 Patent filled this need and was "the first, and remains the only, effective treatment for medial calcified lesions." Appx8694-8695; *see also* Appx8758, Appx8769-8770, Appx8801-8803, Appx8871-8872. These surgeons also testified that there was initially significant skepticism in the field regarding IVL, only to be replaced by industry praise when the procedure proved extremely successful. *See,*

*e.g,* Appx8692, Appx8697-8698; Appx8803-8809; Appx8872, Appx8875-8877; Appx8758-8759, Appx8763; Appx7521-7522, Appx7544-7555; Appx8770-8772.

The testimony of these surgeons was confirmed by clinical studies, including a head-to-head comparison of IVL and atherectomy, concluding that IVL was far superior in treating calcium embedded deep in the vessel wall. Appx8067 ("IVL is unique among all technologies in its ability to modify calcium circumferentially and transmurally … We believe that IVL balloon is going to transform the market."). Other clinical studies confirmed this, including trials showing procedural success rates for IVL of up to 95%, as compared to 78% for angioplasty and 85% for atherectomy, with IVL also causing significantly fewer severe complications. Appx7535-7536; Appx8031-8032; Appx8037. Similarly, the surgeon testimony of industry praise was supported by objective literature describing Shockwave IVL as, among other things, "a transformational technology," and "unique among all technologies in its ability to modify calcium," and "revolutionary," among other statements. Appx8054, Appx8067.

Shockwave also submitted significant evidence of commercial success. For example, Shockwave submitted element-by-element analysis from its expert showing that Shockwave's IVL system practiced the '371 Patent, Appx7556; Appx8926-8931, and evidence that Shockwave's revenue from these systems had

grown 339% in a year, exceeding $10 million per quarter in 2019. Appx7556; Appx8883; Appx8670.

### B. The Board Failed to Properly Consider the Objective Indicia Evidence

The Board committed at least two independent errors in considering—and essentially disregarding wholesale—the substantial evidence of objective indicia presented by Shockwave.

First, the Board failed to properly consider to Shockwave's evidence of nexus and improperly found Shockwave was not entitled to a presumption of nexus. Shockwave presented evidence from its expert Dr. Berger (a professor of cardiology at Johns Hopkins with a Ph.D. in Electrical Engineering from MIT and an M.D. from Harvard) who testified that Shockwave's IVL device embodied and was coextensive with claim 1 of the '371 Patent. Appx7424-7425, Appx7455-7456, Appx7539-7544, Appx7556. Dr. Berger supported this opinion with both an element-by-element chart in his declaration, and a further element-by-element chart in Exhibit 2196. Appx7539-7544, Appx7556.

The Board found that Shockwave failed to prove its IVL devices practiced the claims, because it supposedly failed to present a claim chart that quoted the specific elements of the claim. Appx48-49. However, this statement is factually incorrect, as Dr. Berger specifically relied on the claim chart in Exhibit 2196 that expressly sets forth each of the claim elements alongside corresponding evidence for the

Shockwave C2 device. Appx8926-8931, Appx7556. The Board's analysis of nexus does not even acknowledge the existence of this claim chart.

Instead, the Board pointed to a different element-by-element chart included in Dr. Berger's declaration showing where each element appeared in the Shockwave device. Appx48-49, Appx7539-7541. The Board dismissed this evidence based on the argument that "the claim chart does not include any claim language at all. Rather, it merely refers to claim language using shorthand [1a]–[1e]." Appx48-49. But this was the exact shorthand that CSI used to label each element in the Petition, and the Board did not claim to have any trouble understanding the Petition. *See* Appx354-362 (labelling elements as 1[a]-1[e]). Moreover, CSI did not attempt to rebut any of the specific assertions in either of Shockwave's claim charts, nor did it submit any contrary evidence. Under these circumstances where the evidence was undisputed, the Board was required to presume nexus. *See Polaris*, 882 F.3d at 1072 (Board erred in failing to presume nexus where there was "undisputed evidence" and expert testimony commercial products embodied claims).

Equally without basis is the Board's further assertion that Shockwave submitted no evidence its IVL device contained "electrodes," "arc," or "plasma." Shockwave's charts expressly discuss use of the "IVL generator" to release "an electrical discharge from the emitters" that "vaporizes the fluid within the balloon" (i.e., creating an arc between the electrodes), and contain pictures of this process.

Appx7539-7541. There was also express testimony the Shockwave device used electrodes to generate the shockwaves, which the Board appears to have ignored. Appx8692-8693 (Shockwave IVL "includes multiple electrodes for generating a shockwave in the angioplasty balloon"). And as noted above, additional evidence on all elements was provided in Exhibit 2196, which the Board also ignored.

Second, the Board failed to conduct "a reasoned, collective weighing of its evidence of secondary considerations" as required. *Volvo Penta of the Am., LLC v. Brunswick Corp.*, --- F. 4th ---, 2023 WL 5440530, at *7 (Fed. Cir. Aug. 24, 2023). This Court's decision in *Volvo* is illustrative. There, the Board was found to have failed to properly consider objective indicia evidence where it "assign[ed] only vague weights (i.e., 'some weight' and 'very little weight') to the various factors and fail[ed] to explain its overall summation." *Id.* at *7. The Board used the same improper approach here, assigning vague "weight" to various factors but never explaining how all the factors fit into the overall obviousness analysis, which compounded errors the Board made in assessing the objective indicia generally.

For example, as to commercial success, the Board almost entirely discounted Shockwave's evidence of extraordinary sales growth (over 300% year-over-year for its IVL system) and over $40 million in 2019 sales, describing it as "weak," and dismissing it as "*projected* revenue" and "forward looking statements" and because Shockwave did not prove an exact market share. Appx62-64. As an initial matter,

the Board's characterization is (again) factually incorrect, as it ignores the evidence of ***actual*** (not merely "projected") revenue and revenue increases in the record. Appx7556; Appx883; Appx8670. The Board's finding was further in error because market share data "is not required to show commercial success." *Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1378 (Fed. Cir. 2021).

Moreover, the Board ignored the testimony of clinicians that Shockwave IVL provided a ***new*** market for treating medial plaque. *See* Section V.A, above. This is the exact error this Court found in *Volvo*, where the Board dismissed evidence that "the Forward Drive essentially created a new market for stern drives" and "Forward Drive have increased significantly since its launch in 2015" as merely having "some weight." 2023 WL 5440530, at *8. This Court found "[t]his finding was not supported by substantial evidence," and the same is true here. *Id*. Indeed, the Board's determination in this case is even less defensible, given its factual mischaracterizations.

Similarly, as to long-felt need and industry praise, the Board found the clinician testimony submitted by Shockwave to be "of modest, but meaningful, probative value on whether IVL is more effective than pre-existing options for treating calcified plaque that includes plaque within the medial tissues of arteries." Appx51. The Board also found "the CAD Studies as objective and reliable evidence of the potential efficacy of using IVL to treat severe coronary artery calcification."

Appx54. However, the Board assigned "little weight" to other significant statements of industry praise that Shockwave IVL, including statements in literature describing it as "a transformational technology," and "unique among all technologies in its ability to modify calcium," and "revolutionary," discounting these as statements by "financial analysts." Appx8054, Appx8067; *see also* Appx61 ("we ascribe some, but not great, weight to Patent Owner's evidence of industry praise"). The Board similarly assigned "little probative weight" to the FDA's breakthrough device designation. Appx56-57.

Once again, *Volvo* is exactly on point. There, this Court held that the Board failed to properly consider evidence of long-felt need and industry praise where it gave "little weight" to statements that described the invention as "radical," "game-changing," and as starting a "revolution"—some of the exact same praise present here. *Volvo*, 2023 WL 5440530, at *8.

Indeed, the Board's failure to give proper consideration was even worse in this case because the Board's rationale for dismissing the praise (that it supposedly came from financial analysts) was simply wrong. Several of the statements of praise identified by Shockwave came from peer-reviewed medical publications by physicians. Appx8054 (2019 review by American College of Cardiology stating IVL was "a transformational technology"), Appx8067 (2018 peer-reviewed article describing IVL as "unique among all technologies in its ability to modify calcium").

The Board did not address Ex. 2130 at all, and dismissed Ex. 2131 as "prospective and not definitive." Appx58-59.

As another example, the Board purported to rely on the Dill paper as "the most probative evidence" in rejecting Shockwave's "contention that Shockwave IVL was the only treatment available for [complex] lesions." Appx53. But the Dill paper does not address IVL at all; rather, it addresses only a comparison between "rotational atherectomy" and "angioplasty." *Id.*; Appx8022. Neither party made this irrelevant comparison. And the Board nowhere explained why it relied on a paper that does not address IVL as supposedly the "most probative evidence" about IVL.

The Board's ultimate weighing of the objective indicia evidence was equally deficient. As discussed above, the Board assigned "modest, but meaningful" weight to the clinician testimony of long-felt need, "little weight" to the statements of commercial success, "little probative weight" to the breakthrough device designation, and "some, but not great, weight" to the industry praise. Appx51, Appx56-57, Appx61. But in its summation of all the factors, the Board simply stated that "Patent Owner's objective evidence of non-obviousness is voluminous, but largely weak for all the reasons that we express above even crediting Patent Owner for having established some nexus." Appx65. The Board then dismissed this "voluminous" evidence, stating it "does not warrant a conclusion that claim 1 remains patentable." *Id.*

The Board's approach here is again virtually identical to the reasoning that this Court found deficient in *Volvo*, where the Board "fail[ed] to provide any explanation for [its] conclusion. Even if its assignment of weight to each individual factor was supported by substantial evidence ('some weight' for copying, industry praise, and commercial success; and 'very little weight' for skepticism, failure of others, and long-felt but unsolved need), it stands to reason that these individual weights would sum to a greater weight. The Board does not discuss the summation of the factors at all other than to say, without explanation, that they collectively 'weigh[ ] somewhat in favor of nonobviousness.' That is not sufficient to sustain its determination." *Volvo*, 2023 WL 5440530, at *9,

### C. The Board Improperly Denied Additional Discovery into CSI's Reversal of Position on IVL During Rehearing

The Board also purported to reject Shockwave's objective indicia evidence by relying on a lone declaration from CSI's expert Dr. Chambers, whom CSI had paid over $700,000 and is now employed as CSI's Chief Medical Officer. Appx10190, Appx10231; Appx10410. CSI argued that there was no long felt need or failure of others to treat medial plaque, because "based upon Dr. Chambers' testimony … orbital atherectomy was a successful method of treating heavily calcified plaque that included medial plaque." Appx52. CSI also questioned the safety and efficacy of IVL, asserting (again, based on Dr. Chambers' testimony) that treatments such as atherectomy "were at least as safe, and perhaps safer, as evidenced by fewer

complications." Appx759-760. The Board accepted CSI's assertions that IVL was not safer or more effective than prior treatments, finding that "Petitioner has also established that previous methods for treating the same type of stenoses, e.g., rotational and orbital atherectomy, remain viable treatment options that may have advantages in certain circumstances" and the "Petitioner has submitted credible evidence that IVL does or is likely to lead to long term side effects." Appx59-60.

There was no basis for the Board to rely on Dr. Chambers in the first place, but even if it were justified, such reliance could not be reasonably maintained in light of contrary evidence from CSI that emerged for the first time at the rehearing stage. Beginning in early 2022, CSI publicly reversed its position about the safety and effectiveness of IVL over prior treatments and directly contradicted its prior representations on which the Board relied. For example, on January 13, 2022, CSI issued a public press release stating it was exploring an IVL product, and touting that IVL "has been used successfully for many years" (i.e., Shockwave's product) and would "enable CSI to offer products that effectively treat a broader range of calcific coronary lesions." Appx10649. CSI further stated that IVL would "expand its treatable patient population" and "greatly expand patient access to care." Appx10649-10650. CSI further stated on an earnings call that IVL would "expand the market" and allow it to reach "a completely different customer group that historically, maybe has not treated calcium in the past." Appx10674. In other words,

after having argued (and persuaded the Board) specifically to reject Shockwave's evidence that IVL was safe and effective and allowed treatment for previously unreached patients, CSI reversed positions in public and argued that IVL was extremely successful and would expand treatment to new patients. The Rehearing FWD did not consider or even mention this evidence in its analysis of objective indicia, which itself is error.

Contrary to its duty of candor in the IPR proceedings, CSI did not disclose to the Board its new public position on IVL, and refused to produce to Shockwave or the Board any discovery on the basis for its new claims. In view of CSI's refusal, Shockwave promptly filed a motion seeking additional discovery on the basis for CSI's public statements "to get to the bottom of these issues concerning CSI's apparent about-face on the importance, safety, and efficacy of IVL." Appx1231. Shockwave argued that discovery into CSI's about-face would help the Board answer the "open questions" it raised in its original FWD. But the Board denied the requested discovery, citing a wish to avoid "further delay" and asserting that it saw "nothing that materially conflicts with the existing record" in the press release. Appx91-92.

Shockwave submits this was an abuse of discretion and that discovery was "in the interests of justice," because CSI's statements were clearly inconsistent and undermine the exact basis on which CSI (and the Board) disregarded the objective

indicia evidence. At the very least, it was in the interests of justice to get to the bottom of CSI's contradictory claims, so that the Board could understand which version of CSI's statements were true and rely on accurate information in its decision, i.e., whether IVL was in fact more effective and expanded treatment to new patients, or whether it did not. And it was certainly in the interests of justice for Shockwave to have full and fair opportunity explore these serious issues and present a complete evidentiary picture to the Board for consideration. *See Ultratec*, 872 F.3d at 1272-73 (finding "no reasoned basis why it would not be in the interest of justice to consider sworn inconsistent testimony on the identical issue"). The Board did not consider any of these interests, and in fact did not even discuss the precedential *Garmin* factors the Board applies in assessing discovery requests.

Finally, "delay" was not a basis to deny this discovery because there was no delay by Shockwave. It is undisputed that Shockwave promptly raised the issue during rehearing as soon as CSI issued its public statements contradicting its prior disparagement of IVL. *Id.* at 1272 (delay not a basis to deny discovery where evidence "did not exist during the IPR discovery period" and was promptly raised).

## CONCLUSION

For the foregoing reasons, Shockwave respectfully requests that this Court reverse on claims 1-4 and 6-17, or at minimum vacate and remand for further proceedings on those claims.

Dated: September 20, 2023

Respectfully submitted,

By: <u>*/s/ David C. McPhie*</u>
David C. McPhie

David C. McPhie
Stephen M. Payne
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Phone: 949-760-0991

Michael R. Fleming
IRELL & MANELLA LLP
750 17th Street NW
Washington, D.C. 20006
Phone: 202-777-6500

W. Cook Alciati
GARDELLA GRACE P.A.
80 M Street SE, 1st Floor
Washington, D.C. 20003
Phone: 703-556-9600

*Counsel for Appellant*
*Shockwave Medical, Inc.*

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally-spaced typeface and includes 13,940 words, excluding those items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

Dated: September 20, 2023

Respectfully submitted,

By: */s/ David C. McPhie*
David C. McPhie

David C. McPhie
Stephen M. Payne
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Phone: 949-760-0991

Michael R. Fleming
IRELL & MANELLA LLP
750 17th Street NW
Washington, D.C. 20006
Phone: 202-777-6500

W. Cook Alciati
GARDELLA GRACE P.A.
80 M Street SE, 1st Floor
Washington, D.C. 20003
Phone: 703-556-9600

*Counsel for Appellant Shockwave Medical, Inc.*

# ADDENDUM

# TABLE OF CONTENTS
**[ADDENDUM]**



| Paper / Ex. No. | Document Description | Page |
|---|---|---|
| Paper 99 | Final Written Decision on Rehearing of Final Written Decision 37 C.F.R.§ 42.71(d) (February 2, 2023) | Appx1 |
| Paper 75 | Final Written Decision (July 8, 2020) | Appx98 |
| Ex. 1001 | U.S. Patent No. 8,956,371 | Appx187 |

Trials@uspto.gov
Tel: 571-272-7822

Paper 99
Entered: February 2, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

CARDIOVASCULAR SYSTEMS, INC.,
Petitioner,

v.

SHOCKWAVE MEDICAL, INC.,
Patent Owner.

---

IPR2019-00405
Patent 8,956,371 B2

---

Before MITCHELL G. WEATHERLY, RICHARD H. MARSCHALL, and AVELYN M. ROSS, *Administrative Patent Judges.*

WEATHERLY, *Administrative Patent Judge.*

DECISION
On Rehearing of Final Written Decision
*37 C.F.R. § 42.71(d)*
Denying Petitioner's Motion to Exclude
*37 C.F.R. § 42.64(c)*
Denying Patent Owner's Motion for Additional Discovery
*37 C.F.R. § 42.51(c)*

# I. INTRODUCTION

## A. Background

Cardiovascular Systems, Inc. ("Petitioner") filed a petition (Paper 1, "Pet.") to institute an *inter partes* review of claims 1–17 (the "challenged claims") of U.S. Patent No. 8,956,371 B2 (Ex. 1001, "the '371 patent"). 35 U.S.C. § 311. Shockwave Medical, Inc. ("Patent Owner") timely filed a Preliminary Response. Paper 11 ("Prelim. Resp."). On July 9, 2019, based on the record before us at the time, we instituted an *inter partes* review of all challenged claims on all grounds set forth by Petitioner. Paper 19 ("Institution Decision" or "Dec."). We instituted the review on the following challenges to the claims:

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1–6, 11, 14–16 | 103 | Levy,[2] AAPA,[3] and Mantell,[4] Uchiyama,[5] or Willneff[6] |
| 7, 12 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Hayes[7] |

[1] Because the claims at issue have an effective filing date before March 16, 2013, the effective date of the applicable provisions of the Leahy Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284 (2011) ("AIA"), we apply the pre-AIA version of 35 U.S.C. § 103 in this Decision.

[2] European Patent Application EP 0571306 A1 (Ex. 1003, "Levy").

[3] Applicant Admitted Prior Art ("AAPA").

[4] U.S. Published Patent App. 2010/0036294 A1 (Ex. 1004, "Mantell").

[5] Japanese Laid Open Application No. JP 62-275446 A (Ex. 1005, "Uchiyama").

[6] German Patent Application No. DE 3038445 A1 (Ex. 1006, "Willneff").

[7] U.S. Patent No. 7,309,324 B2 (Ex. 1007, "Hayes").

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 8, 12 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Duchamp[8] |
| 9 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Naimark[9] |
| 10 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Beyer[10] |
| 13 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Bhatta[11] |
| 17 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Schultheiss[12] |
| 1–4, 6, 11, 15, 16 | 103 | Willneff, AAPA, and Levy or Mantell |
| 5, 14 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Uchiyama |
| 7, 12 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Hayes |
| 8, 12 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Duchamp |
| 9 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Naimark |

[8] U.S. Published Patent App. 2002/0082553 A1 (Ex. 1008, "Duchamp").

[9] U.S. Patent No. 7,569,032 B2 (Ex. 1009, "Naimark").

[10] U.S. Published Patent App. 2006/0190022 A1 (Ex. 1010, "Beyar").

[11] U.S. Patent No. 5,152,768 (Ex. 1012, "Bhatta").

[12] U.S. Published Patent App. 2007/0239082 A1 (Ex. 1011, "Schultheiss").

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 10 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Beyar |
| 13 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Bhatta |
| 17 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Schultheiss |

After we instituted this review, Patent Owner filed a Patent Owner Response in opposition to the Petition (Paper 39, "PO Resp."). Petitioner filed a Reply in support of the Petition (Paper 56, "Reply"). Patent Owner filed a Sur-reply responding to the Reply (Paper 64, "Sur-reply"). Patent Owner did not move to amend any claim of the '371 patent.

We heard oral argument on April 15, 2020. A transcript of the argument has been entered in the record (Paper 74, "Tr.").

On July 8, 2020, we issued a Final Written Decision in this proceeding in which we concluded that claims 1–4 and 6–17 were unpatentable as obvious in view of applicant admitted prior art ("AAPA") combined with a number of other prior art references. Paper 75 ("Dec." or "Decision"), 83–87.[13] During the proceeding, Patent Owner argued that we could not consider AAPA when analyzing Petitioner's challenges because AAPA is not "prior art consisting of patents or printed publications" under 35 U.S.C. § 311(b). Paper 39, 64–65. We disagreed and ruled that the

[13] We also concluded that Petitioner had failed to demonstrate that claim 5 was unpatentable. Dec. 83–87.

AAPA relied upon by Petitioner was prior art contained within a "patent" under § 311(b). Dec. 35–36.

On August 19, 2020, the Director of the United States Patent and Trademark Office issued a memorandum setting forth binding guidance on the manner in which the Board shall consider statements by a patent applicant in the patent specification regarding the prior art in support of a request for *inter partes* review. Ex. 3002 ("AAPA Guidance").[14] The AAPA Guidance identifies our Decision ruling that AAPA is prior art found in a patent as being "inconsistent" with § 311(b). AAPA Guidance, 3. Thus, in an Order dated August 27, 2020, we *sua sponte* initiated rehearing to reconsider the issue of how AAPA should be considered in view of the AAPA Guidance. Paper 76, 3. We also instructed the parties to confer and be prepared to inform the panel of their preferences for a briefing schedule to present arguments on the effect of the AAPA Guidance on our Decision. *Id.* Based, in part, on input from the parties gathered in a teleconference on September 11, 2020, we set a briefing schedule for the rehearing instructing each party to submit two briefs with Petitioner filing the first and third brief and Patent Owner filing the second and fourth brief in series. Paper 77, 3.

As instructed, the parties filed the following briefs. Petitioner filed Petitioner's Opening Brief on Rehearing. Paper 78 ("RH Brief"). Patent Owner filed Shockwave Medical, Inc.'s Responsive Brief on Rehearing. Paper 81 ("RH Resp."). Petitioner filed Petitioner's Reply on Rehearing. Paper 82 ("RH Reply"). Patent Owner filed Shockwave Medical Inc.'s Sur-reply on Rehearing. Paper 83 ("RH Sur-reply").

---

[14] The AAPA Guidance is found at https://www.uspto.gov/sites/default/files/documents/signed_aapa_guidance_memo.pdf.

After the parties filed their briefs on rehearing, on February 1, 2022, the Federal Circuit issued *Qualcomm Inc. v. Apple Inc.*, 24 F.4th 1367 (2022) in which it addressed the manner in which AAPA may be considered by the Board in *inter partes* review proceedings. *Id.* at 1376. On June 9, 2022, the Director published a memo entitled Updated Guidance on the Treatment of Statements of the Applicant in the Challenged Patent in Inter Partes Reviews under § 311 (Ex. 3003, "Updated AAPA Guidance").[15] The Updated AAPA Guidance supersedes the AAPA Guidance. Updated AAPA Guidance, 1. Neither party requested additional briefing on the effect of the *Qualcomm* decision or the Updated AAPA Guidance. We apply the Updated AAPA Guidance and follow the precedent reflected in the *Qualcomm* decision cited above when considering the parties' arguments on rehearing.

Briefly, we again conclude that Petitioner has demonstrated by a preponderance of evidence that claims 1–4 and 6–17 are unpatentable, but for the reasons expressed below rather than those expressed in our Decision. Additionally, we maintain our prior conclusion that Petitioner has failed to demonstrate that claim 5 is unpatentable without any modification to our reasoning expressed in the Decision. We repeat our prior analysis of claim 5 from our Decision so that this single paper contains the substance of our analysis of all of Petitioner's challenges to the claims. Accordingly, for the reasons set forth below, we determine that Petitioner has demonstrated by a preponderance of evidence that claims 1–4 and 6–17 are unpatentable but has failed to show that claim 5 is unpatentable.

---

[15] The Updated AAPA Guidance is accessible at: https://www.uspto.gov/sites/default/files/documents/20220609updatedAAPAmemo.pdf.

B. Related Proceedings

Petitioner identified no related matters. Pet. 2. Patent Owner has identified the following petitions for *inter partes* review and patents or patent applications as related matters:

- Petition for *Inter Partes* Review of U.S. Patent No. 9,642,673, IPR2019-00408 (filed December 7, 2018);
- Petition for *Inter Partes* Review of U.S. Patent No. 8,728,091, IPR2019-00409 (filed December 7, 2018);
- U.S. Patent Application No. 13/646,570 filed on October 5, 2012, and issued as U.S. Patent No. 9,011,462;
- U.S. Patent Application No. 14/660,539 filed on March 17, 2015, and issued as U.S. Patent No. 10,039,561;
- U.S. Patent Application No. 16/028,225 filed on July 5, 2018;
- U.S. Patent Application No. 13/049,199 filed on March 16, 2011, and issued as U.S. Patent No. 8,956,374;
- U.S. Patent Application No. 13/465,264 filed on May 7, 2012, and issued as U.S. Patent No. 9,072,534; and
- U.S. Patent Application No. 13/646,583 filed on October 5, 2012.

Paper 3, 1–2.

C. The ’371 Patent

The ’371 patent is directed to “a treatment system for percutaneous coronary angioplasty or peripheral angioplasty in which a dilation catheter is used to cross a lesion in order to dilate the lesion and restore normal blood flow in the artery.” Ex. 1001, 1:13–16. The patent purports to improve upon the prior art angioplasty balloon catheter 10 illustrated in Figure 1 (reproduced below left) by adding electrodes 22, 24 as shown in Figure 2 (reproduced below right), which generate arcs that create shock waves within balloon 26 to break up calcified lesions in a blood vessel.

FIG. 1
(PRIOR ART)




FIG. 2




FIG. 1 is a view of the therapeutic end of a typical prior art over-the-wire angioplasty balloon catheter. *Id.* at 3:7–8.

FIG. 2 is a side view of a dilating angioplasty balloon catheter with two electrodes within the balloon. *Id.* at 3:9–10.

Balloon 26 may be filled with water or saline to gently fix balloon 26 against the walls of an artery in direct proximity to a calcified lesion. *Id.* at 4:27–29. Carrier 21 includes lumen 29 through which a physician inserts a guide wire (not shown) to guide catheter 20 to the desired location in a patient's body. *Id.* at 4:31–33. Electrical arcs between electrodes 22, 24 generate shock waves in the fluid. *Id.* at 4:16–17. Figure 11, reproduced in pertinent part at right, "is a pressure volume curve showing the various stages in the breaking of a calcified lesion with shock waves." *Id.* at 3:45–46.

FIG. 11




Figures 11A and 11B, reproduced below left and right respectively, are cross-sectional views illustrating a vessel before and after treatment.

FIG. 11A




Figure 11A illustrates a compliant balloon expanded snugly against the vessel wall. *Id.* at 3:48, 5:31–32.

FIG. 11B




Figure 11B illustrates pulverized, calcified plaque "on a vessel wall." *Id.* at 3:50–51.

The Specification explains that: "As the High Voltage pulses generate shock waves (Region B and C) extremely high pressures, extremely short in duration will chip away the calcified lesion slowly and controllably expanding the opening in the vessel to allow blood to flow un-obstructed (FIG. 11B)." *Id.* at 5:33–38.

Claims 1 and 15 are the only independent claims among the challenged claims. *Id.* at 6:21–8:16. Illustrative claim 1 recites:

> 1. An angioplasty catheter comprising:
>
> [a] an elongated carrier sized to fit within a blood vessel, said carrier having a guide wire lumen extending therethrough;
>
> [b] an angioplasty balloon located near a distal end of the carrier with a distal end of the balloon being sealed to the carrier near the distal end of the carrier and with a proximal end of the

> balloon defining an annular channel arranged to receive a fluid therein that inflates the balloon; and
>
> [c] an arc generator including a pair of electrodes,
>
> [d] said electrodes being positioned within and in non-touching relation to the balloon,
>
> [e] said arc generator generating a high voltage pulse sufficient to create a plasma arc between the electrodes resulting in a mechanical shock wave within the balloon that is conducted through the fluid and through the balloon and wherein the balloon is arranged to remain intact during the formation of the shock wave.

*Id.* at 6:21–39 (with third and fourth line breaks and letter designations [a]–[e] added to aid discussion).

## II. ANALYSIS

### A. Claim Interpretation

For petitions like this one that are filed after November 13, 2018, we interpret claims in the same manner used in a civil action under 35 U.S.C. § 282(b), "including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2019).[16] When applying that standard, we interpret the claim language as it would be understood by one of ordinary skill in the art in light of the specification. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed.

---

[16] On October 11, 2018, the USPTO revised its rules to harmonize the Board's claim construction standard with that used in federal district court. Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (now codified at 37 C.F.R. § 42.100(b) (2019)). This rule change applies to petitions filed on or after November 13, 2018. *Id.*

Cir. 2010). Thus, we give claim terms their ordinary and customary meaning as understood by an ordinarily skilled artisan. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning 'is the meaning that the term would have to a person of ordinary skill in the art in question.'" (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc))). Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

1. "angioplasty balloon"

Petitioner and Patent Owner disagree about the meaning of "angioplasty balloon" as used in the challenged claims. Petitioner contends that "angioplasty balloon" means "an inflatable sac that is configured to be inserted into a blood vessel for use in a medical procedure to widen narrowed or obstructed blood vessels." Pet. 12. Patent Owner argues that "angioplasty balloon" refers to "a balloon that displaces the plaque into the vessel wall to expand the lumen of the vessel." PO Resp. 5.

a. Intrinsic Evidence

The plain language of the claim does not refer to any limitation on the type of "angioplasty" for which the "balloon" is designed. Rather, the claim merely recites an "angioplasty balloon." Dependent claims 7 and 8 limit the balloon to being formed of "compliant" or "non-compliant" material respectively. Ex. 1001, 6:51–54. Thus, the plain language of the claims does not reflect a requirement that the claimed "angioplasty balloon" must displace plaque "into the vessel wall."

The Specification states that the "present invention relates to a treatment system for percutaneous coronary angioplasty or peripheral angioplasty in which a dilation catheter is used to cross a lesion in order to dilate the lesion and restore normal blood flow in the artery." *Id.* at 1:13–18. This passage implies that an "angioplasty balloon" is used "to dilate the lesion and restore normal blood flow in the artery" without specifying or limiting how the dilation is achieved.

The Specification later illustrates the use of two types of "angioplasty balloons," a prior art balloon that does not employ shockwaves, Ex. 1001, Figs. 10A–C, and the claimed balloon that does employ shockwaves, *id.* Figs. 11A, 11B, 12, 13. When describing an embodiment of the claimed balloon in Figure 11A, the Specification indicates that the balloon is "expanded to fit snugly to the vessel wall . . . but this is not a requirement." *Id.* at 5:32–33. When describing Figure 11B, the Specification states that shockwaves will cause "extremely high pressures, extremely short in duration [that] will chip away the calcified lesion slowly and controllably expanding the opening in the vessel." *Id.* at 5:33–37. Figures 12 and 13 of the '371 patent illustrate calcified plaque that is "pulverized by the shock waves" and "reshaped" by "the expanded balloon." *Id.* at 5:39–48, Figs. 12, 13. In all instances, the Specification illustrates and describes breaking and redistributing plaque within a vessel wall without ever explicitly referring to displacing plaque "into the vessel wall" from outside the wall. Accordingly, we find that the Specification alone does not resolve whether "angioplasty balloon" refers to a balloon that must dilate a blood vessel, at least in part, by displacing "the plaque into the vessel wall."

Patent Owner argues, based on testimony from Dr. Berger, that intrinsic evidence in the form of two prior art patents submitted during prosecution of the '371 patent use "'angioplasty balloon' in a manner consistent with the plain meaning of that term as used in the '371 patent." PO Resp. 10–11 (citing Ex. 2109 ("O'Boyle"), 1:33–37 (angioplasty balloon used to "stretch and compact the stenosis material against the wall of the artery"); Ex. 2110 ("O'Connor"), 3:8–12 (angioplasty balloon that "opens the occluded part of the artery by pressing the thrombus against the internal wall of the artery")). Neither quoted passage from O'Boyle and O'Connor supports Patent Owner's argument that an "angioplasty balloon" must displace plaque "into the vessel." Petitioner correctly points out that the passages more strongly support its argument for a broader definition because both passages merely describe compacting or pressing material "against" rather than "into" the wall of the vessel. Reply 11.

Even more importantly, O'Boyle and O'Connor each describe angioplasty as a procedure that can result in the removal of material from the vessel wall via ultrasonic ablation, without displacing material "into the vessel wall." For example, O'Boyle's device, which is described as an "angioplasty catheter," Ex. 2109, 3:20–21, performs angioplasty through ultrasonic ablation of stenosis material without significant "crushing of the material of the stenosis against the vessel wall," *id.* at 3:53–62. O'Connor describes angioplasty as being performed by ablating a thrombus and softening calcified plaque within a vessel. Ex. 2110, 3:23–57. O'Connor's angioplasty balloon includes an ultrasound transducer and is inflated with saline to only 1–3 atmospheres. *Id.* at 3:36–41. The low-pressure saline ensures that the balloon presses against the thrombus to transmit and focus

ultrasonic energy to break the thrombus into "microparticulate matter" (i.e, ablation) while also creating "microfractures within the calcified plaque 12 which is embedded in the wall" of the artery. *Id.* at 3:41–57. O'Boyle and O'Connor thus support Petitioner's broader definition of "angioplasty balloon" as not requiring that the balloon displace plaque "into the vessel wall" but merely requiring that the balloon widens a narrowed or obstructed vessel.

b. Extrinsic Evidence

We do not consider it necessary to rely upon extrinsic evidence to support our conclusion that an "angioplasty balloon" is not limited to those balloons that displace material "into the vessel wall." Nevertheless, the balance of such evidence of record supports our conclusion that Patent Owner's definition of "angioplasty balloon" is unduly narrow.

Patent Owner contends that medical and lay dictionaries and testimony from Dr. Berger and Dr. Jensen that establish that an "angioplasty balloon" must displace plaque "into the vessel wall." PO Resp. 11–12 (citing Ex. 2100 ¶¶ 86–88; Ex. 2111, 126:8–16; Ex. 2018; Ex. 2020). Five of the six definitions of "angioplasty" proffered by Patent Owner as establishing that angioplasty refers to displacing plaque "into the vessel wall" fail to go so far. Rather, Petitioner persuasively points out that five of the six definitions refer to angioplasty more generally as merely referring to surgical repair of a blood vessel, sometimes by compressing deposits of fatty substances or plaque blocking the vessel, and other times by using a laser beam or replacing part of the vessel. Ex. 2019, 1–3; Ex. 2020, 1. One of Patent Owner's dictionaries states that an angioplasty is a procedure in which a "balloon is inflated to compress the fatty matter into the artery

wall," which supports Patent Owner's argument. Ex. 2018, 1. However, we find that the group of definitions proffered by Patent Owner as a whole demonstrate that angioplasty refers more broadly to procedures that repair blood vessels and do not necessarily involve displacing material "into the vessel wall."

Patent Owner also relies upon Dr. Berger, who opines that, based on definitions in a lay dictionary for "angio-," "plasty," "plastic," and "elastic deformation," an ordinarily skilled artisan understands "angioplasty" to refer to a procedure that "involves the plastic or permanent deformation or molding of blood vessels." Ex. 2100 ¶ 86 (citing Exs. 2166–2169, 2190). Based on his etymological analysis of "angioplasty," and without further evidentiary support, he extends his opinion by concluding that "the plastic molding of the vessel takes place by the displacement of plaque into the vessel wall to expand the lumen."

We heavily discount Dr. Berger's conclusion about angioplasty requiring "displacement . . . into the vessel wall" as a non sequitur. At most, the evidence upon which he bases his opinion establishes only that angioplasty involves the permanent deformation of a vessel. Additionally, his testimony on cross-examination that "angioplasty" cannot refer to merely pressing plaque or a thrombus against the vessel wall, Ex. 1204, 13:7–13, 13:23–14:24, is irreconcilably inconsistent with prior art that was before the Examiner, O'Boyle and O'Connor. As discussed above, O'Boyle and O'Connor both describe angioplasty as compacting material *against* the vessel wall. Ex. 2109, 1:33–37, 3:53–62; Ex. 2110, 3:8–12. We simply do not consider Dr. Berger's opinion that angioplasty must involve displacing

plaque "into the vessel wall" is credible when considered against objective evidence that he cites.

Petitioner cites another patent, which was not before the Examiner that further establishes that an ordinarily skilled artisan would understand "angioplasty" as referring more broadly to both recanalization and dilation of a blood vessel. Reply 11 (citing Ex. 1041, 2).

c. Conclusion

For the reasons expressed above, we conclude that "angioplasty balloon" refers to "an inflatable sac that is configured to be inserted into a blood vessel for use in a medical procedure to widen narrowed or obstructed blood vessels."

2. Other Disputed Terms

The parties expressly address and disagree about the meaning of two other phrases appearing in claim 1. Namely, "distal end of the balloon sealed to the carrier near the distal end of the carrier" and "carrier having a guidewire lumen extending therethrough." *Compare* Reply 12–13, *with* PO Resp. 16–18 *and* Sur-Reply 10–13. We adopt Patent Owner's interpretations of both terms for the reasons expressed in its briefing and because Patent Owner's interpretations comport more closely with the plain language of the phrases. PO Resp. 16–18; Sur-Reply 10–13. However, Petitioner proves by a preponderance of evidence that an angioplasty balloon sealed near the distal end of a carrier having a guidewire extending through the carrier as recited in these two phrases was well known. *See* Part II.F.1.d.iii below.

B. The Parties' Post-Institution Arguments

In our Institution Decision, we concluded that the argument and evidence adduced by Petitioner demonstrated a reasonable likelihood that at least one claim was unpatentable, and we instituted review of all challenges to claims 1–17 as identified in the table in Part I.A above. Dec. 26–27. We must now determine whether Petitioner has established by a preponderance of the evidence that the specified claims are unpatentable over the cited prior art. 35 U.S.C. § 316(e) (2018). We previously instructed Patent Owner that "any arguments for patentability not raised in the [Patent Owner Response] may be deemed waived." Paper 20, 7; *see also In re Nuvasive, Inc.*, 842 F.3d 1376, 1381 (Fed. Cir. 2016) (holding that patent owner's failure to proffer argument at trial as instructed in scheduling order constitutes waiver). Additionally, the Board's Trial Practice Guide states that the Patent Owner Response "should identify all the involved claims that are believed to be patentable and state the basis for that belief." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

C. Legal Standards

Petitioner challenges the patentability of claims 1–17 on the grounds that the claims are obvious. To prevail in its challenges to the patentability of the claims, Petitioner must establish unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d) (2018). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the

challenge to each claim”)). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

The Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), reaffirmed the framework for determining obviousness as set forth in *Graham v. John Deere Co.*, 383 U.S. 1 (1966). The *KSR* Court summarized the four factual inquiries set forth in *Graham* that we apply in determining whether a claim is unpatentable as obvious under 35 U.S.C. § 103(a) as follows: (1) determining the scope and content of the prior art, (2) ascertaining the differences between the prior art and the claims at issue, (3) resolving the level of ordinary skill in the pertinent art, and (4) considering objective evidence indicating obviousness or nonobviousness. *KSR*, 550 U.S. at 406 (citing *Graham*, 383 U.S. at 17–18). In an *inter partes* review, Petitioner cannot satisfy its burden of proving obviousness by employing “mere conclusory statements.” *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

To prevail in an *inter partes* review, Petitioner must explain how the proposed combinations of prior art would have rendered the challenged claims unpatentable. An obviousness analysis “need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.” *KSR*, 550 U.S. at 418; *accord In re Translogic Tech., Inc.*, 504 F.3d 1249, 1259 (Fed. Cir. 2007). However, Petitioner cannot satisfy its burden of proving obviousness by employing

"mere conclusory statements," but "must instead articulate specific reasoning, based on evidence of record" to support an obviousness determination. *Magnum Oil*, 829 F.3d at 1380–81. Petitioner also must articulate a reason why a person of ordinary skill in the art would have combined the prior art references. *NuVasive*, 842 F.3d at 1382.

At this final stage, we determine whether a preponderance of the evidence of record shows that the challenged claims would have been rendered obvious in view of the asserted prior art. We analyze the asserted grounds of unpatentability in accordance with these principles.

D. Level of Ordinary Skill in the Art

We review the grounds of unpatentability in view of the understanding of a person of ordinary skill in the art at the time of the invention. *Graham*, 383 U.S. at 17. Petitioner submits that the ordinarily skilled artisan would have

> knowledge roughly equivalent to the knowledge and/or training of a person holding the degree of Bachelor of Science in Mechanical Engineering, Biomedical Engineering or equivalent, and at least three to five years of practical experience (or comparable and/or equivalent education or training), including familiarity with the various medical devices and techniques for treating plaque buildup in blood vessel or body passages, such as balloon angioplasty, ablation, rotational atherectomy, lithotripsy.

Pet. 11; Ex. 1002 ¶¶ 63–66.

Patent Owner disagrees and contends that the level of ordinary skill in the art would have been a "multidisciplinary individual or team that included"

> i) at least one person with a medical degree and relevant clinical experience concerning the management of patients with vascular disease, and ii) at least one person with an electrical engineering, biomedical engineering or equivalent degree and at least two

> years of experience in the engineering, design, testing or development of catheter-based medical devices.

PO Resp. 4 (citing Ex. 2100 ¶ 3–14).

The parties' positions primarily differ in that Patent Owner suggests that a medical degree is required along with an engineering degree. Petitioner notes that none of the inventors of the '371 patent, a great majority of the inventors listed on the prior art asserted here or applied by the Examiner during prosecution, and Patent Owner's Vice President of Research and Development has a medical degree. Reply 5 (citing Ex. 1200 ¶¶ 12–15; Ex. 1216, 6:15–7:1, 10:10–13:18). However, Petitioner contends that three to five years of practical experience with medical devices and techniques for treating plaque buildup is needed. Pet. 11; Ex. 1002 ¶¶ 65–66. We consider Petitioner's stated level of experience to supply similar relevant knowledge to the medical degree that Patent Owner contends to be needed to attain a level of ordinary skill in the art.

For purposes of this Decision, and based on the record, we consider an ordinarily skilled artisan to possess skill attained by education via a bachelor's degree in mechanical, electrical, or biomedical engineering combined with knowledge of medical devices and techniques for treating plaque buildup in blood vessels that is attained either by education (a medical degree) or three to five years of practical experience. Further, we find that the prior art of record reflects the level of skill in the art at the time of the invention. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

Patent Owner contends, however, that "Dr. Jensen [ ] lacks a medical degree and relevant clinical experience and would not qualify as one skilled

in the art." PO Resp. 4–5. Patent Owner also criticizes Dr. Jensen for failing to understand certain concepts and figures in the prior art. *Id.*

We disagree with Patent Owner's contentions about Dr. Jensen's qualifications. Dr. Jensen holds a bachelor's degree in electrical engineering, master's degree in biomedical engineering, doctorates in medical science and medicine. Ex. 1002 ¶¶ 8–13, Appendix A (curriculum vitae). His doctorate of medicine (Dr.Med.) was awarded by the University of Aarhus School of Medicine in Denmark in 2008, and this degree is typically given only to medical doctors. Ex. 1200 ¶ 21. Furthermore, a declarant's expertise and experience need not match perfectly the experience and education of a person of ordinary skill in the art in order to provide testimony so long as there is an adequate relationship between the declarant's education and experience when compared to the claimed invention. *SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1373 (Fed. Cir. 2010). Accordingly, we find that Dr. Jensen is qualified to testify about the perspective of one of ordinary skill in the art at the time of the invention.

E. Overview of the Asserted Prior Art

1. Levy

Levy describes a device for removing "deposits which form on the interior walls of passages, and in particular the removal, by disintegration, of plaque deposits, or atheromas, which form on the inner walls of the blood vessels." Ex. 1003, 1.[17] Levy's device is shown in Figure 1 (substantively reproduced below).

[17] We, like Petitioner, refer to the page numbering of the translation of the Levy reference itself rather than exhibit page numbers.




Levy's Figure 1 is a cross-sectional view of an embodiment of Levy's device for removing deposits from blood vessel walls.

Levy's devices includes balloon 10 protruding from distal end 6 of catheter 8. *Id.* at 3. Convergent lens 16 on optical fiber 12 protrudes into balloon 10 from distal end 6 of catheter 8. Balloon 10 is inflated with, e.g., saline, supplied by liquid source 22 through a suitable liquid coupling within the bore of catheter 8. *Id.* Laser source 20 emits light energy that is carried into the saline within balloon 10 by optical fiber 12. *Id.*

A user of Levy's device inserts catheter 8 into vessel 2 next to deposit 4 with balloon 10 deflated and then inflates balloon 10 with saline until it contacts deposit 4. *Id.* Laser energy is pulsed into the liquid within balloon 10 to create cavitation as gas bubbles which implode and agitate the fluid to disintegrate deposit 4. *Id.* at 4. According to Dr. Jensen, an ordinarily skilled artisan understands that Levy's laser pulses create shockwaves that cause the disintegration of deposit 4. Ex. 1002 ¶ 116.

2. AAPA

The '371 patent labels and describes catheter 10 illustrated in Figure 1 (reproduced right) as "PRIOR ART." Ex. 1001, Figure 1.

FIG. 1
(PRIOR ART)



The Specification further describes Figure 1 as "a view of the therapeutic end of a typical prior art *over-the-wire* angioplasty balloon catheter 10. Such catheters are usually non-complaint with a fixed maximum dimension when expanded with a fluid such as saline." *Id.* at 3:66–4:2 (emphasis added). Although Figure 1 does not illustrate a guidewire, the Specification implies its presence when describing catheter 10 as being "over-the-wire."

FIG. 2




Figure 2, which illustrates the claimed catheter 20, also fails to illustrate a guidewire. *Id.* at Figure 2, 3:9–12. The Specification indicates that the guidewire is not shown but inserted through lumen 29 in carrier 21. *Id.* at 4:31–33. Although a carrier and lumen are not enumerated on Figure 1, similarities between Figures 1 and 2 imply, and we conclude, that Figure 1 illustrates a carrier and lumen that are essentially the same as carrier 21 and lumen 29 of Figure 2.

Accordingly, we consider the AAPA to demonstrate the knowledge of an ordinarily skilled artisan at the time of the invention that it was well known to configure an angioplasty balloon catheter as shown in Figure 1. That is, the AAPA demonstrates that it was well known for such a catheter to include a carrier with a balloon postioned near its distal end with the carrier protruding from the distal end of the balloon and a guidewire lumen extending through the carrier.

3. Mantell

Mantell is directed to "an invasive radially-firing electrohydraulic lithotripsy probe that creates a substantially annular shockwave for uses such as breaking up concretions that are at least semi-annular." Ex. 1004 ¶ 20.

> In one implementation, the EHL probes described below may be delivered to a proper channel of a heart by threading (or pre-loading) an EHL probe through a center lumen of a catheter or balloon device. The catheter may be threaded through appropriate veins or arteries to address concretions either forming in vessels or even in the valves of the heart or other organs.

*Id.* ¶ 21. One embodiment of Mantell's device is illustrated below.




*FIG. 2*

> Figure 2 is a cross-sectional side view of an embodiment of Mantell's electrohydraulic lithotripsy probe. *Id.* ¶ 4.

Distal portion 101 of probe 100 includes insulating body 102 surrounding electrodes 104, 106, which are positioned within balloon 118. *Id.* ¶¶ 23–29. Balloon 118 "encapsulates a liquid such as saline" and an arc between electrodes 104, 106 "causes a steam bubble in the liquid [that] . . . rapidly expands and contracts back on itself" to generate "a shockwave." *Id.* ¶ 29. That shockwave "radiates away from the lithotripsy tip 101 in a substantially radial manner such that the shockwave is at least semi-annular." *Id.*

IPR2019-00405
Patent 8,956,371 B2

4. Uchiyama

Uchiyama describes an arc-based shockwave generator within an inflated balloon as illustrated in Figures 1–7. Ex. 1005, 298–99.[18] We reproduce Figures 1 and 3(a)–(d) below from the translation of Uchiyama.




Drawing1




Drawing3

Figure 1 is a cross section view illustrating the balloon inflated and some of the internal elements of the lithotripsy probe. *Id.* at 300.

Figures 3(a)–(d) are cross section views illustrating the process of using the probe of Figure 1 in the urinary duct. *Id.*

Electrodes 3 are positioned near the distal end of tube 1 that includes tube 6 for inflating balloon 7 with fluid through opening 5. *Id.* at 298. Figures 3(a)–(d) illustrate advancing the probe in a urinary duct N to a position close to calculus S (Figure 3(a)), inflating balloon 7 so that it contacts calculus S (Figure 3(b)), and using arcs between electrodes 3 to generate shockwaves that break up calculus S (Figures 3(c) and (d)). *Id.* at 298–99. The optimal gap between electrodes 3 and calculus S for making the shockwaves most effective at breaking up calculus S is managed by controlling the degree to which balloon 7 is inflated. *Id.*; *see also id.* Figures 3(b) and (c). Uchiyama indicates that arcs are generated within

[18] We, like Petitioner, refer to the page numbering of the translation of the Uchiyama reference itself rather than exhibit page numbers.

balloon 7 "so that there is no risk that the electric discharge sparks hit a human tissue directly." *Id.* at 299. Uchiyama notes that arcs directly contacting human tissue may damage the tissue. *Id.* at 297.

5. Willneff

Willneff describes a "shock wave generator for medical applications with a spark gap located within a housing." Ex. 1006, 2.[19] We reproduce Willneff's Figure 1 at right, which is a schematic illustration of Willneff's catheter with a partial cross section view showing the configuration of tip 22. *Id.* at 9. Supply tube 8, return tube 10, and current feed 6 pass through sheath 12. *Id.* Balloon 18 is inflated and deflated with fluid supplied and controlled via tubes 8, 10. *Id.* A mechanical connection 20 between tip 22 and balloon 18 holds spark gap 16 in a fixed relationship with balloon 18. *Id.* Spark gap 16 is centered to avoid unintended tissue damage or burns. *Id.* at 5. The shock waves generated by arcs across spark gap 16 can remove concretions from the urinary tract. *Id.* at 4–5.




F. Claims 1–17: Obviousness in View of Levy, AAPA, and One of Mantell, Uchiyama, or Willneff, and in Further View of Various Other References for Certain Claims

Petitioner argues that claims 1–6, 11, 14–16 are unpatentable as obvious in view of the combined teachings of Levy, the AAPA, and any one

---

[19] We, like Petitioner, refer to the page numbering of the translation of the Willneff reference itself rather than exhibit page numbers.

of Mantell, Uchiyama, or Willneff. Pet. 13–42. Petitioner relies on one or more of the same references or additional references to argue that dependent claims 7–10, 12, 13, and 17 are also obvious. *Id.* at 34–43. For the reasons expressed below, Petitioner has demonstrated by a preponderance of evidence that claims 1–4 and 6–17 are obvious in view of the teachings of the asserted combinations of prior art. However, Petitioner has failed to demonstrate by a preponderance of evidence that claim 5 is obvious.

1. Independent Claim 1

a. Summary of Petitioner's Argument and Evidence

Petitioner relies upon Levy as describing most of the physical elements of the catheter of claim 1 (carrier 1a, balloon 1b, and shockwave generator 1c–e) except that Levy uses a laser to generate shockwaves instead of an electrical arc. Pet. 23–31 (citing Ex. 1003, 1, 3, Figure 1; Ex. 1002 ¶¶ 109–123). Petitioner also relies upon AAPA as evidence that an ordinarily skilled artisan considered it well known for a carrier to include a guidewire lumen (element 1a) and balloon (element 1b). *Id.* at 23–25 (citing Ex. 1001, 3:65–4:2, Figure 1; Ex. 1002 ¶¶ 109, 113). Petitioner argues that an ordinarily skilled artisan would have been motivated to substitute any one of the arc-based shockwave generators described by Mantell, Uchiyama, or Willneff for Levy's laser-based shockwave generator to save cost, reduce complexity, and reduce overheating risks. *Id.* at 28–29 (citing Ex. 1002 ¶ 120). Petitioner contends that an ordinarily skilled artisan would have considered arc generators and lasers to be interchangeable devices for generating shockwaves to disintegrate unwanted deposits within blood vessels. *Id.* (citing Ex. 1002 ¶ 120); *see also id.* at 19–21 (citing Ex. 1002 ¶ 98; Ex. 1012, 1:5–10; Ex. 1006, 3) (discussing similarity of laser- and arc-

based methods for generating shockwaves to remove unwanted deposits within the body).

Petitioner persuades us by preponderance of evidence that the combined teachings of Levy and one of Mantell, Uchiyama, and Willneff along with the background knowledge reflected in the AAPA render claim 1 unpatentable as obvious. We address Patent Owner's arguments otherwise below.

b. Whether Levy's Balloon Is an Angioplasty Balloon

Petitioner relies upon Levy as describing an angioplasty balloon near a distal end of the carrier and AAPA as describing the distal end of the balloon being sealed to the carrier. Pet. 25–26 (citing Ex. 1001, 3:65–4:2, Fig. 1; Ex. 1003, 4, Fig. 1; Ex. 1002 ¶¶ 113, 114). Patent Owner argues that Levy fails to describe an angioplasty balloon because Levy's balloon "does not displace plaque into the vessel wall in order to widen the lumen of the vessel." PO Resp. 20 (citing Ex. 2100 ¶¶ 55–58, 163–170). Rather, Patent Owner contends that Levy "removes" plaque through "erosion" and "disintegration." *Id.* (citing Ex. 1003, 3, 6; Ex. 2100 ¶¶ 163–170).

Patent Owner's argument is unpersuasive in rebutting Petitioner's showing that the prior art describes the claimed angioplasty balloon for two reasons. First, even accepting Patent Owner's description of Levy as using "erosion" and "disintegration" to remove plaque from the wall of an artery, such processes still widen a narrowed or obstructed blood vessel by removing "plaque deposits, or atheromas, which form on the inner walls of the blood vessels." Ex. 1003, 1. Such widening through ablation is within the scope of "angioplasty balloon" as we have interpreted the term. *See* Part II.A.1 above. Second, Patent Owner's argument fails to address Petitioner's

showing, Pet. 25, that the AAPA describes an angioplasty balloon. *See* PO Resp. 20–22 (addressing only whether Levy describes claimed "angioplasty balloon").

Based on our review of the record, Petitioner persuades us by a preponderance of evidence that Levy and the AAPA each describe the claimed angioplasty balloon.

c. Whether Levy's Balloon Includes a Shockwave Generator

Petitioner contends that Levy's laser-based device generates shockwaves inside the balloon without touching the balloon, which remains intact during formation of the shockwaves. Pet. 26–30 (citing Ex. 1003, 3, Fig. 1; Ex. 1021 ("Levy '227"),[20] 3:58–61; Ex. 1002 ¶¶ 116, 121, 122). Patent Owner contends that Levy fails to describe a "shockwave generator" because Levy refers only to "cavitation bubbles" that lead to "vigorous agitation" that causes disintegration of the plaque deposits. PO Resp. 22. Patent Owner concedes that Levy '227 refers to shockwaves, but argues that Levy '227 describes using shockwaves only within a tooth canal and not within a blood vessel. *Id.* at 22–24 (citing Ex. 2100 ¶¶ 55–58). We disagree.

Levy indisputably incorporates Levy '227 by reference as describing the laser used within Levy's balloon (Ex. 1003, 3, 5), and we, therefore, consider Levy '227 to be part of Levy for our analysis. Levy '227 first describes that its laser generates an "implosion" of gas bubbles within a tooth canal that results in "shockwaves" that detach debris from the walls of the canal. Ex. 1021, 3:39–42. Levy '227 later indicates that the same

[20] Exhibit 1021 is U.S. Patent 5,116,227, also to Levy, which is incorporated by reference into Levy. Ex. 1003, 3.

technique can clean blood vessels by removing "plaque deposits, or atheromas." *Id.* at 4:37–5:2; *see also* 2:12–33 (describing cavitation-based implosions as cleaning tooth canals and blood vessels among other body passages).

Patent Owner also argues that Levy's description of cavitation bubbles refers to the generation of "hydraulic or acoustic" waves rather than shockwaves. PO Resp. 23–24 (citing Ex. 2105 ("de la Torre"), 3:25–52; Ex. 2100 ¶¶ 55–58). Patent Owner supports its argument with Dr. Berger's analysis of de la Torre's description of the manner in which it uses a laser to create cavitation bubbles that avoid creating shockwaves. *Id.* (citing Ex. 2105, 3:25–52). We discount Dr. Berger's testimony and de la Torre's disclosure because they are inconsistent with Levy's express description of using its laser to generate cavitation bubbles within a balloon to create shockwaves as we find immediately above. *See* Ex. 1003, 3, 5 (incorporating description of the laser of Levy '227 as laser used in its balloon); Ex. 1021, 2:12–33, 3:39–42, 4:37–5:2 (expressly describing using laser to generate cavitation bubbles leading to shockwaves).

Petitioner also relies upon each of Mantell, Uchiyama, and Willneff as describing an arc generator that creates shockwaves between electrodes positioned within a balloon as claimed. Pet. 26–30 (citing Ex. 1004 ¶¶ 21, 24, 29, Figs. 1, 2, 5–7; Ex. 1005, 298, Figs. 1–7; Ex. 1006, 5, 10, Figs. 1–3; Ex. 1002 ¶¶ 117–119). Patent Owner does not respond to Petitioner's showing that each of these three references describes using arcs between electrodes within a balloon to generate shockwaves. PO Resp. 20–24 (arguing only that Levy does not describe generating shockwaves inside a balloon).

For the reasons above, Petitioner persuasively demonstrates by a preponderance of evidence that each of Levy, Mantell, Uchiyama, and Willneff describes generating shockwaves within a balloon, with Levy using a laser and the other references using electrical arcs between electrodes to do so.

d. The Nature of Petitioner's Reliance on AAPA

Neither party has requested briefing on the effect of the *Qualcomm* decision or the Updated AAPA Guidance. Under the Updated AAPA Guidance, "'patents or printed publications' that form the 'basis' of a ground for *inter partes* review must themselves be prior art to the challenged patent' and not the challenged patent itself or any admissions therein." Updated AAPA Guidance, 2 (citing *Qualcomm*, 24 F.4th at 1374). "[B]ecause admissions are not prior art and therefore cannot form the basis of an IPR, it is 'impermissible for a petition to challenge a patent relying on solely AAPA without also relying on a prior art patent or printed publication.'" *Id.* (quoting *Qualcomm*, 24 F.4th at 1377).

In every challenge to a claim in this proceeding, Petitioner relies upon one or more of Levy, Mantell, Uchiyama, Willneff, Hayes, Duchamp, Naimark, and Beyar, all of which are prior art patents or printed publications. Pet. 4–6. Accordingly, based on the Updated AAPA Guidance, Petitioner's reliance on AAPA is not the "basis" of its challenges. Rather, we determine that Petitioner has relied upon AAPA as demonstrating the background knowledge possessed by a person of ordinary skill in the art at the time of the invention that angioplasty catheters were conventionally inserted into a patient along a guidewire that passes through a lumen in the

catheter. Pet. 23–24 (citing Ex. 1001, 3:65–4:2 and referring to Healy (Exhibit 1047) and Hayes (Exhibit 1007)).

In its Opening Brief on Rehearing, Petitioner cites specific portions of Healy and Hayes supporting its position that the general structure of an angioplasty catheter as claimed was well known and part of the background knowledge of an ordinarily skilled artisan. RH Brief 2–4. Patent Owner argues that these citations to specific portions of Healy and Hayes are untimely and should not be considered. RH Sur-reply 1–3. Although we agree that Petitioner did not provide the specific citations to Healy and Hayes in the Petition, the proposition for which Petitioner cited Healy and Hayes, the well-known configuration of an angioplasty catheter, was apparent on the face of Healy and Hayes. Moreover, we find Petitioner's citation to the AAPA as evidence of the knowledge of an ordinarily skilled artisan is sufficient even without the additional support provided by Healy and Hayes.

For all these reasons, we view Petitioner's use of AAPA in its challenges to be a proper use of evidence demonstrating the background knowledge of an ordinarily skilled artisan.

e. Motive to Combine Teachings of the Prior Art

i. Whether EHL Probes[21] Would Have Been Considered Too Dangerous to Use in Blood Vessels

Patent Owner argues that danger to healthy tissue stemming from using EHL-generated shockwaves within blood vessels would have prevented an ordinarily skilled artisan from being motivated to incorporate

---

[21] Mantell and the parties refer to electrohydraulic lithotripsy probes as "EHL probes." Ex. 1004 ¶ 21; Pet. 1; PO Resp. 1.

the EHL probes of Mantell, Uchiyama, or Willneff into Levy's balloon. PO Resp. 24–44.

Patent Owner relies primarily upon Chernenko (Ex. 2046) as proving that EHL-generated shockwaves cannot be used safely within 5 mm of "soft tissues" such as the walls of a blood vessel. *Id.* at 24–25 (citing Ex. 2046 ¶ 11). Chernenko relates to a lithotripsy device for breaking calcified stones in the urinary system. Ex. 2046 ¶ 1. Chernenko's admonition against using EHL devices within 5 mm of soft tissue appears in its description of known devices. *See id.* ¶ 11 (in Background of the Invention section). Chernenko indicates that at least one prior art device includes a nozzle to direct shockwaves to a focal point. *Id.* ¶ 13. Dr. Berger relies heavily upon Chernenko's broad statements about other prior art that 5 mm is as close as an EHL probe can be located to soft tissue without damaging it and that shielding is necessary to focus shockwave energy. Ex. 2100 ¶¶ 32–38 (citing Ex. 2046 ¶¶ 11, 13, 88, Fig. 6).

We discount Dr. Berger's conclusions about the minimum safe distance between EHL probes and healthy tissue for two reasons. First, Chernenko advises that its EHL probe should be moved closer to its target such that at least one and preferably both electrodes directly contact the stone to be broken to ensure that arcing passes through the target stone. *Id.* ¶¶ 89–91, 105, Figs. 6b, 6c, 7a–d, 8a. Second, none of the other prior art summarized by Chernenko places an EHL probe inside a balloon or forms part of Petitioner's proposed combination. Chernenko and the prior art that it discusses relates to intracorporeal EHL probes that are not placed within balloons. *Id.* ¶¶ 1–13. Although Chernenko claims that its device can be used for "fragmentation of any foreign object[], which might appear in other

locations of the body, e.g. in blood vessels etc.," *id.* ¶ 3, Chernenko never provides any further details on how so, *see generally id.*

Petitioner persuasively argues that:

> "The prior art must be considered ***as a whole*** for what it teaches." *Medichem, S.A. v. Rolabo*, 437 F.3d 1157, 1166 (Fed. Cir. 2006); *In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991). Although a reference teaches away from the claimed invention when it "suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant" (*id.*, at 1165 (citing *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994)), there is no rule "that a single reference that teaches away will mandate a finding of nonobviousness" (*Medichem*, 437 F.3d at 1165; *In re Dome Patent*, 799 F.3d 1372, 1381 (Fed. Cir. 2015)).

Reply 19. Each of Mantell, Uchiyama, and Willneff generates shockwaves within a balloon that are used to erode an unwanted deposit within a cavity of the body. Pet. 26–30 (citing Ex. 1004 ¶¶ 21, 24, 29, Figs. 1, 2, 5–7; Ex. 1005, 298, Figs. 1–7; Ex. 1006, 5, 10, Figs. 1–3; Ex. 1002 ¶¶ 117–119). Furthermore, Petitioner establishes that Levy generates shockwaves within an angioplasty balloon using a laser rather than electrodes. *See* Parts II.F.1.b–c above.

At most, Chernenko is relevant through its summary that the Canadian counterpart (Ex. 2102) to Bhatta (Ex. 1012) describes focusing shockwaves emanating from an EHL probe to increase the effectiveness of the device. Regarding safety, Bhatta suggests that damage to healthy tissue may result from direct impact of plasma generated by an EHL spark or laser or inadvertent puncturing by sharply pointed laser delivery fiber. Ex. 1012, 1:46–51. Bhatta comments that its nozzle 30 shapes shockwaves toward a focal point while also protecting surrounding tissue from problems associated with tip impacts and damaging effects of plasma. *Id.* at 3:22–25,

3:48–4:6. On balance, we find Patent Owner's argument that Chernenko forecloses any motivation to incorporate the EHL probes of Mantell, Uchiyama, or Willneff into Levy's angioplasty balloon unpersuasive.

ii. Petitioner's Alleged Motives to Replace Levy's Laser with an EHL Probe from Mantell, Uchiyama, or Willneff

Petitioner, through Dr. Jensen's testimony, contends that an ordinarily skilled artisan would have been motivated to substitute an EHL shockwave generator such as those described in Mantell, Uchiyama, or Willneff for Levy's laser-based shockwave generator for three reasons, including: (1) reducing complexity, (2) reducing cost and (2) generating less heat, which Levy recognized as an issue with its laser-based shockwave generator. Pet. 28 (citing Ex. 1002 ¶ 120). We analyze each reason below and conclude that Petitioner has proven by a preponderance of evidence that an ordinarily skilled artisan would have been motivated for at least two reasons (reducing cost and complexity) to substitute an EHL shockwave generator for Levy's.

a) Complexity

Patent Owner argues that we should disregard Dr. Jensen's testimony that EHL systems are less complex than laser-based systems because he fails to cite objective evidence in support. PO Resp. 53. Patent Owner also argues, based on testimony from Dr. Berger and Dr. Jensen, that creating shockwaves using the sparks of EHL devices is "complicated" and not well understood. PO Resp. 54 (citing Ex. 2100 ¶¶ 138–139; Ex. 2156, 70:4–6, 83:13–14). Patent Owner, based on testimony from Dr. Berger, further argues that "electrical connections" of EHL systems are "more complex than the simple optical fiber technology of Levy." PO Resp. 54 (citing Ex. 2100 ¶ 140). The cited testimony from Dr. Berger fails to support the proposition

for which Patent Owner cites it because it wholly fails to express any opinion about the circuitry that drives EHL or laser-based shockwave generators. Petitioner responds that the physics of spark formation are not claimed and that circuits for reliably creating sparks are well known. Reply 32 (citing Ex. 1200 ¶ 138).

Based on our review of the record, we determine that Petitioner has proven by a preponderance of evidence that an ordinarily skilled artisan would have been motivated to substitute an EHL probe for a laser lithotripsy probe to reduce complexity.

b) Cost

Petitioner contends that using a "laser to generate shockwave energy is well known to be expensive — approximately 10 times more expensive than a system employing electrohydraulic (i.e., pair of electrodes) system to generate shockwaves." Ex. 1002 ¶ 95. During his deposition, Dr. Jensen stated that his opinion was based upon a journal article. Ex. 2111, 61:8–17 (identifying Huang article (Ex. 2157)).

Patent Owner does not dispute that Huang concludes that laser-based lithotripsy systems are greater than ten times more expensive to use than EHL systems, but rather argues that Huang's conclusion is improperly based upon total system costs including capital and maintenance costs. PO Resp. 56. Patent Owner argues, based on Dr. Berger's testimony, that comparing cost "at a catheter level" (i.e., the cost of the catheter alone) is more appropriate. *Id.* (citing Ex. 2100 ¶ 144). Dr. Berger fails to cite evidence to support his opinion or state how much more expensive and EHL catheter would be than a laser lithotripsy catheter. Ex. 2100 ¶ 144.

By contrast, Huang explains the basis of its cost analysis to conclude that the cost per case of using EHL is $336 versus $4,220 for laser-based lithotripsy. Huang explains:

> The large discrepancy in costs can be ascribed not only to the large initial capital outlay for the Candela LaserTripter, but also to the substantial amount that must be spent yearly on maintenance and supplies. Indeed, this yearly cost of the LaserTripter is more than the capital cost of the EHL machine. In effect, a new EHL machine could be purchased each year we operate the LaserTripter.

Ex. 2157, 238.[22] Huang also includes a table summarizing the costs by category that reflects the amortized costs of the probes (i.e., "fibers") per case that reveals that laser probes are almost five times more expensive per case than EHL probes. *Id.* at 239. Based on our review of Huang, we find that the analysis fairly reflects the comparative operating cost per case for each type of system.

Patent Owner also criticizes Dr. Jensen's reliance upon Huang's analysis because the comparatively poor safety of EHL versus laser lithotripsy outweighs the cost savings. PO Resp. 57–58. Patent Owner quotes Huang, *id.* at 57, which states that "[t]he perforation rates of lasertripsy are 1% to 12%, whereas that of EHL has been shown to be as high as 17% to 25%." Ex. 2157, 237. Huang's statement describes the safety of prior versions of EHL, however, not the EHL probe that Huang analyzed, which Huang described as "similar in freedom from significant complications" to the laser lithotripsy devices that were studied. *Id.* at 238. Huang also concludes that "EHL can be used safely for distal ureteral stones

[22] We cite the native page numbers reflected in Huang rather than the exhibit page number.

and is more cost effective than lasertripsy." *Id.* at 239. Huang recognized that the EHL and laser lithotripsy "modalities have inherent advantages and disadvantages." *Id.* However, if a hospital "must choose one lithotripter," the "EHL unit with the smaller-caliber probes would be the logical choice, because this is a safe, effective, and cost effective modality." *Id.*

Based on our review of the entire record, Petitioner has proven by a preponderance of evidence that an ordinarily skilled artisan would have been motivated to substitute an EHL probe for a laser lithotripsy probe to save cost.

c) Reduce Heat

Petitioner contends that Levy itself identifies heat generated by its laser as enough of a concern that its balloon could be cooled by circulating liquid through the balloon. Pet. 18, 29 (citing Ex. 1002 ¶¶ 96, 120); Reply 31 (citing Ex. 1003, 3–5). However, Petitioner fails to adduce evidence that an EHL shockwave generator produces less heat than a laser-based shockwave generator such as Levy's. Accordingly, we determine that Petitioner has failed to prove by a preponderance of evidence that an ordinarily skilled artisan would have been motivated to substitute an EHL probe for Levy's laser probe to reduce heat generated by the probe.

iii. Motive to Incorporate a AAPA Guidewire and Sealing Arrangement into Levy

On the merits, no dispute exists that an angioplasty balloon catheters having a guidewire extending through a carrier to which the angioplasty balloon is sealed near its distal end were well known. The '371 patent labels such an arrangement "PRIOR ART" as shown in Figure 1,

FIG. 1
(PRIOR ART)



reproduced at right. Although the guidewire is not shown in Figure 1 or any figure illustrating the claimed invention, the Specification describes Figure 1 as illustrating "a typical prior art over-the-wire angioplasty balloon catheter 10." *Id.* at 3:66–67; *see also id.* 4:31–33 (describing guidewire not shown in Figure 2 illustration of invention).

Petitioner relies upon Figure 1 of the '371 patent and its accompanying text as constituting AAPA reflecting the background knowledge of an ordinarily skilled artisan at the time of the invention. Pet. 23–25 (citing Ex. 1001, 3:65–4:2, Fig. 1; Ex. 1002 ¶ 113). Petitioner bolsters its showing by noting that a similar arrangement is also shown in other prior art, Healy (Ex. 1047). *Id.* Prior art of record confirms that the arrangement of a balloon sealed near the distal end of a carrier with a longitudinal lumen through which a guidewire extends was well known. Ex. 1008 ¶¶ 21–22, Figs. 1–3; Ex. 1047, Abstract, 3:17–27, Fig. 2; Ex. 1268 ("Lennox"), 4:63–5:8; Figs. 1, 3; Ex. 2110, 3:26–51, Figs. 2, 3. The prosecution history of the '371 patent confirms the same. The Examiner found that the prior art taught the claimed structural arrangement between the balloon, carrier, and guidewire, Ex. 1013, 304 (applying Lennox), and Patent Owner did not contest the Examiner's finding, *id.* at 290–297.

Petitioner argues that it was known to an ordinarily skilled artisan to use a guidewire extending through an elongated bore to assist a physician to navigate the catheter to reach the area for treatment. Pet. 24 (citing Ex. 1002 ¶ 112). Petitioner also argues that it would have been obvious to "implement the AAPA with the angioplasty balloon described in Levy" as a "routine design choice" because the arrangement was "the most common

angioplasty catheter and balloon design, with predictable and expected results." Pet. 26 (citing Ex. 1002 ¶ 115).

Patent Owner argues that Petitioner did not establish that an ordinarily skilled artisan would have been motivated to modify Levy by incorporating the guidewire extending through the carrier as described by the AAPA. PO Resp. 59–62. Patent Owner also argues that Petitioner failed to establish that an ordinarily skilled artisan would have been motivated to modify Levy to seal its balloon near the distal end of Levy's catheter as described by the AAPA. *Id.* at 62–63.

In response to both arguments, Petitioner points out that an ordinarily skilled artisan would understand Levy to be adapted for angioplasty procedures. Reply 34 (citing Ex. 1002 ¶¶ 114, 156; Ex. 1003, 5 ("[T]he balloon may have the shape of a balloon of the kind that is used with catheters used to perform treatments in [b]lood vessels."); Ex. 1200 ¶ 142). Petitioner also contends, based on testimony of Dr. Jensen, that an ordinarily skilled artisan

> looking to adapt Levy's catheter and/or balloon design to increase the types of treatments Levy could perform, would have been motivated to look to other catheters/balloons used to perform treatments in blood vessels, including the AAPA—i.e., the "most common angioplasty catheter and balloon design" as Dr. Jensen described in his original declaration.

Reply 34 (citing Ex. 1002 ¶¶ 115, 157). Petitioner also argues that configuring Levy according to well-known principles reflected by the AAPA "would have been a routine design choice well within the [artisan's] skill set and would have yielded predicable results." *Id.* (citing Ex. 1002 ¶¶ 115, 157; *KSR*, 550 U.S. 398 at 416).

In its Sur-reply, Patent Owner argues that Dr. Jensen's testimony is insufficient because he fails to explain how or why an ordinarily skilled artisan would have modified Levy's catheter. Sur-reply 31–32. However, we find this argument unpersuasive because the prior art and prosecution history of the '371 patent indisputably establishes that the configuration of an angioplasty catheter with a balloon sealed to the distal end of a carrier through which a guidewire extends was so well known. Ex. 1001, 3:65–4:2, Fig. 1; Ex. 1008 ¶¶ 21–22, Figs. 1–3; Ex. 1047, Abstract, 3:17–27, Fig. 2; Ex. 1268, 4:63–5:8; Figs. 1, 3; Ex. 2110, 3:26–51, Figs. 2, 3; Ex. 1013, 290–297, 304.

For all the reasons identified by Petitioner above and the testimony by Dr. Jensen, we find that Petitioner has proven by a preponderance of evidence that an ordinarily skilled artisan would have had motive to combine teachings of Levy with the background knowledge reflected in the AAPA to arrive at the claimed configuration of the balloon sealed near the distal end of a carrier through which a guidewire extends.

f. Reasonable Expectation of Success

Petitioner contends that an ordinarily skilled artisan would have understood how to substitute an EHL shockwave generator from Mantell, Uchiyama, or Willneff for Levy's laser-based shockwave generator because electrodes and lasers were known and interchangeable alternative mechanisms for generating shockwaves. Pet. 1–2 (citing Ex. 1012), 19–20 (citing Ex. 1012, 1:5–10, 1:15–30, Ex. 1002 ¶ 98), 28–29 (citing Ex. 1002 ¶ 120). Patent Owner contends that an ordinarily skilled artisan would not have reasonably expected to successfully substitute electrodes of Mantell,

Uchiyama, or Willneff for Levy's laser for four reasons. PO Resp. 44–53. We address each reason below.

i. Whether EHL and Laser Lithotripsy Are Known Alternatives

Patent Owner argues that Dr. Jensen wrongly concludes that Levy's laser generate shockwaves in the same manner as electrodes. PO Resp. 44–45. More specifically, Patent Owner argues that Levy does not generate shockwaves at all, but merely generates "less powerful and harmful acoustic waves." *Id.* at 45 (citing Ex. 2100 ¶ 131). For the reasons expressed in Part II.F.1.c above, we disagree and find that Petitioner has proven by a preponderance of evidence that Levy, Mantell, Uchiyama, and Willneff all generate shockwaves in the same manner, by creating cavitation bubbles in the fluid whose collapse creates shockwaves.

Patent Owner also argues that Bhatta does not establish that lasers and electrodes are known interchangeable alternatives for generating shockwaves. *Id.* at 45–46. More specifically, Patent Owner contends that Bhatta refers to waves generated by lasers as "stress waves" but waves generated by electrodes as "shockwaves." *Id.* (citing Ex. 1012, 1:17–18, 2:5–11; Ex. 2100 ¶¶ 46, 55–58). Patent Owner's argument is unpersuasive because we see no meaningful distinction drawn by Bhatta between "stress waves" and "shockwaves." Bhatta expressly equates laser and electrodes as mechanisms for breaking biliary calculi when it explains that: "Electrohydraulic lithotripsy and laser lithotripsy systems frequently are used to fragment urinary and biliary stones. Both systems utilize plasma-induced stress waves to fragment calculi." Ex. 1012, 1:16–19. Furthermore, when Bhatta describes its own electrode-based invention, it sometimes refers to the electrodes as generating "energy pulse waves," which Bhatta equates

with "shockwaves." *Id.* at 2:5–11, Abstract. Patent Owner's argument that Bhatta's choice of "stress" or "shock" refers to different types of waves is simply not supported by Bhatta considered as a whole. Bhatta also expressly states that its device is suited for treating arteriosclerotic plaque. *Id.* at 1:5–9. We find that the record establishes that an ordinarily skilled artisan would have understood lasers and electrodes to be alternative forms of generating shockwaves for treating plaque in vessels.

ii. Whether an Artisan Would Have Expected Electrodes to Burst the Angioplasty Balloon

Patent Owner argues that an ordinarily skilled artisan would have expected an EHL probe placed in an angioplasty balloon to fail by bursting the balloon. PO Resp. 46–51. Patent Owner relies primarily upon testimony from Dr. Berger and his review of other evidence including declarations from other witnesses and objective evidence. *Id.* (citing Ex. 2100 ¶¶ 148–161 (citing Ex. 2033, 3[23] ("Zhong"); Ex. 2048; Ex. 2111; Ex. 2115; Ex. 2117; Ex. 2118; Fig. 5; Ex. 2119; Ex. 2170; Ex. 2173; Ex. 2174; Ex. 2175)). Dr. Berger's opinion rests upon his understanding that EHL steam bubbles create "peak pressures of 50-250 ATM" (Ex. 2100 ¶ 154 (citing Ex. 2033, 5, Fig. 8)), which exceed typical burst pressures of angioplasty balloons of "around 25–30 ATM" (Ex. 2100 ¶ 153 (citing Ex. 2048, 2; Ex. 2111, 162:14–163:5; Ex. 2115, 4, Table 2)).

Petitioner responds that Dr. Berger's testimony is inconsistent with the teachings of the prior art that Petitioner cites as a basis for its challenge because each of Mantell, Uchiyama, and Willneff describes using an EHL

---

[23] Our citations refer to the exhibit page number rather than Zhong's internal numbering.

probe within a balloon without bursting the balloon. Reply 27. Petitioner also notes that Willneff explains that steep pressure spikes pass through the balloon and healthy tissue to act upon target concretions. *Id.* at 28 (citing Ex. 1006, 4[24]); *see also* Ex. 1006, 7. Petitioner also points out that Dr. Berger's reliance on testimony from Drs. Soukas, Kereiakes, and Armstrong expressing skepticism that Patent Owner's device would work without bursting the balloon is flawed for three reasons. Reply 28. More specifically, Petitioner argues that: (1) Drs. Soukas, Kereiakes, and Armstrong are not proven to be ordinarily skilled artisans, (2) they did not review the '371 patent or the asserted prior art, and (3) their skepticism has not been shown to have existed at the time of invention. *Id.*

Based on our review of the entire record, Petitioner persuades us that an ordinarily skilled artisan would have had a reasonable expectation that substituting an EHL probe as taught by Mantell, Uchiyama, or Willneff for Levy's laser probe would not have burst Levy's balloon.

iii. Whether the Proposed Combination Results in an Unacceptably Large Balloon Diameter

Patent Owner argues, based on Dr. Berger's testimony, that an ordinarily skilled artisan would have expected that adding electrical components to the interior of the angioplasty balloon described in the AAPA would be unsuccessful because it would increase the diameter of the balloon. PO Resp. 51–52 (citing Ex. 2100 ¶¶ 121, 133, 150, 151, 171–173). We discount Dr. Berger's testimony because it is: (1) poorly supported by objective evidence (citing no evidence of the size of EHL, ultrasound, or

---

[24] Our citations to Willneff refer to Willneff's internal numbering rather than the exhibit page number.

laser-based angioplasty devices in the prior art), (2) is inconsistent with the express teachings of at least Levy (Ex. 1003, Fig. 1), O'Boyle (Ex. 2109, 3:20–21, 3:53–62), O'Connor (Ex. 2110, 3:36–57), and Bhatta (Ex. 1012, 2:52–3:11, Fig. 1), which all describe devices used to treat blood vessels that include probes inside a balloon, and (3) based upon a flawed legal premise that demonstrating obviousness requires proof that one device may be bodily incorporated into another.

Based on our review of the entire record, Petitioner persuades us that an ordinarily skilled artisan would have expected to succeed at placing an EHL probe inside a balloon without resulting in an acceptably large diameter of the balloon.

iv. Whether the Proposed Combination Would Lead to Restenosis and Embolism

Patent Owner contends, based on Dr. Berger's testimony, that an ordinarily skilled artisan would have feared that placing a shockwave generator inside an angioplasty balloon would "likely have result[ed] in embolism" and "lead to restenosis caused by thermal damage." PO Resp. 52–53 (citing Ex. 2100 ¶¶ 174–176, 206). Petitioner points out that balloon angioplasty without a shockwave generator includes a low risk of embolism and contends that an ordinarily skilled artisan would expect a similarly low risk using a balloon with a shockwave generator. Reply 29–30 (citing Ex. 1200 ¶ 133). Petitioner also points out that a saline-filled balloon would protect the patient from thermal damage. *Id.* at 30 (citing Ex. 1200 ¶ 133).

Both Dr. Berger and Dr. Jensen appear to draw their respective conclusions without any objective evidence to support them. *See* Ex. 2100 ¶¶ 174–176, 206; Ex. 1200 ¶ 133. O'Boyle and O'Connor from the prior art

also express concerns about embolism associated with balloon angioplasty. Ex. 2109, 1:32–43; Ex. 2110, 1:14–20. We also note that a risk of embolism is present even in Patent Owner's commercial device. *See* Ex. 2028, 3 (listing "Emboli (air, tissue, thrombus, or atherosclerotic emboli" and stating that "[p]ossible adverse effects are consistent with standard angioplasty"). Therefore, because embolism is a generalized concern with all balloon angioplasty, we fail to see why an ordinarily skilled artisan would have believed no reasonable chance of success existed if the prior art teachings were combined as proposed by Petitioner.

Regarding restenosis from thermal damage, Levy refers to the saline in its balloon as "coolant," which can be circulated or may be of low enough temperature or high enough heat absorption capacity to address any concern about damaging the vessel with excessive heat. Ex. 1003, 4–5. Moreover, even if we were to credit Patent Owner's proof, we do not consider the alleged concern to be of the type that would obviate Petitioner's motivations to substitute the EHL devices of Mantell, Uchiyama, or Willneff for Levy's laser probe. Our reviewing court has recognized that a given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate any or all reasons to combine teachings. *See Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000) ("The fact that the motivating benefit comes at the expense of another benefit, however, should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another. Instead, the benefits, both lost and gained, should be weighed against one another.").

We determine that Petitioner has demonstrated that an ordinarily skilled artisan would have reasonably believed that Petitioner's proposed combination of teachings from the prior art would be successful.

g. Objective Indicia of Nonobviousness

i. Nexus

Patent Owner argues, based solely upon testimony of Dr. Berger, that it has proven that it is entitled to a presumption of nexus between the claimed invention and all objective evidence of non-obviousness because "the claims" are "essentially coextensive with the Shockwave IVL system." PO Resp. 68–69 (citing Ex. 2100 ¶ 201). Dr. Berger's cited testimony states:

> The claims are also not merely directed to a small component of a larger system; rather, they are directed to the essence of the innovation that was identified by analysts as one of the major drivers of Shockwave's success. The analysts identified Shockwave's "elegant," "easy-to-use," "unique" and "innovative" technology as one of the most important factors in Shockwave's stock performance.

Ex. 2100 ¶ 201. Dr. Berger does not link the claims to the structure of Patent Owner's commercial device in this testimony. Rather, he links the claims to "the essence of the innovation" and the "major drivers of [Patent Owner's] success." *Id.* Dr. Berger's immediately preceding paragraph reflects his comparison of the claims to Patent Owner's commercial product. *Id.* ¶ 200. We interpret Patent Owner to have intended to cite paragraph 200 of Dr. Berger's testimony.

Petitioner appears to have interpreted Patent Owner's argument the same way. *See* Reply 36 (referring to Dr. Berger's testimony as ¶ 200 as the evidence of nexus). Petitioner contends that Dr. Berger cannot render an

opinion that the claims cover Patent Owner's Shockwave IVL[25] product because he has seen only photos of the Shockwave IVL, does not know who prepared the claim chart that appears in his Declaration, and merely reviewed written materials to verify that the words and pictures appearing in the chart were present in the cited documents. *Id.*

Patent Owner bears the burden of establishing that a nexus exists "between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019)). Patent Owner is entitled to a rebuttable presumption of nexus "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)); *see also Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 32 (PTAB Jan. 24, 2020) (Final Written Decision) (precedential). "A patent claim is not coextensive with a product that includes a 'critical' unclaimed feature that is claimed by a different patent and that materially impacts the product's functionality . . . ." *Fox Factory*, 944 F.3d at 1375. Nevertheless, even if a patentee fails to demonstrate a presumption of nexus, it may directly establish a nexus between the claimed invention and the objective evidence of non-obviousness. *Id.* at 1378. The patentee bears the burden of directly proving such a nexus. *Id.*

Based on our review of Dr. Berger's testimony about the "claim chart" appearing in his Declaration, we find that Patent Owner fails to prove

---

[25] IVL refers to intravascular lithotripsy. Ex. 2100 ¶ 190.

by a preponderance of evidence that "the Shockwave IVL devices include each feature recited in the claims" as Dr. Berger opines. Ex. 2100 ¶ 200. First, the claim chart does not include any claim language at all. *Id.* Rather, it merely refers to claim language using shorthand [1a]–[1e], which the parties use in their briefing. *Id.* However, Dr. Berger never explains his understanding of what that shorthand means. *See generally*, Ex. 2100.

More importantly, based on our own review of the chart, many details of the claimed invention are left unaddressed. For example, the chart fails to address expressly whether the Shockwave IVL devices include:

> a "distal end of the balloon being sealed to the carrier near the distal end,"
>
> a "proximal end of the balloon defining an annular channel arranged to receive a fluid therein that inflates the balloon,"
>
> a "pair of electrodes," or
>
> the "arc generator generating a high voltage pulse sufficient to create a plasma arc between the electrodes resulting in a mechanical shock wave within the balloon."

*Compare* Ex. 2100 ¶ 200 (descriptions in claim chart), *with* Ex. 1001, 6:21–39 (claim 1). We have reviewed the entirety of the evidence cited in the chart and found that none of it ever refers to "electrodes," "arc," or "plasma." The evidence adduced by Patent Owner simply fails to carry its burden of persuasion that the claims cover its product, much less that the two are sufficiently coextensive to be entitled to a presumption of nexus. Nevertheless, for purposes of the analysis below, we will assume *arguendo* that Patent Owner has demonstrated that the claims cover its commercial product and some degree of nexus exists between its objective evidence of nonobviousness and the claimed features.

ii. Long Felt Need

Patent Owner contends that its device, Shockwave IVL, filled a long felt need for a device that could effectively treat medial calcified lesions. PO Resp. 69–75. Patent Owner supports its argument with testimony from Dr. Berger (Ex. 2100 ¶¶ 190–203) and testimony from clinicians, Drs. Kereiakes (Ex. 2174), Lyden (Ex. 2171), Hill (Ex. 2172), Soukas (Ex. 2170), and Armstrong (Ex. 2173), and statements appearing in documents distributed by financial analysts at Wells Fargo (Exs. 2003, 2004, 2016, 2017). PO Resp. 69–75. Dr. Berger relies on many of the same items of evidence but also considers journal articles. We analyze each type of evidence below.

a) Clinicians' Testimony

Dr. Kereiakes explains that medial plaque occurs within the walls of arteries and can "cause narrowing of the lumen of the artery" and opines that "there has been no known way to treat a medial calcified lesion." Ex. 2174 ¶ 9. Dr. Lyden testifies that "medial calcified lesions" prevented angioplasty balloons from expanding a vessel sufficiently to enable the placement of a stent to hold the vessel open. Ex. 2171 ¶ 15. Dr. Hill testifies that "the community struggled to achieve full lesion expansion that would allow the lumen of the artery to be expanded to the desired diameter" often because of "medial calcified lesions." Ex. 2172 ¶ 7. Dr. Soukas testifies that "Shockwave IVL was the first, and remains the only, effective treatment for medial calcified lesions. . . . [N]either atherectomy nor an angioplasty balloon are effective at breaking up medial plaque." Ex. 2170 ¶ 15.

We note that none of the Patent Owner's clinicians support any of their testimony about the benefits of Shockwave IVL over competitive

devices with citations to objective evidence. *See* Exs. 2170–2174 (citing no outside evidence objective or otherwise). We consider this fact to slightly reduce the weight of the testimony from these clinicians, but we also recognize them as having firsthand knowledge of outcomes in certain cases involving the use of Patent Owner's Shockwave IVL device. Those experiences, however, are merely ad hoc examples of success that we do not consider to definitively prove that the Shockwave IVL is the first and only way to treat occluded vessels that also exhibit medial calcification. Accordingly, we consider the testimony from clinicians to be of modest, but meaningful, probative value on whether IVL is more effective than pre-existing options for treating calcified plaque that includes plaque within the medial tissues of arteries.

Petitioner argues that no "unmet need to effectively treat medial calcified lesions" exists because medial calcium rarely obstructs blood vessels and rarely causes symptoms that require medical treatment. Reply 37. Petitioner supports its argument with deposition testimony of Drs. Soukas, Hill, and Kereiakes (clinicians proffered by Patent Owner) and declarations from Drs. Chambers and Finn (clinicians proffered by Petitioner). *Id.* at 37–38 (citing Ex. 1212, 34:8–14, 37:24–39:5; Ex. 1211, 86:19–87:19, Ex. 1213, 38:12–23; Ex. 1350 ¶¶ 8–9; Ex. 1362 ¶¶ 9–15). We find that this cited testimony establishes that all five clinicians agree that the presence of medial calcium alone does not call for treatment by cardiovascular intervention. We have carefully reviewed Petitioner's cited evidence and find it persuasive on this point.

Patent Owner attempts to rebut Petitioner's cited evidence by citing deposition testimony from Dr. Finn for the proposition that he defined

"medial calcification" as a condition not associated with atherosclerotic plaque that obstructs blood vessels. Sur-reply 41 (citing Ex. 2253, 25:13–25, 26:5–29:16). Based on our review of this cited testimony from Dr. Finn, we find that it fails to support Patent Owner's position. Rather, the testimony reveals that Dr. Finn uniformly distinguishes "medial calcification" from atherosclerotic plaque, which occurs in the intimal layer of a vessel and is a different form of calcification. Ex. 2253, 25:13–25, 26:5–16. The objective evidence about which Patent Owner questioned Dr. Finn, which relates to the progression of calcification in arteries, similarly distinguishes between medial calcification and atherosclerotic plaque. *See, e.g.*, Ex. 2247 ("atherosclerotic intimal calcification is different from medial Monckeberg calcification, and the latter occurs independently from intimal calcification").

Patent Owner also argues that Dr. Chambers uses "medial calcification" to refer to "deep atherosclerotic plaque that occludes the vessel and requires treatment by angioplasty or otherwise." Sur-reply 41–42 (citing Ex. 2251, 39:2–19, 40:2–4, 132:6–11). However, we find that Dr. Chambers' cited testimony merely confirms his originally stated view that "medial calcium" alone does not require treatment unless calcium is also present in the intima. Ex. 2251, 39:2–40:22. Petitioner contends, based upon Dr. Chambers' testimony, that orbital atherectomy was a successful method of treating heavily calcified plaque that included medial plaque. Reply 38 (citing Ex. 1350 ¶ 9–21). Dr. Chambers' testimony is supported by citations to objective evidence. Ex. 1350 ¶¶ 16–19 (citing Exs. 1351–1353). His testimony is also consistent with the conclusions about the efficacy of rotational atherectomy reflected in the Dill paper

discussed in Part II.F.1.f.ii.b) below, which we consider to be highly probative evidence on this point.

b) Articles Cited by Dr. Berger

Dr. Berger relies, in part, upon reports from financial analysts and three journal articles for his opinion that Shockwave IVL was more effective at treating vessels that included medial calcified lesions than either traditional balloon angioplasty or rotational atherectomy. Ex. 2100 ¶¶ 193–196 (citing Ex. 2126;[26] Ex. 2127; Ex. 2128). Exhibit 2126 ("Dill") is a paper reporting results of a randomized study of about 500 total patients on the comparative efficacy of using either a rotational atherectomy device or traditional angioplasty balloons for treating "complex, calcified, and long lesions" in small coronary arteries. Ex. 2126, 1. Dill concludes that both treatment methods were relatively successful in treating the "difficult morphologies" of the studied complex lesions with success rates of 78% (angioplasty) and 85% (atherectomy). *Id.* at 6–7. Dill concluded that rotational atherectomy may be required to treat lesions "resistant to high balloon pressures." *Id.* at 7.

We view Dill to be among the most probative evidence on the issue of whether rotational atherectomy was effective for treating complex calcified lesions in coronary arteries. Dill establishes that rotational atherectomy was more effective than traditional angioplasty balloons for such lesions and undermines Patent Owner's contention that Shockwave IVL was the only treatment available for such lesions.

[26] Dr. Berger erroneously cites Exhibit 2136, but context makes clear that he intended to cite Exhibit 2126. Ex. 2100 ¶ 194.

Exhibits 2127 and 2128 ("CAD I" and "CAD II" respectively, and collectively, the "CAD Studies") reflect results of tests focusing solely upon whether the Shockwave IVL device is safe and effective at treating "heavily calcified atherosclerotic plaques," Ex. 2127, 1, or "severe CAC [coronary artery calcification]," Ex. 2128, 2. CAD I involved treatment of 60 patients. Ex. 2127, 2. CAD II involved treatment of 120 patients. Ex. 2128, 4. The CAD Studies conclude that Shockwave IVL was "a feasible frontline tool for CAC plaque modification." Ex. 2128, 6. The CAD II study indicates that using Shockwave IVL resulted in "intraplaque calcium fracture, thereby modifying vascular compliance and facilitating stent expansion." *Id.* The success rates of IVL determined in CAD I and CAD II were 95% and 94.2% respectively with very few side effects noted during each 30-day study period. Ex. 2127, 2; Ex. 2128, 5, Table 4. Neither of the CAD Studies presented detailed information of the precise radial depth of calcification within the tissues of the arteries that were treated (i.e., whether the calcification was in the intimal or medial tissues), but CAD II indicated that maximum calcium fracture depth of 0.6±0.3 mm and maximum calcium thickness at fracture site of 0.8±0.3 mm was observed in the 37 patients for whom such data was gathered. Ex. 2128, 7, Table 7.

We similarly view the CAD Studies as objective and reliable evidence of the potential efficacy of using IVL to treat severe coronary artery calcification. However, one limitation that we note is that neither of the CAD Studies reflect whether IVL had detrimental side effects after the 30-day study period.

Petitioner contends, based on testimony by Dr. Chambers, that IVL has been shown to have a primary patency rate (i.e., the rate at which a

treated vessel remains open) that is lower than that expected for balloon angioplasty and drug eluting angioplasty. Reply 39 (citing Ex. 1350 ¶¶ 25–26). Dr. Chambers relies upon articles that reported 12-month patency rates for patients treated with IVL in peripheral arteries (in the "PAD II" trial) was 54% while patients in a different study that were treated with balloon angioplasty or drug eluting balloons exhibited patency rates of 75% and 94.7% respectively. Ex. 1350 ¶¶ 25–26 (Ex. 1355; Ex. 1356). We consider Dr. Berger's testimony on this point to be credible.

c) Statements by Financial Analysts

Patent Owner and Dr. Berger rely upon unsupported statements in documents written by unidentified employees of various financial advisers describing the Shockwave IVL was more effective than "[a]therectomy and other plaque modification devices" at treating medial calcium. *See, e.g.*, Ex. 2100 ¶ 193 (quoting Ex. 2006, 17).

We discount the probative weight of all the statements from financial analysts as being from authors who have not been established to either have relevant medical or scientific training or may have biases based on financial interest. For example, Wells Fargo warns readers of its "analysis" of Patent Owner's stock that: "investors should be aware that the firm may have a conflict of interest that could affect the objectivity of the report and investors should consider this report as only a single factor in making their investment decision." Ex. 2006, 1. Wells Fargo also refers readers of the report to "page 31 for . . . important disclosures" that reflect five different ways in which Wells Fargo has financial interests in or received compensation from Patent Owner in the past or going into the future. *Id.* at 1, 31–32. The probative weight of such evidence is not increased merely by having

Dr. Berger read it and recount the conclusions drawn by such analysts. Accordingly, we ascribe little weight to statements by the financial analysts or Dr. Berger's testimony that relies upon such statements.

d) FDA Breakthrough Designation

Patent Owner argues, based on testimony from Dr. Berger, that the designation of the Shockwave IVL as a "breakthrough device" by the FDA establishes that its device treats a condition for which "no approved or cleared alternatives exist." PO Resp. 73–74 (citing Ex. 2100 ¶¶ 197–199). The documents upon which Dr. Berger bases his testimony are the letter from the FDA informing Patent Owner of its designation (Ex. 2124) and "Guidance for Industry" from the FDA on the "Breakthrough Devices Program" (Ex. 2125). Ex. 2100 ¶¶ 197–199 (citing Ex. 2124; Ex. 2125).

A "breakthrough device" designation as defined in section 515B(b) of the FD&C Act refers to devices:

> (1) that provide for more effective treatment or diagnosis of life-threatening or irreversibly debilitating human disease or conditions; and
>
> (2)(A) that represent breakthrough technologies;
>
> (B) for which no approved or cleared alternatives exist;
>
> (C) that offer significant advantages over existing approved or cleared alternatives, including the potential, compared to existing approved alternatives, to reduce or eliminate the need for hospitalization, improve patient quality of life, facilitate patients' ability to manage their own care (such as through self-directed personal assistance), or establish long-term clinical efficiencies; or
>
> (D) the availability of which is in the best interest of patients.

Ex. 2125, 8.

FDA guidance explains that a breakthrough designation may be granted for devices that meet the requirement of section (1) and *one* of the four subparagraphs listed in section (2) (i.e., one of (2)(A)–(D)). Meeting section (1) requirement can occur when the manufacturer shows "a reasonable expectation that the device could provide for more effective treatment or diagnosis of the disease or condition identified in the proposed indications for use." *Id.* at 9. This showing may be made based upon "literature or preliminary data." *Id.*

Without further explanation or identifying specific evidence, Dr. Berger concludes that "[b]ased on the evidence discussed above, I believe that the Shockwave IVL meets each of the criteria 2(A) through 2(D)." Ex. 2100 ¶ 199. Petitioner correctly notes that Patent Owner has submitted no evidence revealing the content of its request for a breakthrough designation or any correspondence with the FDA relating to its application for the designation other than the FDA's letter granting the breakthrough designation. Reply 40. Petitioner also contends that the FDA grants breakthrough designations about 71% of the time. *Id.*

Based on FDA guidance discussed immediately above, we conclude that Patent Owner could have obtained the designation by merely demonstrating a "reasonable expectation" based on "literature or preliminary data" that the Shockwave IVL is more effective at treating a life threatening or debilitating condition. We discern no reliable basis for Dr. Berger to have concluded that the Shockwave IVL met all four of the section (2) criteria for devices that are "breakthrough devices" because none of the items upon which Dr. Berger relies reflects personal knowledge of underlying facts needed to draw such a conclusion. Accordingly, we ascribe little probative

weight to the FDA's "breakthrough device" designation because: (i) Patent Owner failed to supply evidence of the precise basis for its request for designation or the FDA's precise basis for granting it, (ii) manufacturers need only demonstrate a "reasonable expectation" of meeting the criterion of section (1) based on "literature or preliminary data," and (iii) about 71% of those seeking the designation get it.

e) Evidence First Introduced with the Sur-Reply

Patent Owner presents Exhibit 2131 ("Kassimis") for the first time with its Sur-reply. Sur-reply 42 (citing Ex. 2131). Patent Owner argues that Kassimis reports a head-to-head comparison of orbital atherectomy and IVL treatments and concludes that IVL is superior based on the following quote:

> Moreover, ***shock-wave pulses affect calcium sheets located within the target field regardless of their depth in the vessel wall, which contrasts with inefficacy of PTRA or OA [rotational or orbital atherectomy] to modify deep-seated calcium***. . .
>
> IVL is unique among all technologies in its ability to modify calcium circumferentially and transmurally thus, modifying transmural conduit compliance. [. . .] ***We believe that IVL balloon is going to transform the market***, as it is easy to use, with predictable results and in most centers will replace cutting and scoring balloons for the treatment of calcific disease.

*Id.* (quoting and emphasizing text of Ex. 2131, 11).

This passage speaks glowingly about IVL, but the statement is prospective and not definitive, which is apparent from the following section of Kassimis, labeled "Conclusion," which reads:

> The optimal therapy for calcified CAD [coronary artery disease] is multi-adjunctive and *several strategies should always be available in the catheter laboratory* (Fig. 10). The outcome is less favourable compared to non-calcified lesions, but with increased understanding of calcification, more sophisticated,

> individualized treatment regiments will likely evolve to make optimal use of the variety of dedicated technologies and success. The advent of the IVL balloon *may* revolutionise this indication *but* cost-effectiveess of these advanced technologies will need to be considered.

Ex. 2131, 11 (emphasis added). The "several strategies" of "Fig. 10" includes orbital atherectomy. *Id.* at 10, Fig. 10. Thus, Kassimis recognizes that IVL is not yet proven to be a superior treatment for calcified coronary artery disease, but is likely to be an important option added to existing options for treating the entire population of potential patients. On balance, Kassimis supports Patent Owner's argument that IVL has promise to be an improved mode of treating certain types of coronary artery disease.

f) Conclusion

Based on our analysis of the evidence adduced by both parties, we conclude that Patent Owner has demonstrated that IVL is a promising treatment for stenoses in arteries with complex coronary artery calcification. However, Petitioner has also established that previous methods for treating the same type of stenoses, e.g., rotational and orbital atherectomy, remain viable treatment options that may have advantages in certain circumstances. We also conclude that the medical community at large has recognized that severe calcification of arteries makes successful short and long term treatment more difficult to attain. We also find that neither party has provided conclusive evidence of what, if any, long term detrimental side effects result from treatment with IVL, but Petitioner has submitted credible evidence that IVL does or is likely to lead to long term side effects. Accordingly, whether IVL is more meaningfully effective than prior methods of treating arteries with complex coronary artery calcification remains an open question.

iii. Failure of Others

Patent Owner's argument that all other treatments for coronary artery disease accompanied by complex calcification have failed is based upon the same testimony that we have reviewed in detail in Part II.F.1.f.ii above. PO Resp. 74–79. We are not persuaded by Patent Owner's evidence because Petitioner has adduced persuasive evidence that prior treatments have been used with an acceptable level of success. The evidence supporting our conclusion is also described and analyzed in Part II.F.1.f.ii above. Although IVL may show signs of being able to treat certain types of coronary artery disease in a measurably more effective manner than prior techniques, Patent Owner does not persuade us that those prior techniques are failures.

iv. Skepticism

The parties' arguments and evidence relating to skepticism closely follow their argument and evidence on the issue of whether an ordinarily skilled artisan would not have had a reasonable expectation of succeeding in substituting an EHL probe for Levy's laser probe because of risks of the balloon bursting and embolism. *Compare* PO Resp. 79–82 (citing Ex. 2100 ¶¶ 205–212; Ex. 2170; Ex. 2171; Ex. 2173; Ex. 2174), *with* PO Resp. 46–51 (citing Ex. 2100 ¶¶ 148–161 (citing Ex. 2170; Ex. 2173; Ex. 2174; Ex. 2175)). For the reasons expressed in Part II.F.1.e above, we found that an ordinarily skilled artisan would have had a reasonable expectation of successfully making a working device according to claim 1 that would not burst or result in unwarranted risks of embolism. Accordingly, we find that Patent Owner's evidence of skepticism is a weak indicator of non-obviousness.

v. Industry Praise

Patent Owner argues "first and foremost" that the FDA's designation of Shockwave IVL as a "breakthrough device" is "significant praise" from those in the industry. We have explained in detail why we do not consider the evidence adduced by Patent Owner to establish that the FDA's designation proves that Shockwave IVL was a breakthrough, or praiseworthy as a more effective treatment than existing options. *See* Part II.F.1.f.ii.d) above. For those same reasons, we do not consider the FDA's designation to demonstrate praise by the industry.

Patent Owner also relies upon testimony from the clinicians, Drs. Kereiakes, Hill, and Lyden. PO Resp. 83 (citing Ex. 2171 ¶ 12; Ex. 2172 ¶ 10; Ex. 2174 ¶¶ 10, 16). This testimony reflects unsubstantiated speculation about better efficacy, which has yet to be supported by objective evidence. *See* Part II.F.1.f.ii above. We do not, however, entirely discount what appears to be genuine excitement by clinicians about IVL.

We cannot draw the same conclusion regarding Patent Owner's evidence of "praise," introduced by Dr. Berger, because it merely recounts unsubstantiated and often forward-looking statements from financial analysts or hopeful statements from the Kassimis article. PO Resp. 83–84 (citing Ex. 2100 ¶¶ 216–223 (citing Ex. 2131; Ex. 2132; Ex. 2133, Ex. 2135; Ex. 2139)). We have explained why we consider statements of financial analysts to be of little probative value and the weight we accord the cited portion of Kassimis article, which does not reflect the conclusion drawn in Kassimis above. *See* Parts II.F.1.f.ii.c) and II.F.1.f.ii.e).

For all these reasons, we ascribe some, but not great, weight to Patent Owner's evidence of industry praise.

vi. Commercial Success

Patent Owner contends that its Shockwave IVL devices, Patent Owner's only commercial products, are commercially successful because Patent Owner: (1) "projects revenue for the full year 2019 to range from $38 million to $40 million, which represents 210% to 226% growth over the company's prior year revenue"; (2) realized a 339% increase (of $7.7 million) in revenue for the second quarter of 2019 over the second quarter of 2018; and (3) has a current market capitalization of "about $1 billion." PO Resp. 85–86 (citing Ex. 2100 ¶¶ 224–225; Ex. 2175 ¶ 8; Ex. 2164).

Petitioner responds that Patent Owner's evidence fails to establish commercial success because it fails to reflect the market share achieved by Patent Owner's devices. Reply 44. Patent Owner does not cure this deficiency in its evidentiary showing despite having an opportunity to do so. *See* Sur-reply 38–39 (arguing that it need not provide evidence of market share).

Petitioner also points out that, based on testimony from Mr. Stephens and Patent Owner's 10-Q, Patent Owner increased its spending on its sales and marketing forces by 59% from 2018 to 2019, which at least partially accounts for the increase in revenue that Patent Owner alleges. Reply 45 (citing Ex. 1216, 30:20–37:7; Ex. 2141, 4, 20–23). Patent Owner does not contest that the increase of 59% in sales and marketing expenses did not occur, but rather argues that its expenditures were "relatively low" and not a "primary driver of the device's success." Sur-reply 40 (citing Ex. 2252, 256:11–259:3). We are persuaded that Patent Owner's increased spending on sales and marketing at least partially explains the increase in its revenues.

More importantly, however, "the more probative evidence of commercial success relates to whether the sales represent a substantial quantity in the market." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012) (internal quotations omitted) (quoting *In re Huang*, 100 F.3d 135 140 (Fed. Cir. 1996)). Patent Owner's evidence of revenue increases wholly fails to establish the amount of market share attained by Patent Owner's devices. Just as important, however, is that Patent Owner's "evidence" of revenue increases does not pass muster. Patent Owner relies upon testimony from Dr. Berger and Mr. Stephens. PO Resp. 85–86 (citing Ex. 2100 ¶ 225; Ex. 2175 ¶ 8). The cited testimony from both witnesses relies upon the same document, a press release by Patent Owner reporting financial results and *projected* revenue increases for 2019 over 2018. Ex. 2100 ¶ 225 (citing Ex. 2176); Ex. 2175 ¶ 8 (citing Ex. 2176). The press release rightly points out that "forward looking statements" such as revenue projections "are uncertain" and thus "actual results may differ materially from those projected." Ex. 2176, 1. The press release also reports a net loss of $10.6 million for Q2, 2019, which was $0.5 million higher than the loss reported for Q2, 2018. *Id.* Patent Owner's evidence of its market capitalization is an undated printout of Yahoo's stock quote page. Ex. 2164. Patent Owner fails to explain how its market capitalization meaningfully reflects commercial success, and we discern no reason to find it probative of commercial success.

Patent Owner also contends, based on testimony of Drs. Berger and Armstrong, that its success is more noteworthy because doctors have "a strong financial disincentive" to use Shockwave IVL devices. PO Resp. 86 (citing Ex. 2100 ¶ 227; Ex. 2173 ¶ 29). First, Dr. Berger's testimony simply

quotes and relies upon the cited testimony of Dr. Armstrong; so, ultimately, Dr. Armstrong's testimony is the only evidence that might be probative. Ex. 2100 ¶ 227 (citing Ex. 2173 ¶¶ 28–29). Dr. Armstrong cites no evidence underlying his testimony, which limits its probative value. Second, even if we were to accept Dr. Armstrong's testimony as true, his cited testimony provides no evidence of market share or the quantitative effect of the "disincentive" that he describes. Ex. 2173 ¶¶ 28–29. However, he does testify that he has performed over 2,000 vascular interventions and about 300 such procedures per year with 200 being atherectomy procedures, but he has only performed "over 100" IVL procedures. *Id.* ¶ 5. This testimony implies that he uses directly competing atherectomy devices far more often than Shockwave IVL devices. *Id.* In any event, this testimony does not establish that doctors perform IVL procedures at an abnormally high rate despite financial disincentives.

Even if we were to conclude that Patent Owner's increases in revenue are tied to the claimed features, we find Patent Owner's showing of commercial success to be weak.

h. Weighing of Evidence of Obviousness and Conclusion

We conclude that Petitioner has proven that Guy Levy, a dentist, described a laser-based shockwave generator in an angioplasty balloon to treat atheromas in blood vessels before Patent Owner conceived its claimed invention. We also conclude that Petitioner has persuasively proven that an ordinarily skilled artisan would have been motivated to modifying Levy's device by substituting a known EHL shockwave generator for the laser and adapting Levy's balloon and carrier to use a well-known configuration of a

guidewire to place the balloon. We consider Petitioner's showing of obviousness to be rather straightforward and well supported.

Patent Owner's objective evidence of non-obviousness is voluminous, but largely weak for all the reasons that we express above even crediting Patent Owner for having established some nexus. Ultimately, we find that excitement about the *potential* efficacy of the Shockwave IVL or its *potential* commercial success simply does not warrant a conclusion that claim 1 remains patentable. When we consider all the evidence and arguments adduced by the parties, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy and any one of Mantell, Uchiyama, or Willneff along with the background knowledge reflected in the AAPA render claim 1 unpatentable as obvious.

2. Dependent Claims 2–14

Petitioner contends that the limitations introduced in each of dependent claims 2–6, 11, and 14, all of which ultimately depend from claim 1, are described by one or more of Mantell, Uchiyama, or Willneff or are simply well known by an ordinarily skilled artisan. Pet. 31–39. Except for dependent claim 5, Patent Owner does not distinguish the limitations introduced in these dependent claims from the teachings of the prior art or knowledge of an ordinarily skilled artisan that Petitioner identifies. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15). For the reasons expressed below, we conclude that Petitioner has proven by a preponderance of evidence that dependent claims 2–4 and 6–14 are unpatentable as obvious, but has failed to do so for claim 5.

a. Claim 2

Claim 2 depends from claim 1 and further recites: "wherein the pair of electrodes includes a pair of metallic electrodes." Ex. 1001, 6:40–41. Petitioner argues that Mantell describes that the electrodes of its probe may be metallic. Pet. 31 (citing Ex. 1004 ¶ 23). Petitioner also contends, based on testimony by Dr. Jensen, that an ordinarily skilled artisan would have considered electrodes made of metallic material to have been an obvious design choice because electrodes must be conductive. *Id.* (citing Ex. 1002 ¶ 126). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA and Mantell or the background knowledge of an ordinarily skilled artisan render claim 2 unpatentable as obvious.

b. Claim 3

Claim 3 depends from claim 2 and further recites: "wherein the electrodes are radially displaced from each other." Ex. 1001, 6:42–43. Petitioner argues that Mantell describes electrodes that are radially displaced from each other. Pet. 31–32 (citing Ex. 1004, Figs. 2, 7; Ex. 1002 ¶ 128). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy and Mantell

along with the background knowledge reflected in the AAPA render claim 3 unpatentable as obvious.

c. Claim 4

Claim 4 depends from claim 2 and further recites: "wherein the electrodes are longitudinally displaced from each other." Ex. 1001, 6:44–45. Petitioner argues that Willneff describes electrodes that are longitudinally displaced from each other. Pet. 31–32 (citing Ex. 1006, Fig. 1 (spark gap 16 between two longitudinally displaced electrodes); Ex. 1002 ¶ 130). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA and Mantell or the background knowledge of an ordinarily skilled artisan, and Willneff render claim 4 unpatentable as obvious.

d. Claim 5

Claim 5 depends from claim 2 and further recites: "wherein the pair of electrodes is disposed adjacent to and outside of the guide wire lumen." Ex. 1001, 6:46–47. Petitioner argues that Uchiyama describes "a shockwave generator including a pair of electrodes (3) that are disposed radially spaced away from the lumen of tube (8)." Pet. 32 (citing Ex. 1005, Figs. 1, 3, 4, 6, 7; Ex. 1002 ¶ 132). Petitioner also contends, based on testimony by Dr. Jensen, that an ordinarily skilled artisan would have found it obvious to implement the routine design choice of configuring electrodes as described by Uchiyama. *Id.* at 33 (citing Ex. 1002 ¶ 133).

Patent Owner argues, based upon testimony by Dr. Berger, that an ordinarily skilled artisan would not have radially spaced electrodes from the longitudinal center of an EHL probe because doing so would unacceptably increase the risk of damaging healthy tissue by placing the electrodes too close to such tissue. PO Resp. 65 (citing Ex. 2100 ¶¶ 33–60, 169, 170, 178).

Petitioner responds that Uchiyama expressly describes that electrodes need not be radially centered within its balloon but could be spaced from the longitudinal center of the balloon. Reply 35 (citing Ex. 1200 ¶ 144). Petitioner also contends that an ordinarily skilled artisan would have understood from Uchiyama that placing the electrodes radially off-center would permit shockwaves to attain greater lateral coverage to reach calcifications that are not uniformly distributed around the circumference of a vessel. *Id.* (citing Ex. 1200 ¶ 144 (cross-referencing *id.* ¶¶ 32–34); Ex. 1204, 175:19–177:3). Petitioner also argues that an ordinarily skilled artisan would not have been dissuaded from placing the electrodes off center as shown in Uchiyama because Uchiyama teaches that placing the electrodes within a balloon would avoid undesirable tissue damage. *Id.* (citing Ex. 1200 ¶ 144 (cross-referencing *id.* ¶¶ 32–34)).

In its Sur-reply, Patent Owner argues that Dr. Jensen testifies that Uchiyama's electrodes are not disposed radially away from the lumen of tube 8. Sur-reply 36 (citing Ex. 2249, 38:4–40:15). Patent Owner also points out that Uchiyama's tube 8 is not a guidewire lumen as recited in the claim.

Based on our review of Uchiyama, we agree with Patent Owner that Uchiyama fails to describe "the pair of electrodes is disposed adjacent to and outside of the guide wire lumen" as recited in claim 5. The position of

Uchiyama's pair of electrodes 3 is illustrated in the version of Figure 1 about which Dr. Jensen testified, which we reproduce below. Ex. 2240.




第 1 図

Uchiyama's Figure 1 is a cross-sectional view of Uchiyama's lithotripter with the balloon 7 inflated. Ex. 1005, 299.

Electrodes 3 (blue) are shown offset downward from the longitudinal center of the device as it is shown in the figure. Ex. 2240. Uchiyama states: "The electrodes3 are electrically connected with a pair of electric cables4 inserted into the tube1 above." Ex. 1005, 298. Uchiyama also describes fluid channel 6 through which fluid is injected to inflate balloon 7 or removed to deflate balloon 7. *Id.* Regarding "tube (8)," which Petitioner identifies as corresponding to the claimed lumen through the carrier, Uchiyama states: "The duct end of the balloon7 is air-tightly fixed by a removable stopper ring8 attached on the putter [sic, outer] circumference of the tip part of the tube1." *Id.* Thus, "tube (8)" is not a lumen for a guidewire or even a lumen in a "carrier." Rather, stopper ring 8 is the device for holding balloon 7 to tube 1. *Id.* In addition, Petitioner has not

established that electrodes 3 are disposed both adjacent to and radially "outside" stopper ring 8, as Uchiyama describes them as connected to electric cables 4 radially inside both tube 1 and stopper ring 8. *Id.*; Pet. 32 (arguing that electrodes 3 are radially spaced away from stopper ring 8).

Based on our review of Uchiyama, we find that Petitioner has failed to prove that Uchiyama describes a pair of electrodes that are both "adjacent to and outside of the guidewire lumen" as required in claim 5. Petitioner identifies no other prior art that meets these limitations. Accordingly, we conclude that Petitioner has failed to demonstrate by a preponderance of evidence that claim 5 is unpatentable as obvious.

e. Claim 6

Claim 6 depends from claim 2 and further recites: "wherein the catheter has a distal end and wherein the pair of electrodes is disposed proximal to the distal end of the catheter." Ex. 1001, 6:48–50. Petitioner argues that Willneff describes electrodes that are disposed proximal to the distal end of the catheter. Pet. 33 (citing Ex. 1006,[27] Fig. 1 (spark gap 16 formed between two electrodes disposed proximal to distal end of catheter 22); Ex. 1002 ¶ 135). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with

[27] Petitioner mistakenly cites Ex. 1005 as is made clear by the context (spark gap 16) and as is consistent with the cited testimony from Dr. Jensen. *See* Ex. 1002 ¶ 135 (correctly citing Ex. 1006, Fig. 1).

the background knowledge reflected in the AAPA, Mantell or the background knowledge of an ordinarily skilled artisan, and in further view of Willneff render claim 6 unpatentable as obvious.

f. Claim 7

Claim 7 depends from claim 1 and further recites: "wherein the balloon is formed of non-compliant material." Ex. 1001, 6:51–52. Petitioner correctly notes that the '371 patent acknowledges that prior art angioplasty balloons are typically made of non-compliant material to fix the maximum dimension of the balloon. Pet. 34 (citing Ex. 1001, 3:65–4:2). Petitioner argues that Hayes describes non-compliant angioplasty balloons. *Id.* (citing Ex. 1007, 1:5–10). Based on Dr. Jensen's testimony, Petitioner argues that an ordinarily skilled artisan would readily recognize that Levy as modified by AAPA includes a non-compliant balloon and that using a non-compliant balloon would have been easily implemented. *Id.* (citing Ex. 1002 ¶ 137). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA and one of Mantell, Uchiyama, or Willneff and in further view of Hayes, render claim 7 unpatentable as obvious.

g. Claim 8

Claim 8 depends from claim 1 and further recites: "wherein the balloon is formed of compliant material." Ex. 1001, 6:53–54. Petitioner argues that compliant angioplasty balloons were well known as evidenced

by Duchamp. Pet. 34–35 (citing Ex. 1008 ¶ 40; Ex. 1002 ¶ 138). Based on Dr. Jensen's testimony, Petitioner argues that an ordinarily skilled artisan would readily recognize that a compliant balloon could be readily and successfully substituted for the angioplasty balloon of Levy as modified by AAPA. *Id.* at 35 (citing Ex. 1008 ¶ 40). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA and one of Mantell, Uchiyama, or Willneff and in further view of Duchamp, render claim 8 unpatentable as obvious.

h. Claim 9

Claim 9 depends from claim 1 and further recites: "wherein the balloon has a surface, and wherein the catheter further comprises at least one stress riser carried on the surface of the balloon." Ex. 1001, 6:55–57. Petitioner argues that angioplasty balloons with stress risers were well known as evidenced by Naimark in the form of micro-needles 21, 31 on the surface of its balloon. Pet. 35–36 (citing Ex. 1009,[28] Abstract, Figs. 2, 3 (illustrating micro-needles 21, 31); Ex. 1002 ¶ 140). Based on Dr. Jensen's testimony, Petitioner argues that an ordinarily skilled artisan would readily recognize that a balloon with stress risers could be readily and successfully substituted for the angioplasty balloon of Levy as modified by AAPA. *Id.*

---

[28] Petitioner mistakenly cites Ex. 1008 as is made clear by the context (microneedles 21, 31). Ex. 1009, Abstract, 4:21–31, 5:18–20, Figs. 2, 3.

at 35 (citing Ex. 1008 ¶ 40). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA and one of Mantell, Uchiyama, or Willneff and in further view of Naimark, render claim 9 unpatentable as obvious.

i. Claim 10

Claim 10 depends from claim 1 and further recites: "further comprising a sensor that senses reflected energy." Ex. 1001, 6:58–59. Petitioner argues that sensors used with shockwaves created within a fluid-filled balloon were well known as evidenced by Beyar. Pet. 36 (citing Ex. 1010, ¶¶ 192, 243; Ex. 1002 ¶ 142). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA and one of Mantell, Uchiyama, or Willneff and in further view of Beyar, render claim 10 unpatentable as obvious.

j. Claim 11

Claim 11 depends from claim 1 and further recites: "further comprising a reflector within the balloon that focuses the shock waves."

Ex. 1001, 6:60–61. Petitioner argues that Willneff describes a wall 34 that reflects and focuses its shockwave. Pet. 37 (citing Ex. 1006, 10, Fig. 2 (pressure waves reflected by wall 34 toward focal point 36); Ex. 1002 ¶ 144). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA Mantell, Uchiyama, or Willneff render claim 11 unpatentable as obvious.

k. Claim 12

Claim 12 depends from claim 1 and further recites: "wherein the balloon electrically insulates the pair of electrodes from tissue external to the catheter." Ex. 1001, 6:62–64. Petitioner argues that balloon material was well known to generally be non-conductive and insulating to the electrodes within them. Pet. 37 (citing Ex. 1002 ¶ 146). For example, Uchiyama teaches that its balloon regulates the force emanating from its spark generator and prevents its spark from directly hitting human tissue. *Id.* (citing Ex. 1005, 298). Additionally, Duchamp and Hayes both describe non-conductive materials used to insulate the pair of electrodes from tissue. *Id.* at 38 (citing Exs. 1007, 1008; Ex. 1002 ¶ 146). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with

the background knowledge reflected in the AAPA and one of Mantell, Uchiyama, or Willneff and in further view of Duchamp or Hayes render claim 12 unpatentable as obvious.

l. Claim 13

Claim 13 depends from claim 1 and further recites:

> wherein the pair of electrodes includes a first electrode and a second electrode, the second electrode being arranged to form an electrical arc with the first electrode to generate the mechanical shock wave and to generator including a pair of electrodes being positioned reflect the mechanical shock wave in a desired pattern.

Ex. 1001, 6:65–7:2. Petitioner argues that Bhatta describes a shockwave generator with a pair of electrodes in which one of the electrodes is a metallic nozzle that also reflects the shockwave in a desired pattern. Pet. 38 (citing Ex. 1012, 3:17–25). Based on Dr. Jensen's testimony, Petitioner argues that an ordinarily skilled artisan would have found it obvious to have modified Levy in view of Mantell to include Bhatta's nozzle-shaped electrode to focus the shockwave being generated. *Id.* at 38–39 (citing Ex. 1002 ¶ 148). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA and one of Mantell, Uchiyama, or Willneff and in further view of Bhatta render claim 13 unpatentable as obvious.

m. Claim 14

Claim 14 depends from claim 1 and further recites: "wherein the balloon has a center axis and the guidewire lumen has a center axis in common with the balloon center axis; and wherein at least one electrode of the electrode pair is disposed in non-intersecting relation with respect to the balloon center axis." Ex. 1001, 7:3–8. Petitioner argues that "Uchiyama discloses a balloon with a center of axis that is collinear with the guidewire lumen." Pet. 39 (cross-referencing argument relating to claim 5). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

As explained in Part II.F.2.d above, we find that Uchiyama fails to describe a pair of electrodes that are outside of a guidewire lumen. However, Uchiyama does illustrate a pair of electrodes in which one of the electrodes is located off the center longitudinal axis of its balloon. Additionally, the AAPA that forms part of Petitioner's challenge to claim 1 describes a guidewire lumen that shares a common central longitudinal axis with the balloon. Ex. 1001, 3:65–4:2, Fig. 1.

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA and one of Mantell or Willneff along with Uchiyama or the combined teachings of Levy along with the background knowledge reflected in the AAPA and Uchiyama render claim 14 unpatentable as obvious.

3. Independent Claim 15

Independent claim 15 is directed to a system comprising an angioplasty catheter that is materially the same as the catheter of claim 1 and a "power source configured to provide a high voltage pulse to the arc generator" that is not recited in claim 1. *Compare* Ex. 1001, 7:9–8:9, *with id.* at 6:21–39. Petitioner contends, and we agree, that all the arguments directed to claim 1 apply to claim 15. Pet. 40. With respect to the "power source," Petitioner argues that each of Levy, Mantell, Uchiyama, and Willneff describe a power source that is configured to provide a high voltage pulse to their respective arc generators. *Id.* at 40–41 (citing Ex. 1003, 4, Fig. 1 (laser light source 20); Ex. 1004 ¶ 24 (Autolith EHL generator); Ex. 1005, 299 (high voltage supplied to electrodes 3); Ex. 1006, 9 (current feed 6)). Petitioner argues, based in part on testimony by Dr. Jensen, that an ordinarily skilled artisan would have included a suitable generator to ensure that the pair of electrodes generates a spark resulting in the formation of shockwaves. *Id.* at 41 (citing Ex. 1002 ¶ 164).

Patent Owner argues, based on testimony by Dr. Berger, that the prior art cautions against deploying EHL electrodes within an angioplasty balloon. PO Resp. 65–66 (citing Ex. 2100 ¶ 178). We have fully considered and found unpersuasive Patent Owner's argument. *See* Part II.F.1 above. For the reasons, expressed in connection with our analysis of claim 1 and Petitioner's argument and evidence discussed immediately above, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA and any one of Mantell, Uchiyama, or Willneff render claim 15 unpatentable as obvious.

4. Dependent Claims 16 and 17

Petitioner contends that the limitations introduced in each of dependent claims 16 and 17, both of which directly depend from claim 15, are described by the prior art. Pet. 42–43. For the reasons expressed below, we conclude that Petitioner has proven by a preponderance of evidence that dependent claims 16 and 17 are unpatentable as obvious.

a. Claim 16

Claim 16 depends from claim 15 and further recites: "wherein the power source is arranged to provide high voltage pulses having at least one of selectable pulse durations, selectable voltage amplitudes, and selectable pulse repetition rates." Ex. 1001, 9:10–13. Petitioner contends that both Levy and Mantell describe power sources meeting the requirements of claim 16. Pet. 42 (citing Ex. 1003, 3 (incorporating controllable power source described in Levy '227); Ex. 1005 ¶¶ 51, 82 (describing power source with selectable voltage amplitudes (e.g., power level) and pulse repetition rates (e.g., number of pulses)); Ex. 1002 ¶¶ 168–169). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA and any one of Mantell, Uchiyama, or Willneff render claim 16 unpatentable as obvious.

b. Claim 17

Claim 17 depends from claim 15 and recites: "further comprising an R wave detector that synchronizes the mechanical shock waves with a

cardiac R waves." Ex. 1001, 9:14–16. Petitioner contends that Schultheiss describes "a shockwave applicator and an R wave detector that synchronizes the mechanical shockwaves with cardiac waves." Pet. 43 (citing Ex. 1011 ¶ 72; Ex. 1002 ¶ 171). Petitioner also contends, based on the same evidence, that it would have been obvious to use Schultheiss' detector to avoid a fibrillation in the patient. *Id.* Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy along with the background knowledge reflected in the AAPA and any one of Mantell, Uchiyama, or Willneff along with Schultheiss renders claim 17 unpatentable as obvious.

5. Conclusion

Based on our review of the entire record and the parties' arguments, we conclude that Petitioner has demonstrated by a preponderance of evidence that claims 1–4 and 6–17 are unpatentable as obvious.

G. Claims 1–17: Obviousness in View of Willneff, AAPA, and Levy or Mantell and in Further View of Various Other References for Certain Claims

As an alternative, Petitioner argues that the same prior art applied above, but with Willneff as a primary reference, renders claims 1–17 obvious. *Compare* Pet. 13–43 (addressing Levy as primary reference), *with id.* at 43–60 (addressing Willneff as primary reference). Because we have found that the challenges based on Levy as the primary reference render claims 1–4 and 6–17 unpatentable as obvious, we find the challenges to

these claims based upon Willneff as the primary references moot and do not address them in this Decision. *See Boston Sci. Simed, Inc. v. Cook Grp. Inc.*, No. 2019-1594, 2020 WL 2071962, at *4 (Fed. Cir. Apr. 30, 2020) (holding that "the Board need not address issues that are not necessary to the resolution of the proceeding").

However, because we have found that Petitioner's challenge to claim 5 based upon Levy as the primary reference fails, we must determine whether Petitioner's challenges to claim 5 based upon Willneff, AAPA, Levy, and Uchiyama or Willneff, AAPA, Mantell, and Uchiyama render claim 5 obvious. Petitioner's challenges to claim 5 based upon Willneff as the primary reference fail for the same reasons explained in Part II.F.2.d above, because Petitioner relies on Uchiyama in the manner in this challenge as in the previous challenge, and Petitioner has not proven that Uchiyama discloses the limitations of claim 5 for the reasons explained above.

## III. PETITIONER'S MOTION TO EXCLUDE

Petitioner moves to exclude Exhibits 2002–2004, 2006, 2008, 2016, 2017, 2124, 2125, 2126, 2132, 2133, 2139, 2141, 2149, 2152, 2161, 2162, 2163, 2164, 2170–2176, 2196 and certain paragraphs from Dr. Berger's Declaration for various reasons. Paper 67 ("Motion" or "Mot."). Patent Owner opposes the Motion. Paper 68 ("Opposition" or "Opp."). Petitioner filed a reply brief in support of the Motion. Paper 70 ("Motion Reply" or "Mot. Reply"). For the reasons explained below, we deny the Motion as unpersuasive, moot, or both.

### A. Hearsay

Petitioner moves to exclude Exhibits 2002–2004, 2006, 2008, 2016, 2017, 2124, 2125, 2132, 2133, 2139, 2141, and 2164 as containing

inadmissible hearsay under Federal Rules of Evidence 801, 802, and 805. Mot. 1–4. These Exhibits include news articles (Exs. 2002–2004), materials from financial analysts or investment bankers (Exs. 2006, 2008, 2016, 2017, 2132, 2133, 2139), materials received from or authored by the FDA (Exs. 2124, 2125), Yahoo Finance data (Ex. 2164), and one of Patent Owner's 10-Q submissions (Ex. 2141). *Id.*

Patent Owner argues that "laudatory statements" are not offered for the truth of the matter but rather to show that the statements were made. Opp. 1–2. Patent Owner further contends that the exhibits Petitioner seeks to exclude "are relied upon by an expert, who is entitled to rely on hearsay materials to support his or her opinions." *Id.* at 2. Lastly, Patent Owner argues that the exhibits are sufficiently trustworthy in light of the totality of the circumstances. *Id.* at 3.

Petitioner fails to persuade us that we should exclude any of these exhibits. These exhibits are, for the most part, offered in support of Patent Owner's argument that objective evidence of nonobviousness exists, *i.e.*, long felt need, failure of others, skepticism, industry praise, and commercial success. *See generally* PO. Resp. 69–89. Patent Owner does not rely on statements made in these exhibits for the truth of the matter asserted, for example, that the Shockwave device has a "unique ability" to treat medial calcium (Ex. 2017 1) or that it is "space-age technology" (Ex. 2002, 1). Rather, Patent Owner relies upon these statements to show that industry actors took notice of and commented on the Shockwave device. *Quanergy Sys., Inc. v. Velodyne Lidar, Inc.*, IPR2018-00256, Paper 66 at 5–6 (PTAB May 21, 2020) ("[S]tatements offered solely for the purpose of showing they were made are admissible."); *Fox Factory, Inc. v. SRAM, LLC*, IPR2016-

01876, Paper 59 at 59 (PTAB Apr. 2, 2018). To the extent that the evidence may have served a hearsay purpose, we assign it little if any weight. Further, experts like Dr. Berger are permitted to rely on hearsay if experts in the same field would reasonably rely on such materials in forming opinions and inferences based on the subject. *See* Fed. R. Evid. 703. To the extent that Dr. Berger relies upon evidence that is not of a type upon which "experts in the field would reasonably rely," we have assigned very little weight to such evidence. Therefore, we deny Petitioner's motion to exclude these Exhibits 2002–2004, 2006, 2008, 2016, 2017, 2124, 2125, 2132, 2133, 2139, 2141, and 2164 as being unpersuasive, moot, or both.

B. Uncited Exhibits

Petitioner moves to exclude exhibits 2126, 2152, 2161, 2162, and 2163 as being irrelevant under Fed. R. Evid. 401 and 402 because Patent Owner does not cite them in its briefing. Patent Owner responds that Dr. Berger cites and relies upon Exhibits 2126 and 2161–2163. Opp. 6 (citing Ex. 2100 ¶¶ 194 (with a typo mistakenly referring to 2126 as 2136), 224 (referring to Ex. 2196, which cites Exs. 2161–2163)). We deny Petitioner's Motion because the exhibits are relied upon by Dr. Berger in offering his testimony.

However, Patent Owner does not identify where it or any of its declarants cite or rely upon Ex. 2152, and we find no such citations. *Id.* at 6–7. Exhibit 2152 is U.S. Patent 5,454,809 to Janssen, entitled "Electrosurgical Catheter and Method for Resolving Atherosclerotic Plaque by Radio Frequency Sparking." Ex. 2152, Title. We have not considered Ex. 2152 in rendering our Decision and, therefore, deny Petitioner's Motion as being moot.

C. Personal Knowledge

Petitioner moves to exclude Exhibit 2196, which is a claim chart mapping certain claims to the Shockwave devices, because Mr. Stephens has no personal knowledge of who prepared the exhibit. Mot. 5. Patent Owner argues that Petitioner failed to timely object to Exhibit 2196 and therefore waived any objection now raised. Opp. 7. Patent Owner further explains that Dr. Berger relies upon Exhibit 2196, not Mr. Stephens, and argues that an expert need not have personal knowledge about the facts and data upon which he relies. *Id.* Petitioner does not respond to Patent Owner's arguments. *See generally*, Mot. Reply.

Our rules require that "[a] party wishing to challenge the admissibility of deposition evidence must make an objection during the deposition [and, a] party wishing to challenge evidence other than deposition evidence, must file any objections within five business days of service of evidence." 37 C.F.R. § 42.64(a); Consolidated Trial Practice Guide, November 2019, 78–79 ("Consolidated TPG").[29] "A motion to exclude evidence must be filed to preserve any objection." 37 C.F.R. § 42.64(c). The failure to raise an objection at the appropriate time, results in a waiver of the objection. As a result, we advise parties that "[a] motion to exclude evidence should . . . [i]dentify where in the record the objection was originally made." Consolidated TPG 79. Here, Petitioner does not identify the portion of the record where its objection to Exhibits 2178–2180 were originally made. *See* Mot. 5. Our review of the Petitioner's Objections (Papers 22, 43), the testimony of Mr. Stephens (Ex. 1216), and the testimony of Dr. Berger

---

[29] The Consolidated TPG is available at https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf).

(Exs. 1126, 1204) show that Petitioner failed to object to Exhibit 2196. Therefore, we deny Petitioner's motion to exclude Exhibit 2196.

D. Authentication

Petitioner moves to exclude Exhibit 2149, a Japanese Patent with an included Abstract in English because Patent Owner failed to provide a complete certified translation. Mot. 5. Patent Owner served a certified translation of Exhibit 2149 (Ex. 2222), which it files with its Opposition as Exhibit 2256. Petitioner does not argue that Patent Owner's supplemental evidence failed to cure its objection to Exhibit 2149. *See generally*, Mot. Reply. We deny Petitioner's Motion to exclude Ex. 2149 because the service of Exhibit 2256 cured Petitioner's objection.

E. Relevance or Prejudice

Petitioner moves to exclude Exhibits 2003, 2004, 2006, 2125, 2139, 2141, and 2170–2176 as irrelevant or prejudicial under Federal Rules of Evidence 401, 402, and 403. Mot. 5–9. Petitioner contends the identified exhibits provide scant, cumulative, and unhelpful information that should be excluded. *See generally id.*

Patent Owner argues that instead of excluding evidence deemed to be irrelevant, little weight should be accorded such evidence. Opp. 8. Patent Owner explains that each of Petitioner's arguments go to the weight but not the admissibility of the evidence. *See generally id.* at 8–14. Patent Owner also contends that the declarations of Drs. Lyden, Kereiakes, Hill, Soukas, and Armstrong (Exs. 2170–2174) each "bring[] a different perspective and emphasize[] different aspects of the Shockwave device," and therefore are not cumulative. *Id.* at 11. Further, according to Patent Owner, "[t]he

declarations also corroborate one another in various respects, which is another important aspect of the declarations." *Id.*

We are not persuaded by Petitioner's arguments that Exhibits 2003, 2004, 2006, 2125, 2139, 2141, and 2170–2176 must be excluded from the record. The evidence Petitioner seeks to exclude support Patent Owner's argument that the '371 patent is nonobviousness; specifically, the exhibits relate to objective indicia of nonobviousness. Therefore, the objected to exhibits are relevant as having a "tendency to make a fact more or less probable." Fed. R. Evid. 401. Further, because the decision here is rendered by the panel, as opposed to a jury, there is little risk that the purported "scant, unhelpful needlessly cumulative and/or misleading information," Mot. 6, will confuse or mislead the panel such that the probative value is outweighed by the danger of unfair prejudice. Fed. R. Evid. 403; *see Corning Inc. v. DSM IP Assets B.V.*, IPR2013-00053, Paper 66 at 19 (PTAB May 1, 2014) ("Similar to a district court in a bench trial, the Board, sitting as a non-jury tribunal with administrative expertise, is well-positioned to determine and assign appropriate weight to the evidence presented."). As appropriate, we have explained above the weight that we accord various aspects of these exhibits. For the reasons above, we are not persuaded that the testimony or documents at issue should be excluded and, thus, we deny Patent Owner's Motion to exclude Exhibits 2003, 2004, 2006, 2125, 2139, 2141, and 2170–2176.

F. Portions of Dr. Berger's Testimony

Petitioner moves to exclude portions of the declaration testimony of Dr. Berger under Federal Rules of Evidence 702 and 703. Mot. 9–10. More specifically, Petitioner argues:

> paragraphs 18, 19, 59, 60, 66, 132 (testimony not based on sufficient facts or data, patent owner has not shown the '371 patent is entitled to a June 13, 2008 priority date), 143, 144 (testimony not based on sufficient facts or data), 165 (testimony not based on sufficient facts or data), 170 (testimony not based on sufficient facts or data), 175 (testimony not based on sufficient facts or data), 199 (not qualified to opine on device meeting criteria), 201, 205, 205 [sic], 217, 218, 220, 221, 222, and 229 (testimony not based on sufficient facts or data) are inadmissible under FRE 702(b) and/or 703.

*Id.*

Patent Owner argues that Petitioner's basis for excluding certain paragraphs of Dr. Berger's declaration are conclusory and that Petitioner "does not explain which aspects of the opinions are unsupported or what facts or data could or should have been considered." Opp. 14.

Whether Dr. Berger's opinions are conclusory, mischaracterize evidence, or are not adequately based on objective evidence goes to the weight we should accord to his testimony. As appropriate, we have explained above the weight that we accord the allegedly objectionable testimony by Dr. Berger. Thus, we deny Petitioner's motion to exclude the identified paragraphs of Dr. Berger's declaration (Ex. 2100).

## IV. PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY

In our Order of September 15, 2020, we instructed the parties to submit briefing in accordance with their input on the schedule for that briefing. Paper 77, 2–3. We also ordered that "neither party may submit additional evidence in the proceeding." *Id.* at 3. Nevertheless, Patent Owner later sought authorization to move for additional discovery based upon the content of a press release by Petitioner dated January 13, 2022 (the "Press Release"). *See generally* Ex. 2260 (reflecting Patent Owner's request

made during a conference call on March 9, 2022). We authorized Patent Owner to file the requested motion for additional discovery and advised Patent Owner to brief the "threshold issue" of procedural propriety of reopening discovery given that our rehearing order expressly precluded the parties from introducing new evidence on rehearing. *Id.* at 8:11–9:14; Paper 86, 2–3. We authorized each party to file two briefs in an alternating series with Patent Owner filing the opening brief and Petitioner filing the last of the four authorized briefs. Paper 86, 3–4.

In response to our authorization, Patent Owner filed its motion for additional discovery. Paper 89 ("Discovery Motion" or "Disc. Mot."). Petitioner filed its opposition to the Discovery Motion. Paper 93 ("Discovery Opposition" or "Disc. Opp."). Patent Owner filed its Reply in response to the Discovery Opposition. Paper 94 ("Discovery Reply" or "Disc. Reply"). Petitioner filed its Sur-reply in response to the Discovery Reply. Paper 96 ("Disc. Sur-reply").

A. Whether the Board Has Authority to Reopen Discovery During Rehearing

Patent Owner identifies two provisions with the Rules governing this proceeding that permit the panel to reopen discovery during rehearing. First, Patent Owner argues that Rule 42.51(b)(2)(i), which addresses "additional discovery," "confers significant discretion on the Board with respect to issue of scope, manner, and timing" by broadly stating that the "Board may specify conditions for such additional discovery." Disc. Mot. 6–7. Patent Owner contends that the "conditions" that we may specify includes "***when*** the Board may authorize discovery." *Id.* at 7. Patent Owner further contends that our discretion under Rule 42.5(a) gives us broad authority to

"determine a proper course of conduct . . . for any situation not specifically covered" under our Rules. *Id.*

Petitioner responds that the "Board does not have the authority to reopen the record to address an issue unrelated to the AAPA issue" for two reasons. Disc. Opp. 5–6. First, Petitioner argues that reopening discovery would contravene the overarching dictate in Rule 42.1 to interpret and apply our Rules "to secure the just, speedy, and inexpensive resolution of every proceeding." 37 C.F.R. § 42.1(b). Second, Petitioner contends that, although Rule 42.5(b) conveys discretionary authority for the Board to waive or suspend our governing Rules, Patent Owner cites no authority extending the Board's discretion to "opening a closed record to admit evidence *wholly unrelated* to the reason the IPR remains pending." Disc. Opp. 6. Petitioner beseeches that although "the Board is clearly empowered to revisit its earlier decisions to correct its own errors, it does not have the authority to reopen a closed record to permit a disgruntled litigant a second bite at the apple." *Id.* As support for its argument, Petitioner analogizes the procedural posture of rehearing with a remand proceeding governed by Standard Operating Procedure 9, which states that "additional evidence is *generally prohibited* unless the remand was due to: (1) a lack of due process or denial of APA rights; or (2) an erroneous claim interpretation and the evidence of record is insufficient to afford due process." *Id.* (citing SOP 9, 10, 14). Petitioner contends, and we agree, that neither condition for permitting additional discovery on remand is present in this rehearing. Petitioner also argues that the manner in which other administrative agencies decide whether to admit new evidence in a closed proceeding is instructive. *Id.* at 7.

Patent Owner also argues that the Consolidated TPG "allows a party to submit new evidence with a rehearing request." Mot. 8 (citing Consolidated TPG 90; *Huawei Device Co. Ltd. v. Optis Cellular Tech., LLC*, Case IPR2018-00816, slip. op. at 4, (PTAB Jan. 8, 2019) (Paper 19) (precedential)). Patent Owner is correct that the Consolidated TPG does permit a party to file new evidence with its request for rehearing, but also requires the submitting party to demonstrate "good cause" for admitting the evidence into the record. Consolidated TPG 90; *Huawei* at 4. Petitioner distinguishes the *Huawei* decision from the situation at hand by pointing out that the *Huawei* panel was evaluating whether to admit evidence relating to the issue raised on rehearing. Opp. 7, n.4.

On the narrow issue of whether the panel has authority to grant the motion for additional discovery, we find that it does have such authority under at least Rule 42.5. However, for the reasons expressed below, we deny the Discovery Motion under the circumstances presented in this proceeding.

B. Whether the Interests of Justice Dictate Additional Discovery

Patent Owner argues that the Press Release raises "serious questions" including "striking incongruities between the facts presented in [the Press Release] and facts presented by [Petitioner] during trial." Discovery Mot. 9. The Press Release reflects Petitioner's ongoing efforts to develop an IVL balloon catheter and control console, which are described as having completed "feasibility testing." Ex. 2261, 1. If Petitioner is able to commercialize its IVL catheter, the Press Release states that adding this product could triple Petitioner's "total addressable market" to $1.3 billion. *Id.* The Press Release also carefully points out that the statements relating to

the developmental IVL catheter and the "expansion of market opportunities" stemming from its commercialization are "forward-looking statements" that are subject to significant "risks and uncertainties" including, among others, "intellectual property protections." *Id.* at 2.

Under 37 C.F.R. § 42.51(a)(2)(i), "additional discovery" is appropriate when shown to be in the "interests of justice." 37 C.F.R. § 42.51(a)(2)(i). Patent Owner contends that Petitioner's Press Release, which published months after the record at trial closed, demonstrates that additional discovery is needed in the interests of justice because the Release raises "serious questions about the factual and evidentiary underpinnings" of our Decision. Disc. Mot. 2. Patent Owner also advances a number of ways in which the Release "prompts serious questions" allegedly requiring further investigation to resolve allegedly "striking incongruities between the facts presented in [the Press Release] and facts presented by [Petitioner] during trial." *Id.* at 8–12.

Petitioner responds that public policy strongly disfavors reopening discovery at this late stage. Opp. 9 (citing, e.g., *INS v. Abudu*, 485 U.S. 94, 107 (1988) ("There is a strong public policy in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases."); *see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 295 (1974) (concluding "there is sound basis for adhering to our practice of declining to require reopening of the record, except in the most extraordinary circumstances")). Petitioner argues that the "interests of justice" standard in our Rule 42.51(b)(2)(i) is our mechanism for enforcing this policy. *Id.*

Petitioner also argues that the statements in the Press Release about the feasibility testing of an IVL balloon catheter and control console and expansion of Petitioner's addressable market if it is able to commercialize the catheter do not present "striking incongruities" with the existing evidence "on the importance, safety, and efficacy of IVL." Opp. 8. More specifically, Petitioner contends that, during trial, it has argued only that IVL is not the only treatment for treating heavy calcification and it has never argued that IVL was unsafe. *Id.* at 9–10 (citing Reply 37–40). Petitioner argues that "[a]t most, the press release announces the uncontroversial fact that [Petitioner] is exploring other medical tools in its toolkit." *Id.* at 10.

We agree with Petitioner that the Press Release contains nothing that materially conflicts with the existing record. We also find that the "risks and uncertainties" in the Press Release statements about Petitioner's potential market expansion dramatically diminish the probative value of those statements in determining how to weigh objective evidence of nonobviousness. Even if we were to grant the Discovery Motion, it appears to be highly likely that Petitioner's IVL catheter is still in its nascent stages,[30] which only generates more uncertainty about the degree to which Petitioner might expand its participation in the market for treating vascular calcification. In essence, far too many uncertainties remain about the probative value or even relevance of any evidence that might be obtained by granting the Discovery Motion. Moreover, the trial in this proceeding has already been delayed beyond the resolution of the appeals of the related

[30] The Press Release indicates that the "first in-human experience" with its IVL system is planned to begin in 2023.

proceedings. We fail to see how further delay would serve the interests of justice. For all these reasons, we deny the Discovery Motion.

## V. CONCLUSION[31]

In summary,

| Claim(s) | 35 U.S.C. § | Reference(s) | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 15, 16 | 103 | Levy, AAPA, Mantell | 1–3, 15, 16 | |
| 4, 6, 11 | 103 | Levy, AAPA, Mantell, Willneff | 4, 6, 11 | |
| 5, 14 | 103 | Levy, AAPA, Mantell, Uchiyama | 14 | 5 |
| 7, 12 | 103 | Levy, AAPA, Mantell, Hayes | 7, 12 | |
| 8, 12 | 103 | Levy, AAPA, Mantell, Duchamp | 8, 12 | |
| 9 | 103 | Levy, AAPA, Mantell, Naimark | 9 | |
| 10 | 103 | Levy, AAPA, Mantell, Beyer | 10 | |

[31] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

| Claim(s) | 35 U.S.C. § | Reference(s) | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 13 | 103 | Levy, AAPA, Mantell, Bhatta | 13 | |
| 17 | 103 | Levy, AAPA, Mantell, Schultheiss | 17 | |
| 1, 2, 5, 14–16 | 103 | Levy, AAPA, Uchiyama | 1, 2, 14–16 | 5 |
| 4, 6, 11 | 103 | Levy, AAPA, Uchiyama, Willneff | 4, 6, 11 | |
| 7, 12 | 103 | Levy, AAPA, Uchiyama, Hayes | 7, 12 | |
| 8, 12 | 103 | Levy, AAPA, Uchiyama, Duchamp | 8, 12 | |
| 9 | 103 | Levy, AAPA, Uchiyama, Naimark | 9 | |
| 10 | 103 | Levy, AAPA, Uchiyama, Beyer | 10 | |
| 13 | 103 | Levy, AAPA, Uchiyama, Bhatta | 13 | |
| 17 | 103 | Levy, AAPA, Uchiyama, Schultheiss | 17 | |
| 1, 2, 4, 6, 11, 15, 16 | 103 | Levy, AAPA, Willneff | 1, 2, 4, 6, 11, 15, 16 | |
| 7, 12 | 103 | Levy, AAPA, Willneff, Hayes | 7, 12 | |

| Claim(s) | 35 U.S.C. § | Reference(s) | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 8, 12 | 103 | Levy, AAPA, Willneff, Duchamp | 8, 12 | |
| 9 | 103 | Levy, AAPA, Willneff, Naimark | 9 | |
| 10 | 103 | Levy, AAPA, Willneff, Beyer | 10 | |
| 13 | 103 | Levy, AAPA, Willneff, Bhatta | 13 | |
| 17 | 103 | Levy, AAPA, Willneff, Schultheiss | 17 | |
| 1, 2, 4, 6, 11, 15 | 103 | Willneff, AAPA, Levy[32] | | |
| 3, 16 | 103 | Willneff, AAPA, Levy, Mantell | | |
| 5, 14 | 103 | Willneff, AAPA, Levy, Uchiyama | | 5 |
| 7, 12 | 103 | Willneff, AAPA, Levy, Hayes | | |

[32] For all challenges to claims 1–4 and 6–17 relying upon Willneff as a primary prior art reference, we do not reach a decision because those challenges are moot in view of our ruling on the challenges to these claims based upon Levy as the primary prior art reference. *See Boston Sci. Simed, Inc. v. Cook Grp. Inc.*, No. 2019-1594, 2020 WL 2071962, at *4 (Fed. Cir. Apr. 30, 2020) (holding that "the Board need not address issues that are not necessary to the resolution of the proceeding"); *cf. Ex parte Moncla*, Appeal No. 2009-006448 (PTAB June 22, 2010) (holding that it is premature to address a provisional rejection) (designated precedential).

| Claim(s) | 35 U.S.C. § | Reference(s) | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 8, 12 | 103 | Willneff, AAPA, Levy, Duchamp | | |
| 9 | 103 | Willneff, AAPA, Levy, Naimark | | |
| 10 | 103 | Willneff, AAPA, Levy, Beyar | | |
| 13 | 103 | Willneff, AAPA, Levy, Bhatta | | |
| 17 | 103 | Willneff, AAPA, Levy, Schultheiss | | |
| 1–3, 15, 16 | 103 | Willneff, AAPA, Mantell | | |
| 5, 14 | 103 | Willneff, AAPA, Mantell, Uchiyama | | 5 |
| 7, 12 | 103 | Willneff, AAPA, Mantell, Hayes | | |
| 8, 12 | 103 | Willneff, AAPA, Mantell, Duchamp | | |
| 9 | 103 | Willneff, AAPA, Mantell, Naimark | | |
| 10 | 103 | Willneff, AAPA, Mantell, Beyar | | |
| 13 | 103 | Willneff, AAPA, Mantell, Bhatta | | |
| 17 | 103 | Willneff, AAPA, Levy, Schultheiss | | |
| | | **Overall Outcome** | 1–4, 6–17 | 5 |

## VI. ORDER

For the reasons given, it is:

ORDERED, based on a preponderance of evidence, that claims 1–4 and 6–17 of U.S. Patent 8,956,371 B2 are *unpatentable* as obvious under 35 U.S.C. § 103;

FURTHER ORDERED that Petitioner has not demonstrated that claim 5 of U.S. Patent 8,956,371 B2 is *unpatentable*; and

FURTHER ORDERED that Petitioner's Motion to Exclude Exhibits 2002–2004, 2006, 2008, 2016, 2017, 2124, 2125, 2126, 2132, 2133, 2139, 2141, 2149, 2152, 2161, 2162, 2163, 2164, 2170–2176, 2196, and 2100 (¶¶ 18, 19, 59, 60, 66, 132, 143, 144, 165, 170, 175, 199, 201, 205, 217, 218, 220, 221, 222, and 229) is *denied*;

FURTHER ORDERED that Patent Owner's Motion for Additional Discovery is *denied*; and

FURTHER ORDERED because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Mark C. Nelson
Jeffrey Stone
BARNES & THORNBURG LLP
mnelson@btlaw.com
jstone@btlaw.com

PATENT OWNER:

Greg H. Gardella
Michael Stallman
W. Cook Alciati
Natalie J. Grace
Ruth G. Davila
GARDELLA GRACE P.A.
ggardella@gardellagrace.com
mstallman@mofo.com
calciati@gardellagrace.com
ngrace@gardellagrace.com
rdavila@gardellagrace.com

Trials@uspto.gov
Tel: 571-272-7822

Paper 75
Date: July 8, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

CARDIOVASCULAR SYSTEMS, INC.,
Petitioner,

v.

SHOCKWAVE MEDICAL, INC.,
Patent Owner.

---

IPR2019-00405
Patent 8,956,371 B2

---

Before MITCHELL G. WEATHERLY, RICHARD H. MARSCHALL, and AVELYN M. ROSS, *Administrative Patent Judges.*

WEATHERLY, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
Denying Petitioner's Motion to Exclude
*35 U.S.C. § 318(a), 37 C.F.R. § 42.64*

# I. INTRODUCTION

## A. Background

Cardiovascular Systems, Inc. ("Petitioner") filed a petition (Paper 1, "Pet.") to institute an *inter partes* review of claims 1–17 (the "challenged claims") of U.S. Patent No. 8,956,371 B2 (Ex. 1001, "the '371 patent").

35 U.S.C. § 311. Shockwave Medical, Inc. ("Patent Owner") timely filed a Preliminary Response. Paper 11 ("Prelim. Resp."). On July 9, 2019, based on the record before us at the time, we instituted an *inter partes* review of all challenged claims on all grounds set forth by Petitioner. Paper 19 ("Institution Decision" or "Dec."). We instituted the review on the following challenges to the claims:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–6, 11, 14–16 | 103 | Levy,[1] AAPA,[2] and Mantell,[3] Uchiyama,[4] or Willneff[5] |
| 7, 12 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Hayes[6] |
| 8, 12 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Duchamp[7] |
| 9 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Naimark[8] |

[1] European Patent Application EP 0571306 A1 (Ex. 1003, "Levy").

[2] Applicant Admitted Prior Art ("AAPA").

[3] U.S. Published Patent App. 2010/0036294 A1 (Ex. 1004, "Mantell").

[4] Japanese Laid Open Application No. JP 62-275446 A (Ex. 1005, "Uchiyama").

[5] German Patent Application No. DE 3038445 A1 (Ex. 1006, "Willneff").

[6] U.S. Patent No. 7,309,324 B2 (Ex. 1007, "Hayes").

[7] U.S. Published Patent App. 2002/0082553 A1 (Ex. 1008, "Duchamp").

[8] U.S. Patent No. 7,569,032 B2 (Ex. 1009, "Naimark").

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 10 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Beyer[9] |
| 13 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Bhatta[10] |
| 17 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Schultheiss[11] |
| 1–4, 6, 11, 15, 16 | 103 | Willneff, AAPA, and Levy or Mantell |
| 5, 14 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Uchiyama |
| 7, 12 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Hayes |
| 8, 12 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Duchamp |
| 9 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Naimark |
| 10 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Beyar |
| 13 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Bhatta |
| 17 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Schultheiss |

[9] U.S. Published Patent App. 2006/0190022 A1 (Ex. 1010, "Beyar").

[10] U.S. Patent No. 5,152,768 (Ex. 1012, "Bhatta").

[11] U.S. Published Patent App. 2007/0239082 A1 (Ex. 1011, "Schultheiss").

After we instituted this review, Patent Owner filed a Patent Owner Response in opposition to the Petition (Paper 39, "PO Resp."). Petitioner filed a Reply in support of the Petition (Paper 56, "Reply"). Patent Owner filed a Sur-reply responding to the Reply (Paper 64, "Sur-reply"). Patent Owner did not move to amend any claim of the '371 patent.

We heard oral argument on April 15, 2020. A transcript of the argument has been entered in the record (Paper 74, "Tr.").

We have jurisdiction under 35 U.S.C. § 6. The evidentiary standard is a preponderance of the evidence. *See* 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons expressed below, we conclude that Petitioner has demonstrated by a preponderance of evidence that claims 1–4 and 6–17 are unpatentable, but it has failed to do so for claim 5.

B. RELATED PROCEEDINGS

Petitioner identified no related matters. Pet. 2. Patent Owner has identified the following petitions for *inter partes* review and patents or patent applications as related matters:

- Petition for *Inter Partes* Review of U.S. Patent No. 9,642,673, IPR2019-00408 (filed December 7, 2018);
- Petition for *Inter Partes* Review of U.S. Patent No. 8,728,091, IPR2019-00409 (filed December 7, 2018);
- U.S. Patent Application No. 13/646,570 filed on October 5, 2012, and issued as U.S. Patent No. 9,011,462;
- U.S. Patent Application No. 14/660,539 filed on March 17, 2015, and issued as U.S. Patent No. 10,039,561;
- U.S. Patent Application No. 16/028,225 filed on July 5, 2018;

- U.S. Patent Application No. 13/049,199 filed on March 16, 2011, and issued as U.S. Patent No. 8,956,374;
- U.S. Patent Application No. 13/465,264 filed on May 7, 2012, and issued as U.S. Patent No. 9,072,534; and
- U.S. Patent Application No. 13/646,583 filed on October 5, 2012.

Paper 3, 1–2.

C. THE '371 PATENT

The '371 patent is directed to "a treatment system for percutaneous coronary angioplasty or peripheral angioplasty in which a dilation catheter is used to cross a lesion in order to dilate the lesion and restore normal blood flow in the artery." Ex. 1001, 1:13–16. The patent purports to improve upon the prior art angioplasty balloon catheter 10 illustrated in Figure 1 (reproduced below left) by adding electrodes 22, 24 as shown in Figure 2 (reproduced below right), which generate arcs that create shock waves within balloon 26 to break up calcified lesions in a blood vessel.

FIG. 1
(PRIOR ART)




FIG. 2




FIG. 1 is a view of the therapeutic end of a typical prior art over-the-wire angioplasty balloon catheter. *Id.* at 3:7–8.

FIG. 2 is a side view of a dilating angioplasty balloon catheter with two electrodes within the balloon. *Id.* at 3:9–10.

Balloon 26 may be filled with water or saline to gently fix balloon 26 against the walls of an artery in direct proximity to a calcified lesion. *Id.* at 4:27–29. Carrier 21 includes lumen 29 through which a physician inserts a guide wire (not shown) to guide catheter 20 to the desired location in a patient's body. *Id.* at 4:31–33. Electrical arcs between electrodes 22, 24 generate shock waves in the fluid. *Id.* at 4:16–17. Figure 11, reproduced in pertinent part at right, "is a pressure volume curve showing the various stages in the breaking of a calcified lesion with shock waves." *Id.* at 3:45–46.

FIG. 11




Figures 11A and 11B, reproduced below left and right respectively, are cross-sectional views illustrating a vessel before and after treatment.

FIG. 11A




Figure 11A illustrates a compliant balloon expanded snugly against the vessel wall. *Id.* at 3:48, 5:31–32.

FIG. 11B




Figure 11B illustrates pulverized, calcified plaque "on a vessel wall." *Id.* at 3:50–51.

The Specification explains that: "As the High Voltage pulses generate shock waves (Region B and C) extremely high pressures, extremely short in duration will chip away the calcified lesion slowly and controllably expanding the opening in the vessel to allow blood to flow un-obstructed (FIG. 11B)." *Id.* at 5:33–38.

Claims 1 and 15 are the independent claims among the challenged claims. *Id.* at 6:21–8:16. Illustrative claim 1 recites:

> 1. An angioplasty catheter comprising:
>
> [a] an elongated carrier sized to fit within a blood vessel, said carrier having a guide wire lumen extending therethrough;
>
> [b] an angioplasty balloon located near a distal end of the carrier with a distal end of the balloon being sealed to the carrier near the distal end of the carrier and with a proximal end of the

> balloon defining an annular channel arranged to receive a fluid therein that inflates the balloon; and
>
> [c] an arc generator including a pair of electrodes,
>
> [d] said electrodes being positioned within and in non-touching relation to the balloon,
>
> [e] said arc generator generating a high voltage pulse sufficient to create a plasma arc between the electrodes resulting in a mechanical shock wave within the balloon that is conducted through the fluid and through the balloon and wherein the balloon is arranged to remain intact during the formation of the shock wave.

*Id.* at 6:21–39 (with third and fourth line breaks and letter designations [a]–[e] added to aid discussion).

## II. ANALYSIS

### A. Claim Interpretation

For petitions such as this one that are filed after November 13, 2018, we interpret claims in the same manner used in a civil action under 35 U.S.C. § 282(b), "including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2019).[12] When applying that standard, we interpret the claim language as it would be understood by one of ordinary skill in the art in light of the specification. *In re Suitco Surface, Inc.*, 603 F.3d 1255,

---

[12] On October 11, 2018, the USPTO revised its rules to harmonize the Board's claim construction standard with that used in federal district court. Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (now codified at 37 C.F.R. § 42.100(b) (2019)). This rule change applies to petitions filed on or after November 13, 2018. *Id.*

1260 (Fed. Cir. 2010). Thus, we give claim terms their ordinary and customary meaning as understood by an ordinarily skilled artisan. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning 'is the meaning that the term would have to a person of ordinary skill in the art in question.'" (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc))). Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

*1. "angioplasty balloon"*

Petitioner and Patent Owner disagree about the meaning of "angioplasty balloon" as used in the challenged claims. Petitioner contends that "angioplasty balloon" means "an inflatable sac that is configured to be inserted into a blood vessel for use in a medical procedure to widen narrowed or obstructed blood vessels." Pet. 12. Patent Owner argues that "angioplasty balloon" refers to "a balloon that displaces the plaque into the vessel wall to expand the lumen of the vessel." PO Resp. 5.

a. Intrinsic Evidence

The plain language of the claim does not refer to any limitation on the type of "angioplasty" for which the "balloon" is designed. Rather, the claim merely recites an "angioplasty balloon." Dependent claims 7 and 8 limit the balloon to being formed of "compliant" or "non-compliant" material respectively. Ex. 1001, 6:51–54. Thus, the plain language of the claims does not reflect a requirement that the claimed "angioplasty balloon" must displace plaque "into the vessel wall."

The Specification states that the "present invention relates to a treatment system for percutaneous coronary angioplasty or peripheral angioplasty in which a dilation catheter is used to cross a lesion in order to dilate the lesion and restore normal blood flow in the artery." *Id.* at 1:13–18. This passage implies that an "angioplasty balloon" is used "to dilate the lesion and restore normal blood flow in the artery" without specifying or limiting how the dilation is achieved.

The Specification later illustrates the use of two types of "angioplasty balloons," a prior art balloon that does not employ shockwaves, Ex. 1001, Figs. 10A–C, and the claimed balloon that does employ shockwaves, *id.* Figs. 11A, 11B, 12, 13. When describing an embodiment of the claimed balloon in Figure 11A, the Specification indicates that the balloon is "expanded to fit snugly to the vessel wall . . . but this is not a requirement." *Id.* at 5:32–33. When describing Figure 11B, the Specification states that shockwaves will cause "extremely high pressures, extremely short in duration [that] will chip away the calcified lesion slowly and controllably expanding the opening in the vessel." *Id.* at 5:33–37. Figures 12 and 13 of the '371 patent illustrate calcified plaque that is "pulverized by the shock waves" and "reshaped" by "the expanded balloon." *Id.* at 5:39–48, Figs. 12, 13. In all instances, the Specification illustrates and describes breaking and redistributing plaque within a vessel wall without ever explicitly referring to displacing plaque "into the vessel wall" from outside the wall. Accordingly, we find that the Specification alone does not resolve whether "angioplasty balloon" refers to a balloon that must dilate a blood vessel, at least in part, by displacing "the plaque into the vessel wall."

Patent Owner argues, based on testimony from Dr. Berger, that intrinsic evidence in the form of two prior art patents submitted during prosecution of the '371 patent use "'angioplasty balloon' in a manner consistent with the plain meaning of that term as used in the '371 patent." PO Resp. 10–11 (citing Ex. 2109 ("O'Boyle"), 1:33–37 (angioplasty balloon used to "stretch and compact the stenosis material against the wall of the artery"); Ex. 2110 ("O'Connor"), 3:8–12 (angioplasty balloon that "opens the occluded part of the artery by pressing the thrombus against the internal wall of the artery")). Neither quoted passage from O'Boyle and O'Connor supports Patent Owner's argument that an "angioplasty balloon" must displace plaque "into the vessel." Petitioner correctly points out that the passages more strongly support its argument for a broader definition because both passages merely describe compacting or pressing material "against" rather than "into" the wall of the vessel. Reply 11.

Even more importantly, O'Boyle and O'Connor each describe angioplasty as a procedure that can result in the removal of material from the vessel wall via ultrasonic ablation, without displacing material "into the vessel wall." For example, O'Boyle's device, which is described as an "angioplasty catheter," Ex. 2109, 3:20–21, performs angioplasty through ultrasonic ablation of stenosis material without significant "crushing of the material of the stenosis against the vessel wall," *id.* at 3:53–62. O'Connor describes angioplasty as being performed by ablating a thrombus and softening calcified plaque within a vessel. Ex. 2110, 3:23–57. O'Connor's angioplasty balloon includes an ultrasound transducer and is inflated with saline to only 1–3 atmospheres. *Id.* at 3:36–41. The low-pressure saline ensures that the balloon presses against the thrombus to transmit and focus

ultrasonic energy to break the thrombus into "microparticulate matter" (i.e, ablation) while also creating "microfractures within the calcified plaque 12 which is embedded in the wall" of the artery. *Id.* at 3:41–57. O'Boyle and O'Connor thus support Petitioner's broader definition of "angioplasty balloon" as not requiring that the balloon displace plaque "into the vessel wall" but merely requiring that the balloon widens a narrowed or obstructed vessel.

b. Extrinsic Evidence

We do not consider it necessary to rely upon extrinsic evidence to support our conclusion that an "angioplasty balloon" is not limited to those balloons that displace material "into the vessel wall." Nevertheless, the balance of such evidence of record supports our conclusion that Patent Owner's definition of "angioplasty balloon" is unduly narrow.

Patent Owner contends that medical and lay dictionaries and testimony from Dr. Berger and Dr. Jensen that establish that an "angioplasty balloon" must displace plaque "into the vessel wall." PO Resp. 11–12 (citing Ex. 2100 ¶¶ 86–88; Ex. 2111, 126:8–16; Ex. 2018; Ex. 2020). Five of the six definitions of "angioplasty" proffered by Patent Owner as establishing that angioplasty refers to displacing plaque "into the vessel wall" fail to go so far. Rather, Petitioner persuasively points out that five of the six definitions refer to angioplasty more generally as merely referring to surgical repair of a blood vessel, sometimes by compressing deposits of fatty substances or plaque blocking the vessel, and other times by using a laser beam or replacing part of the vessel. Ex. 2019, 1–3; Ex. 2020, 1. One of Patent Owner's dictionaries states that an angioplasty is a procedure in which a "balloon is inflated to compress the fatty matter into the artery

wall," which supports Patent Owner's argument. Ex. 2018, 1. However, we find that the group of definitions proffered by Patent Owner as a whole demonstrate that angioplasty refers more broadly to procedures that repair blood vessels and do not necessarily involve displacing material "into the vessel wall."

Patent Owner also relies upon Dr. Berger, who opines that, based on definitions in a lay dictionary for "angio-," "plasty," "plastic," and "elastic deformation," an ordinarily skilled artisan understands "angioplasty" to refer to a procedure that "involves the plastic or permanent deformation or molding of blood vessels." Ex. 2100 ¶ 86 (citing Exs. 2166–2169, 2190). Based on his etymological analysis of "angioplasty," and without further evidentiary support, he extends his opinion by concluding that "the plastic molding of the vessel takes place by the displacement of plaque into the vessel wall to expand the lumen."

We heavily discount Dr. Berger's conclusion about angioplasty requiring "displacement . . . into the vessel wall" as a non sequitur. At most, the evidence upon which he bases his opinion establishes only that angioplasty involves the permanent deformation of a vessel. Additionally, his testimony on cross-examination that "angioplasty" cannot refer to merely pressing plaque or a thrombus against the vessel wall, Ex. 1204, 13:7–13, 13:23–14:24, is irreconcilably inconsistent with prior art that was before the Examiner, O'Boyle and O'Connor. As discussed above, O'Boyle and O'Connor both describe angioplasty as pressing material *against* the vessel wall. Ex. 2109, 1:33–37, 3:53–62; Ex. 2110, 3:8–12. We simply do not consider Dr. Berger's opinion that angioplasty must involve displacing

plaque "into the vessel wall" is credible when considered against objective evidence that he cites.

Petitioner cites another patent, which was not before the Examiner that further establishes that an ordinarily skilled artisan would understand "angioplasty" as referring more broadly to both recanalization and dilation of a blood vessel. Reply 11 (citing Ex. 1041, 2).

c. Conclusion

For the reasons expressed above, we conclude that "angioplasty balloon" refers to "an inflatable sac that is configured to be inserted into a blood vessel for use in a medical procedure to widen narrowed or obstructed blood vessels."

*2. Other Disputed Terms*

The parties expressly address and disagree about the meaning of two other phrases appearing in claim 1. Namely, "distal end of the balloon sealed to the carrier near the distal end of the carrier" and "carrier having a guidewire lumen extending therethrough." *Compare* Reply 12–13, *with* PO Resp. 16–18 *and* Sur-Reply 10–13. We adopt Patent Owner's interpretations of both terms for the reasons expressed in its briefing and because Patent Owner's interpretations comport more closely with the plain language of the phrases. PO Resp. 16–18; Sur-Reply 10–13. However, Petitioner establishes that the combined teachings of Levy and AAPA describe an angioplasty balloon sealed near the distal end of a carrier having a guidewire extending through the carrier as recited in these two phrases. *See* Part II.F.1.d.iii below.

B. THE PARTIES' POST-INSTITUTION ARGUMENTS

In our Institution Decision, we concluded that the argument and evidence adduced by Petitioner demonstrated a reasonable likelihood that at least one claim was unpatentable, and we instituted review of all challenges to claims 1–17 as identified in the table in Part I.A above. Dec. 26–27. We must now determine whether Petitioner has established by a preponderance of the evidence that the specified claims are unpatentable over the cited prior art. 35 U.S.C. § 316(e) (2018). We previously instructed Patent Owner that "any arguments for patentability not raised in the [Patent Owner Response] may be deemed waived." Paper 20, 7; *see also In re Nuvasive, Inc.*, 842 F.3d 1376, 1381 (Fed. Cir. 2016) (holding that patent owner's failure to proffer argument at trial as instructed in scheduling order constitutes waiver). Additionally, the Board's Trial Practice Guide states that the Patent Owner Response "should identify all the involved claims that are believed to be patentable and state the basis for that belief." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

C. LEGAL STANDARDS

Petitioner challenges the patentability of claims 1–17 on the grounds that the claims are obvious. To prevail in its challenges to the patentability of the claims, Petitioner must establish unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d) (2018). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the

challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

The Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), reaffirmed the framework for determining obviousness as set forth in *Graham v. John Deere Co.*, 383 U.S. 1 (1966). The *KSR* Court summarized the four factual inquiries set forth in *Graham* that we apply in determining whether a claim is unpatentable as obvious under 35 U.S.C. § 103(a) as follows: (1) determining the scope and content of the prior art, (2) ascertaining the differences between the prior art and the claims at issue, (3) resolving the level of ordinary skill in the pertinent art, and (4) considering objective evidence indicating obviousness or nonobviousness. *KSR*, 550 U.S. at 406 (citing *Graham*, 383 U.S. at 17–18). In an *inter partes* review, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

To prevail in an *inter partes* review, Petitioner must explain how the proposed combinations of prior art would have rendered the challenged claims unpatentable. An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418; *accord In re Translogic Tech., Inc.*, 504 F.3d 1249, 1259 (Fed. Cir. 2007). However, Petitioner cannot satisfy its burden of proving obviousness by employing

"mere conclusory statements," but "must instead articulate specific reasoning, based on evidence of record" to support an obviousness determination. *Magnum Oil*, 829 F.3d at 1380–81. Petitioner also must articulate a reason why a person of ordinary skill in the art would have combined the prior art references. *NuVasive*, 842 F.3d at 1382.

At this final stage, we determine whether a preponderance of the evidence of record shows that the challenged claims would have been rendered obvious in view of the asserted prior art. We analyze the asserted grounds of unpatentability in accordance with these principles.

D. LEVEL OF ORDINARY SKILL IN THE ART

We review the grounds of unpatentability in view of the understanding of a person of ordinary skill in the art at the time of the invention. *Graham*, 383 U.S. at 17. Petitioner submits that the ordinarily skilled artisan would have

> knowledge roughly equivalent to the knowledge and/or training of a person holding the degree of Bachelor of Science in Mechanical Engineering, Biomedical Engineering or equivalent, and at least three to five years of practical experience (or comparable and/or equivalent education or training), including familiarity with the various medical devices and techniques for treating plaque buildup in blood vessel or body passages, such as balloon angioplasty, ablation, rotational atherectomy, lithotripsy.

Pet. 11; Ex. 1002 ¶¶ 63–66.

Patent Owner disagrees and contends that the level of ordinary skill in the art would have been a "multidisciplinary individual or team that included"

> i) at least one person with a medical degree and relevant clinical experience concerning the management of patients with vascular disease, and ii) at least one person with an electrical engineering, biomedical engineering or equivalent degree and at least two

> years of experience in the engineering, design, testing or development of catheter-based medical devices.

PO Resp. 4 (citing Ex. 2100 ¶ 3–14).

The parties' positions primarily differ in that Patent Owner suggests that a medical degree is required along with an engineering degree. Petitioner notes that none of the inventors of the '371 patent, a great majority of the inventors listed on the prior art asserted here or applied by the Examiner during prosecution, and Patent Owner's Vice President of Research and Development has a medical degree. Reply 5 (citing Ex. 1200 ¶¶ 12–15; Ex. 1216, 6:15–7:1, 10:10–13:18). However, Petitioner contends that three to five years of practical experience with medical devices and techniques for treating plaque buildup is needed. Pet. 11; Ex. 1002 ¶¶ 65–66. We consider Petitioner's stated level of experience to supply similar relevant knowledge to the medical degree that Patent Owner contends to be needed to attain a level of ordinary skill in the art.

For purposes of this Decision, and based on the record, we consider an ordinarily skilled artisan to possess skill attained by education via a bachelor's degree in mechanical, electrical, or biomedical engineering combined with knowledge of medical devices and techniques for treating plaque buildup in blood vessels that is attained either by education (a medical degree) or three to five years of practical experience. Further, we find that the prior art of record reflects the level of skill in the art at the time of the invention. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

Patent Owner contends, however, that "Dr. Jensen [ ] lacks a medical degree and relevant clinical experience and would not qualify as one skilled

in the art." PO Resp. 4–5. Patent Owner also criticizes Dr. Jensen for failing to understand certain concepts and figures in the prior art. *Id.*

We disagree with Patent Owner's contentions about Dr. Jensen's qualifications. Dr. Jensen holds a bachelor's degree in electrical engineering, master's degree in biomedical engineering, doctorates in medical science and medicine. Ex. 1002 ¶¶ 8–13, Appendix A (curriculum vitae). His doctorate of medicine (Dr.Med.) was awarded by the University of Aarhus School of Medicine in Denmark in 2008, and this degree is typically given only to medical doctors. Ex. 1200 ¶ 21. Furthermore, a declarant's expertise and experience need not match perfectly the experience and education of a person of ordinary skill in the art in order to provide testimony so long as there is an adequate relationship between the declarant's education and experience when compared to the claimed invention. *SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1373 (Fed. Cir. 2010). Accordingly, we find that Dr. Jensen is qualified to testify about the perspective of one of ordinary skill in the art at the time of the invention.

E. OVERVIEW OF THE ASSERTED PRIOR ART

*1. Levy*

Levy describes a device for removing "deposits which form on the interior walls of passages, and in particular the removal, by disintegration, of plaque deposits, or atheromas, which form on the inner walls of the blood vessels." Ex. 1003, 1.[13] Levy's device is shown in Figure 1 (substantively reproduced below).

[13] We, like Petitioner, refer to the page numbering of the translation of the Levy reference itself rather than exhibit page numbers.




Levy's Figure 1 is a cross-sectional view of an embodiment of Levy's device for removing deposits from blood vessel walls.

Levy's devices includes balloon 10 protruding from distal end 6 of catheter 8. *Id.* at 3. Convergent lens 16 on optical fiber 12 protrudes into balloon 10 from distal end 6 of catheter 8. Balloon 10 is inflated with, e.g., saline, supplied by liquid source 22 through a suitable liquid coupling within the bore of catheter 8. *Id.* Laser source 20 emits light energy that is carried into the saline within balloon 10 by optical fiber 12. *Id.*

A user of Levy's device inserts catheter 8 into vessel 2 next to deposit 4 with balloon 10 deflated and then inflates balloon 10 with saline until it contacts deposit 4. *Id.* Laser energy is pulsed into the liquid within balloon 10 to create cavitation as gas bubbles which implode and agitate the fluid to disintegrate deposit 4. *Id.* at 4. According to Dr. Jensen, an ordinarily skilled artisan understands that Levy's laser pulses create shockwaves that cause the disintegration of deposit 4. Ex. 1002 ¶ 116.

*2. AAPA*

Figure 1 of the '371 patent (reproduced right) is labeled and described as "PRIOR ART." Ex. 1001, Figure 1. The

FIG. 1
(PRIOR ART)



Specification describes Figure 1 as "a view of the therapeutic end of a typical prior art *over-the-wire* angioplasty balloon catheter 10. Such catheters are usually non-complaint with a fixed maximum dimension when expanded with a fluid such as saline." *Id.* at 3:66–4:2 (emphasis added). Although Figure 1 does not illustrate a guidewire, the Specification implies its presence when describing catheter 10 as being "over-the-wire."

Figure 2, which illustrates the claimed catheter 20, also fails to illustrate a guidewire. *Id.* at Figure 2, 3:9–12. The Specification indicates that the guidewire is not shown but inserted through lumen 29 in carrier 21. *Id.* at 4:31–33. Although a carrier and lumen are not enumerated on Figure 1, similarities between Figures 1 and 2 imply, and we conclude, that Figure 1 illustrates a carrier and lumen that are essentially the same as carrier 21 and lumen 29 of Figure 2.

FIG. 2




Accordingly, we understand that the AAPA includes the angioplasty balloon catheter comprising a carrier with a balloon postioned near the distal end and a guidewire lumen extending through the carrier and protruding from the distal end of the balloon as illustrated in Figure 1.

*3. Mantell*

Mantell is directed to "an invasive radially-firing electrohydraulic lithotripsy probe that creates a substantially annular shockwave for uses such as breaking up concretions that are at least semi-annular." Ex. 1004 ¶ 20.

> In one implementation, the EHL probes described below may be delivered to a proper channel of a heart by threading (or pre-loading) an EHL probe through a center lumen of a catheter or balloon device. The catheter may be threaded through appropriate veins or arteries to address concretions either

> forming in vessels or even in the valves of the heart or other organs.

*Id.* ¶ 21. One embodiment of Mantell's device is illustrated below.




*FIG. 2*

> Figure 2 is a cross-sectional side view of an embodiment of Mantell's electrohydraulic lithotripsy probe. *Id.* ¶ 4.

Distal portion 101 of probe 100 includes insulating body 102 surrounding electrodes 104, 106, which are positioned within balloon 118. *Id.* ¶¶ 23–29. Balloon 118 "encapsulates a liquid such as saline" and an arc between electrodes 104, 106 "causes a steam bubble in the liquid [that] . . . rapidly expands and contracts back on itself" to generate "a shockwave." *Id.* ¶ 29. That shockwave "radiates away from the lithotripsy tip 101 in a substantially radial manner such that the shockwave is at least semi-annular." *Id.*

*4. Uchiyama*

Uchiyama describes an arc-based shockwave generator within an inflated balloon as illustrated in Figures 1–7. Ex. 1005, 298–99.[14] We reproduce Figures 1 and 3(a)–(d) below from the translation of Uchiyama.




Drawing1




Drawing3

Figure 1 is a cross section view illustrating the balloon inflated and some of the internal elements of the lithotripsy probe. *Id.* at 300.

Figures 3(a)–(d) are cross section views illustrating the process of using the probe of Figure 1 in the urinary duct. *Id.*

Electrodes 3 are positioned near the distal end of tube 1 that includes tube 6 for inflating balloon 7 with fluid through opening 5. *Id.* at 298. Figures 3(a)–(d) illustrate advancing the probe in a urinary duct N to a position close to calculus S (Figure 3(a)), inflating balloon 7 so that it contacts calculus S (Figure 3(b)), and using arcs between electrodes 3 to generate shockwaves that break up calculus S (Figures 3(c) and (d)). *Id.* at 298–99. The optimal gap between electrodes 3 and calculus S for making the shockwaves most effective at breaking up calculus S is managed by controlling the degree to which balloon 7 is inflated. *Id.*; *see also id.* Figures 3(b) and (c). Uchiyama indicates that arcs are generated within

[14] We, like Petitioner, refer to the page numbering of the translation of the Uchiyama reference itself rather than exhibit page numbers.

balloon 7 "so that there is no risk that the electric discharge sparks hit a human tissue directly." *Id.* at 299. Uchiyama notes that arcs directly contacting human tissue may damage the tissue. *Id.* at 297.

*5. Willneff*

Willneff describes a "shock wave generator for medical applications with a spark gap located within a housing." Ex. 1006, 2.[15] We reproduce Willneff's Figure 1 at right, which is a schematic illustration of Willneff's catheter with a partial cross section view showing the configuration of tip 22. *Id.* at 9. Supply tube 8, return tube 10, and current feed 6 pass through sheath 12. *Id.* Balloon 18 is inflated and deflated with fluid supplied and controlled via tubes 8, 10. *Id.* A mechanical connection 20 between tip 22 and balloon 18 holds spark gap 16 in a fixed relationship with balloon 18. *Id.* Spark gap 16 is centered to avoid unintended tissue damage or burns. *Id.* at 5. The shock waves generated by arcs across spark gap 16 can remove concretions from the urinary tract. *Id.* at 4–5.




F. CLAIMS 1–17: OBVIOUSNESS IN VIEW OF LEVY, AAPA, AND ONE OF MANTELL, UCHIYAMA, OR WILLNEFF, AND IN FURTHER VIEW OF VARIOUS OTHER REFERENCES FOR CERTAIN CLAIMS

Petitioner argues that claims 1–6, 11, 14–16 are unpatentable as obvious in view of the combined teachings of Levy, the AAPA, and any one

---

[15] We, like Petitioner, refer to the page numbering of the translation of the Willneff reference itself rather than exhibit page numbers.

of Mantell, Uchiyama, or Willneff. Pet. 13–42. Petitioner relies on one or more of the same references or additional references to argue that dependent claims 7–10, 12, 13, and 17 are also obvious. *Id.* at 34–43. For the reasons expressed below, Petitioner has demonstrated by a preponderance of evidence that claims 1–4 and 6–17 are obvious in view of the teachings of the asserted combinations of prior art. However, Petitioner has failed to demonstrate by a preponderance of evidence that claim 5 is obvious.

*1. Independent Claim 1*

a. Summary of Petitioner's Argument and Evidence

Petitioner relies upon Levy as describing most of the physical elements of the catheter of claim 1 (carrier 1a, balloon 1b, and shockwave generator 1c–e) except that Levy uses a laser to generate shockwaves instead of an electrical arc. Pet. 23–31 (citing Ex. 1003, 1, 3, Figure 1; Ex. 1002 ¶¶ 109–123). Petitioner also relies upon AAPA as teaching the carrier with a guidewire lumen (element 1a) and balloon (element 1b). *Id.* at 23–25 (citing Ex. 1001, 3:65–4:2, Figure 1; Ex. 1002 ¶¶ 109, 113). Petitioner argues that an ordinarily skilled artisan would have been motivated to substitute any one of the arc-based shockwave generators described by Mantell, Uchiyama, or Willneff for Levy's laser-based shockwave generator to save cost, reduce complexity, and reduce overheating risks. *Id.* at 28–29 (citing Ex. 1002 ¶ 120). Petitioner contends that an ordinarily skilled artisan would have considered arc generators and lasers to be interchangeable devices for generating shockwaves to disintegrate unwanted deposits within blood vessels. *Id.* (citing Ex. 1002 ¶ 120); *see also id.* at 19–21 (citing Ex. 1002 ¶ 98; Ex. 1012, 1:5–10; Ex. 1006, 3) (discussing similarity of laser-

and arc-based methods for generating shockwaves to remove unwanted deposits within the body).

Petitioner persuades us by preponderance of evidence that the combined teachings of Levy, AAPA, and one of Mantell, Uchiyama, and Willneff describe all limitations of claim 1 and that an ordinarily skilled artisan would have combined those teachings to arrive at the angioplasty catheter of claim 1. We address Patent Owner's arguments otherwise below.

b. Whether Levy's Balloon Is an Angioplasty Balloon

Petitioner relies upon Levy as describing an angioplasty balloon near a distal end of the carrier and AAPA as describing the distal end of the balloon being sealed to the carrier. Pet. 25–26 (citing Ex. 1001, 3:65–4:2, Fig. 1; Ex. 1003, 4, Fig. 1; Ex. 1002 ¶¶ 113, 114). Patent Owner argues that Levy fails to describe an angioplasty balloon because Levy's balloon "does not displace plaque into the vessel wall in order to widen the lumen of the vessel." PO Resp. 20 (citing Ex. 2100 ¶¶ 55–58, 163–170). Rather, Patent Owner contends that Levy "removes" plaque through "erosion" and "disintegration." *Id.* (citing Ex. 1003, 3, 6; Ex. 2100 ¶¶ 163–170).

Patent Owner's argument is unpersuasive in rebutting Petitioner's showing that the prior art describes the claimed angioplasty balloon for two reasons. First, even accepting Patent Owner's description of Levy as using "erosion" and "disintegration" to remove plaque from the wall of an artery, such processes still widen a narrowed or obstructed blood vessel by removing "plaque deposits, or atheromas, which form on the inner walls of the blood vessels." Ex. 1003, 1. Such widening through ablation is within the scope of "angioplasty balloon" as we have interpreted the term. *See* Part II.A.1 above. Second, Patent Owner's argument fails to address Petitioner's

showing, Pet. 25, that the AAPA describes an angioplasty balloon. *See* PO Resp. 20–22 (addressing only whether Levy describes claimed "angioplasty balloon").

Based on our review of the record, Petitioner persuades us by a preponderance of evidence that Levy and the AAPA each describe the claimed angioplasty balloon.

c. Whether Levy's Balloon Includes a Shockwave Generator

Petitioner contends that Levy's laser-based device generates shockwaves inside the balloon without touching the balloon, which remains intact during formation of the shockwaves. Pet. 26–30 (citing Ex. 1003, 3, Fig. 1; Ex. 1021 ("Levy '227"),[16] 3:58–61; Ex. 1002 ¶¶ 116, 121, 122). Patent Owner contends that Levy fails to describe a "shockwave generator" because Levy refers only to "cavitation bubbles" that lead to "vigorous agitation" that causes disintegration of the plaque deposits. PO Resp. 22. Patent Owner concedes that Levy '227 refers to shockwaves, but argues that Levy '227 describes using shockwaves only within a tooth canal and not within a blood vessel. *Id.* at 22–24 (citing Ex. 2100 ¶¶ 55–58). We disagree.

Levy indisputably incorporates Levy '227 by reference as describing the laser used within Levy's balloon (Ex. 1003, 3, 5), and we, therefore, consider Levy '227 to be part of Levy for our analysis. Levy '227 first describes that its laser generates an "implosion" of gas bubbles within a tooth canal that results in "shockwaves" that detach debris from the walls of the canal. Ex. 1021, 3:39–42. Levy '227 later indicates that the same

[16] Exhibit 1021 is U.S. Patent 5,116,227, also to Levy, which is incorporated by reference into Levy. Ex. 1003, 3.

technique can clean blood vessels by removing "plaque deposits, or atheromas." *Id.* at 4:37–5:2; *see also* 2:12–33 (describing cavitation-based implosions as cleaning tooth canals and blood vessels among other body passages).

Patent Owner also argues that Levy's description of cavitation bubbles refers to the generation of "hydraulic or acoustic" waves rather than shockwaves. PO Resp. 23–24 (citing Ex. 2105 ("de la Torre"), 3:25–52; Ex. 2100 ¶¶ 55–58). Patent Owner supports its argument with Dr. Berger's analysis of de la Torre's description of the manner in which it uses a laser to create cavitation bubbles that avoid creating shockwaves. *Id.* (citing Ex. 2105, 3:25–52). We discount Dr. Berger's testimony and de la Torre's disclosure because they are inconsistent with Levy's express description of using its laser to generate cavitation bubbles within a balloon to create shockwaves as we find immediately above. *See* Ex. 1003, 3, 5 (incorporating description of the laser of Levy '227 as laser used in its balloon); Ex. 1021, 2:12–33, 3:39–42, 4:37–5:2 (expressly describing using laser to generate cavitation bubbles leading to shockwaves).

Petitioner also relies upon each of Mantell, Uchiyama, and Willneff as describing an arc generator that creates shockwaves between electrodes positioned within a balloon as claimed. Pet. 26–30 (citing Ex. 1004 ¶¶ 21, 24, 29, Figs. 1, 2, 5–7; Ex. 1005, 298, Figs. 1–7; Ex. 1006, 5, 10, Figs. 1–3; Ex. 1002 ¶¶ 117–119). Patent Owner does not respond to Petitioner's showing that each of these three references describes using arcs between electrodes within a balloon to generate shockwaves. PO Resp. 20–24 (arguing only that Levy does not describe generating shockwaves inside a balloon).

For the reasons above, Petitioner persuasively demonstrates by a preponderance of evidence that each of Levy, Mantell, Uchiyama, and Willneff describes generating shockwaves within a balloon, with Levy using a laser and the other references using electrical arcs between electrodes to do so.

d. Motive to Combine Teachings of the Prior Art

i. Whether EHL Probes[17] Would Have Been Considered Too Dangerous to Use in Blood Vessels

Patent Owner argues that danger to healthy tissue stemming from using EHL-generated shockwaves within blood vessels would have prevented an ordinarily skilled artisan from being motivated to incorporate the EHL probes of Mantell, Uchiyama, or Willneff into Levy's balloon. PO Resp. 24–44.

Patent Owner relies primarily upon Chernenko (Ex. 2046) as proving that EHL-generated shockwaves cannot be used safely within 5 mm of "soft tissues" such as the walls of a blood vessel. *Id.* at 24–25 (citing Ex. 2046 ¶ 11). Chernenko relates to a lithotripsy device for breaking calcified stones in the urinary system. Ex. 2046 ¶ 1. Chernenko's admonition against using EHL devices within 5 mm of soft tissue appears in its description of known devices. *See id.* ¶ 11 (in Background of the Invention section). Chernenko indicates that at least one prior art device includes a nozzle to direct shockwaves to a focal point. *Id.* ¶ 13. Dr. Berger relies heavily upon Chernenko's broad statements about other prior art that 5 mm is as close as an EHL probe can be located to soft tissue without damaging it and that

[17] Mantell and the parties refer to electrohydraulic lithotripsy probes as "EHL probes." Ex. 1004 ¶ 21; Pet. 1; PO Resp. 1.

shielding is necessary to focus shockwave energy. Ex. 2100 ¶¶ 32–38 (citing Ex. 2046 ¶¶ 11, 13, 88, Fig. 6).

We discount Dr. Berger's conclusions about the minimum safe distance between EHL probes and healthy tissue for two reasons. First, Chernenko advises that its EHL probe should be moved closer to its target such that at least one and preferably both electrodes directly contact the stone to be broken to ensure that arcing passes through the target stone. *Id.* ¶¶ 89–91, 105, Figs. 6b, 6c, 7a–d, 8a. Second, none of the other prior art summarized by Chernenko places an EHL probe inside a balloon or forms part of Petitioner's proposed combination. Chernenko and the prior art that it discusses relates to intracorporeal EHL probes that are not placed within balloons. *Id.* ¶¶ 1–13. Although Chernenko claims that its device can be used for "fragmentation of any foreign object[], which might appear in other locations of the body, e.g. in blood vessels etc.," *id.* ¶ 3, Chernenko never provides any further details on how so, *see generally id.*

Petitioner persuasively argues that:

> The prior art must be considered ***as a whole*** for what it teaches." *Medichem, S.A. v. Rolabo*, 437 F.3d 1157, 1166 (Fed. Cir. 2006); *In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991). Although a reference teaches away from the claimed invention when it "suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant" (*id.*, at 1165 (citing *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994)), there is no rule "that a single reference that teaches away will mandate a finding of nonobviousness" (*Medichem*, 437 F.3d at 1165; *In re Dome Patent*, 799 F.3d 1372, 1381 (Fed. Cir. 2015)).

Reply 19. Each of Mantell, Uchiyama, and Willneff generates shockwaves within a balloon that are used to erode an unwanted deposit within a cavity of the body. Pet. 26–30 (citing Ex. 1004 ¶¶ 21, 24, 29, Figs. 1, 2, 5–7;

Ex. 1005, 298, Figs. 1–7; Ex. 1006, 5, 10, Figs. 1–3; Ex. 1002 ¶¶ 117–119). Furthermore, Petitioner establishes that Levy generates shockwaves within an angioplasty balloon using a laser rather than electrodes. *See* Parts II.F.1.b–c above.

At most, Chernenko is relevant through its summary that the Canadian counterpart (Ex. 2102) to Bhatta (Ex. 1012) describes focusing shockwaves emanating from an EHL probe to increase the effectiveness of the device. Regarding safety, Bhatta suggests that damage to healthy tissue may result from direct impact of plasma generated by an EHL spark or laser or inadvertent puncturing by sharply pointed laser delivery fiber. Ex. 1012, 1:46–51. Bhatta comments that its nozzle 30 shapes shockwaves toward a focal point while also protecting surrounding tissue from problems associated with tip impacts and damaging effects of plasma. *Id.* at 3:22–25, 3:48–4:6. On balance, we find Patent Owner's argument that Chernenko forecloses any motivation to incorporate the EHL probes of Mantell, Uchiyama, or Willneff into Levy's angioplasty balloon unpersuasive.

ii. Petitioner's Alleged Motives to Replace Levy's Laser with an EHL Probe from Mantell, Uchiyama, or Willneff

Petitioner, through Dr. Jensen's testimony, contends that an ordinarily skilled artisan would have been motivated to substitute an EHL shockwave generator such as those described in Mantell, Uchiyama, or Willneff for Levy's laser-based shockwave generator for three reasons, including: (1) reducing complexity, (2) reducing cost and (2) generating less heat, which Levy recognized as an issue with its laser-based shockwave generator. Pet. 28 (citing Ex. 1002 ¶ 120). We analyze each reason below and conclude that Petitioner has proven by a preponderance of evidence that an ordinarily skilled artisan would have been motivated for at least two reasons

(reducing cost and complexity) to substitute an EHL shockwave generator for Levy's.

a) Complexity

Patent Owner argues that we should disregard Dr. Jensen's testimony that EHL systems are less complex than laser-based systems because he fails to cite objective evidence in support. PO Resp. 53. Patent Owner also argues, based on testimony from Dr. Berger and Dr. Jensen, that creating shockwaves using the sparks of EHL devices is "complicated" and not well understood. PO Resp. 54 (citing Ex. 2100 ¶¶ 138–139; Ex. 2156, 70:4–6, 83:13–14). Patent Owner, based on testimony from Dr. Berger, further argues that "electrical connections" of EHL systems are "more complex than the simple optical fiber technology of Levy." PO Resp. 54 (citing Ex. 2100 ¶ 140). The cited testimony from Dr. Berger fails to support the proposition for which Patent Owner cites it because it wholly fails to express any opinion about the circuitry that drives EHL or laser-based shockwave generators. Petitioner responds that the physics of spark formation are not claimed and that circuits for reliably creating sparks are well known. Reply 32 (citing Ex. 1200 ¶ 138).

Based on our review of the record, we determine that Petitioner has proven by a preponderance of evidence that an ordinarily skilled artisan would have been motivated to substitute an EHL probe for a laser lithotripsy probe to reduce complexity.

b) Cost

Petitioner contends that using a "laser to generate shockwave energy is well known to be expensive — approximately 10 times more expensive than a system employing electrohydraulic (i.e., pair of electrodes) system to

generate shockwaves." Ex. 1002 ¶ 95. During his deposition, Dr. Jensen stated that his opinion was based upon a journal article. Ex. 2111, 61:8–17 (identifying Huang article (Ex. 2157)).

Patent Owner does not dispute that Huang concludes that laser-based lithotripsy systems are greater than ten times more expensive to use than EHL systems, but rather argues that Huang's conclusion is improperly based upon total system costs including capital and maintenance costs. PO Resp. 56. Patent Owner argues, based on Dr. Berger's testimony, that comparing cost "at a catheter level" (i.e., the cost of the catheter alone) is more appropriate. *Id.* (citing Ex. 2100 ¶ 144). Dr. Berger fails to cite evidence to support his opinion or state how much more expensive and EHL catheter would be than a laser lithotripsy catheter. Ex. 2100 ¶ 144.

By contrast, Huang explains the basis of its cost analysis to conclude that the cost per case of using EHL is $336 versus $4,220 for laser-based lithotripsy. Huang explains:

> The large discrepancy in costs can be ascribed not only to the large initial capital outlay for the Candela LaserTripter, but also to the substantial amount that must be spent yearly on maintenance and supplies. Indeed, this yearly cost of the LaserTripter is more than the capital cost of the EHL machine. In effect, a new EHL machine could be purchased each year we operate the LaserTripter.

Ex. 2157, 238.[18] Huang also includes a table summarizing the costs by category that reflects the amortized costs of the probes (i.e., "fibers") per case that reveals that laser probes are almost five times more expensive per case than EHL probes. *Id.* at 239. Based on our review of Huang, we find

[18] We cite the native page numbers reflected in Huang rather than the exhibit page number.

that the analysis fairly reflects the comparative operating cost per case for each type of system.

Patent Owner also criticizes Dr. Jensen's reliance upon Huang's analysis because the comparatively poor safety of EHL versus laser lithotripsy outweighs the cost savings. PO Resp. 57–58. Patent Owner quotes Huang, *id.* at 57, which states that "[t]he perforation rates of lasertripsy are 1% to 12%, whereas that of EHL has been shown to be as high as 17% to 25%." Ex. 2157, 237. Huang's statement describes the safety of prior versions of EHL, however, not the EHL probe that Huang analyzed, which Huang described as "similar in freedom from significant complications" to the laser lithotripsy devices that were studied. *Id.* at 238. Huang also concludes that "EHL can be used safely for distal ureteral stones and is more cost effective than lasertripsy." *Id.* at 239. Huang recognized that the EHL and laser lithotripsy "modalities have inherent advantages and disadvantages." *Id.* However, if a hospital "must choose one lithotripter," the "EHL unit with the smaller-caliber probes would be the logical choice, because this is a safe, effective, and cost effective modality." *Id.*

Based on our review of the entire record, Petitioner has proven by a preponderance of evidence that an ordinarily skilled artisan would have been motivated to substitute an EHL probe for a laser lithotripsy probe to save cost.

c) Reduce Heat

Petitioner contends that Levy itself identifies heat generated by its laser as enough of a concern that its balloon could be cooled by circulating liquid through the balloon. Pet. 18, 29 (citing Ex. 1002 ¶¶ 96, 120); Reply 31 (citing Ex. 1003, 3–5). However, Petitioner fails to adduce

evidence that an EHL shockwave generator produces less heat than a laser-based shockwave generator such as Levy's. Accordingly, we determine that Petitioner has failed to prove by a preponderance of evidence that an ordinarily skilled artisan would have been motivated to substitute an EHL probe for Levy's laser probe to reduce heat generated by the probe.

iii. Motive to Incorporate a AAPA Guidewire and Sealing Arrangement into Levy

As an initial matter, we address Patent Owner's argument that we may not consider AAPA during this proceeding because the AAPA is not a patent or printed publication under § 311(b). PO Resp. 64–65. We disagree.

The Federal Circuit has affirmed Board decisions in *inter partes* review that claims were unpatentable based in part upon admitted prior art found in the challenged patent. *B/E Aerospace, Inc. v. C&D Zodiac, Inc.*, No. 2019-1935, 2020 WL 3478651, at *5 (Fed. Cir. June 26, 2020); *Papst Licensing GMBH & Co. v. Samsung Elecs. Am., Inc.*, 924 F.3d 1243, 1255 (Fed. Cir. 2019). Additionally, the Board, and our reviewing Court, have long treated a patentee's admissions as prior art: "We see no reason why the patentee's representations in their application should not be accepted at face value as admissions that . . . may be considered 'prior art' for any purpose, including use as evidence of obviousness under 35 U.S.C. [§] 103." *In re Nomiya*, 509 F.2d 566, 570–71 (CCPA 1975). This is true, even though the admissions may not qualify as prior art under 35 U.S.C. § 102:

> [A] statement by an applicant, whether in the application or in other papers submitted during prosecution, that certain matter is "prior art" to him, is an admission that that matter is prior art for all purposes, whether or not a basis in [§] 102 can be found for its use as prior art.

*Id.* at 571 n.5. The AAPA upon which Petitioner relies is expressly characterized as prior art and appears in a patent. We consider the AAPA to constitute "prior art consisting of patents" as stated in 35 U.S.C. § 311(b). Accordingly, we find Patent Owner's argument unpersuasive and consider the AAPA relied upon by Petitioner.

On the merits, no dispute exists that a guidewire extending through a carrier to which an angioplasty balloon is sealed near its distal end was well known. The '371 patent labels such an arrangement "PRIOR ART" as shown in Figure 1, reproduced at right. Although the guidewire is not shown in Figure 1 or any figure illustrating the claimed invention, the Specification describes Figure 1 as illustrating "a typical prior art over-the-wire angioplasty balloon catheter 10." *Id.* at 3:66–67; *see also id.* 4:31–33 (describing guidewire not shown in Figure 2 illustration of invention).

FIG. 1
(PRIOR ART)




Petitioner relies upon Figure 1 of the '371 patent and its accompanying text as constituting AAPA. Pet. 23–25 (citing Ex. 1001, 3:65–4:2, Fig. 1; Ex. 1002 ¶ 113). Petitioner contends that a similar arrangement is also shown in other prior art, Healy (Ex. 1047). *Id.* Prior art of record confirms that the arrangement of a balloon sealed near the distal end of a carrier through which a guidewire extends was well known. Ex. 1008 ¶¶ 21–22, Figs. 1–3; Ex. 1047, Abstract, 3:17–27, Fig. 2; Ex. 1268 ("Lennox"), 4:63–5:8; Figs. 1, 3; Ex. 2110, 3:26–51, Figs. 2, 3. The prosecution history of the '371 patent confirms the same. The Examiner found that the prior art taught the claimed structural arrangement between

the balloon, carrier, and guidewire, Ex. 1013, 304 (applying Lennox), and Patent Owner did not contest the Examiner's finding, *id.* at 290–297.

Petitioner argues that it was known to an ordinarily skilled artisan to use a guidewire extending through an elongated bore to assist a physician to navigate the catheter to reach the area for treatment. Pet. 24 (citing Ex. 1002 ¶ 112). Petitioner also argues that it would have been obvious to "implement the AAPA with the angioplasty balloon described in Levy" as a "routine design choice" because the arrangement was "the most common angioplasty catheter and balloon design, with predictable and expected results." Pet. 26 (citing Ex. 1002 ¶ 115).

Patent Owner argues that Petitioner did not establish that an ordinarily skilled artisan would have been motivated to modify Levy by incorporating the guidewire extending through the carrier as described by the AAPA. PO Resp. 59–62. Patent Owner also argues that Petitioner failed to establish that an ordinarily skilled artisan would have been motivated to modify Levy to seal its balloon near the distal end of Levy's catheter as described by the AAPA. *Id.* at 62–63.

In response to both arguments, Petitioner points out that an ordinarily skilled artisan would understand Levy to be adapted for angioplasty procedures. Reply 34 (citing Ex. 1002 ¶¶ 114, 156; Ex. 1003, 5 ("[T]he balloon may have the shape of a balloon of the kind that is used with catheters used to perform treatments in [b]lood vessels."); Ex. 1200 ¶ 142). Petitioner also contends, based on testimony of Dr. Jensen, that an ordinarily skilled artisan

> looking to adapt Levy's catheter and/or balloon design to increase the types of treatments Levy could perform, would have been motivated to look to other catheters/balloons used to

> perform treatments in blood vessels, including the AAPA—i.e., the "most common angioplasty catheter and balloon design" as Dr. Jensen described in his original declaration.

Reply 34 (citing Ex. 1002 ¶¶ 115, 157). Petitioner also argues that configuring Levy according to well-known principles reflected by the AAPA "would have been a routine design choice well within the [artisan's] skill set and would have yielded predicable results." *Id.* (citing Ex. 1002 ¶¶ 115, 157; *KSR*, 550 U.S. 398 at 416).

In its Sur-reply, Patent Owner argues that Dr. Jensen's testimony is insufficient because he fails to explain how or why an ordinarily skilled artisan would have modified Levy's catheter. Sur-reply 31–32. However, we find this argument unpersuasive because the prior art and prosecution history of the '371 patent indisputably establishes that the configuration of an angioplasty catheter with a balloon sealed to the distal end of a carrier through which a guidewire extends was so well known. Ex. 1001, 3:65–4:2, Fig. 1; Ex. 1008 ¶¶ 21–22, Figs. 1–3; Ex. 1047, Abstract, 3:17–27, Fig. 2; Ex. 1268, 4:63–5:8; Figs. 1, 3; Ex. 2110, 3:26–51, Figs. 2, 3; Ex. 1013, 290–297, 304.

For all the reasons identified by Petitioner above and the testimony by Dr. Jensen, we find that Petitioner has proven by a preponderance of evidence that an ordinarily skilled artisan would have had motive to combine teachings of Levy and AAPA to arrive at the claimed configuration of the balloon sealed near the distal end of a carrier through which a guidewire extends.

e. Reasonable Expectation of Success

Petitioner contends that an ordinarily skilled artisan would have understood how to substitute an EHL shockwave generator from Mantell,

Uchiyama, or Willneff for Levy's laser-based shockwave generator because electrodes and lasers were known and interchangeable alternative mechanisms for generating shockwaves. Pet. 1–2 (citing Ex. 1012), 19–20 (citing Ex. 1012, 1:5–10, 1:15–30, Ex. 1002 ¶ 98), 28–29 (citing Ex. 1002 ¶ 120). Patent Owner contends that an ordinarily skilled artisan would not have reasonably expected to successfully substitute electrodes of Mantell, Uchiyama, or Willneff for Levy's laser for four reasons. PO Resp. 44–53. We address each reason below.

i. Whether EHL and Laser Lithotripsy Are Known Alternatives

Patent Owner argues that Dr. Jensen wrongly concludes that Levy's laser generate shockwaves in the same manner as electrodes. PO Resp. 44–45. More specifically, Patent Owner argues that Levy does not generate shockwaves at all, but merely generates "less powerful and harmful acoustic waves." *Id.* at 45 (citing Ex. 2100 ¶ 131). For the reasons expressed in Part II.F.1.c above, we disagree and find that Petitioner has proven by a preponderance of evidence that Levy, Mantell, Uchiyama, and Willneff all generate shockwaves in the same manner, by creating cavitation bubbles in the fluid whose collapse creates shockwaves.

Patent Owner also argues that Bhatta does not establish that lasers and electrodes are known interchangeable alternatives for generating shockwaves. *Id.* at 45–46. More specifically, Patent Owner contends that Bhatta refers to waves generated by lasers as "stress waves" but waves generated by electrodes as "shockwaves." *Id.* (citing Ex. 1012, 1:17–18, 2:5–11; Ex. 2100 ¶¶ 46, 55–58). Patent Owner's argument is unpersuasive because we see no meaningful distinction drawn by Bhatta between "stress waves" and "shockwaves." Bhatta expressly equates laser and electrodes as

mechanisms for breaking biliary calculi when it explains that: "Electrohydraulic lithotripsy and laser lithotripsy systems frequently are used to fragment urinary and biliary stones. Both systems utilize plasma-induced stress waves to fragment calculi." Ex. 1012, 1:16–19. Furthermore, when Bhatta describes its own electrode-based invention, it sometimes refers to the electrodes as generating "energy pulse waves," which Bhatta equates with "shockwaves." *Id.* at 2:5–11, Abstract. Patent Owner's argument that Bhatta's choice of "stress" or "shock" refers to different types of waves is simply not supported by Bhatta considered as a whole. Bhatta also expressly states that its device is suited for treating arteriosclerotic plaque. *Id.* at 1:5–9. We find that the record establishes that an ordinarily skilled artisan would have understood lasers and electrodes to be alternative forms of generating shockwaves for treating plaque in vessels.

ii. Whether an Artisan Would Have Expected Electrodes to Burst the Angioplasty Balloon

Patent Owner argues that an ordinarily skilled artisan would have expected an EHL probe placed in an angioplasty balloon to fail by bursting the balloon. PO Resp. 46–51. Patent Owner relies primarily upon testimony from Dr. Berger and his review of other evidence including declarations from other witnesses and objective evidence. *Id.* (citing Ex. 2100 ¶¶ 148–161 (citing Ex. 2033, 3[19] ("Zhong"); Ex. 2048; Ex. 2111; Ex. 2115; Ex. 2117; Ex. 2118; Fig. 5; Ex. 2119; Ex. 2170; Ex. 2173; Ex. 2174; Ex. 2175). Dr. Berger's opinion rests upon his understanding that EHL steam bubbles create "peak pressures of 50-250 ATM" (Ex. 2100 ¶ 154

[19] Our citations refer to the exhibit page number rather than Zhong's internal numbering.

citing Ex. 2033, 5, Fig. 8), which exceed typical burst pressures of angioplasty balloons of "around 25–30 ATM" (Ex. 2100 ¶ 153 (citing Ex. 2048, 2; Ex. 2111, 162:14–163:5; Ex. 2115, 4, Table 2)).

Petitioner responds that Dr. Berger's testimony is inconsistent with the teachings of the prior art that Petitioner cites as a basis for its challenge because each of Mantell, Uchiyama, and Willneff describes using an EHL probe within a balloon without bursting the balloon. Reply 27. Petitioner also notes that Willneff explains that steep pressure spikes pass through the balloon and healthy tissue to act upon target concretions. *Id.* at 28 (citing Ex. 1006, 4[20]); *see also* Ex. 1006, 7. Petitioner also points out that Dr. Berger's reliance on testimony from Drs. Soukas, Kereiakes, and Armstrong expressing skepticism that Patent Owner's device would work without bursting the balloon is flawed for three reasons. Reply 28. More specifically, Petitioner argues that: (1) Drs. Soukas, Kereiakes, and Armstrong are not proven to be ordinarily skilled artisans, (2) they did not review the '371 patent or the asserted prior art, and (3) their skepticism has not been shown to have existed at the time of invention. *Id.*

Based on our review of the entire record, Petitioner persuades us that an ordinarily skilled artisan would have had a reasonable expectation that substituting an EHL probe as taught by Mantell, Uchiyama, or Willneff for Levy's laser probe would not have burst Levy's balloon.

[20] Our citations to Willneff refer to Willneff's internal numbering rather than the exhibit page number.

iii. Whether the Proposed Combination Results in an Unacceptably Large Balloon Diameter

Patent Owner argues, based on Dr. Berger's testimony, that an ordinarily skilled artisan would have expected that adding electrical components to the interior of the AAPA angioplasty balloon would be unsuccessful because it would increase the diameter of the balloon. PO Resp. 51–52 (citing Ex. 2100 ¶¶ 121, 133, 150, 151, 171–173). We discount Dr. Berger's testimony because it is: (1) poorly supported by objective evidence (citing no evidence of the size of EHL, ultrasound, or laser-based angioplasty devices in the prior art), (2) is inconsistent with the express teachings of at least Levy (Ex. 1003, Fig. 1), O'Boyle (Ex. 2109, 3:20–21, 3:53–62), O'Connor (Ex. 2110, 3:36–57), and Bhatta (Ex. 1012, 2:52–3:11, Fig. 1), which all describe devices used to treat blood vessels that include probes inside a balloon, and (3) based upon a flawed legal premise that demonstrating obviousness requires proof that one device may be bodily incorporated into another.

Based on our review of the entire record, Petitioner persuades us that an ordinarily skilled artisan would have expected to succeed at placing an EHL probe inside a balloon without resulting in an acceptably large diameter of the balloon.

iv. Whether the Proposed Combination Would Lead to Restenosis and Embolism

Patent Owner contends, based on Dr. Berger's testimony, that an ordinarily skilled artisan would have feared that placing a shockwave generator inside an angioplasty balloon would "likely have result[ed] in embolism" and "lead to restenosis caused by thermal damage." PO Resp. 52–53 (citing Ex. 2100 ¶¶ 174–176, 206). Petitioner points out that

balloon angioplasty without a shockwave generator includes a low risk of embolism and contends that an ordinarily skilled artisan would expect a similarly low risk using a balloon with a shockwave generator. Reply 29–30 (citing Ex. 1200 ¶ 133). Petitioner also points out that a saline-filled balloon would protect the patient from thermal damage. *Id.* at 30 (citing Ex. 1200 ¶ 133).

Both Dr. Berger and Dr. Jensen appear to draw their respective conclusions without any objective evidence to support them. *See* Ex. 2100 ¶¶ 174–176, 206; Ex. 1200 ¶ 133. O'Boyle and O'Connor from the prior art also express concerns about embolism associated with balloon angioplasty. Ex. 2109, 1:32–43; Ex. 2110, 1:14–20. We also note that a risk of embolism is present even in Patent Owner's commercial device. *See* Ex. 2028, 3 (listing "Emboli (air, tissue, thrombus, or atherosclerotic emboli" and stating that "[p]ossible adverse effects are consistent with standard angioplasty"). Therefore, because embolism is a generalized concern with all balloon angioplasty, we fail to see why an ordinarily skilled artisan would have believed no reasonable chance of success existed if the prior art teachings were combined as proposed by Petitioner.

Regarding restenosis from thermal damage, Levy refers to the saline in its balloon as "coolant," which can be circulated or may be of low enough temperature or high enough heat absorption capacity to address any concern about damaging the vessel with excessive heat. Ex. 1003, 4–5. Moreover, even if we were to credit Patent Owner's proof, we do not consider the alleged concern to be of the type that would obviate Petitioner's motivations to substitute the EHL devices of Mantell, Uchiyama, or Willneff for Levy's laser probe. Our reviewing court has recognized that a given course of

action often has simultaneous advantages and disadvantages, and this does not necessarily obviate any or all reasons to combine teachings. *See Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000) ("The fact that the motivating benefit comes at the expense of another benefit, however, should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another. Instead, the benefits, both lost and gained, should be weighed against one another.").

We determine that Petitioner has demonstrated that an ordinarily skilled artisan would have reasonably believed that Petitioner's proposed combination of teachings from the prior art would be successful.

f. Objective Indicia of Nonobviousness

i. Nexus

Patent Owner argues, based solely upon testimony of Dr. Berger, that it has proven that it is entitled to a presumption of nexus between the claimed invention and all objective evidence of non-obviousness because "the claims" are "essentially coextensive with the Shockwave IVL system." PO Resp. 68–69 (citing Ex. 2100 ¶ 201). Dr. Berger's cited testimony states:

> The claims are also not merely directed to a small component of a larger system; rather, they are directed to the essence of the innovation that was identified by analysts as one of the major drivers of Shockwave's success. The analysts identified Shockwave's "elegant," "easy-to-use," "unique" and "innovative" technology as one of the most important factors in Shockwave's stock performance.

Ex. 2100 ¶ 201. Dr. Berger does not link the claims to the structure of Patent Owner's commercial device in this testimony. Rather, he links the claims to "the essence of the innovation" and the "major drivers of [Patent

Owner's] success." *Id.* Dr. Berger's immediately preceding paragraph reflects his comparison of the claims to Patent Owner's commercial product. *Id.* ¶ 200. We interpret Patent Owner to have intended to cite paragraph 200 of Dr. Berger's testimony.

Petitioner appears to have interpreted Patent Owner's argument the same way. *See* Reply 36 (referring to Dr. Berger's testimony as ¶ 200 as the evidence of nexus). Petitioner contends that Dr. Berger cannot render an opinion that the claims cover Patent Owner's Shockwave IVL[21] product because he has seen only photos of the Shockwave IVL, does not know who prepared the claim chart that appears in his Declaration, and merely reviewed written materials to verify that the words and pictures appearing in the chart were present in the cited documents. *Id.*

Patent Owner bears the burden of establishing that a nexus exists "between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019)). Patent Owner is entitled to a rebuttable presumption of nexus "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)); *see also Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 32 (PTAB Jan. 24, 2020) (Final Written Decision) (precedential). "A patent claim is not coextensive with a product that includes a 'critical' unclaimed feature that is claimed by a different patent

[21] IVL refers to intravascular lithotripsy. Ex. 2100 ¶ 190.

and that materially impacts the product's functionality . . . ." *Fox Factory*, 944 F.3d at 1375. Nevertheless, even if a patentee fails to demonstrate a presumption of nexus, it may directly establish a nexus between the claimed invention and the objective evidence of non-obviousness. *Id.* at 1378. The patentee bears the burden of directly proving such a nexus. *Id.*

Based on our review of Dr. Berger's testimony about the "claim chart" appearing in his Declaration, we find that Patent Owner fails to prove by a preponderance of evidence that "the Shockwave IVL devices include each feature recited in the claims" as Dr. Berger opines. Ex. 2100 ¶ 200. First, the claim chart does not include any claim language at all. *Id.* Rather, it merely refers to claim language using shorthand [1a]–[1e], which the parties use in their briefing. *Id.* However, Dr. Berger never explains his understanding of what that shorthand means. *See generally*, Ex. 2100.

More importantly, based on our own review of the chart, many details of the claimed invention are left unaddressed. For example, the chart fails to address expressly whether the Shockwave IVL devices include:

> a "distal end of the balloon being sealed to the carrier near the distal end,"
>
> a "proximal end of the balloon defining an annular channel arranged to receive a fluid therein that inflates the balloon,"
>
> a "pair of electrodes," or
>
> the "arc generator generating a high voltage pulse sufficient to create a plasma arc between the electrodes resulting in a mechanical shock wave within the balloon."

*Compare* Ex. 2100 ¶ 200 (descriptions in claim chart), *with* Ex. 1001, 6:21–39 (claim 1). We have reviewed the entirety of the evidence cited in the chart and found that none of it ever refers to "electrodes," "arc," or "plasma." The evidence adduced by Patent Owner simply fails to carry its

burden of persuasion that the claims cover its product, much less that the two are sufficiently coextensive to be entitled to a presumption of nexus. Nevertheless, for purposes of the analysis below, we will assume that Patent Owner has demonstrated that the claims cover its commercial product and some degree of nexus between its objective evidence of nonobviousness and the claimed features.

ii. Long Felt Need

Patent Owner contends that its device, Shockwave IVL, filled a long felt need for a device that could effectively treat medial calcified lesions. PO Resp. 69–75. Patent Owner supports its argument with testimony from Dr. Berger (Ex. 2100 ¶¶ 190–203) and testimony from clinicians, Drs. Kereiakes (Ex. 2174), Lyden (Ex. 2171), Hill (Ex. 2172), Soukas (Ex. 2170), and Armstrong (Ex. 2173), and statements appearing in documents distributed by financial analysts at Wells Fargo (Exs. 2003, 2004, 2016, 2017). PO Resp. 69–75. Dr. Berger relies on many of the same items of evidence but also considers journal articles. We analyze each type of evidence below.

a) Clinicians' Testimony

Dr. Kereiakes explains that medial plaque occurs within the walls of arteries and can "cause narrowing of the lumen of the artery" and opines that "there has been no known way to treat a medial calcified lesion." Ex. 2174 ¶ 9. Dr. Lyden testifies that "medial calcified lesions" prevented angioplasty balloons from expanding a vessel sufficiently to enable the placement of a stent to hold the vessel open. Ex. 2171 ¶ 15. Dr. Hill testifies that "the community struggled to achieve full lesion expansion that would allow the lumen of the artery to be expanded to the desired diameter" often because of

"medial calcified lesions." Ex. 2172 ¶ 7. Dr. Soukas testifies that "Shockwave IVL was the first, and remains the only, effective treatment for medial calcified lesions. . . . [N]either atherectomy nor an angioplasty balloon are effective at breaking up medial plaque." Ex. 2170 ¶ 15.

We note that none of the Patent Owner's clinicians support any of their testimony about the benefits of Shockwave IVL over competitive devices with citations to objective evidence. *See* Exs. 2170–2174 (citing no outside evidence objective or otherwise). We consider this fact to slightly reduce the weight of the testimony from these clinicians, but we also recognize them as having firsthand knowledge of outcomes in certain cases involving the use of Patent Owner's Shockwave IVL device. Those experiences, however, are merely ad hoc examples of success that we do not consider to definitively prove that the Shockwave IVL is the first and only way to treat occluded vessels that also exhibit medial calcification. Accordingly, we consider the testimony from clinicians to be of modest, but meaningful, probative value on whether IVL is more effective than pre-existing options for treating calcified plaque that includes plaque within the medial tissues of arteries.

Petitioner argues that no "unmet need to effectively treat medial calcified lesions" exists because medial calcium rarely obstructs blood vessels and rarely causes symptoms that require medical treatment. Reply 37. Petitioner supports its argument with deposition testimony of Drs. Soukas, Hill, and Kereiakes (clinicians proffered by Patent Owner) and declarations from Drs. Chambers and Finn (clinicians proffered by Petitioner). *Id.* at 37–38 (citing Ex. 1212, 34:8–14, 37:24–39:5; Ex. 1211, 86:19–87:19, Ex. 1213, 38:12–23; Ex. 1350 ¶¶ 8–9; Ex. 1362 ¶¶ 9–15). We

find that this cited testimony establishes that all five clinicians agree that the presence of medial calcium alone does not call for treatment by cardiovascular intervention. We have carefully reviewed Petitioner's cited evidence and find it persuasive on this point.

Patent Owner attempts to rebut Petitioner's cited evidence by citing deposition testimony from Dr. Finn for the proposition that he defined "medial calcification" as a condition not associated with atherosclerotic plaque that obstructs blood vessels. Sur-reply 41 (citing Ex. 2253, 25:13–25, 26:5–29:16). Based on our review of this cited testimony from Dr. Finn, we find that it fails to support Patent Owner's position. Rather, the testimony reveals that Dr. Finn uniformly distinguishes "medial calcification" from atherosclerotic plaque, which occurs in the intimal layer of a vessel and is a different form of calcification. Ex. 2253, 25:13–25, 26:5–16. The objective evidence about which Patent Owner questioned Dr. Finn, which relates to the progression of calcification in arteries, similarly distinguishes between medial calcification and atherosclerotic plaque. *See, e.g.*, Ex. 2247 ("atherosclerotic intimal calcification is different from medial Monckeberg calcification, and the latter occurs independently from intimal calcification").

Patent Owner also argues that Dr. Chambers uses "medial calcification" to refer to "deep atherosclerotic plaque that occludes the vessel and requires treatment by angioplasty or otherwise." Sur-reply 41–42 (citing Ex. 2251, 39:2–19, 40:2–4, 132:6–11). However, we find that Dr. Chambers' cited testimony merely confirms his originally stated view that "medial calcium" alone does not require treatment unless calcium is also present in the intima. Ex. 2251, 39:2–40:22. Petitioner contends, based

upon Dr. Chambers' testimony, that orbital atherectomy was a successful method of treating heavily calcified plaque that included medial plaque. Reply 38 (citing Ex. 1350 ¶ 9–21). Dr. Chambers' testimony is supported by citations to objective evidence. Ex. 1350 ¶¶ 16–19 (citing Exs. 1351–1353). His testimony is also consistent with the conclusions about the efficacy of rotational atherectomy reflected in the Dill paper discussed in Part II.F.1.f.ii.b) below, which we consider to be highly probative evidence on this point.

b) Articles Cited by Dr. Berger

Dr. Berger relies, in part, upon reports from financial analysts and three journal articles for his opinion that Shockwave IVL was more effective at treating vessels that included medial calcified lesions than either traditional balloon angioplasty or rotational atherectomy. Ex. 2100 ¶¶ 193–196 (citing Ex. 2126;[22] Ex. 2127; Ex. 2128). Exhibit 2126 ("Dill") is a paper reporting results of a randomized study of about 500 total patients on the comparative efficacy of using either a rotational atherectomy device or traditional angioplasty balloons for treating "complex, calcified, and long lesions" in small coronary arteries. Ex. 2126, 1. Dill concludes that both treatment methods were relatively successful in treating the "difficult morphologies" of the studied complex lesions with success rates of 78% (angioplasty) and 85% (atherectomy). *Id.* at 6–7. Dill concluded that rotational atherectomy may be required to treat lesions "resistant to high balloon pressures." *Id.* at 7.

---

[22] Dr. Berger erroneously cites Exhibit 2136, but context makes clear that he intended to cite Exhibit 2126. Ex. 2100 ¶ 194.

We view Dill to be among the most probative evidence on the issue of whether rotational atherectomy was effective for treating complex calcified lesions in coronary arteries. Dill establishes that rotational atherectomy was more effective than traditional angioplasty balloons for such lesions and undermines Patent Owner's contention that Shockwave IVL was the only treatment available for such lesions.

Exhibits 2127 and 2128 ("CAD I" and "CAD II" respectively, and collectively, the "CAD Studies") reflect results of tests focusing solely upon whether the Shockwave IVL device is safe and effective at treating "heavily calcified atherosclerotic plaques," Ex. 2127, 1, or "severe CAC [coronary artery calcification]," Ex. 2128, 2. CAD I involved treatment of 60 patients. Ex. 2127, 2. CAD II involved treatment of 120 patients. Ex. 2128, 4. The CAD Studies conclude that Shockwave IVL was "a feasible frontline tool for CAC plaque modification." Ex. 2128, 6. The CAD II study indicates that using Shockwave IVL resulted in "intraplaque calcium fracture, thereby modifying vascular compliance and facilitating stent expansion." *Id.* The success rates of IVL determined in CAD I and CAD II were 95% and 94.2% respectively with very few side effects noted during each 30-day study period. Ex. 2127, 2; Ex. 2128, 5, Table 4. Neither of the CAD Studies presented detailed information of the precise radial depth of calcification within the tissues of the arteries that were treated (i.e., whether the calcification was in the intimal or medial tissues), but CAD II indicated that maximum calcium fracture depth of 0.6±0.3 mm and maximum calcium thickness at fracture site of 0.8±0.3 mm was observed in the 37 patients for whom such data was gathered. Ex. 2128, 7, Table 7.

We similarly view the CAD Studies as objective and reliable evidence of the potential efficacy of using IVL to treat severe coronary artery calcification. However, one limitation that we note is that neither of the CAD Studies reflect whether IVL had detrimental side effects after the 30-day study period.

Petitioner contends, based on testimony by Dr. Chambers, that IVL has been shown to have a primary patency rate (i.e., the rate at which a treated vessel remains open) that is lower than that expected for balloon angioplasty and drug eluting angioplasty. Reply 39 (citing Ex. 1350 ¶¶ 25–26). Dr. Chambers relies upon articles that reported 12-month patency rates for patients treated with IVL in peripheral arteries (in the "PAD II" trial) was 54% while patients in a different study that were treated with balloon angioplasty or drug eluting balloons exhibited patency rates of 75% and 94.7% respectively. Ex. 1350 ¶¶ 25–26 (Ex. 1355; Ex. 1356). We consider Dr. Berger's testimony on this point to be credible.

c) Statements by Financial Analysts

Patent Owner and Dr. Berger rely upon unsupported statements in documents written by unidentified employees of various financial advisers describing the Shockwave IVL was more effective than "[a]therectomy and other plaque modification devices" at treating medial calcium. *See, e.g.*, Ex. 2100 ¶ 193 (quoting Ex. 2006, 17).

We discount the probative weight of all the statements from financial analysts as being from authors who have not been established to either have relevant medical or scientific training or may have biases based on financial interest. For example, Wells Fargo warns readers of its "analysis" of Patent Owner's stock that: "investors should be aware that the firm may have a

conflict of interest that could affect the objectivity of the report and investors should consider this report as only a single factor in making their investment decision." Ex. 2006, 1. Wells Fargo also refers readers of the report to "page 31 for . . . important disclosures" that reflect five different ways in which Wells Fargo has financial interests in or received compensation from Patent Owner in the past or going into the future. *Id.* at 1, 31–32. The probative weight of such evidence is not increased merely by having Dr. Berger read it and recount the conclusions drawn by such analysts. Accordingly, we ascribe little weight to statements by the financial analysts or Dr. Berger's testimony that relies upon such statements.

d) FDA Breakthrough Designation

Patent Owner argues, based on testimony from Dr. Berger, that the designation of the Shockwave IVL as a "breakthrough device" by the FDA establishes that its device treats a condition for which "no approved or cleared alternatives exist." PO Resp. 73–74 (citing Ex. 2100 ¶¶ 197–199). The documents upon which Dr. Berger bases his testimony are the letter from the FDA informing Patent Owner of its designation (Ex. 2124) and "Guidance for Industry" from the FDA on the "Breakthrough Devices Program" (Ex. 2125). Ex. 2100 ¶¶ 197–199 (citing Ex. 2124; Ex. 2125).

A "breakthrough device" designation as defined in section 515B(b) of the FD&C Act refers to devices:

> (1) that provide for more effective treatment or diagnosis of life-threatening or irreversibly debilitating human disease or conditions; and
>
> (2)(A) that represent breakthrough technologies;
>
> (B) for which no approved or cleared alternatives exist;

> (C) that offer significant advantages over existing approved or cleared alternatives, including the potential, compared to existing approved alternatives, to reduce or eliminate the need for hospitalization, improve patient quality of life, facilitate patients' ability to manage their own care (such as through self-directed personal assistance), or establish long-term clinical efficiencies; or
>
> (D) the availability of which is in the best interest of patients.

Ex. 2125, 8.

FDA guidance explains that a breakthrough designation may be granted for devices that meet the requirement of section (1) and *one* of the four subparagraphs listed in section (2) (i.e., one of (2)(A)–(D)). Meeting section (1) requirement can occur when the manufacturer shows "a reasonable expectation that the device could provide for more effective treatment or diagnosis of the disease or condition identified in the proposed indications for use." *Id.* at 9. This showing may be made based upon "literature or preliminary data." *Id.*

Without further explanation or identifying specific evidence, Dr. Berger concludes that "[b]ased on the evidence discussed above, I believe that the Shockwave IVL meets each of the criteria 2(A) through 2(D)." Ex. 2100 ¶ 199. Petitioner correctly notes that Patent Owner has submitted no evidence revealing the content of its request for a breakthrough designation or any correspondence with the FDA relating to its application for the designation other than the FDA's letter granting the breakthrough designation. Reply 40. Petitioner also contends that the FDA grants breakthrough designations about 71% of the time. *Id.*

Based on FDA guidance discussed immediately above, we conclude that Patent Owner could have obtained the designation by merely

demonstrating a "reasonable expectation" based on "literature or preliminary data" that the Shockwave IVL is more effective at treating a life threatening or debilitating condition. We discern no reliable basis for Dr. Berger to have concluded that the Shockwave IVL met all four of the section (2) criteria for devices that are "breakthrough devices" because none of the items upon which Dr. Berger relies reflects personal knowledge of underlying facts needed to draw such a conclusion. Accordingly, we ascribe little probative weight to the FDA's "breakthrough device" designation because: (i) Patent Owner failed to supply evidence of the precise basis for its request for designation or the FDA's precise basis for granting it, (ii) manufacturers need only demonstrate a "reasonable expectation" of meeting the criterion of section (1) based on "literature or preliminary data," and (iii) about 71% of those seeking the designation get it.

e) Evidence First Introduced with the Sur-Reply

Patent Owner presents Exhibit 2131 ("Kassimis") for the first time with its Sur-reply. Sur-reply 42 (citing Ex. 2131). Patent Owner argues that Kassimis reports a head-to-head comparison of orbital atherectomy and IVL treatments and concludes that IVL is superior based on the following quote:

> Moreover, ***shock-wave pulses affect calcium sheets located within the target field regardless of their depth in the vessel wall, which contrasts with inefficacy of PTRA or OA [rotational or orbital atherectomy] to modify deep-seated calcium***. . .
>
> IVL is unique among all technologies in its ability to modify calcium circumferentially and transmurally thus, modifying transmural conduit compliance. [. . .] ***We believe that IVL balloon is going to transform the market***, as it is easy to use, with predictable results and in most centers will replace cutting and scoring balloons for the treatment of calcific disease.

*Id.* (quoting and emphasizing text of Ex. 2131, 11).

This passage speaks glowingly about IVL, but the statement is prospective and not definitive, which is apparent from the following section of Kassimis, labeled "Conclusion," which reads:

> The optimal therapy for calcified CAD [coronary artery disease] is multi-adjunctive and *several strategies should always be available in the catheter laboratory* (Fig. 10). The outcome is less favourable compared to non-calcified lesions, but with increased understanding of calcification, more sophisticated, individualized treatment regiments will likely evolve to make optimal use of the variety of dedicated technologies and success. The advent of the IVL balloon *may* revolutionise this indication *but* cost-effectiveess of these advanced technologies will need to be considered.

Ex. 2131, 11 (emphasis added). The "several strategies" of "Fig. 10" includes orbital atherectomy. *Id.* at 10, Fig. 10. Thus, Kassimis recognizes that IVL is not yet proven to be a superior treatment for calcified coronary artery disease, but is likely to be an important option added to existing options for treating the entire population of potential patients. On balance, Kassimis supports Patent Owner's argument that IVL has promise to be an improved mode of treating certain types of coronary artery disease.

f) Conclusion

Based on our analysis of the evidence adduced by both parties, we conclude that Patent Owner has demonstrated that IVL is a promising treatment for stenoses in arteries with complex coronary artery calcification. However, Petitioner has also established that previous methods for treating the same type of stenoses, e.g., rotational and orbital atherectomy, remain viable treatment options that may have advantages in certain circumstances. We also conclude that the medical community at large has recognized that

severe calcification of arteries makes successful short and long term treatment more difficult to attain. We also find that neither party has provided conclusive evidence of what, if any, long term detrimental side effects result from treatment with IVL, but Petitioner has submitted credible evidence that IVL does or is likely to lead to long term side effects. Accordingly, whether IVL is more meaningfully effective than prior methods of treating arteries with complex coronary artery calcification remains an open question.

iii. Failure of Others

Patent Owner's argument that all other treatments for coronary artery disease accompanied by complex calcification have failed is based upon the same testimony that we have reviewed in detail in Part II.F.1.f.ii above. PO Resp. 74–79. We are not persuaded by Patent Owner's evidence because Petitioner has adduced persuasive evidence that prior treatments have been used with an acceptable level of success. The evidence supporting our conclusion is also described and analyzed in Part II.F.1.f.ii above. Although IVL may show signs of being able to treat certain types of coronary artery disease in a measurably more effective manner than prior techniques, Patent Owner does not persuade us that those prior techniques are failures.

iv. Skepticism

The parties' arguments and evidence relating to skepticism closely follow their argument and evidence on the issue of whether an ordinarily skilled artisan would not have had a reasonable expectation of succeeding in substituting an EHL probe for Levy's laser probe because of risks of the balloon bursting and embolism. *Compare* PO Resp. 79–82 (citing Ex. 2100 ¶¶ 205–212; Ex. 2170; Ex. 2171; Ex. 2173; Ex. 2174), *with* PO Resp. 46–51

(citing Ex. 2100 ¶¶ 148–161 (citing Ex. 2170; Ex. 2173; Ex. 2174; Ex. 2175)). For the reasons expressed in Part II.F.1.e above, we found that an ordinarily skilled artisan would have had a reasonable expectation of successfully making a working device according to claim 1 that would not burst or result in unwarranted risks of embolism. Accordingly, we find that Patent Owner's evidence of skepticism is a weak indicator of non-obviousness.

v. Industry Praise

Patent Owner argues "first and foremost" that the FDA's designation of Shockwave IVL as a "breakthrough device" is "significant praise" from those in the industry. We have explained in detail why we do not consider the evidence adduced by Patent Owner to establish that the FDA's designation proves that Shockwave IVL was a breakthrough, or praiseworthy as a more effective treatment than existing options. *See* Part II.F.1.f.ii.d) above. For those same reasons, we do not consider the FDA's designation to demonstrate praise by the industry.

Patent Owner also relies upon testimony from the clinicians, Drs. Kereiakes, Hill, and Lyden. PO Resp. 83 (citing Ex. 2171 ¶ 12; Ex. 2172 ¶ 10; Ex. 2174 ¶¶ 10, 16). This testimony reflects unsubstantiated speculation about better efficacy, which has yet to be supported by objective evidence. *See* Part II.F.1.f.ii above. We do not, however, entirely discount what appears to be genuine excitement by clinicians about IVL.

We cannot draw the same conclusion regarding Patent Owner's evidence of "praise," introduced by Dr. Berger, because it merely recounts unsubstantiated and often forward-looking statements from financial analysts or hopeful statements from the Kassimis article. PO Resp. 83–84

(citing Ex. 2100 ¶¶ 216–223 (citing Ex. 2131; Ex. 2132; Ex. 2133, Ex. 2135; Ex. 2139)). We have explained why we consider statements of financial analysts to be of little probative value and the weight we accord the cited portion of Kassimis article, which does not reflect the conclusion drawn in Kassimis above. *See* Parts II.F.1.f.ii.c) and II.F.1.f.ii.e).

For all these reasons, we ascribe some, but not great, weight to Patent Owner's evidence of industry praise.

vi. Commercial Success

Patent Owner contends that its Shockwave IVL devices, Patent Owner's only commercial products, are commercially successful because Patent Owner: (1) "projects revenue for the full year 2019 to range from $38 million to $40 million, which represents 210% to 226% growth over the company's prior year revenue"; (2) realized a 339% increase (of $7.7 million) in revenue for the second quarter of 2019 over the second quarter of 2018; and (3) has a current market capitalization of "about $1 billion." PO Resp. 85–86 (citing Ex. 2100 ¶¶ 224–225; Ex. 2175 ¶ 8; Ex. 2164).

Petitioner responds that Patent Owner's evidence fails to establish commercial success because it fails to reflect the market share achieved by Patent Owner's devices. Reply 44. Patent Owner does not cure this deficiency in its evidentiary showing despite having an opportunity to do so. *See* Sur-reply 38–39 (arguing that it need not provide evidence of market share).

Petitioner also points out that, based on testimony from Mr. Stephens and Patent Owner's 10-Q, Patent Owner increased its spending on its sales and marketing forces by 59% from 2018 to 2019, which at least partially accounts for the increase in revenue that Patent Owner alleges. Reply 45

(citing Ex. 1216, 30:20–37:7; Ex. 2141, 4, 20–23). Patent Owner does not contest that the increase of 59% in sales and marketing expenses did not occur, but rather argues that its expenditures were "relatively low" and not a "primary driver of the device's success." Sur-reply 40 (citing Ex. 2252, 256:11–259:3). We are persuaded that Patent Owner's increased spending on sales and marketing at least partially explains the increase in its revenues.

More importantly, however, "the more probative evidence of commercial success relates to whether the sales represent a substantial quantity in the market." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012) (internal quotations omitted) (quoting *In re Huang*, 100 F.3d 135 140 (Fed. Cir. 1996)). Patent Owner's evidence of revenue increases wholly fails to establish the amount of market share attained by Patent Owner's devices. Just as important, however, is that Patent Owner's "evidence" of revenue increases does not pass muster. Patent Owner relies upon testimony from Dr. Berger and Mr. Stephens. PO Resp. 85–86 (citing Ex. 2100 ¶ 225; Ex. 2175 ¶ 8). The cited testimony from both witnesses relies upon the same document, a press release by Patent Owner reporting financial results and *projected* revenue increases for 2019 over 2018. Ex. 2100 ¶ 225 (citing Ex. 2176); Ex. 2175 ¶ 8 (citing Ex. 2176). The press release rightly points out that "forward looking statements" such as revenue projections "are uncertain" and thus "actual results may differ materially from those projected." Ex. 2176, 1. The press release also reports a net loss of $10.6 million for Q2, 2019, which was $0.5 million higher than the loss reported for Q2, 2018. *Id.* Patent Owner's evidence of its market capitalization is an undated printout of Yahoo's stock quote page. Ex. 2164. Patent Owner fails to explain how its market capitalization meaningfully

reflects commercial success, and we discern no reason to find it probative of commercial success.

Patent Owner also contends, based on testimony of Drs. Berger and Armstrong, that its success is more noteworthy because doctors have "a strong financial disincentive" to use Shockwave IVL devices. PO Resp. 86 (citing Ex. 2100 ¶ 227; Ex. 2173 ¶ 29). First, Dr. Berger's testimony simply quotes and relies upon the cited testimony of Dr. Armstrong; so, ultimately, Dr. Armstrong's testimony is the only evidence that might be probative. Ex. 2100 ¶ 227 (citing Ex. 2173 ¶¶ 28–29). Dr. Armstrong cites no evidence underlying his testimony, which limits its probative value. Second, even if we were to accept Dr. Armstrong's testimony as true, his cited testimony provides no evidence of market share or the quantitative effect of the "disincentive" that he describes. Ex. 2173 ¶¶ 28–29. However, he does testify that he has performed over 2,000 vascular interventions and about 300 such procedures per year with 200 being atherectomy procedures, but he has only performed "over 100" IVL procedures. *Id.* ¶ 5. This testimony implies that he uses directly competing atherectomy devices far more often than Shockwave IVL devices. *Id.* In any event, this testimony does not establish that doctors perform IVL procedures at an abnormally high rate despite financial disincentives.

Even if we were to conclude that Patent Owner's increases in revenue are tied to the claimed features, we find Patent Owner's showing of commercial success to be weak.

g. Weighing of Evidence of Obviousness and Conclusion

We conclude that Petitioner has proven that Guy Levy, a dentist, described a laser-based shockwave generator in an angioplasty balloon to

treat atheromas in blood vessels before Patent Owner conceived its claimed invention. We also conclude that Petitioner has persuasively proven that an ordinarily skilled artisan would have been motivated to modifying Levy's device by substituting a known EHL shockwave generator for the laser and adapting Levy's balloon and carrier to use a well-known configuration of a guidewire to place the balloon. We consider Petitioner's showing of obviousness to be rather straightforward and well supported.

Patent Owner's objective evidence of non-obviousness is voluminous, but largely weak for all the reasons that we express above even crediting Patent Owner for having established some nexus. Ultimately, we find that excitement about the *potential* efficacy of the Shockwave IVL or its *potential* commercial success simply does not warrant a conclusion that claim 1 remains patentable. When we consider all the evidence and arguments adduced by the parties, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and any one of Mantell, Uchiyama, or Willneff render claim 1 unpatentable as obvious.

*2. Dependent Claims 2–14*

Petitioner contends that the limitations introduced in each of dependent claims 2–6, 11, and 14, all of which ultimately depend from claim 1, are described by one or more of Mantell, Uchiyama, or Willneff or are simply well known by an ordinarily skilled artisan. Pet. 31–39. Except for dependent claim 5, Patent Owner does not distinguish the limitations introduced in these dependent claims from the teachings of the prior art or knowledge of an ordinarily skilled artisan that Petitioner identifies. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15). For the

reasons expressed below, we conclude that Petitioner has proven by a preponderance of evidence that dependent claims 2–4 and 6–14 are unpatentable as obvious, but has failed to do so for claim 5.

a. Claim 2

Claim 2 depends from claim 1 and further recites: "wherein the pair of electrodes includes a pair of metallic electrodes." Ex. 1001, 6:40–41. Petitioner argues that Mantell describes that the electrodes of its probe may be metallic. Pet. 31 (citing Ex. 1004 ¶ 23). Petitioner also contends, based on testimony by Dr. Jensen, that an ordinarily skilled artisan would have considered electrodes made of metallic material to have been an obvious design choice because electrodes must be conductive. *Id.* (citing Ex. 1002 ¶ 126). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and Mantell or the background knowledge of an ordinarily skilled artisan render claim 2 unpatentable as obvious.

b. Claim 3

Claim 3 depends from claim 2 and further recites: "wherein the electrodes are radially displaced from each other." Ex. 1001, 6:42–43. Petitioner argues that Mantell describes electrodes that are radially displaced from each other. Pet. 31–32 (citing Ex. 1004, Figs. 2, 7; Ex. 1002 ¶ 128). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and Mantell render claim 3 unpatentable as obvious.

c. Claim 4

Claim 4 depends from claim 2 and further recites: "wherein the electrodes are longitudinally displaced from each other." Ex. 1001, 6:44–45. Petitioner argues that Willneff describes electrodes that are longitudinally displaced from each other. Pet. 31–32 (citing Ex. 1006, Fig. 1 (spark gap 16 between two longitudinally displaced electrodes); Ex. 1002 ¶ 130). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, Mantell or the background knowledge of an ordinarily skilled artisan, and Willneff render claim 4 unpatentable as obvious.

d. Claim 5

Claim 5 depends from claim 2 and further recites: "wherein the pair of electrodes is disposed adjacent to and outside of the guide wire lumen." Ex. 1001, 6:46–47. Petitioner argues that Uchiyama describes "a shockwave generator including a pair of electrodes (3) that are disposed radially spaced away from the lumen of tube (8)." Pet. 32 (citing Ex. 1005, Figs. 1, 3, 4, 6, 7; Ex. 1002 ¶ 132). Petitioner also contends, based on testimony by Dr. Jensen, that an ordinarily skilled artisan would have found it obvious to

implement the routine design choice of configuring electrodes as described by Uchiyama. *Id.* at 33 (citing Ex. 1002 ¶ 133).

Patent Owner argues, based upon testimony by Dr. Berger, that an ordinarily skilled artisan would not have radially spaced electrodes from the longitudinal center of an EHL probe because doing so would unacceptably increase the risk of damaging healthy tissue by placing the electrodes too close to such tissue. PO Resp. 65 (citing Ex. 2100 ¶¶ 33–60, 169, 170, 178).

Petitioner responds that Uchiyama expressly describes that electrodes need not be radially centered within its balloon but could be spaced from the longitudinal center of the balloon. Reply 35 (citing Ex. 1200 ¶ 144). Petitioner also contends that an ordinarily skilled artisan would have understood from Uchiyama that placing the electrodes radially off-center would permit shockwaves to attain greater lateral coverage to reach calcifications that are not uniformly distributed around the circumference of a vessel. *Id.* (citing Ex. 1200 ¶ 144 (cross-referencing *id.* ¶¶ 32–34); Ex. 1204, 175:19–177:3). Petitioner also argues that an ordinarily skilled artisan would not have been dissuaded from placing the electrodes off center as shown in Uchiyama because Uchiyama teaches that placing the electrodes within a balloon would avoid undesirable tissue damage. *Id.* (citing Ex. 1200 ¶ 144 (cross-referencing *id.* ¶¶ 32–34)).

In its Sur-reply, Patent Owner argues that Dr. Jensen testifies that Uchiyama's electrodes are not disposed radially away from the lumen of tube 8. Sur-reply 36 (citing Ex. 2249, 38:4–40:15). Patent Owner also points out that Uchiyama's tube 8 is not a guidewire lumen as recited in the claim.

Based on our review of Uchiyama, we agree with Patent Owner that Uchiyama fails to describe "the pair of electrodes is disposed adjacent to and outside of the guide wire lumen" as recited in claim 5. The position of Uchiyama's pair of electrodes 3 is illustrated in the version of Figure 1 about which Dr. Jensen testified, which we reproduce below. Ex. 2240.




第 1 図

Uchiyama's Figure 1 is a cross-sectional view of Uchiyama's lithotripter with the balloon 7 inflated. Ex. 1005, 299.

Electrodes 3 (blue) are shown offset downward from the longitudinal center of the device as it is shown in the figure. Ex. 2240. Uchiyama states: "The electrodes3 are electrically connected with a pair of electric cables4 inserted into the tube1 above." Ex. 1005, 298. Uchiyama also describes fluid channel 6 through which fluid is injected to inflate balloon 7 or removed to deflate balloon 7. *Id.* Regarding "tube (8)," which Petitioner identifies as corresponding to the claimed lumen through the carrier, Uchiyama states: "The duct end of the balloon7 is air-tightly fixed by a removable stopper ring8 attached on the putter [sic, outer] circumference of

the tip part of the tube1." *Id.* Thus, "tube (8)" is not a lumen for a guidewire or even a lumen in a "carrier." Rather, stopper ring 8 is the device for holding balloon 7 to tube 1. *Id.* In addition, Petitioner has not established that electrodes 3 are disposed both adjacent to and radially "outside" stopper ring 8, as Uchiyama describes them as connected to electric cables 4 radially inside both tube 1 and stopper ring 8. *Id.*; Pet. 32 (arguing that electrodes 3 are radially spaced away from stopper ring 8).

Based on our review of Uchiyama, we find that Petitioner has failed to prove that Uchiyama describes a pair of electrodes that are both "adjacent to and outside of the guidewire lumen" as required in claim 5. Petitioner identifies no other prior art that meets these limitations. Accordingly, we conclude that Petitioner has failed to demonstrate by a preponderance of evidence that claim 5 is unpatentable as obvious in view of the combined teachings of Levy, AAPA, Mantell, and Uchiyama or the combined teachings of Levy, AAPA, Uchiyama, and the background knowledge of an ordinarily skilled artisan.

e. Claim 6

Claim 6 depends from claim 2 and further recites: "wherein the catheter has a distal end and wherein the pair of electrodes is disposed proximal to the distal end of the catheter." Ex. 1001, 6:48–50. Petitioner argues that Willneff describes electrodes that are disposed proximal to the distal end of the catheter. Pet. 33 (citing Ex. 1006,[23] Fig. 1 (spark gap 16 formed between two electrodes disposed proximal to distal end of

[23] Petitioner mistakenly cites Ex. 1005 as is made clear by the context (spark gap 16) and as is consistent with the cited testimony from Dr. Jensen. *See* Ex. 1002 ¶ 135 (correctly citing Ex. 1006, Fig. 1).

catheter 22); Ex. 1002 ¶ 135). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, Mantell or the background knowledge of an ordinarily skilled artisan, and in further view of Willneff render claim 6 unpatentable as obvious.

f. Claim 7

Claim 7 depends from claim 1 and further recites: "wherein the balloon is formed of non-compliant material." Ex. 1001, 6:51–52. Petitioner correctly notes that the '371 patent acknowledges that prior art angioplasty balloons are typically made of non-compliant material to fix the maximum dimension of the balloon. Pet. 34 (citing Ex. 1001, 3:65–4:2). Petitioner argues that Hayes describes non-compliant angioplasty balloons. *Id.* (citing Ex. 1007, 1:5–10). Based on Dr. Jensen's testimony, Petitioner argues that an ordinarily skilled artisan would readily recognize that Levy as modified by AAPA includes a non-compliant balloon and that using a non-compliant balloon would have been easily implemented. *Id.* (citing Ex. 1002 ¶ 137). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and one of Mantell, Uchiyama, or Willneff and in further view of Hayes, render claim 7 unpatentable as obvious.

g. Claim 8

Claim 8 depends from claim 1 and further recites: "wherein the balloon is formed of compliant material." Ex. 1001, 6:53–54. Petitioner argues that compliant angioplasty balloons were well known as evidenced by Duchamp. Pet. 34–35 (citing Ex. 1008 ¶ 40; Ex. 1002 ¶ 138). Based on Dr. Jensen's testimony, Petitioner argues that an ordinarily skilled artisan would readily recognize that a compliant balloon could be readily and successfully substituted for the angioplasty balloon of Levy as modified by AAPA. *Id.* at 35 (citing Ex. 1008 ¶ 40). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and one of Mantell, Uchiyama, or Willneff and in further view of Duchamp, render claim 8 unpatentable as obvious.

h. Claim 9

Claim 9 depends from claim 1 and further recites: "wherein the balloon has a surface, and wherein the catheter further comprises at least one stress riser carried on the surface of the balloon." Ex. 1001, 6:55–57. Petitioner argues that angioplasty balloons with stress risers were well known as evidenced by Naimark in the form of micro-needles 21, 31 on the surface of its balloon. Pet. 35–36 (citing Ex. 1009,[24] Abstract, Figs. 2, 3 (illustrating micro-needles 21, 31); Ex. 1002 ¶ 140). Based on Dr. Jensen's

[24] Petitioner mistakenly cites Ex. 1008 as is made clear by the context (microneedles 21, 31). Ex. 1009, Abstract, 4:21–31, 5:18–20, Figs. 2, 3.

testimony, Petitioner argues that an ordinarily skilled artisan would readily recognize that a balloon with stress risers could be readily and successfully substituted for the angioplasty balloon of Levy as modified by AAPA. *Id.* at 35 (citing Ex. 1008 ¶ 40). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and one of Mantell, Uchiyama, or Willneff and in further view of Naimark, render claim 9 unpatentable as obvious.

i. Claim 10

Claim 10 depends from claim 1 and further recites: "further comprising a sensor that senses reflected energy." Ex. 1001, 6:58–59. Petitioner argues that sensors used with shockwaves created within a fluid-filled balloon were well known as evidenced by Beyar. Pet. 36 (citing Ex. 1010, ¶¶ 192, 243; Ex. 1002 ¶ 142). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and one of Mantell, Uchiyama, or Willneff and in further view of Beyar, render claim 10 unpatentable as obvious.

j. Claim 11

Claim 11 depends from claim 1 and further recites: "further comprising a reflector within the balloon that focuses the shock waves." Ex. 1001, 6:60–61. Petitioner argues that Willneff describes a wall 34 that reflects and focuses its shockwave. Pet. 37 (citing Ex. 1006, 10, Fig. 2 (pressure waves reflected by wall 34 toward focal point 36); Ex. 1002 ¶ 144). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, Mantell, Uchiyama, or Willneff render claim 11 unpatentable as obvious.

k. Claim 12

Claim 12 depends from claim 1 and further recites: "wherein the balloon electrically insulates the pair of electrodes from tissue external to the catheter." Ex. 1001, 6:62–64. Petitioner argues that balloon material was well known to generally be non-conductive and insulating to the electrodes within them. Pet. 37 (citing Ex. 1002 ¶ 146). For example, Uchiyama teaches that its balloon regulates the force emanating from its spark generator and prevents its spark from directly hitting human tissue. *Id.* (citing Ex. 1005, 298). Additionally, Duchamp and Hayes both describe non-conductive materials used to insulate the pair of electrodes from tissue. *Id.* at 38 (citing Exs. 1007, 1008; Ex. 1002 ¶ 146). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and one of Mantell, Uchiyama, or Willneff and in further view of Duchamp or Hayes render claim 12 unpatentable as obvious.

l. Claim 13

Claim 13 depends from claim 1 and further recites:

> wherein the pair of electrodes includes a first electrode and a second electrode, the second electrode being arranged to form an electrical arc with the first electrode to generate the mechanical shock wave and to generator including a pair of electrodes being positioned reflect the mechanical shock wave in a desired pattern.

Ex. 1001, 6:65–7:2. Petitioner argues that Bhatta describes a shockwave generator with a pair of electrodes in which one of the electrodes is a metallic nozzle that also reflects the shockwave in a desired pattern. Pet. 38 (citing Ex. 1012, 3:17–25). Based on Dr. Jensen's testimony, Petitioner argues that an ordinarily skilled artisan would have found it obvious to have modified Levy in view of Mantell to include Bhatta's nozzle-shaped electrode to focus the shockwave being generated. *Id.* at 38–39 (citing Ex. 1002 ¶ 148). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and one of Mantell, Uchiyama, or Willneff and in further view of Bhatta render claim 13 unpatentable as obvious.

m. Claim 14

Claim 14 depends from claim 1 and further recites: "wherein the balloon has a center axis and the guidewire lumen has a center axis in common with the balloon center axis; and wherein at least one electrode of the electrode pair is disposed in non-intersecting relation with respect to the balloon center axis." Ex. 1001, 7:3–8. Petitioner argues that "Uchiyama discloses a balloon with a center of axis that is collinear with the guidewire lumen." Pet. 39 (cross-referencing argument relating to claim 5). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

As explained in Part II.F.2.d above, we find that Uchiyama fails to describe a pair of electrodes that are outside of a guidewire lumen. However, Uchiyama does illustrate a pair of electrodes in which one of the electrodes is located off the center longitudinal axis of its balloon. Additionally, the AAPA that forms part of Petitioner's challenge to claim 1 describes a guidewire lumen that shares a common central longitudinal axis with the balloon. Ex. 1001, 3:65–4:2, Fig. 1.

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and one of Mantell or Willneff along with Uchiyama or the combined teachings of Levy, AAPA, and Uchiyama render claim 14 unpatentable as obvious.

*3. Independent Claim 15*

Independent claim 15 is directed to a system comprising an angioplasty catheter that is materially the same as the catheter of claim 1 and a "power source configured to provide a high voltage pulse to the arc

generator" that is not recited in claim 1. *Compare* Ex. 1001, 7:9–8:9, *with id.* at 6:21–39. Petitioner contends, and we agree, that all the arguments directed to claim 1 apply to claim 15. Pet. 40. With respect to the "power source," Petitioner argues that each of Levy, Mantell, Uchiyama, and Willneff describe a power source that is configured to provide a high voltage pulse to their respective arc generators. *Id.* at 40–41 (citing Ex. 1003, 4, Fig. 1 (laser light source 20); Ex. 1004 ¶ 24 (Autolith EHL generator); Ex. 1005, 299 (high voltage supplied to electrodes 3); Ex. 1006, 9 (current feed 6)). Petitioner argues, based in part on testimony by Dr. Jensen, that an ordinarily skilled artisan would have included a suitable generator to ensure that the pair of electrodes generates a spark resulting in the formation of shockwaves. *Id.* at 41 (citing Ex. 1002 ¶ 164).

Patent Owner argues, based on testimony by Dr. Berger, that the prior art cautions against deploying EHL electrodes within an angioplasty balloon. PO Resp. 65–66 (citing Ex. 2100 ¶ 178). We have fully considered and found unpersuasive Patent Owner's argument. *See* Part II.F.1 above. For the reasons, expressed in connection with our analysis of claim 1 and Petitioner's argument and evidence discussed immediately above, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and any one of Mantell, Uchiyama, or Willneff render claim 15 unpatentable as obvious.

*4. Dependent Claims 16 and 17*

Petitioner contends that the limitations introduced in each of dependent claims 16 and 17, both of which directly depend from claim 15, are described by the prior art. Pet. 42–43. For the reasons expressed below,

we conclude that Petitioner has proven by a preponderance of evidence that dependent claims 16 and 17 are unpatentable as obvious.

a. Claim 16

Claim 16 depends from claim 15 and further recites: "wherein the power source is arranged to provide high voltage pulses having at least one of selectable pulse durations, selectable voltage amplitudes, and selectable pulse repetition rates." Ex. 1001, 9:10–13. Petitioner contends that both Levy and Mantell describe power sources meeting the requirements of claim 16. Pet. 42 (citing Ex. 1003, 3 (incorporating controllable power source described in Levy '227); Ex. 1005 ¶¶ 51, 82 (describing power source with selectable voltage amplitudes (e.g., power level) and pulse repetition rates (e.g., number of pulses)); Ex. 1002 ¶¶ 168–169). Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and any one of Mantell, Uchiyama, or Willneff render claim 16 unpatentable as obvious.

b. Claim 17

Claim 17 depends from claim 15 and recites: "further comprising an R wave detector that synchronizes the mechanical shock waves with a cardiac R waves." Ex. 1001, 9:14–16. Petitioner contends that Schultheiss describes "a shockwave applicator and an R wave detector that synchronizes the mechanical shockwaves with cardiac waves." Pet. 43 (citing Ex. 1011 ¶ 72; Ex. 1002 ¶ 171). Petitioner also contends, based on the same evidence,

that it would have been obvious to use Schultheiss' detector to avoid a fibrillation in the patient. *Id.* Patent Owner does not respond to Petitioner's showing. *See* PO Resp. 18–65 (presenting arguments only for claims 1, 5, and 15).

Based on our review of Petitioner's argument and evidence, which we adopt as our own findings, we conclude that Petitioner has proven by a preponderance of evidence that the combined teachings of Levy, AAPA, and any one of Mantell, Uchiyama, or Willneff along with Schultheiss renders claim 17 unpatentable as obvious.

*5. Conclusion*

Based on our review of the entire record and the parties' arguments, we conclude that Petitioner has demonstrated by a preponderance of evidence that claims 1–4 and 6–17 are unpatentable as obvious.

G. CLAIMS 1–17: OBVIOUSNESS IN VIEW OF WILLNEFF, AAPA, AND LEVY OR MANTELL AND IN FURTHER VIEW OF VARIOUS OTHER REFERENCES FOR CERTAIN CLAIMS

As an alternative, Petitioner argues that the same prior art applied above, but with Willneff as a primary reference, renders claims 1–17 obvious. *Compare* Pet. 13–43 (addressing Levy as primary reference), *with id.* at 43–60 (addressing Willneff as primary reference). Because we have found that the challenges based on Levy as the primary reference render claims 1–4 and 6–17 unpatentable as obvious, we find the challenges to these claims based upon Willneff as the primary references moot and do not address them in this Decision. *See Boston Sci. Simed, Inc. v. Cook Grp. Inc.*, No. 2019-1594, 2020 WL 2071962, at *4 (Fed. Cir. Apr. 30, 2020) (holding that "the Board need not address issues that are not necessary to the resolution of the proceeding").

However, because we have found that Petitioner's challenge to claim 5 based upon Levy as the primary reference fails, we must determine whether Petitioner's challenges to claim 5 based upon Willneff, AAPA, Levy, and Uchiyama or Willneff, AAPA, Mantell, and Uchiyama render claim 5 obvious. Petitioner's challenges to claim 5 based upon Willneff as the primary reference fail for the same reasons explained in Part II.F.2.d above, because Petitioner relies on Uchiyama in the manner in this challenge as in the previous challenge, and Petitioner has not proven that Uchiyama discloses the limitations of claim 5 for the reasons explained above.

## III. PETITIONER'S MOTION TO EXCLUDE

Petitioner moves to exclude Exhibits 2002–2004, 2006, 2008, 2016, 2017, 2124, 2125, 2126, 2132, 2133, 2139, 2141, 2149, 2152, 2161, 2162, 2163, 2164, 2170–2176, 2196 and certain paragraphs from Dr. Berger's Declaration for various reasons. Paper 67 ("Motion" or "Mot."). Patent Owner opposes the Motion. Paper 68 ("Opposition" or "Opp."). Petitioner filed a reply brief in support of the Motion. Paper 70 ("Motion Reply" or "Mot. Reply"). For the reasons explained below, we deny the Motion as unpersuasive, moot, or both.

### A. HEARSAY

Petitioner moves to exclude Exhibits 2002–2004, 2006, 2008, 2016, 2017, 2124, 2125, 2132, 2133, 2139, 2141, and 2164 as containing inadmissible hearsay under Federal Rules of Evidence 801, 802, and 805. Mot. 1–4. These Exhibits include news articles (Exs. 2002–2004), materials from financial analysts or investment bankers (Exs. 2006, 2008, 2016, 2017, 2132, 2133, 2139), materials received from or authored by the FDA

(Exs. 2124, 2125), Yahoo Finance data (Ex. 2164), and one of Patent Owner's 10-Q submissions (Ex. 2141). *Id.*

Patent Owner argues that "laudatory statements" are not offered for the truth of the matter but rather to show that the statements were made. Opp. 1–2. Patent Owner further contends that the exhibits Petitioner seeks to exclude "are relied upon by an expert, who is entitled to rely on hearsay materials to support his or her opinions." *Id.* at 2. Lastly, Patent Owner argues that the exhibits are sufficiently trustworthy in light of the totality of the circumstances. *Id.* at 3.

Petitioner fails to persuade us that we should exclude any of these exhibits. These exhibits are, for the most part, offered in support of Patent Owner's argument that objective evidence of nonobviousness exists, *i.e.*, long felt need, failure of others, skepticism, industry praise, and commercial success. *See generally* PO. Resp. 69–89. Patent Owner does not rely on statements made in these exhibits for the truth of the matter asserted, for example, that the Shockwave device has a "unique ability" to treat medial calcium (Ex. 2017 1) or that it is "space-age technology" (Ex. 2002, 1). Rather, Patent Owner relies upon these statements to show that industry actors took notice of and commented on the Shockwave device. *Quanergy Sys., Inc. v. Velodyne Lidar, Inc.*, IPR2018-00256, Paper 66 at 5–6 (PTAB May 21, 2020) ("[S]tatements offered solely for the purpose of showing they were made are admissible."); *Fox Factory, Inc. v. SRAM, LLC*, IPR2016-01876, Paper 59 at 59 (PTAB Apr. 2, 2018). To the extent that the evidence may have served a hearsay purpose, we assign it little if any weight. Further, experts like Dr. Berger are permitted to rely on hearsay if experts in the same field would reasonably rely on such materials in forming opinions

and inferences based on the subject. *See* Fed. R. Evid. 703. To the extent that Dr. Berger relies upon evidence that is not of a type upon which "experts in the field would reasonably rely," we have assigned very little weight to such evidence. Therefore, we deny Petitioner's motion to exclude these Exhibits 2002–2004, 2006, 2008, 2016, 2017, 2124, 2125, 2132, 2133, 2139, 2141, and 2164 as being unpersuasive, moot, or both.

B. UNCITED EXHIBITS

Petitioner moves to exclude exhibits 2126, 2152, 2161, 2162, and 2163 as being irrelevant under Fed. R. Evid. 401 and 402 because Patent Owner does not cite them in its briefing. Patent Owner responds that Dr. Berger cites and relies upon Exhibits 2126 and 2161–2163. Opp. 6 (citing Ex. 2100 ¶¶ 194 (with a typo mistakenly referring to 2126 as 2136), 224 (referring to Ex. 2196, which cites Exs. 2161–2163)). We deny Petitioner's Motion because the exhibits are relied upon by Dr. Berger in offering his testimony.

However, Patent Owner does not identify where it or any of its declarants cite or rely upon Ex. 2152, and we find no such citations. *Id.* at 6–7. Exhibit 2152 is U.S. Patent 5,454,809 to Janssen, entitled "Electrosurgical Catheter and Method for Resolving Atherosclerotic Plaque by Radio Frequency Sparking." Ex. 2152, Title. We have not considered Ex. 2152 in rendering our Decision and, therefore, deny Petitioner's Motion as being moot.

C. PERSONAL KNOWLEDGE

Petitioner moves to exclude Exhibit 2196, which is a claim chart mapping certain claims to the Shockwave devices, because Mr. Stephens has no personal knowledge of who prepared the exhibit. Mot. 5. Patent Owner

argues that Petitioner failed to timely object to Exhibit 2196 and therefore waived any objection now raised. Opp. 7. Patent Owner further explains that Dr. Berger relies upon Exhibit 2196, not Mr. Stephens, and argues that an expert need not have personal knowledge about the facts and data upon which he relies. *Id.* Petitioner does not respond to Patent Owner's arguments. *See generally*, Mot. Reply.

Our rules require that "[a] party wishing to challenge the admissibility of deposition evidence must make an objection during the deposition [and, a] party wishing to challenge evidence other than deposition evidence, must file any objections within five business days of service of evidence." 37 C.F.R. § 42.64(a); Combined Trial Practice Guide, November 2019, 78–79 ("Combined TPG").[25] "A motion to exclude evidence must be filed to preserve any objection." 37 C.F.R. § 42.64(c). The failure to raise an objection at the appropriate time, results in a waiver of the objection. As a result, we advise parties that "[a] motion to exclude evidence should . . . [i]dentify where in the record the objection was originally made." *Id.* at 79. Here, Petitioner does not identify the portion of the record where its objection to Exhibits 2178–2180 were originally made. *See* Mot. 5. Our review of the Petitioner's Objections (Papers 22, 43), the testimony of Mr. Stephens (Ex. 1216), and the testimony of Dr. Berger (Exs. 1126, 1204) show that Petitioner failed to object to Exhibit 2196. Therefore, we deny Petitioner's motion to exclude Exhibit 2196.

---

[25] The Combined TPG is available at https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf).

D. AUTHENTICATION

Petitioner moves to exclude Exhibit 2149, a Japanese Patent with an included Abstract in English because Patent Owner failed to provide a complete certified translation. Mot. 5. Patent Owner served a certified translation of Exhibit 2149 (Ex. 2222), which it files with its Opposition as Exhibit 2256. Petitioner does not argue that Patent Owner's supplemental evidence failed to cure its objection to Exhibit 2149. *See generally*, Mot. Reply. We deny Petitioner's Motion to exclude Ex. 2149 because the service of Exhibit 2256 cured Petitioner's objection.

E. RELEVANCE OR PREJUDICE

Petitioner moves to exclude Exhibits 2003, 2004, 2006, 2125, 2139, 2141, and 2170–2176 as irrelevant or prejudicial under Federal Rules of Evidence 401, 402, and 403. Mot. 5–9. Petitioner contends the identified exhibits provide scant, cumulative, and unhelpful information that should be excluded. *See generally id.*

Patent Owner argues that instead of excluding evidence deemed to be irrelevant, little weight should be accorded such evidence. Opp. 8. Patent Owner explains that each of Petitioner's arguments go to the weight but not the admissibility of the evidence. *See generally id.* at 8–14. Patent Owner also contends that the declarations of Drs. Lyden, Kereiakes, Hill, Soukas, and Armstrong (Exs. 2170–2174) each "bring[] a different perspective and emphasize[] different aspects of the Shockwave device," and therefore are not cumulative. *Id.* at 11. Further, according to Patent Owner, "[t]he declarations also corroborate one another in various respects, which is another important aspect of the declarations." *Id.*

We are not persuaded by Petitioner's arguments that Exhibits 2003, 2004, 2006, 2125, 2139, 2141, and 2170–2176 must be excluded from the record. The evidence Petitioner seeks to exclude support Patent Owner's argument that the '371 patent is nonobviousness; specifically, the exhibits relate to objective indicia of nonobviousness. Therefore, the objected to exhibits are relevant as having a "tendency to make a fact more or less probable." Fed. R. Evid. 401. Further, because the decision here is rendered by the panel, as opposed to a jury, there is little risk that the purported "scant, unhelpful needlessly cumulative and/or misleading information," Mot. 6, will confuse or mislead the panel such that the probative value is outweighed by the danger of unfair prejudice. Fed. R. Evid. 403; *see Corning Inc. v. DSM IP Assets B.V.*, IPR2013-00053, Paper 66 at 19 (PTAB May 1, 2014) ("Similar to a district court in a bench trial, the Board, sitting as a non-jury tribunal with administrative expertise, is well-positioned to determine and assign appropriate weight to the evidence presented."). As appropriate, we have explained above the weight that we accord various aspects of these exhibits. For the reasons above, we are not persuaded that the testimony or documents at issue should be excluded and, thus, we deny Patent Owner's Motion to exclude Exhibits 2003, 2004, 2006, 2125, 2139, 2141, and 2170–2176.

F. PORTIONS OF DR. BERGER'S TESTIMONY

Petitioner moves to exclude portions of the declaration testimony of Dr. Berger under Federal Rules of Evidence 702 and 703. Mot. 9–10. More specifically, Petitioner argues:

> paragraphs 18, 19, 59, 60, 66, 132 (testimony not based on sufficient facts or data, patent owner has not shown the '371 patent is entitled to a June 13, 2008 priority date), 143, 144

> (testimony not based on sufficient facts or data), 165 (testimony not based on sufficient facts or data), 170 (testimony not based on sufficient facts or data), 175 (testimony not based on sufficient facts or data), 199 (not qualified to opine on device meeting criteria), 201, 205, 205 [sic], 217, 218, 220, 221, 222, and 229 (testimony not based on sufficient facts or data) are inadmissible under FRE 702(b) and/or 703.

*Id.*

Patent Owner argues that Petitioner's basis for excluding certain paragraphs of Dr. Berger's declaration are conclusory and that Petitioner "does not explain which aspects of the opinions are unsupported or what facts or data could or should have been considered." Opp. 14.

Whether Dr. Berger's opinions are conclusory, mischaracterize evidence, or are not adequately based on objective evidence goes to the weight we should accord to his testimony. As appropriate, we have explained above the weight that we accord the allegedly objectionable testimony by Dr. Berger. Thus, we deny Petitioner's motion to exclude the identified paragraphs of Dr. Berger's declaration (Ex. 2100).

## IV. CONCLUSION[26]

In summary,

| Claim(s) | 35 U.S.C. § | Reference(s) | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 15, 16 | 103 | Levy, AAPA, Mantell | 1–3, 15, 16 | |

[26] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg.

| Claim(s) | 35 U.S.C. § | Reference(s) | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 4, 6, 11 | 103 | Levy, AAPA, Mantell, Willneff | 4, 6, 11 | |
| 5, 14 | 103 | Levy, AAPA, Mantell, Uchiyama | 14 | 5 |
| 7, 12 | 103 | Levy, AAPA, Mantell, Hayes | 7, 12 | |
| 8, 12 | 103 | Levy, AAPA, Mantell, Duchamp | 8, 12 | |
| 9 | 103 | Levy, AAPA, Mantell, Naimark | 9 | |
| 10 | 103 | Levy, AAPA, Mantell, Beyer | 10 | |
| 13 | 103 | Levy, AAPA, Mantell, Bhatta | 13 | |
| 17 | 103 | Levy, AAPA, Mantell, Schultheiss | 17 | |
| 1, 2, 5, 14–16 | 103 | Levy, AAPA, Uchiyama | 1, 2, 14–16 | 5 |
| 4, 6, 11 | 103 | Levy, AAPA, Uchiyama, Willneff | 4, 6, 11 | |
| 7, 12 | 103 | Levy, AAPA, Uchiyama, Hayes | 7, 12 | |

16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

| Claim(s) | 35 U.S.C. § | Reference(s) | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 8, 12 | 103 | Levy, AAPA, Uchiyama, Duchamp | 8, 12 | |
| 9 | 103 | Levy, AAPA, Uchiyama, Naimark | 9 | |
| 10 | 103 | Levy, AAPA, Uchiyama, Beyer | 10 | |
| 13 | 103 | Levy, AAPA, Uchiyama, Bhatta | 13 | |
| 17 | 103 | Levy, AAPA, Uchiyama, Schultheiss | 17 | |
| 1, 2, 4, 6, 11, 15, 16 | 103 | Levy, AAPA, Willneff | 1, 2, 4, 6, 11, 15, 16 | |
| 7, 12 | 103 | Levy, AAPA, Willneff, Hayes | 7, 12 | |
| 8, 12 | 103 | Levy, AAPA, Willneff, Duchamp | 8, 12 | |
| 9 | 103 | Levy, AAPA, Willneff, Naimark | 9 | |
| 10 | 103 | Levy, AAPA, Willneff, Beyer | 10 | |
| 13 | 103 | Levy, AAPA, Willneff, Bhatta | 13 | |
| 17 | 103 | Levy, AAPA, Willneff, Schultheiss | 17 | |

| Claim(s) | 35 U.S.C. § | Reference(s) | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4, 6, 11, 15 | 103 | Willneff, AAPA, Levy[27] | | |
| 3, 16 | 103 | Willneff, AAPA, Levy, Mantell | | |
| 5, 14 | 103 | Willneff, AAPA, Levy, Uchiyama | | 5 |
| 7, 12 | 103 | Willneff, AAPA, Levy, Hayes | | |
| 8, 12 | 103 | Willneff, AAPA, Levy, Duchamp | | |
| 9 | 103 | Willneff, AAPA, Levy, Naimark | | |
| 10 | 103 | Willneff, AAPA, Levy, Beyar | | |
| 13 | 103 | Willneff, AAPA, Levy, Bhatta | | |
| 17 | 103 | Willneff, AAPA, Levy, Schultheiss | | |
| 1–3, 15, 16 | 103 | Willneff, AAPA, Mantell | | |

[27] For all challenges to claims 1–4 and 6–17 relying upon Willneff as a primary prior art reference, we do not reach a decision because those challenges are moot in view of our ruling on the challenges to these claims based upon Levy as the primary prior art reference. *See Boston Sci. Simed, Inc. v. Cook Grp. Inc.*, No. 2019-1594, 2020 WL 2071962, at *4 (Fed. Cir. Apr. 30, 2020) (holding that "the Board need not address issues that are not necessary to the resolution of the proceeding"); *cf. Ex parte Moncla*, Appeal No. 2009-006448 (PTAB June 22, 2010) (holding that it is premature to address a provisional rejection) (designated precedential).

| Claim(s) | 35 U.S.C. § | Reference(s) | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 5, 14 | 103 | Willneff, AAPA, Mantell, Uchiyama | | 5 |
| 7, 12 | 103 | Willneff, AAPA, Mantell, Hayes | | |
| 8, 12 | 103 | Willneff, AAPA, Mantell, Duchamp | | |
| 9 | 103 | Willneff, AAPA, Mantell, Naimark | | |
| 10 | 103 | Willneff, AAPA, Mantell, Beyar | | |
| 13 | 103 | Willneff, AAPA, Mantell, Bhatta | | |
| 17 | 103 | Willneff, AAPA, Levy, Schultheiss | | |
| | | **Overall Outcome** | 1–4, 6–17 | 5 |

## V. ORDER

For the reasons given, it is:

ORDERED, based on a preponderance of evidence, that claims 1–4 and 6–17 of U.S. Patent 8,956,371 B2 are *unpatentable* as obvious under 35 U.S.C. § 103;

FURTHER ORDERED that Petitioner has not demonstrated that claim 5 of U.S. Patent 8,956,371 B2 is *unpatentable*; and

FURTHER ORDERED that Petitioner's Motion to Exclude Exhibits 2002–2004, 2006, 2008, 2016, 2017, 2124, 2125, 2126, 2132, 2133, 2139, 2141, 2149, 2152, 2161, 2162, 2163, 2164, 2170–2176, 2196, and 2100

(¶¶ 18, 19, 59, 60, 66, 132, 143, 144, 165, 170, 175, 199, 201, 205, 217, 218, 220, 221, 222, and 229) is *denied*;

FURTHER ORDERED because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Mark C. Nelson
Jeffrey Stone
BARNES & THORNBURG LLP
mnelson@btlaw.com
jstone@btlaw.com

PATENT OWNER:

Greg H. Gardella
W. Cook Alciati
Natalie J. Grace
Ruth G. Davila
GARDELLA GRACE P.A.
ggardella@gardellagrace.com
calciati@gardellagrace.com
ngrace@gardellagrace.com
rdavila@gardellagrace.com

Michael Stallman
MORRISON & FOERSTER LLP
mstallman@mofo.com

US008956371B2

(12) **United States Patent**
**Hawkins et al.**

(10) **Patent No.: US 8,956,371 B2**
(45) **Date of Patent: *Feb. 17, 2015**

(54) **SHOCKWAVE BALLOON CATHETER SYSTEM**

(75) Inventors: **Daniel Hawkins**, Newcastle, WA (US); **Clifton A. Alferness**, Port Orchard, WA (US); **John M. Adams**, Snohomish, WA (US)

(73) Assignee: **Shockwave Medical, Inc.**, Fremont, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 294 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/482,995**

(22) Filed: **Jun. 11, 2009**

(65) **Prior Publication Data**

US 2009/0312768 A1 Dec. 17, 2009

**Related U.S. Application Data**

(60) Provisional application No. 61/061,170, filed on Jun. 13, 2008.

(51) **Int. Cl.**
***A61B 17/22*** (2006.01)
*A61B 17/225* (2006.01)
*A61B 17/3207* (2006.01)

(52) **U.S. Cl.**
CPC ....... ***A61B 17/2202*** (2013.01); *A61B 17/22022* (2013.01); *A61B 17/2251* (2013.01); *A61B 17/320725* (2013.01); *A61B 2017/22024* (2013.01); *A61B 2017/22025* (2013.01); ***A61B 17/22029*** (2013.01); *A61B 2017/22058* (2013.01); *A61B 2017/22061* (2013.01); *A61B 2017/22062* (2013.01)
USPC ................................ **606/128**; 601/4; 606/194

(58) **Field of Classification Search**
USPC ............. 606/48, 50, 127, 128, 159, 167, 169, 606/170, 1–4; 601/2, 4; 604/22; 600/439
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,785,382 | A | 1/1974 | Schmidt-Kloiber et al. |
| 3,902,499 | A | 9/1975 | Shene |
| 4,027,674 | A | 6/1977 | Tessler et al. |
| 4,662,126 | A | 5/1987 | Malcolm |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 3038445 | A1 | 5/1982 |
| EP | 0442199 | A2 | 8/1991 |

(Continued)

OTHER PUBLICATIONS

International Search Report for PCT Application No. PCT/US2009/047070, dated Jan. 19. 2010.

(Continued)

*Primary Examiner* — Kathleen Holwerda
(74) *Attorney, Agent, or Firm* — Morrison & Foerster LLP

(57) **ABSTRACT**

A system for breaking obstructions in body lumens includes a catheter including an elongated carrier, a balloon about the carrier in sealed relation thereto, the balloon being arranged to receive a fluid therein that inflates the balloon, and an arc generator including at least one electrode within the balloon that forms a mechanical shock wave within the balloon. The system further includes a power source that provides electrical energy to the arc generator.

**17 Claims, 8 Drawing Sheets**






(56) **References Cited**

U.S. PATENT DOCUMENTS

4,685,458 A 8/1987 Leckrone
4,809,682 A 3/1989 Forssmann et al.
4,900,303 A 2/1990 Lemelson
5,009,232 A * 4/1991 Hassler et al. ................ 600/439
5,057,103 A 10/1991 Davis
5,078,717 A * 1/1992 Parins et al. .................... 606/48
5,103,804 A * 4/1992 Abele et al. ................... 600/116
5,152,767 A * 10/1992 Sypal et al. ................... 606/128
5,152,768 A * 10/1992 Bhatta ........................... 606/128
5,176,675 A 1/1993 Watson et al.
5,246,447 A 9/1993 Rosen et al.
5,281,231 A 1/1994 Rosen et al.
5,324,255 A 6/1994 Passafaro et al.
5,336,234 A * 8/1994 Vigil et al. .................... 606/159
5,368,591 A * 11/1994 Lennox et al. .................. 606/27
5,395,335 A 3/1995 Jang
5,417,208 A 5/1995 Winkler
5,425,735 A 6/1995 Rosen et al.
5,472,406 A 12/1995 de la Torre et al.
5,582,578 A 12/1996 Zhong et al.
5,603,731 A 2/1997 Whitney
5,609,606 A 3/1997 O'Boyle
5,662,590 A 9/1997 de la Torre et al.
5,931,805 A 8/1999 Brisken
6,007,530 A 12/1999 Dornhofer et al.
6,033,371 A 3/2000 Torre et al.
6,083,232 A 7/2000 Cox
6,210,408 B1 * 4/2001 Chandrasekaran et al. .... 606/41
6,217,531 B1 4/2001 Reitmajer
6,277,138 B1 8/2001 Levinson et al.
6,287,272 B1 * 9/2001 Brisken et al. .................. 604/22
6,352,535 B1 3/2002 Lewis et al.
6,367,203 B1 4/2002 Graham et al.
6,371,971 B1 4/2002 Tsugita et al.
6,398,792 B1 6/2002 O'Connor
6,406,486 B1 6/2002 DeLa Torre et al.
6,514,203 B2 * 2/2003 Bukshpan ..................... 600/439
6,524,251 B2 2/2003 Rabiner et al.
6,589,253 B1 7/2003 Cornish et al.
6,607,003 B1 8/2003 Wilson
6,638,246 B1 10/2003 Naimark et al.
6,652,547 B2 11/2003 Rabiner et al.
6,736,784 B1 * 5/2004 Menne et al. ..................... 601/2
6,740,081 B2 5/2004 Hilal
6,755,821 B1 * 6/2004 Fry ................................. 606/15
6,989,009 B2 * 1/2006 Lafontaine ...................... 606/20
7,241,295 B2 7/2007 Maguire
7,569,032 B2 * 8/2009 Naimark et al. ......... 604/103.01
8,556,813 B2 10/2013 Cioanta et al.
8,728,091 B2 * 5/2014 Hakala et al. ................. 606/128
2001/0044596 A1 11/2001 Jaafar
2002/0177889 A1 11/2002 Brisken et al.
2003/0004434 A1 1/2003 Greco et al.
2003/0176873 A1 9/2003 Chernenko et al.
2003/0229370 A1 12/2003 Miller
2004/0044308 A1 * 3/2004 Naimark et al. .............. 604/103
2004/0097996 A1 5/2004 Rabiner et al.
2004/0254570 A1 12/2004 Hadjicostis et al.
2005/0015953 A1 1/2005 Keidar
2005/0021013 A1 1/2005 Visuri et al.
2005/0251131 A1 11/2005 Lesh
2006/0004286 A1 1/2006 Chang et al.
2006/0184076 A1 8/2006 Gill et al.
2006/0190022 A1 * 8/2006 Beyar et al. ................... 606/192
2007/0088380 A1 4/2007 Hirszowicz et al.
2007/0239082 A1 * 10/2007 Schultheiss et al. .............. 601/4
2007/0239253 A1 10/2007 Jagger et al.
2007/0244423 A1 10/2007 Zummeris et al.
2008/0097251 A1 4/2008 Babaev
2008/0188913 A1 8/2008 Stone et al.
2009/0041833 A1 2/2009 Bettinger et al.
2009/0247945 A1 10/2009 Levit et al.
2009/0254114 A1 10/2009 Hirszowics et al.
2010/0016862 A1 1/2010 Hawkins et al.
2010/0036294 A1 * 2/2010 Mantell et al. .................... 601/4
2010/0114020 A1 5/2010 Hawkins et al.
2010/0114065 A1 5/2010 Hawkins et al.
2010/0121322 A1 5/2010 Swanson
2010/0305565 A1 12/2010 Truckai et al.
2011/0034832 A1 2/2011 Cioanta et al.
2011/0118634 A1 5/2011 Golan
2011/0166570 A1 7/2011 Hawkins et al.
2011/0257523 A1 10/2011 Hastings et al.
2011/0295227 A1 12/2011 Hawkins et al.
2012/0071889 A1 3/2012 Mantell et al.
2012/0095461 A1 4/2012 Herscher et al.
2012/0203255 A1 8/2012 Hawkins et al.
2012/0221013 A1 8/2012 Hawkins et al.
2013/0030431 A1 1/2013 Adams
2013/0030447 A1 1/2013 Adams
2013/0150874 A1 6/2013 Kassab
2014/0005576 A1 1/2014 Adams et al.
2014/0243820 A1 8/2014 Adams et al.
2014/0243847 A1 8/2014 Hakala et al.
2014/0288570 A1 9/2014 Adams

FOREIGN PATENT DOCUMENTS

EP 0571306 A1 11/1993
JP 62-275446 A 11/1987
JP 6-125915 A 5/1994
JP 7-47135 A 2/1995
JP 10-99444 A 4/1998
JP 10-513379 A 12/1998
JP 2002-538932 A 11/2002
JP 2004-81374 A 3/2004
JP 2005-95410 A 4/2005
JP 2005-515825 A 6/2005
JP 2006-516465 A 7/2006
WO 96/24297 A1 8/1996
WO 2004/069072 A2 8/2004
WO 2006/127158 A2 11/2006
WO 2007/149905 A2 12/2007
WO 2009/121017 A2 10/2009
WO 2009/152352 A2 12/2009
WO WO2010014515 A2 2/2010
WO 2011/143468 A2 11/2011
WO 2013/059735 A1 4/2013

OTHER PUBLICATIONS

International Written Opinion received for PCT Patent Application No. PCT/US2011/047070, mailed on May 1, 2012, 5 pages.
International Search Report received for PCT Patent Application No. PCT/US2012/023172, mailed on Sep. 28, 2012, 3 pages.
International Preliminary Report on Patentability received for PCT Patent Application No. PCT/US2011/047070, mailed on Feb. 21, 2013, 7 pages.
International Search Report and Written Opinion received for PCT Patent Application No. PCT/US2013/031805 mailed on May 20, 2013, 13 pages.
International Preliminary Report on Patentability received for PCT Patent Application No. PCT/US2012/023172, mailed on Aug. 15, 2013, 6 pages.
Office Action received for Australian Patent Application No. 2009257368, issued on Jul. 31, 2013, 4 pages.
Office Action received for Japanese Patent Application No. 2011-513694, mailed on Aug. 27, 2013, 6 pages (3 pages of English Translation and 3 pages of Official copy).
Advisory Action received for U.S. Appl. No. 13/267,383, mailed on Jan. 6, 2014, 4 pages.
Adams et al., U.S. Appl. No. 13/777,807, filed Feb. 26, 2013, titled "Shock Wave Catheter System with ARC Preconditioning".
Hakala et al., U.S. Appl. No. 13/615,107, filed Sep. 13, 2012, titled "Shockwave Catheter System with Energy Control".
Hakala et al., U.S. Appl. No. 13/831,543, filed Mar. 14, 2013, titled "Low Profile Electrodes for an Angioplasty Shock Wave Catheter", 52 pages.
Rosenschein et al., "Shock-Wave Thrombus Ablation, a New Method for Noninvasive Mechanical Thrombolysis", The American Journal of Cardiology, vol. 70, Nov. 15, 1992, pp. 1358-1361.

(56) **References Cited**

OTHER PUBLICATIONS

Zhong et al., "Transient Oscillation of Cavitation Bubbles Near Stone Surface During Electohydraulic Lithotripsy", Journal of Endourology, vol. 11, No. 1, Feb. 1997, pp. 55-61.
International Search Report and Written Opinion received for PCT Patent Application No. PCT/US2013/039987, mailed on Sep. 23, 2013, 15 pages.
International Search Report and Written Opinion received for PCT Patent Application No. PCT/US2013/048277, mailed on Oct. 2, 2013, 14 pages.
Extended European Search Report (includes Supplementary European Search Report and Search Opinion) received for European Patent Application No. 09763640.1, mailed on Oct. 10, 2013, 5 pages.
Final Office Action received for U.S. Appl. No. 13/267,383, mailed on Oct. 25, 2013, 8 pages.
International Search Report and Written Opinion received for PCT Patent Application No. PCT/US2013/059533, mailed on Nov. 7, 2013, 14 pages.
Hakala et al., U.S. Appl. No. 14/061,554, filed Oct. 23, 2013, titled "Low Profile Electrodes for an Angioplasty Shock Wave Catheter".
Hakala et al., U.S. Appl. No. 14/079,463, filed Nov. 13, 2013, titled "Shockwave Catheter System with Energy Control".
International Search Report and Written Opinion received for PCT Patent Application No. PCT/US2013/055431, mailed on Nov. 12, 2013, 9 pages.
Hawkins et al., U.S. Appl. No. 13/960,683, filed Aug. 6, 2013, titled "Shockwave Nerve Therapy System and Method".
Office Action received for Australian Patent Application No. 2009257368, issued on Apr. 28, 2014, 4 pages.
Non-Final Office Action received for U.S. Appl. No. 12/501,619, mailed on Jan. 28, 2014, 10 pages.
Non-Final Office Action received for U.S. Appl. No. 12/581,295, mailed on Mar. 10, 2014, 11 pages.
Non-Final Office Action received for U.S. Appl. No. 13/049,199, mailed on Feb. 4, 2014, 8 pages.
Non-Final Office Action received for U.S. Appl. No. 14/061,554, mailed on Mar. 12, 2014, 14 pages.
Notice of Allowance received for U.S. Appl. No. 14/061,554, mailed on Apr. 25, 2014, 8 pages.
Non Final Office Action received for U.S. Appl. No. 14/079,463, mailed on Mar. 4, 2014, 9 pages.
Notice of Allowance received for U.S. Appl. No. 14/079,463, mailed on Apr. 1, 2014, 5 pages.
Adams et al., Unpublished U.S. Appl. No. 14/271,342, filed May 6, 2014, titled "Shock Wave Balloon Catheter with Multiple Shock Wave Sources", 21 pages.
Adams, John M. , U.S. Appl. No. 14/218,858, filed Mar. 18, 2014, titled "Shockwave Catheter System with Energy Control", 24 pages.
Hakala et al., Unpublished U.S. Appl. No. 14/271,276, filed May 6, 2014, titled "Shockwave Catheter System with Energy Control", 20 pages.
Adams, John M., Unpublished U.S. Appl. No. 14/273,063, filed May 8, 2014, titled "Shock Wave Guide Wire", 24 pages.
Final Office Action received for U.S. Appl. No. 12/581,295, mailed on Jun. 5, 2014, 14 pages.
Non Final Office Action received for U.S. Appl. No. 13/465,264, mailed on Oct. 29, 2014, 13 pages.
Non Final Office Action received for U.S. Appl. No. 13/646,570, mailed on Oct. 29, 2014, 10 pages.
Non-Final Office Action received for U.S. Appl. No. 13/646,583, mailed on Oct. 31, 2014, 8 pages.
Written Opinon received for PCT Patent Application No. PCT/US2009/047070, mailed on Jan. 19, 2010, 5 pages.
International Preliminary Report on Patentability received for PCT Patent Application No. PCT/US2009/047070, mailed on Dec. 23, 2010, 7 pages.
Advisory Action Received for U.S. Appl. No. 12/581,295, mailed on Jul. 3, 2014, 3 pages.
Final Office Action received for U.S. Appl. No. 13/049,199 mailed on Aug. 11, 2014, 8 pages.
Notice of Allowance received for U.S. Appl. No. 13/831,543, mailed on Oct. 8, 2014, 14 pages.
Non-Final Office Action received for U.S. Appl. No. 14/271,276, mailed on Aug. 4, 2014, 7 pages.
Non-Final Office Action received for U.S. Appl. No. 14/271,342, mailed on Sep. 2, 2014, 6 pages.
Notice of Acceptance Received for Australian Patent Application No. 2009257368, mailed on Aug. 28, 2014, 2 pages.
Office Action Received for Japanese Patent Application No. 2011-513694, mailed on Jun. 10, 2014, 2 pages of Official Copy only (See Communication under 37 CFR § 1.98(a) (3)).
Cleveland et al., "The Physics of Shock Wave Lithotripsy", Extracorporeal Shock Wave Lithotripsy Part IV, Chapter 38, 2012, pp. 317-332.
Connors et al., "Renal Nerves Mediate Changes in Contralateral Renal Blood Flow after Extracorporeal Shockwave Lithotripsy", Nephron Physiol, vol. 95, 2003, pp. 67-75.
Doug Hakala, "Unpublished U.S. Appl. No. 14/515,130, filed Oct. 15, 2014, titled "Low Profile Electrodes for an Angioplasty Shock Wave Catheter"".
Gambihler et al., "Permeabilization of the Plasma Membrane of LI210 Mouse Leukemia Cells Using Lithotripter Shock Waves", The Journal of Membrane Biology, vol. 141, 1994, pp. 267-275.
Grassi, et al., "Novel Antihypertensive Therapies: Renal Sympathetic Nerve Ablation and Carotid Baroreceptor Stimulation", Curr Hypertens Rep vol. 14, 2012, pp. 567-572.
Kodama et al., "Shock wave-mediated molecular delivery into cells", Biochimica et Biophysica Acta vol. 1542, 2002, pp. 186-194.
Lauer et al., "Shock wave permeabilization as a new gene transfer method", Gene Therapy vol. 4, 1997, pp. 710-715.

* cited by examiner

FIG. 1
(PRIOR ART)




FIG. 2




FIG. 3



FIG. 3A




FIG. 4




FIG. 5



FIG. 6




FIG. 7




FIG. 8




FIG. 8A



FIG. 9


80
85
86
82
84
HV PULSE GENERATOR
30
PROCESSOR
88
−
+

FIG. 10


10-15
ATmos
~200 psi
PRESSURE
B
C
A
0
VOLUME → BIGGER

FIG. 10A
(PRIOR ART)




FIG. 10B
(PRIOR ART)




FIG. 10C
(PRIOR ART)




FIG. 11




FIG. 11A




FIG. 11B



FIG. 12




FIG. 13



FIG. 14


SKIN EKG
102
R WAVE DETECTOR
100
104
CONTROLLER FOR HV SWITCH
32
+
VARIABLE HV SOURCE
–
ARC

FIG. 15



# SHOCKWAVE BALLOON CATHETER SYSTEM

## PRIORITY CLAIM

The present application claims the benefit of U.S. Provisional Patent Application Ser. No. 61/061,170, filed Jun. 13, 2008, which application is incorporated herein by reference in its entirety.

## BACKGROUND OF THE INVENTION

The present invention relates to a treatment system for percutaneous coronary angioplasty or peripheral angioplasty in which a dilation catheter is used to cross a lesion in order to dilate the lesion and restore normal blood flow in the artery. It is particularly useful when the lesion is a calcified lesion in the wall of the artery. Calcified lesions require high pressures (sometimes as high as 10-15 or even 30 atmospheres) to break the calcified plaque and push it back into the vessel wall. With such pressures comes trauma to the vessel wall which can contribute to vessel rebound, dissection, thrombus formation, and a high level of restenosis. Non-concentric calcified lesions can result in undue stress to the free wall of the vessel when exposed to high pressures. An angioplasty balloon when inflated to high pressures can have a specific maximum diameter to which it will expand but the opening in the vessel under a concentric lesion will typically be much smaller. As the pressure is increased to open the passage way for blood the balloon will be confined to the size of the open in the calcified lesion (before it is broken open). As the pressure builds a tremendous amount of energy is stored in the balloon until the calcified lesion breaks or cracks. That energy is then released and results in the rapid expansion of the balloon to its maximum dimension and may stress and injure the vessel walls.

## SUMMARY OF THE INVENTION

The invention provides a catheter that comprises an elongated carrier, a dilating balloon about the carrier in sealed relation thereto, the balloon being arranged to receive a fluid therein that inflates the balloon, and an arc generator including at least one electrode within the balloon that forms a mechanical shock wave within the balloon.

The at least one electrode may include a single metallic electrode of a pair of metallic electrodes. The electrodes may be radially displaced from each other or longitudinally displaced from each other. The at least one electrode may be formed of stainless steel.

The balloon may be formed of non-compliant material or of compliant material. The dilating balloon may have at least one stress riser carried on its surface.

The catheter may further comprise a sensor that senses reflected energy. The sensor may be distal to the at least one electrode. The sensor may be disposed on the carrier.

The catheter may further comprise a reflector within the dilating balloon that focuses the shock waves. The reflector may form one of the at least one electrodes. The catheter has a center line and the reflector may be arranged to focus the shock waves off of the catheter center line.

The fluid may be saline. The fluid may include an x-ray contrast.

The catheter may further include a lumen for receiving a guide wire. The lumen may be defined by the carrier.

The invention further provides a system comprising a catheter including an elongated carrier, a dilating balloon about



the carrier in sealed relation thereto, the balloon being arranged to receive a fluid therein that inflates the balloon, and an arc generator including at least one electrode within the balloon that forms a mechanical shock wave within the balloon. The system further comprises a power source that provides electrical energy to the arc generator.

The power source is preferably arranged to provide pulsed high voltage. The power source may be arranged to provide high voltage pulses having selectable pulse durations, selectable voltage amplitudes, and/or selectable pulse repetition rates.

The system may further comprise an R wave detector that synchronizes the mechanical shock waves with cardiac R waves.

The at least one electrode may include a single metallic electrode of a pair of metallic electrodes. The electrodes may be radially displaced from each other or longitudinally displaced from each other. The at least one electrode may be formed of stainless steel.

The balloon may be formed of non-compliant material or of compliant material. The dilating balloon may have at least one stress riser carried on its surface.

The catheter may further comprise a sensor that senses reflected energy. The sensor may be distal to the at least one electrode. The sensor may be disposed on the carrier.

The catheter may further comprise a reflector within the dilating balloon that focuses the shock waves. The reflector may form one of the at least one electrodes. The catheter has a center line and the reflector may be arranged to focus the shock waves off of the catheter center line.

The fluid may be saline. The fluid may include an x-ray contrast.

The catheter may further include a lumen for receiving a guide wire. The lumen may be defined by the carrier.

The invention further provides a method comprising the step of providing a catheter including an elongated carrier, a dilating balloon about the carrier in sealed relation thereto, the balloon being arranged to receive a fluid therein that inflates the balloon, and an arc generator including at least one electrode within the balloon that forms a mechanical shock wave within the balloon. The method further comprises the steps of inserting the catheter into a body lumen of a patient adjacent an obstruction of the body lumen, admitting fluid into the balloon, and applying high voltage pulses to the arc generator to form a series of mechanical shocks within the balloon.

The method may include the further step of detecting cardiac R waves of the patient's heart, and synchronizing the mechanical shocks with the detected R waves.

The method may further include the step of varying one of the repetition rate, amplitude and duration of the high voltage pulses to vary the intensity of the mechanical shock waves.

The method may include the further step of sensing reflected energy within the catheter.

The method may include the further step of placing a guide wire into the body lumen and guiding the catheter into the body lumen along the guide wire.

The method may include the further step of focusing the mechanical shockwaves. The mechanical shockwaves may be focused away from the catheter center axis.

The method may include the further steps of adding an x-ray contrast to the fluid and visualizing the catheter under fluoroscopy.

## BRIEF DESCRIPTION OF THE DRAWINGS

For illustration and not limitation, some of the features of the present invention are set forth in the appended claims. The

various embodiments of the invention, together with representative features and advantages thereof, may best be understood by making reference to the following description taken in conjunction with the accompanying drawings, in the several figures of which like reference numerals identify identical elements, and wherein:

FIG. **1** is a view of the therapeutic end of a typical prior art over-the-wire angioplasty balloon catheter.

FIG. **2** is a side view of a dilating angioplasty balloon catheter with two electrodes within the balloon attached to a source of high voltage pulses according to one embodiment of the invention.

FIG. **3** is a schematic of a high voltage pulse generator.

FIG. **3**A shows voltage pulses that may be obtained with the generator of FIG. **3**.

FIG. **4** is a side view of the catheter of FIG. **2** showing an arc between the electrodes and simulations of the shock wave flow.

FIG. **5** is a side view of a dilating catheter with insulated electrodes within the balloon and displaced along the length of the balloon according to another embodiment of the invention.

FIG. **6** is a side view of a dilating catheter with insulated electrodes within the balloon displaced with a single pole in the balloon and a second being the ionic fluid inside the balloon according to a further embodiment of the invention.

FIG. **7** is a side view of a dilating catheter with insulated electrodes within the balloon and studs to reach the calcification according to a still further embodiment of the invention.

FIG. **8** is a side view of a dilating catheter with insulated electrodes within the balloon with raised ribs on the balloon according to still another embodiment of the invention.

FIG. **8**A is a front view of the catheter of FIG. **8**.

FIG. **9** is a side view of a dilating catheter with insulated electrodes within the balloon and a sensor to detect reflected signals according to a further embodiment of the invention.

FIG. **10** is a pressure volume curve of a prior art balloon breaking a calcified lesion.

FIG. **10**A is a sectional view of a balloon expanding freely within a vessel.

FIG. **10**B is a sectional view of a balloon constrained to the point of breaking in a vessel.

FIG. **10**C is a sectional view of a balloon after breaking within the vessel.

FIG. **11** is a pressure volume curve showing the various stages in the breaking of a calcified lesion with shock waves according to an embodiment of the invention.

FIG. **11**A is a sectional view showing a compliant balloon within a vessel.

FIG. **11**B is a sectional view showing pulverized calcification on a vessel wall.

FIG. **12** illustrates shock waves delivered through the balloon wall and endothelium to a calcified lesion.

FIG. **13** shows calcified plaque pulverized and smooth a endothelium restored by the expanded balloon after pulverization.

FIG. **14** is a schematic of a circuit that uses a surface EKG to synchronize the shock wave to the "R" wave for treating vessels near the heart.

FIG. **15** is a side view, partly cut away, of a dilating catheter with a parabolic reflector acting as one electrode and provides a focused shock wave inside a fluid filled compliant balloon.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** is a view of the therapeutic end of a typical prior art over-the-wire angioplasty balloon catheter **10**. Such catheters are usually non-complaint with a fixed maximum dimension when expanded with a fluid such as saline.

FIG. **2** is a view of a dilating angioplasty balloon catheter **20** according to an embodiment of the invention. The catheter **20** includes an elongated carrier, such as a hollow sheath **21**, and a dilating balloon **26** formed about the sheath **21** in sealed relation thereto at a seal **23**. The balloon **26** forms an annular channel **27** about the sheath **21** through which fluid, such as saline, may be admitted into the balloon to inflate the balloon. The channel **27** further permits the balloon **26** to be provided with two electrodes **22** and **24** within the fluid filled balloon **26**. The electrodes **22** and **24** are attached to a source of high voltage pulses **30**. The electrodes **22** and **24** are formed of metal, such as stainless steel, and are placed a controlled distance apart to allow a reproducible arc for a given voltage and current. The electrical arcs between electrodes **22** and **24** in the fluid are used to generate shock waves in the fluid. The variable high voltage pulse generator **30** is used to deliver a stream of pulses to the electrodes **22** and **24** to create a stream of shock waves within the balloon **26** and within the artery being treated (not shown). The magnitude of the shock waves can be controlled by controlling the magnitude of the pulsed voltage, the current, the duration and repetition rate. The insulating nature of the balloon **26** protects the patient from electrical shocks.

The balloon **26** may be filled with water or saline in order to gently fix the balloon in the walls of the artery in the direct proximity with the calcified lesion. The fluid may also contain an x-ray contrast to permit fluoroscopic viewing of the catheter during use. The carrier **21** includes a lumen **29** through which a guidewire (not shown) may be inserted to guide the catheter into position. Once positioned the physician or operator can start with low energy shock waves and increase the energy as needed to crack the calcified plaque. Such shockwaves will be conducted through the fluid, through the balloon, through the blood and vessel wall to the calcified lesion where the energy will break the hardened plaque without the application of excessive pressure by the balloon on the walls of the artery.

FIG. **3** is a schematic of the high voltage pulse generator **30**. FIG. **3**A shows a resulting waveform. The voltage needed will depend on the gap between the electrodes and generally 100 to 3000 volts. The high voltage switch **32** can be set to control the duration of the pulse. The pulse duration will depend on the surface area of the electrodes **22** and **24** and needs to be sufficient to generate a gas bubble at the surface of the electrode causing a plasma arc of electric current to jump the bubble and create a rapidly expanding and collapsing bubble, which creates the mechanical shock wave in the balloon. Such shock waves can be as short as a few microseconds.

FIG. **4** is a cross sectional view of the shockwave catheter **20** showing an arc **25** between the electrodes **22** and **24** and simulations of the shock wave flow **28**. The shock wave **28** will radiate out from the electrodes **22** and **24** in all directions and will travel through the balloon **26** to the vessel where it will break the calcified lesion into smaller pieces.

FIG. **5** shows another dilating catheter **40**. It has insulated electrodes **42** and **44** within the balloon **46** displaced along the length of the balloon **46**.

FIG. **6** shows a dilating catheter **50** with an insulated electrode **52** within the balloon **56**. The electrode is a single electrode pole in the balloon, a second pole being the ionic fluid **54** inside the balloon. This unipolar configuration uses the ionic fluid as the other electrical pole and permits a

smaller balloon and catheter design for low profile balloons. The ionic fluid is connected electrically to the HV pulse generator **30**.

FIG. **7** is another dilating **60** catheter with electrodes **62** and **64** within the balloon **66** and studs **65** to reach the calcification. The studs **65** form mechanical stress risers on the balloon surface **67** and are designed to mechanically conduct the shock wave through the intimal layer of tissue of the vessel and deliver it directly to the calcified lesion.

FIG. **8** is another dilating catheter **70** with electrodes **72** and **74** within the balloon **76** and with raised ribs **75** on the surface **77** of the balloon **76**. The raised ribs **75** (best seen in FIG. **8**A) form stress risers that will focus the shockwave energy to linear regions of the calcified plaque.

FIG. **9** is a further dilating catheter **80** with electrodes **82** and **84** within the balloon **86**. The catheter **80** further includes a sensor **85** to detect reflected signals. Reflected signals from the calcified plaque can be processed by a processor **88** to determine quality of the calcification and quality of pulverization of the lesion.

FIG. **10** is a pressure volume curve of a prior art balloon breaking a calcified lesion FIG. **10**B shows the build up of energy within the balloon (region A to B) and FIG. **10**C shows the release of the energy (region B to C) when the calcification breaks. At region C the artery is expanded to the maximum dimension of the balloon. Such a dimension can lead to injury to the vessel walls. FIG. **10**A shows the initial inflation of the balloon.

FIG. **11** is a pressure volume curve showing the various stages in the breaking of a calcified lesion with shock waves according to the embodiment. The balloon is expanded with a saline fluid and can be expanded to fit snugly to the vessel wall (Region A)(FIG. **11**A) but this is not a requirement. As the High Voltage pulses generate shock waves (Region B and C) extremely high pressures, extremely short in duration will chip away the calcified lesion slowly and controllably expanding the opening in the vessel to allow blood to flow un-obstructed (FIG. **11**B).

FIG. **12** shows, in a cutaway view, shock waves **98** delivered in all directions through the wall **92** of a saline filled balloon **90** and intima **94** to a calcified lesion **96**. The shock waves **98** pulverize the lesion **96**. The balloon wall **92** may be formed of non-compliant or compliant material to contact the intima **94**.

FIG. **13** shows calcified plaque **96** pulverized by the shock waves. The intima **94** is smoothed and restored after the expanded balloon (not shown) has pulverized and reshaped the plaque into the vessel wall.

FIG. **14** is a schematic of a circuit **100** that uses the generator circuit **30** of FIG. **3** and a surface EKG **102** to synchronize the shock wave to the "R" wave for treating vessels near the heart. The circuit **100** includes an R-wave detector **102** and a controller **104** to control the high voltage switch **32**. Mechanical shocks can stimulate heart muscle and could lead to an arrhythmia. While it is unlikely that shockwaves of such short duration as contemplated herein would stimulate the heart by synchronizing the pulses (or bursts of pulses) with the R-wave, an additional degree of safety is provided when used on vessels of the heart or near the heart. While the balloon in the current drawings will provide an electrical isolation of the patient from the current, a device could be made in a non-balloon or non-isolated manner using blood as the fluid. In such a device, synchronization to the R-wave would significantly improve the safety against unwanted arrhythmias.

FIG. **15** shows a still further dilation catheter **110** wherein a shock wave is focused with a parabolic reflector **114** acting as one electrode inside a fluid filled compliant balloon **116**. The other electrode **112** is located at the coaxial center of the reflector **114**. By using the reflector as one electrode, the shock wave can be focused and therefore pointed at an angle (45 degrees, for example) off the center line **111** of the catheter artery. In this configuration, the other electrode **112** will be designed to be at the coaxial center of the reflector and designed to arc to the reflector **114** through the fluid. The catheter can be rotated if needed to break hard plaque as it rotates and delivers shockwaves.

While particular embodiments of the present invention have been shown and described, modifications may be made. For example, instead of manual actuation and spring loaded return of the valves used herein, constructions are possible which perform in a reversed manner by being spring actuated and manually returned. It is therefore intended in the appended claims to cover all such changes and modifications which fall within the true spirit and scope of the invention as defined by those claims.

What is claimed is:

**1**. An angioplasty catheter comprising:

an elongated carrier sized to fit within a blood vessel, said carrier having a guide wire lumen extending therethrough;

an angioplasty balloon located near a distal end of the carrier with a distal end of the balloon being sealed to the carrier near the distal end of the carrier and with a proximal end of the balloon defining an annular channel arranged to receive a fluid therein that inflates the balloon; and

an arc generator including a pair of electrodes, said electrodes being positioned within and in non-touching relation to the balloon, said arc generator generating a high voltage pulse sufficient to create a plasma arc between the electrodes resulting in a mechanical shock wave within the balloon that is conducted through the fluid and through the balloon and wherein the balloon is arranged to remain intact during the formation of the shock wave.

**2**. The catheter of claim **1**, wherein the pair of electrodes includes a pair of metallic electrodes.

**3**. The catheter of claim **2**, wherein the electrodes are radially displaced from each other.

**4**. The catheter of claim **2**, wherein the electrodes are longitudinally displaced from each other.

**5**. The catheter of claim **2**, wherein the pair of electrodes is disposed adjacent to and outside of the guide wire lumen.

**6**. The catheter of claim **2**, wherein the catheter has a distal end and wherein the pair of electrodes is disposed proximal to the distal end of the catheter.

**7**. The catheter of claim **1**, wherein the balloon is formed of non-compliant material.

**8**. The catheter of claim **1**, wherein the balloon is formed of compliant material.

**9**. The catheter of claim **1**, wherein the balloon has a surface, and wherein the catheter further comprises at least one stress riser carried on the surface of the balloon.

**10**. The catheter of claim **1**, further comprising a sensor that senses reflected energy.

**11**. The catheter of claim **1**, further comprising a reflector within the balloon that focuses the shock waves.

**12**. The catheter of claim **1**, wherein the balloon electrically insulates the pair of electrodes from tissue external to the catheter.

**13**. The catheter of claim **1**, wherein the pair of electrodes includes a first electrode and a second electrode, the second electrode being arranged to form an electrical arc with the first

electrode to generate the mechanical shock wave and to reflect the mechanical shock wave in a desired pattern.

**14**. The catheter of claim **1**, wherein the balloon has a center axis and the guide wire lumen has a center axis in common with the balloon center axis; and

wherein at least one electrode of the electrode pair is disposed in non-intersecting relation with respect to the balloon center axis.

**15**. A system comprising:

an angioplasty catheter including an elongated carrier sized to fit within a blood vessel, said carrier having a guide wire lumen extending therethrough, an angioplasty balloon located near a distal end of the carrier with a distal end of the balloon being sealed to the carrier near the distal end of the carrier and with a proximal end of the balloon defining an annular channel arranged to receive a fluid therein that inflates the balloon, and an arc generator including a pair of electrodes being positioned within and in non-touching relation to the balloon; and

a power source configured to provide a high voltage pulse to the arc generator, said high voltage pulse sufficient to create a plasma arc between the electrodes resulting in a mechanical shock wave within the balloon that is conducted through the fluid and through the balloon and wherein the balloon is arranged to remain intact during the formation of the shock wave.

**16**. The system of claim **15**, wherein the power source is arranged to provide high voltage pulses having at least one of selectable pulse durations, selectable voltage amplitudes, and selectable pulse repetition rates.

**17**. The system of claim **15**, further comprising an R wave detector that synchronizes the mechanical shock waves with a cardiac R waves.

* * * * *

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 20, 2023

Respectfully submitted,

By: *_/s/ David C. McPhie_*
David C. McPhie

David C. McPhie
Stephen M. Payne
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Phone: 949-760-0991

Michael R. Fleming
IRELL & MANELLA LLP
750 17th Street NW
Washington, D.C. 20006
Phone: 202-777-6500

W. Cook Alciati
GARDELLA GRACE P.A.
80 M Street SE, 1st Floor
Washington, D.C. 20003
Phone: 703-556-9600

*Counsel for Appellant*
*Shockwave Medical, Inc.*