**Docket Nos. 2023-1864, 2023-1940**

*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

SHOCKWAVE MEDICAL, INC.,
*Appellant*

v.

CARDIOVASCULAR SYSTEMS, INC.,
*Cross-Appellant*

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,
*Intervenor*

*Appeal from the United States Patent and Trademark Office Patent Trial and Appeal Board in Case No. IPR2019-00405 · Richard Marschall, Administrative Patent Judge Avelyn Marie Ross, Administrative Patent Judge · Mitchell G. Weatherly, Administrative Patent Judge.*

## SECOND CORRECTED NON-CONFIDENTIAL RESPONSE AND REPLY BRIEF OF APPELLANT SHOCKWAVE MEDICAL, INC.

MICHAEL R. FLEMING, ESQ.
IRELL & MANELLA LLP
750 17th Street NW, Suite 850
Washington, District of Columbia. 20006
(202) 777-6500 Telephone
mfleming@irell.com

DAVID C. MCPHIE, ESQ.
STEPHEN M. PAYNE, ESQ.
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, California 92660
(949) 760-0991 Telephone
dmcphie@irell.com
spayne@irell.com

W. COOK ALCIATI, ESQ.
GARDELLA GRACE P.A.
80 M Street SE, 1st Floor
Washington, District of Columbia. 20003
(703) 556-9600 Telephone
calciati@gardellagrace.com

*Attorneys for Appellant Shockwave Medical, Inc.*

COUNSEL PRESS INC. · (213) 680-2300 PRINTED ON RECYCLED PAPER

# CERTIFICATE OF INTEREST

Counsel for Appellant Shockwave Medical, Inc. certifies the following:

1. The full name of every party represented by me is:

    Shockwave Medical, Inc.

2. The names of the real parties in interest represented by me are:

    Not applicable.

3. All parent corporations and any publicly held companies that own ten percent (10%) or more of the stock of the parties represented by me are:

    Blackrock, Inc.
    Vanguard Group, Inc.

4. The names of all law firms and the partners or associates that appeared for the parties represented by me in the trial court or are expected to appear in this Court are:

| | |
|---|---|
| IRELL & MANELLA LLP<br>Michael R. Fleming<br>David C. McPhie<br>Stephen M. Payne | GARDELLA GRACE P.A.<br>Greg H. Gardella<br>Natalie J. Grace<br>Ruth G. Davila<br>W. Cook Alciati |
| MORRISON & FOERSTER<br>Mehran Arjomand<br>Michael Stallman<br>Anna Yuan<br>Jean Nguyen | |

5. Other than the originating case, any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

    None.

6. Organizational Victims and Bankruptcy Cases:

Not applicable.

Dated: May 1, 2024

Respectfully submitted,

By: */s/ David C. McPhie*
David C. McPhie

David C. McPhie
Stephen M. Payne
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Phone: 949-760-0991

Michael R. Fleming
IRELL & MANELLA LLP
750 17th Street NW
Washington, D.C. 20006
Phone: 202-777-6500

W. Cook Alciati
GARDELLA GRACE P.A.
80 M Street SE, 1st Floor
Washington, D.C. 20003
Phone: 703-556-9600

*Counsel for Appellant*
*Shockwave Medical, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

REPLY ARGUMENT ................................................................................. 2

I. The Board Improperly Relied on AAPA as a "Basis" ........................ 2

A. This Court Has Jurisdiction to Address the AAPA Issue ........................................................................ 2

B. All of the Board's Cited Grounds Improperly Used AAPA as a "Basis" ........................................................ 4

C. There Is No "Combination" Exception In the Statute ........... 10

D. Intervenor's Policy Arguments Contradict the Statute and Legislative History ................................................ 11

E. The FWD Cannot Be Affirmed Based on Prior Art Disclosures Identified for the First Time on Rehearing ........ 14

II. The Board Misconstrued the Claim Term "Angioplasty Balloon" ........................................................................ 16

A. CSI Clearly Errs in Arguing that "Angioplasty Balloon" is Not Limited to a "Particular Type of Balloon" ........................................................................ 16

B. CSI's Arguments Regarding "Into the Vessel Wall" Are Irrelevant and Do Not Provide a Basis for Affirmance ........................................................................ 19

C. Shockwave's Proposed Claim Construction Was Correct ........................................................................ 22

D. Levy Does Not Disclose an "Angioplasty Balloon" as Properly Construed ........................................................ 24

E. AAPA Cannot Cure The Deficiencies of Levy Given the Lack of a Motivation to Combine ................................... 24

**Page**

III. The Board Identified No Evidence of Motivation to Introduce a Guidewire Lumen into Levy ........ 27

IV. The Board Failed to Satisfy the "Shock Wave" Element ........ 30

A. Levy '227 Does Not Disclose Shockwaves For Blood Vessels ........ 30

B. The Board Identified No Motivation to Combine the Distinct Embodiments Disclosed in Levy '227 ........ 32

V. The Board Improperly Disregarded the Objective Indicia Evidence ........ 34

A. The Board Failed to Properly Consider Nexus ........ 34

B. The Board Failed to Appropriately Consider the Substantial Objective Evidence of Nonobviousness ........ 36

VI. The Board Improperly Denied Additional Discovery ........ 39

SUMMARY OF CROSS-APPEAL RESPONSE ARGUMENT ........ 42

CROSS-APPEAL RESPONSE ARGUMENT ........ 42

I. The Cross-Appeal Should Be Dismissed as CSI Lacks Standing ........ 42

A. CSI's Speculative Product Development Efforts Do Not Confer Standing ........ 43

B. Shockwave's Statements Do Not Manufacture Standing ........ 47

II. Alternatively, the Board's Finding of Patentability for Claim 5 is Supported by Substantial Evidence and Should Be Affirmed ........ 50

A. Factual and Procedural Background ........ 50

B. CSI's Sole Cited Basis for the Electrode Configuration of Claim 5 (Uchiyama) Admittedly Lacks This Element ........ 54

**Page**

C. The Board Correctly Rejected CSI's "Design Choice" Argument ........ 57

CONCLUSION ........ 61

CERTIFICATE OF COMPLIANCE ........ 63

**CONFIDENTIAL MATERIAL OMITTED**

The material redacted on page 44 consists of alleged product development information of Appellee CSI. The Court granted CSI's motion for a Protective Order as to this material on September 19, 2023, at Docket No. 28.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Voip-Pal.com, Inc.*,
976 F.3d 1316 (Fed. Cir. 2020) ....................59

*Atofina v. Great Lakes Chemical Corp.*,
441 F.3d 991 (Fed. Cir. 2006) ....................21

*Callaway Golf Co. v. Acushnet Co.*,
576 F.3d 1331 (Fed. Cir. 2009) ....................32, 33

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l*,
246 F.3d 1336 (Fed. Cir. 2001) ....................23

*Cuozzo Speed Technologies, LLC v. Lee*,
579 U.S. 261 (2016)....................3

*Cygnus Therapeutics Systems v. ALZA Corp.*,
92 F.3d 1153 (Fed. Cir. 1996) ....................48, 49

*Dell Inc. v. Acceleron, LLC*,
818 F.3d 1293 (Fed. Cir. 2016) ....................15

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*,
214 F.3d 1302 (Fed. Cir. 2000) ....................19

*Enzo Biochem., Inc. v. Applera Corp.*,
599 F.3d 1325 (Fed. Cir. 2010) ....................31

*Fanduel Inc. v. Interactive Games LLC*,
966 F.3d 1334 (Fed. Cir. 2020) ....................58

*Fisher & Paykel Healthcare Ltd. v. ResMed Ltd.*,
789 F. App'x 877 (Fed. Cir. 2019)....................45, 46

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
383 F.3d 1352 (Fed. Cir. 2004) ....................19

*General Elec. Co. v. Raytheon Techs. Corp.*,
983 F.3d 1334 (Fed. Cir. 2020) ....................48

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
849 F.3d 1034 (Fed. Cir. 2017) ....................27

*JTEKT Corp. v. GKN Auto. Ltd.*,
898 F.3d 1217 (Fed. Cir. 2018) ....................43, 45, 46

*Knauf Insulation, Inc. v. Rockwool Int'l A/S*,
788 F. App'x 728 (Fed. Cir. 2019) ....................42

*Koninklijke Philips N.V. v. Google LLC*,
948 F.3d 1330 (Fed. Cir. 2020) ....................6, 7

*Lingamfelter v. Kappos*,
513 F. App'x 934 (Fed. Cir. 2012) ....................12

*ModernaTx, Inc. v. Arbutus BioPharma Corp.*,
18 F.4th 1352 (Fed. Cir. 2021) ....................42

*Netflix, Inc. v. DivX, LLC*,
84 F.4th 1371 (Fed. Cir. 2023) ....................60

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ....................56

*Personal Web Techs., Inc. v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ....................55

*Philip Morris Prod. S.A. v. Int'l Trade Comm'n*,
63 F.4th 1328 (Fed. Cir. 2023) ....................57

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ....................34, 58

*Qualcomm Incorporated v. Apple Inc.*,
24 F.4th 1367 (Fed. Cir. 2022) ....................*passim*

*In re Rudy*,
956 F.3d 1379 (Fed. Cir. 2020) ....................11

*SAS Institute, Inc. v. Iancu*,
138 S. Ct. 1348 (2018)....................3

*In re Stepan Co.*,
868 F.3d 1342 (Fed. Cir. 2017) ....................32

*Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*,
8 F.4th 1349 (Fed. Cir. 2021) ....................................................................36

*Thryv, Inc. v. Click-To-Call Techs., LP*,
140 S. Ct. 1367 (2020)..............................................................................3, 4

*TQ Delta, LLC v. Cisco Sys.*,
942 F.3d 1352 (Fed. Cir. 2019) ..................................................................29

*Ultratec, Inc. v. Captioncall, LLC*,
872 F.3d 1267 (Fed. Cir. 2017) ..................................................................41

*Vicor Corp. v. SynQor, Inc.*,
603 F. App'x 969 (Fed. Cir. 2015)..............................................................33

*Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*,
97 F.4th 882 (Fed. Cir. 2024) ................................................................25, 26

*Volvo Penta of the Am., LLC v. Brunswick Corp.*,
81 F.4th 1202 (Fed. Cir. 2023) .......................................................37, 38, 39

*Wi-Fi One, LLC v. Broadcom Corp.*,
878 F.3d 1364 (Fed. Cir. 2018) ....................................................................4

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ..............................................................................3

35 U.S.C. § 301(a) ..........................................................................................13

35 U.S.C. § 311(b) ..................................................................................*passim*

35 U.S.C. § 319.............................................................................................2, 3

35 U.S.C. § 321(b), (c).....................................................................................12

**Legislative History**

157 Cong. Rec. S5374 (daily ed. Sept 7, 2011).................................................12

**Regulations**

37 C.F.R. § 42.104(b)(4)...................................................................................14

## INTRODUCTION

CSI's brief fails to salvage the Board's flawed final decision on rehearing ("FWD"). The FWD suffers from multiple legal errors, including:

- The improper use of AAPA as a basis for unpatentability;
- A misinterpretation of the term "angioplasty balloon" that disregards the prosecution history and other important intrinsic and extrinsic evidence;
- Obviousness findings lacking any evidence of motivation to combine; and
- A failure to properly accord any meaningful weight to the admittedly "voluminous" objective evidence of non-obviousness.

The FWD's finding of unpatentability is especially egregious as the invention of Shockwave's '371 Patent was a genuine medical technological breakthrough resulting in a real product—Shockwave's IVL system—that has proven a tremendous success for patients and in the marketplace. In less than eight years since receiving FDA approval, Shockwave's IVL system has been used to treat nearly 1 million patients and total sales have exceeded $1.5 billion, including over $730 million in 2023 alone. Physicians have referred to Shockwave's patented invention as "a transformational technology" that is "unique among all technologies in its ability to modify calcium." Appx8054, Appx8067. It was the "first" and "only[] effective treatment for medial calcified lesions." *E.g.*, Appx8694-8695.

In view of the Board's legal and factual errors, Shockwave respectfully requests that this Court reverse the finding of unpatentability with respect to claims 1-4 and 6-17. By contrast, CSI's cross-appeal on claim 5 fails for lack of jurisdiction and is also plainly wrong on the merits.

## REPLY ARGUMENT

### I. The Board Improperly Relied on AAPA as a "Basis"

As explained in Shockwave's opening brief, the FWD's reliance on AAPA is legally improper as the Patent Act clearly provides that the permissible "[s]cope" of an IPR must be "***only*** on the ***basis*** of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b).[1]

#### A. This Court Has Jurisdiction to Address the AAPA Issue

CSI's initial response is that the Board's invalidation of the claims based on AAPA is a non-appealable challenge to "institution" under § 314(d). CSI Br. 28-30. This argument is utterly without merit—and notably is nowhere mentioned in Intervenor's brief. Clearly, Shockwave's appeal is not in any way directed to the decision to institute, but rather seeks review of the Board's FWD that improperly invalidated Shockwave's patent claims based on grounds not permitted by the statute. There is no question that FWDs are appealable. *See* 35 U.S.C. § 319.

[1] All emphasis or highlighting in this brief is added.

CSI and Intervenor acknowledge that *Qualcomm Incorporated v. Apple Inc.*, 24 F.4th 1367, 1375 (Fed. Cir. 2022) previously addressed the AAPA issue on an appeal from the Board. The Court held there that AAPA does not qualify as "prior art consisting of patents or printed publications," and vacated the final decision of the Board on the rationale that "§ 311(b) does not permit AAPA … to be the basis of a ground in an inter partes review." *Id.* In so doing, the Court specifically held that it had "jurisdiction under 28 U.S.C. § 1295(a)(4)(A)." *Id.* at 1372. *Qualcomm* thus confirms that the Board's use of AAPA in a FWD is appealable. Indeed, the Court necessarily confirmed its own jurisdiction in that case, because the issue is "not subject to forfeiture" (as CSI concedes, CSI Br. 30).

The cases cited by CSI do not support its jurisdictional argument, and in fact only further confirm appealability. In *Cuozzo Speed Technologies, LLC v. Lee*, 579 U.S. 261 (2016), the Supreme Court held that § 314(d) does ***not*** "enable the agency to act outside its statutory limits by, for example, canceling a patent claim for 'indefiniteness under § 112' in inter partes review. Such 'shenanigans' may be properly reviewable in the context of § 319 and under the Administrative Procedure Act." *Id.* at 275; *see also SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) ("§ 314(d) does not "enable the agency to act outside its statutory limits").

Likewise, *Thryv, Inc. v. Click-To-Call Techs., LP*, 140 S. Ct. 1367, 1376 (2020) explained that "nothing in § 314(d) or *Cuozzo* withdraws our power to ensure

that an inter partes review proceeds in accordance with the law's demands." In that case, the Court held that the application of § 315(b)'s one-year time bar was not reviewable because it is a procedural provision that "expressly governs institution and nothing more." *Id.* at 1373. In contrast, § 311(b) is a substantive limit on the "[s]cope" of IPR proceedings that limits the bases on which the Board is permitted to invalidate the claims.[2] The Supreme Court was clear in *Thyrv* that its holding did not allow the Board to engage in "wrongful invalidation" of claims, and that "patent owners remain free to appeal final decisions on the merits." *Id.* at 1375. That is exactly what Shockwave is doing here.

### B. All of the Board's Cited Grounds Improperly Used AAPA as a "Basis"

On the merits, the FWD violated the statutory limits on IPR because every single ground alleged in the Petition and relied on by the Board included AAPA as a basis. CSI and Intervenor attempt to dispute this, claiming that AAPA was used as mere "background knowledge" as permitted by *Qualcomm*. CSI Br. 30-35. But this ignores that the FWD itself expressly identifies AAPA as a "Basis" for every ground:

---

[2] CSI's suggestion that *Wi-Fi One, LLC v. Broadcom Corp.*, 878 F.3d 1364 (Fed. Cir. 2018) (en banc) held § 311 is a "preliminary procedural requirement[]" is incorrect. The statement CSI quotes was not about § 311, but rather § 314's provisions regarding "the timing of and notice requirements for the institution decision." *Id.* at 1368.

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1–6, 11, 14–16 | 103 | Levy,[2] AAPA,[3] and Mantell,[4] Uchiyama,[5] or Willneff[6] |
| 7, 12 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Hayes[7] |

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 8, 12 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Duchamp[8] |
| 9 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Naimark[9] |
| 10 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Beyer[10] |
| 13 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Bhatta[11] |
| 17 | 103 | Levy, AAPA, and Mantell, Uchiyama, or Willneff, in further view of Schultheiss[12] |
| 1–4, 6, 11, 15, 16 | 103 | Willneff, AAPA, and Levy or Mantell |
| 5, 14 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Uchiyama |
| 7, 12 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Hayes |
| 8, 12 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Duchamp |
| 9 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Naimark |

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 10 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Beyar |
| 13 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Bhatta |
| 17 | 103 | Willneff, AAPA, and Levy or Mantell in further view of Schultheiss |

Appx2-3; *see also* Appx337-338 (listing grounds presented in CSI's Petition, all of which expressly included AAPA).

Furthermore, the Board's identification of AAPA as a "Basis" for its cited grounds was consistent with how it actually used AAPA in the IPR proceedings and FWD. Both the Petition and CSI's expert expressly described and presented the AAPA as a reference in the alleged obviousness combination. For example, with respect to the "angioplasty balloon" element, the Petition argued that "[i]t would have been obvious to a POSITA to implement the AAPA with the angioplasty balloon described in Levy." Appx357. CSI's expert likewise argued that the claims were obvious "over Levy (Ex. 1003) in combination with the admitted prior art." Appx1641. Neither the Petition nor CSI's expert ever argued or presented the AAPA as mere background knowledge. In fact, the words "background knowledge" do not even appear in the Petition or CSI's expert declaration.

CSI and Intervenor do not identify a single instance in which the AAPA was presented or described in the Petition as mere background knowledge. Instead, CSI argues that the Board "properly determined that the AAPA evidenced the background knowledge of a skilled artisan." CSI Br. 32. But the Board does not have authority to treat material presented as the "basis" for a ground as if it were offered only as background knowledge. In *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330 (Fed. Cir. 2020), this Court made clear that using art as "background

knowledge" presents a theory that is distinct from using art as the basis of a ground, and the two are not interchangeable. There, the petitioner cited a reference called "Hua" as evidence of "general knowledge" but did not include Hua in the asserted grounds. *Id*. at 1334. The Board nonetheless instituted IPR on the ground of "obviousness over SMIL 1.0 in combination with Hua." *Id*. at 1335. This Court held that the Board "erred by instituting inter partes review based on a combination of prior art references not advanced in Google's petition," explaining that the "statute envisions that a petitioner will seek an inter partes review of a particular kind—one guided by a petition describing 'each claim challenged' and 'the grounds on which the challenge to each claim is based.'" *Id*. This Court further explained that "the Board does not 'enjoy[] a license to depart from the petition and institute a different inter partes review of his own design.'" *Id*. at 1336. So too here, the Board does not have a license to do the inverse and change the Petition's reliance on AAPA as a basis for each ground into mere "background knowledge."

A comparison of the original FWD to the rehearing FWD reveals that the Board here did exactly what this Court forbade in *Philips*. After this Court's decision in *Qualcomm* made the Board's original FWD untenable, the Board merely ***rephrased*** its analysis on rehearing to add the words "background knowledge" where AAPA had previously been discussed as a basis for its finding of unpatentability. For example, the Board's original FWD correctly described

Petitioner's obviousness theory as relying on "the combined teachings of Levy, ***AAPA***, and one of Mantell, Uchiyama, and Willneff." Appx123. On rehearing, the Board rewrote the same ground as "the combined teachings of Levy and one of Mantell, Uchiyama, and Willneff ***along with the background knowledge reflected in the AAPA***." Appx28. Of course, CSI's obviousness theory presented in the Petition did not somehow change between the original FWD and the rehearing FWD. The Board simply rewrote the grounds as relying on "background knowledge"—an approach nowhere contemplated in the Petition itself.

Further, the Board did not actually change how it substantively relied on the AAPA from the original FWD to the rehearing FWD. Instead, the Board simply engaged in superficial wordsmithing to insert the concept of "background knowledge" where it had previously only referenced AAPA. This is shown by the following examples from a redline comparison generated by Shockwave of the two decisions (green text showing additions to the rehearing FWD and red text showing deletions):

> ¶¶ 109–123). Petitioner also relies upon AAPA as ~~teaching the carrier with~~evidence that an ordinarily skilled artisan considered it well known for a carrier to include a guidewire lumen (element 1a) and balloon (element 1b). *Id.* at 23–25 (citing Ex. 1001, 3:65–4:2, Figure 1; Ex. 1002 ¶¶ 109, 113). Petitioner argues that an ordinarily skilled artisan would

*Compare* Appx122 to Appx27.

> Petitioner persuades us by preponderance of evidence that the combined teachings of Levy~~, AAPA,~~ and one of Mantell, Uchiyama, and Willneff ~~describe all limitations of claim 1 and that an ordinarily skilled artisan would have combined those teachings to arrive at the angioplasty catheter of claim 1.~~**along with the background knowledge reflected in the AAPA render claim 1 unpatentable as obvious.** We address Patent Owner's arguments otherwise below.

*Compare* Appx123 to Appx28.

> Petitioner relies upon Figure 1 of the '371 patent and its accompanying text as constituting AAPA **reflecting the background knowledge of an ordinarily skilled artisan at the time of the invention**. Pet. 23–25 (citing Ex. 1001, 3:65–4:2, Fig. 1; Ex. 1002 ¶

*Compare* Appx133 to Appx39.

> For all the reasons identified by Petitioner above and the testimony by Dr. Jensen, we find that Petitioner has proven by a preponderance of evidence that an ordinarily skilled artisan would have had motive to combine teachings of Levy ~~and~~**with the background knowledge reflected in the** AAPA to arrive at the claimed configuration of the balloon sealed near the distal end of a carrier through which a guidewire extends.

*Compare* Appx135 to Appx41.

In short, the Board treated this Court's decision in *Qualcomm* as a mere clerical requirement that could be resolved by superficially revising the FWD to add references to "background knowledge." That is not what this Court held; rather, it mandated that AAPA cannot be the basis for an IPR ground. The FWD does not seriously attempt to engage with that requirement or comply with it. Rather, it

purports to invalidate claims based on grounds that exceed statutory limits. This error requires reversal.

### C. There Is No "Combination" Exception In the Statute

CSI and Intervenor further argue that AAPA can be used as a basis for IPR "as long as the challenge also relies on a prior art patent or printed publication." Intervenor Br. 13; CSI Br. 30-31. However, this argument is plainly inconsistent with *Qualcomm*. After all, if this expansive "combination" exception were the law, there would have been no need for a remand in that case.

Moreover, this argument is foreclosed by the plain language of the statute, which states that IPR is restricted to grounds "***only*** on the basis of prior art consisting of patents or printed publications." § 311(b). *Qualcomm* made clear that AAPA is not a "patent or printed publication." 24 F.4th at 1375. Not only does the statute make no exception for combinations, but the use of the word "only" emphasizes that the ***exclusive*** basis for IPR grounds must be the permitted types of prior art.

CSI and Intervenor's proposed "combination" exception would also eviscerate the statutory limits on IPR proceedings. Prior art outside the permitted scope of IPR (such as AAPA, system references, or alleged public use) can almost always be combined with a patent or publication in some fashion as part of an obviousness analysis. Therefore, if the statute is read as CSI and Intervenor urge, the scope restriction on IPRs will become a dead letter, because petitioners will be able

to use any type of non-permitted art as a basis so long as they purport to combine it with at least one patent or publication (even as to a single limitation).

Intervenor also argues that a "combination" exception is supported by the statute's reference to § 103. Intervenor Br. 17-18. However, this argument is foreclosed by § 311(b), which specifically limits the types of prior art that can be used as a basis for obviousness challenges to only "patents or printed publications."

Likewise, the Director's Updated AAPA Guidance does not and cannot change the plain meaning of the statute. CSI and Intervenor do not dispute that the guidance "is not, itself, the law," "does not carry the force of law, and is not binding" on the Court. *In re Rudy*, 956 F.3d 1379, 1382 (Fed. Cir. 2020). To the extent the Guidance is read as permitting ***any*** use of AAPA in an IPR so long as it is used in combination with a patent or printed publication, then the Guidance contradicts the statute and *Qualcomm* for the reasons discussed above.

### D. Intervenor's Policy Arguments Contradict the Statute and Legislative History

Intervenor also argues that "permitting the combination of AAPA with such prior art is entirely consistent with Congress' goal of IPR proceedings and § 311's language." Intervenor Br. 21. This assertion is not only contrary to the statutory text (as discussed above), but is also contradicted by the Congressional intent to limit the scope of IPRs, as expressed in the legislative history.

The America Invents Act ("AIA") created two new types of proceedings at the PTO for reviewing patents. The first, Post Grant Review (PGR), permits broad challenges "on any ground that could be raised" but must be brought within 9 months after the patent issues. 35 U.S.C. § 321(b), (c). The second (IPR) does not have the same time limitation, but is restricted to challenges "only on the basis of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b).

This statutory structure evidences a legislative judgment that general challenges to a patent should be brought in a PGR (or District Court), and that IPR is appropriate only for tailored challenges based on "patents or printed publications." The Congressional Record reflects this view, noting that a "key distinction between the post-grant review procedures and the inter partes reexamination procedures is the grounds and evidence that can be considered." 157 Cong. Rec. S5374 (daily ed. Sept 7, 2011). Congress's decision to create two review procedures of different scope, and with different limitations and estoppel effects, also reflects a calculated balancing of the interests of patent challengers and patent owners. Reading § 311 as CSI and Intervenor urge would upset this balance, turning IPR into a back-door PGR without the same protections for patent owners.

Congress's intent to exclude AAPA as a basis for IPR proceedings is further shown by the fact that the pre-AIA *inter partes* reexamination procedure allowed use of AAPA as a basis, *see Lingamfelter v. Kappos*, 513 F. App'x 934, 941 (Fed.

Cir. 2012), but Congress did ***not*** include AAPA as a permitted basis when it replaced such reexaminations with IPRs in the AIA. Indeed, Congress knew how to expressly authorize use of AAPA when it intended to do so, as it did in other parts of the AIA, but intentionally chose not to for IPRs. *Cf.*, 35 U.S.C. § 301(a) (providing ***two*** available bases for "citation" procedure: (1) "patents or printed publications," § 301(a)(1), and (2) "statements of the patent owner" in the PTO, § 301(a)(2)).

Contrary to Intervenor's argument, the exclusion of AAPA as a basis for IPR does not permit Shockwave to "escape patentability review." The statute and *Qualcomm* are clear that patentability challenges based on AAPA cannot be brought in an IPR, but such challenges can still be presented in a District Court or in a PGR. There is no unfairness in requiring CSI and the Board to comply with the procedures that Congress selected. Similarly, Intervenor's argument that AAPA is "binding" on patent applicants is a straw man. Whatever "binding" effect AAPA has cannot allow it to be used in ways not permitted under the IPR statute.

Finally, Intervenor's suggestion that Shockwave "did not dispute" the alleged AAPA disclosed the claim elements is incorrect. The claims do not require only an angioplasty catheter, but rather (among other things) an "angioplasty balloon" with a "carrier having a guide wire lumen extending therethrough," containing a "pair of electrodes" and other hardware. Appx200. The alleged AAPA of Figure 1 is merely a basic "over-the-wire angioplasty balloon catheter," and Shockwave vigorously

argued before the Board that it did not disclose the actual claim limitations and would not have been modified to contain the other requirements of the claims. *E.g.*, Appx7522, Appx653.

### E. The FWD Cannot Be Affirmed Based on Prior Art Disclosures Identified for the First Time on Rehearing

CSI argues that, even if the use of AAPA was improper, this Court could alternatively rely on alleged disclosures from Healy/Hayes for the guidewire lumen and angioplasty balloon elements, even though CSI did not identify those disclosures at any point in the IPR prior to rehearing. CSI Br. 35-37. This is clearly improper. CSI concedes that the Petition did not identify any particular disclosure of a guidewire lumen or angioplasty balloon in Healy/Hayes. The only reference to Healy/Hayes that CSI identifies in the Petition is a generic statement that "Petitioner refers to the typical prior art over-the-wire angioplasty balloon catheter described in the `371 patent and as disclosed in Healy and Hayes herein as 'AAPA.'" Appx355. This statement did not identify any specific portion of Healy/Hayes that allegedly disclosed any claim element. Further, CSI's Petition did not reference Healy/Hayes ***at all*** in its discussion of the "angioplasty balloon" element, either generically or specifically. Appx356-357.

CSI does not even attempt to explain how its failure to identify specific portions of Healy/Hayes allegedly disclosing the claim elements until rehearing accords with Patent Office regulations. *E.g.*, 37 C.F.R. § 42.104(b)(4) (petition must

"specify where each element of the claim is found in the prior art patents or printed publications relied upon."). Nor does CSI identify any authority holding that it is consistent with due process for Petitioner to assert new arguments for the first time on rehearing, including pointing to specific portions of prior art that were not previously identified. CSI does not dispute that, under *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1301 (Fed. Cir. 2016), it is a violation of a party's procedural rights to introduce "factual assertion" long after regular briefing is closed. CSI asserts that this holding is distinguishable because Shockwave purportedly "had several opportunities to respond." CSI Br. 36. That is clearly incorrect. CSI's disclosure in this case was even ***later*** than the oral argument at issue in *Dell*, and on rehearing Shockwave had no opportunity to challenge CSI's alleged evidence, have its expert address it, or put in responsive evidence.

Notably, Intervenor does ***not*** contend the FWD's reliance on Healy/Hayes was proper. To the contrary, Intervenor confirms that "[t]he petition did not identify … any specific portions of Healy or Hayes." Intervenor Br. 7. Intervenor further argues that the Court need not reach this issue because "the Board plainly stated that it did not need to rely on Healy and Hayes." *Id.* at 28. Regardless of whether the Court agrees that the Board did not rely on Healy/Hayes, the result is the same. Either there is no reliance on the references at all, or the reliance was improper. Neither can sustain the FWD.

## II. The Board Misconstrued the Claim Term "Angioplasty Balloon"

The disputed claim construction issue on appeal is whether the Board erred in adopting CSI's proposed construction for the term "angioplasty balloon": "an inflatable sac that is configured to be inserted into a blood vessel for use in a medical procedure to widen narrowed or obstructed blood vessels." Appx16. Shockwave demonstrated in its opening brief that this construction is far too broad as it purports to encompass many balloons used in medical procedures within blood vessels that are not ***angioplasty*** balloons. Shockwave Br. 28-34. In its brief, CSI makes little effort to defend the Board's actual construction. Instead, CSI repeatedly tries to change the subject by arguing about the correctness of a phrase in Shockwave's alternative proposed construction ("into the vessel wall"). As detailed below, these inapposite arguments fail to address the errors in the Board/CSI's construction.

### A. CSI Clearly Errs in Arguing that "Angioplasty Balloon" is Not Limited to a "Particular Type of Balloon"

The only argument that CSI makes to defend the Board's actual construction is a passing statement that the term "angioplasty balloon" supposedly only requires a balloon "to widen narrowed or obstructed blood vessels" and is "***not otherwise limited to a particular type of balloon***." CSI Br. 38. This argument is self-evidently incorrect and contrary to all of the evidence discussed in Shockwave's opening brief, none of which CSI actually disputes or engages with. *See* Shockwave Br. 28-33.

As an initial matter, CSI's argument contradicts the claim language. The claim does not recite a "balloon." It specifically requires an "***angioplasty*** balloon." As explained in Shockwave's opening brief, CSI's experts agreed that angioplasty is a specific type of surgical procedure in which a "balloon is located at the location of the stenotic lesion, [and] the balloon is inflated to disrupt or push aside the obstruction to improve blood flow." Appx1621-1622; Appx10192. The angioplasty procedure requires a balloon that has the structure and function to perform this procedure, e.g., the structure and ability to be inflated to sufficient pressure to displace plaque. CSI does not dispute this proposition or even address it in its brief.

The prosecution history makes clear that the limitation to an "angioplasty" balloon is specifically intended to encompass ***only*** balloons with the structure and function of an angioplasty balloon, and ***not*** other types of surgical balloons used in blood vessels. The claim originally recited just a "balloon," but was narrowed during prosecution to an "angioplasty balloon" to overcome a rejection over the prior art, including Mantell. Appx3089, Appx2255-2257, Appx2242-2243. This amendment was accompanied by a disclaimer explaining that angioplasty balloons are structurally and functionally distinct from other types of surgical balloons used in blood vessels:

> Mantell does not disclose or suggest an angioplasty catheter with an angioplasty balloon and an arc generator within the balloon. … For example, there are at least several types of balloons advanceable through the vasculature (e.g., Swan-Ganz catheter balloons, embolectomy catheter balloons, wedge pressure balloons, occlusive balloons, etc.) ***that are functionally and structurally distinct from an angioplasty balloon***.

Appx2247.

CSI does not contest that the various balloons identified in this disclaimer do ***not*** qualify as "angioplasty balloons" and do not have the structure needed to perform an angioplasty procedure. However, many of them ***are*** "inserted into a blood vessel for use in a medical procedure to widen narrowed or obstructed blood vessels," and thus would improperly fall within the Board's construction. Shockwave Br. 30-31. For example, CSI does not dispute that Mantell, while not an angioplasty balloon, includes a lithotripsy probe with a balloon inserted into a blood vessel that widens the vessel using pressure waves. Appx1776. CSI likewise does not dispute that occlusive and embolectomy balloons are inserted into arteries during procedures to clear obstructed blood vessels (thereby widening the lumen), but are merely used to block flow downstream from the surgical site; they are not themselves used to perform angioplasty by expanding against the calcified deposit to disrupt plaque. Appx7467-7468; Shockwave Br. 30-31. All of these balloon types are thus encompassed by the Board's construction—they are balloons used in medical

procedures to widen obstructed blood vessels—even though they were specifically disclaimed in prosecution as ***not*** being angioplasty balloons.

CSI does not even attempt to explain how the Board's claim construction can possibly be correct given that (1) the Board failed to consider or even mention the foregoing prosecution history regarding the scope of the term "angioplasty balloon" in the FWD, and then (2) construed the claim to cover ***the exact balloons that were expressly disclaimed***. At a minimum, these are legal errors requiring remand for a proper construction. *See Gemstar-TV Guide Int'l*, *Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1376 (Fed. Cir. 2004) (claim construction "must consider statements made in the prosecution history"); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000) (a claim "cannot later be interpreted to cover that which was previously disclaimed during prosecution").

### B. CSI's Arguments Regarding "Into the Vessel Wall" Are Irrelevant and Do Not Provide a Basis for Affirmance

CSI devotes almost the entirety of the claim construction section of its brief to an argument that "The Board Correctly Rejected Shockwave's Unsupported Requirement To Displace The Plaque 'Into The Vessel Walls.'" CSI Br. 38. CSI is wrong about this point as discussed further below, but even if it were right, it would have no relevance to whether the construction the Board actually adopted is correct.

CSI's specific arguments about the phrase "into the vessel wall" never actually engage with errors in the Board's construction discussed above. Rather,

CSI's discussions of the specification, O'Conner/O'Boyle references, and extrinsic evidence focus only on the different issue of whether angioplasty requires displacing plaque "into the vessel wall," or whether angioplasty may instead merely compact material "against" the wall (or otherwise displace it). CSI Br. 38-41. Regardless of the resolution of that distinct issue, the Board's construction ***as it stands*** is far too broad.

CSI similarly attempts to relate the prosecution disclaimer to the issue of "into the vessel wall," arguing there is no disclaimer of such a phrase. CSI Br. 46-47. This misses the point completely. CSI neither disputes nor engages with the fact that the applicant expressly disclaimed non-angioplasty balloons (including Mantell), or the fact that the Board's claim construction improperly encompasses the disclaimed balloons.

CSI likewise does not dispute that the FWD fails to consider the disclaimer in its claim construction analysis. Instead, CSI argues there was "no reason" for the Board to analyze the prosecution history because it supposedly did so in its Institution Decision. CSI Br. 47. However, the Institution Decision merely adopted a "preliminary" claim interpretation and indicated that a final construction would be deferred until later pending review of "additional argument and evidence." App545. In accordance with the Board's instruction, Shockwave submitted additional argument and evidence regarding the prosecution disclaimer in its Patent Owner

Response. Appx601-604. The Board then engaged in a formal claim construction in its FWD (Appx10-16), but inexplicably ignored the disclaimer, failing to even mention it or explain how its adopted construction squared with it.

In any event, to the extent CSI means to suggest that the FWD implicitly incorporated the claim construction analysis of the Institution Decision (although it did not), that analysis was also clearly in error. The Board merely argued that "Petitioner relies upon Levy and AAPA, not Mantell, as describing the claimed balloon." Appx545. In its Patent Owner response, Shockwave explained that this disclaimer impacted the scope and interpretation of the entire claim, and did not merely operate to carve out Mantell. Rather, the disclaimer "compared Mantell to 'several types of balloons advanceable through the vasculature' making clear that each of those balloons—like Mantell— are not angioplasty balloons as claimed." Appx603. The Board never addressed or considered the fact that the disclaimer was a relevant statement as to the overall scope and meaning of the claim as applied to the entire body of prior art (not just Mantell). *See Atofina v. Great Lakes Chemical Corp.*, 441 F.3d 991, 998 (Fed. Cir. 2006) (disclaimer to "avoid a prior art reference" claiming a particular catalyst was not "limited to that subject matter," but rather extends to "all catalysts" encompassed by patentee's statements).

### C. Shockwave's Proposed Claim Construction Was Correct

The Board's erroneous claim construction analysis at minimum requires vacating and remanding for a proper construction. However, in the alternative, the Court can resolve the claim construction dispute on appeal, because Shockwave's proposed construction was correct and should have been adopted.

Shockwave argued to the Board that, given the addition of the term "angioplasty" to the claim (and associated disclaimer), the term "angioplasty balloon" at minimum had to be limited to "a balloon that is configured to perform angioplasty." Appx809. CSI's own expert agreed that angioplasty is a specific surgical procedure that involves "passing a balloon catheter through the guiding catheter to the section of the artery to be treated. Once the balloon is located at the location of the stenotic lesion, the balloon is inflated to disrupt or push aside the obstruction to improve blood flow." Appx1621-1622. Shockwave's proposed construction ("a balloon that displaces the plaque into the vessel wall to expand the lumen of the vessel") was intended to capture that specific agreed mechanism of action, i.e., that the inflation of the balloon from inside the vessel outward toward the lesion on the vessel wall naturally pushes the plaque outward into the vessel wall.

Neither CSI nor the Board ever disputed the portions of Shockwave's construction stating that angioplasty requires "a balloon that displaces the plaque" or that it necessarily "expand[s] the lumen of the vessel." Rather, the sole dispute

raised by CSI and the Board had to do with the phrase "into the vessel wall." CSI and the Board read this as an exclusionary phrase precluding any other effects on the plaque, and then rejected Shockwave's entire construction based on that (false) premise. For example, CSI argues that angioplasty could also cause the plaque to be "chip[ped] away," "pulverized," or pressed "against" the wall. CSI Br. 39. But Shockwave's construction ***does not exclude*** any of these things. It is an elementary principle of claim interpretation that where, as here, the claim refers in the preamble to an apparatus "comprising" certain elements, the claim "does not exclude additional, unrecited elements." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l*, 246 F.3d 1336, 1348 (Fed. Cir. 2001).

CSI's other critiques of Shockwave's construction are little more than word games. CSI argues (echoing the FWD) that angioplasty can press plaque "against" the vessel wall, as opposed to "into." *E.g.*, Appx13. This is not a substantive problem with Shockwave's proposed construction. Pressing "into" does not exclude also pressing "against," and in any event "against" and "into" are synonyms for the same thing in this context. Shockwave made clear to the Board that no further exclusion was intended, explaining that "whatever else the term 'angioplasty balloon' may mean, it must be a balloon that is adapted to perform angioplasty." Appx810.

CSI's additional argument that angioplasty does not require "high pressure" is a red herring. CSI Br. 44-45. Although angioplasty naturally contemplates using

enough pressure to disrupt the plaque, Shockwave's construction does not include any requirement of "high pressure."

### D. Levy Does Not Disclose an "Angioplasty Balloon" as Properly Construed

The FWD's conclusion that Levy discloses an "angioplasty balloon" indisputably relied on the Board's overbroad claim construction. Appx28; Shockwave Br. 36-37, CSI Br. 48-49. CSI does not even attempt to argue that Levy would disclose this element under a proper construction as urged by Shockwave. As explained in Shockwave's opening brief, Levy does not have an angioplasty balloon and does not perform angioplasty; rather, it uses "cavitation" to "caus[e] erosion of the deposit" within the vessel. Appx1735; Shockwave Br. 12, 30. In fact, Levy affirmatively states its balloon is ***not*** inflated to press plaque into or against the vessel wall as in angioplasty, but rather that "[i]nflation of the body … can be controlled, in order to ***minimize*** the transfer of these mechanical forces to the vessel 2." Appx1739.

### E. AAPA Cannot Cure The Deficiencies of Levy Given the Lack of a Motivation to Combine

CSI nevertheless argues that the FWD can still be affirmed if Levy is found to lack an angioplasty balloon because "AAPA undisputedly discloses an angioplasty balloon, even as construed by Shockwave." *Id*. But even assuming *arguendo* that the Board could rely on AAPA for disclosure of the "angioplasty

balloon" element, the Board did not identify any motivation to combine the alleged angioplasty balloon of AAPA with Levy. Shockwave Br. 37-38.

CSI does not point to ***any*** evidence or reasoning in the FWD identifying a motivation to combine the alleged "angioplasty balloon" of AAPA with Levy. Instead, CSI argues that the Board did not need to find motivation because Shockwave supposedly "did not separately contend … that there was no motivation to combine the AAPA's angioplasty balloon with Levy." CSI Br. 49. This assertion is incorrect. Shockwave expressly argued to the Board that there was no motivation to combine the AAPA and Levy. Appx644-645 (PO Response) (arguing POSA would not be motivated to "add electrical components (e.g. electrodes, wire, etc. to the angioplasty catheters of the AAPA"); Appx7521-7525 (Shockwave expert explaining the same).

CSI's other arguments do not establish a motivation and cannot cure the absence of any proper analysis of this issue in the FWD. For example, CSI echoes the FWD in relying on an allegation that angioplasty catheters were "so well known" and "inextricably intertwined" with guidewires. CSI Br. 49. But the fact that something was known is insufficient to prove obviousness as a matter of law. *See Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*, 97 F.4th 882, 886 (Fed. Cir. 2024) ("[i]t does not suffice to meet the motivation to combine requirement to recognize that two alternative arrangements … were both known in the art"). There

must be evidence of a motivation to combine, and here the Board did not identify any motivation or even a reason to combine the angioplasty balloon of AAPA with Levy. *Id.* at 888 ("It does not suffice to simply be known. A reason for combining must exist.").

Further, the Board's proposed combination was not simply a combination of two well-known things, but rather involved taking an angioplasty balloon, adding to it bulky hardware from Levy (e.g., an optical fiber), and then further replacing that hardware with electrodes from yet another reference. An articulation of the motivation to do this was clearly required. Nor can obviousness be shown on the (incorrect) theory that adding an angioplasty balloon to Levy (a 1993 reference) was merely the unremarkable addition of a "well known" component. Indeed, this only raises the question of why nobody thought to make this supposedly "well known" combination until the invention of Shockwave's '371 Patent in 2008—***15 years later***. The Board never grappled with this issue, and as discussed below, improperly disregarded Shockwave's evidence of objective indicia of nonobviousness that raised exactly this question.

Finally, CSI argues that the Board allegedly "credited Dr. Jensen's testimony" that there was motivation to incorporate a guidewire into Levy so as to "increase the types of treatments Levy could perform." CSI Br. 48. But Dr. Jensen never said any such thing; the Board merely quoted a passage of attorney argument from CSI's

Reply. Appx754. Although this passage cites two paragraphs of Dr. Jensen's expert declaration (¶¶ 115 and 157) (CSI Br. 48) those paragraphs do not say anything about "increas[ing] the types of treatments Levy could perform," much less explain what these alleged additional treatments even are or how the combination would enable them. To the extent the Board credited CSI's attorney argument with no evidentiary support in finding obviousness, that is yet another legal error requiring reversal. *See Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017) ("[a]ttorney argument is not evidence"; vacating PTAB decision relying on unsupported attorney arguments).

## III. The Board Identified No Evidence of Motivation to Introduce a Guidewire Lumen into Levy

CSI acknowledges that the Board relied on a combination of AAPA and Levy for the "guidewire lumen" element. CSI Br. 50. Even assuming AAPA could be used as a basis for the obviousness combination (and it cannot, as discussed above), the Board did not identify any proper evidence of motivation to combine the guidewire lumen of the alleged AAPA with Levy. Shockwave Br. 38-43. The Board merely made conclusory assertions that a "guidewire lumen" was supposedly "well known" and a "design choice," neither of which is sufficient to support obviousness.

CSI does not identify any substantial evidence in the record supporting the Board's assertions regarding motivation to combine, much less present evidence suggesting a POSA would have been motivated to take a simple and already-working

device (Levy) and add significant complexity to it (including a different balloon, a guidewire lumen, high voltage wiring, electrodes, and shockwaves).

CSI first argues that angioplasty catheters having guidewires were supposedly "well known." CSI Br. 50-51. But as discussed above, the fact something is known or even "well known" does not make it obvious to combine with something else.

CSI next argues that the Board purportedly found two motivations to combine: (1) "to assist a physician to navigate the catheter to reach the area for treatment," and (2) "to increase the types of treatments Levy could perform." CSI Br. 51. Neither of these are supported by the evidentiary record, and CSI notably does not even attempt to defend the Board's conclusory assertion it was a "design choice."

First, "assisting a physician" was not alleged by CSI or found by the Board as a motivation to combine the "guidewire lumen" element. The portion of the FWD that CSI cites (Appx39) merely discusses whether it was "known to an ordinarily skilled artisan to use a guidewire." The issue of whether an element is known is different from whether there was a motivation to combine it with other elements, as discussed above. Further, even if the Board had identified this as a motivation, there was no substantial evidence supporting it. The only evidence cited by the Board on this point was a single paragraph of CSI's expert declaration (¶ 112) making a conclusory assertion that "[t]he use of a guidewire to assist the physician to navigate the angioplasty catheter through tortuous passages to reach the area for treatment is

well known to the skilled artisan," with no citation to evidence. Appx1643.[3] "[C]onclusory statements and unspecific expert testimony d[o] not qualify as substantial evidence that could support the Board's conclusions regarding obviousness." *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1360-61 (Fed. Cir. 2019).

Second, the assertion that a guidewire lumen would "increase the treatments Levy could perform" is not supported by substantial evidence, either. As discussed above in Section II.E, this assertion was a pure attorney argument made by CSI with no evidentiary support in the record.

CSI's discussion of motivation also does not engage with the substantial contrary evidence identified by Shockwave. For example, Levy teaches against using a guidewire lumen, because it (and all other prior art lithotripters identified by CSI) use a closed balloon that is sealed on the end of the catheter. Shockwave Br. 41-42, Appx836, Appx7518-7522. Adding a guidewire lumen would have been incompatible with this structure because it would have required punching a hole in the balloon. *Id.* CSI's attempt to argue that Levy does not require this structure is

---

[3] CSI also wrongly asserts this motivation may be supported by "Duchamp" (CSI Br. 52). Duchamp says nothing about assisting a physician, and CSI does not properly quote it. It does not state that the guidewire "allows 'advancement through'" the arteries. Rather, it states that it has a guidewire "suitable for advancement," which is a substantively different disclosure. Appx1848.

simply wrong—Levy expressly states and depicts that the balloon is placed at "[t]he distal end 6 of the catheter 8." Appx1737, Appx1743. Contrary to CSI's argument, Shockwave never contended that CSI was required to prove "bodily incorporation." CSI Br. 53. Rather, it was CSI's burden to present evidence proving a motivation to introduce a guidewire lumen in view of the existing structure of Levy and that a POSA would expect success in so doing. CSI did not satisfy either burden.

## IV. The Board Failed to Satisfy the "Shock Wave" Element

### A. Levy '227 Does Not Disclose Shockwaves For Blood Vessels

As for the "shock wave" element, CSI does not contest that the Board found no disclosure of shockwaves in the primary Levy reference, that the Board relied exclusively on a different Levy reference (Levy '227) as allegedly disclosing the use of shockwaves, or that Levy '227 has multiple different embodiments (including dental, industrial, and blood vessel embodiments). Appx3656-3657.

CSI's argument that Levy '227 discloses use of shockwaves in a blood vessel embodiment is simply incorrect. In making this argument, CSI misleadingly mixes-and-matches different parts of the reference that are discussing different embodiments. For example, CSI quotes a passage from Levy '227 that refers to use of shockwaves in the dental embodiment (Appx3657, 3:39-42), and then cites another passage a full column later (4:64-66), claiming that passage provides that shockwaves "can also be employed in the medical field for cleaning vessels, such as

blood vessels." CSI Br. 54. In reality, the passage CSI quotes (4:64-66) is not talking about shockwaves; rather, it is referring back to the immediately preceding paragraph discussing the "task of removing posts which had previously been implanted in the mouth to support artificial filling to restore a tooth." Appx3657 (4:43-45). Levy '227 pointedly does ***not*** disclose using shockwaves for this task, instead stating that low-power "vibrations produced by the pulses" are used. *Id.* (4:58-60). CSI's other cited passages of Levy '227 likewise are referring to different embodiments or discussing low-power cavitation, not high-power shockwaves. Appx3656 (2:31-34) (referring back to discussion of "cavitation"), Appx3658 (5:13-17) (low-power "cavitation action"), Appx3657 (3:31-45) (discussing tooth canal embodiment). CSI similarly errs in claiming that Levy '227 teaches that treatments in blood vessels should use higher energy than in the tooth canal. Levy '227 actually describes using power as high as "200 to 300 mJ" for tooth canals (Appx3657, 4:55), compared to a lower power of "5-200 mJ" for blood vessels (Appx3658, 5:21).

CSI also argues that the fact Levy '227 mentions use of shockwaves "in every other context" means it should be interpreted to also disclose their use in blood vessels. CSI Br. 55. The opposite is true. It is well-settled that the patentee's omission of an element, where patentee knew how to describe it when desired, is evidence the patentee intended the omission. *See Enzo Biochem., Inc. v. Applera Corp.*, 599 F.3d 1325, 1333 (Fed. Cir. 2010) (declining to read a "'hybridization'

requirement into the claims" where "[t]he applicants knew how to claim a linkage group that does not substantially interfere with hybridization, as they did [elsewhere], but specifically omitted that language from the claims").

### B. The Board Identified No Motivation to Combine the Distinct Embodiments Disclosed in Levy '227

CSI does not even attempt to identify any motivation to combine the shockwaves of Levy '227's dental embodiment with a blood vessel embodiment. Instead, CSI argues that the Board "did not need to identify a motivation to combine Levy '227 with Levy" because Levy '227 was incorporated into Levy. CSI Br. 56. This argument can be easily rejected as it rests on a fundamental legal error.

Even if Levy and Levy '227 can be treated as a single reference under an incorporation by reference theory, this ***does not*** collapse the separately disclosed embodiments into a single embodiment. Where, as here, the proffered obviousness analysis combines different embodiments from a single purported reference (i.e., adding the shockwaves of the dental device to the blood vessel device), there must still be some motivation to combine those embodiments. *See In re Stepan Co.*, 868 F.3d 1342, 1346 n.1 (Fed. Cir. 2017) (when "combining multiple embodiments from a single reference … there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful.").

CSI's cited cases do not support its argument that the Board was not required to analyze motivation to combine. In *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d

1331, 1346 (Fed. Cir. 2009), the incorporated content was merely defining the materials used in the single anticipatory embodiment. And in *Vicor Corp. v. SynQor, Inc.*, 603 F. App'x 969, 975-76 (Fed. Cir. 2015) the original and incorporated reference taught a "single embodiment," not multiple embodiments.

Further, here there was not only an absence of evidence of motivation to combine, but there was substantial contrary evidence. A POSA would not have been motivated to apply shockwaves used to clean the hard bone of a tooth to the soft tissue of a blood vessel, because the art at the time taught this would present unacceptable safety risks to the patient. Shockwave Br. 48-49. CSI does not engage or rebut any of this evidence, instead arguing that the Board supposedly rejected it in the context of a different limitation concerning the use of electrodes rather than a laser. CSI Br. 56. But that discussion is not relevant to whether there was a motivation to use high-power shockwaves in a blood vessel. As Shockwave previously explained, electrodes and lasers can both generate high or low energy pulses. Shockwave Br. 49-50. The question of which power source a POSA would select (electrodes vs. laser) is entirely different from the selection of an appropriate magnitude of power (i.e., high energy or lower energy in a fragile blood vessel).

CSI also points to other references as allegedly disclosing shockwaves, arguing that the Board supposedly found there was a motivation to incorporate them. CSI Br. 57. However, the cited portion of the FWD provides no such thing, but

merely states that "Petitioner also relies upon each of Mantell, Uchiyama, and Willneff ***as describing*** an arc generator that creates shockwaves between electrodes positioned within a balloon as claimed." Appx30. As discussed above, mere disclosure in the prior art is not a motivation to combine.

## V. The Board Improperly Disregarded the Objective Indicia Evidence

### A. The Board Failed to Properly Consider Nexus

It is undisputed that Shockwave submitted substantial evidence that its commercial product practices the '371 Patent, including expert testimony and two claim charts with element-by-element analysis. Appx7539 ("the Shockwave IVL devices include each feature recited in the claims as shown in the chart below"), Appx7539-7544 and Appx8926-8931. CSI submitted no contrary evidence and never disputed that Shockwave's IVL system practiced the claims.[4] In *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1073 (Fed. Cir. 2018), this Court held that the Board erred in failing to presume nexus where the patentee submitted expert testimony "demonstrat[ing] that its commercial products are the inventions disclosed in the challenged claims, [and] where the proffered evidence is not rebutted." The

[4] CSI's assertion Shockwave's expert had no knowledge of the claim chart is false. Dr. Berger testified that he "went through [the claim chart] step by step," and performed a detailed review and confirmation of the supporting materials. Appx4247.

Board committed the same error here by failing to presume nexus where the evidence was unrebutted.

CSI likewise does not attempt to defend the Board's stated rationale for disregarding Shockwave's evidence of nexus, which was that the Board supposedly could not understand Shockwave's claim chart because it used customary shorthand to refer to the claim elements (i.e., "1[a]") rather than the text of the elements—even though this was ***the exact same labelling used in the Petition and the FWD***. Appx48-49; *compare with* Appx354-362, Appx9-10. CSI is unable to defend this rationale, and for good reason: it is so unserious that it calls into question whether the Board properly considered the objective indicia evidence submitted by Shockwave, as opposed to simply inventing reasons to dismiss it after having already reached a conclusion on obviousness.

Nor does CSI dispute that the Board failed to consider the additional claim chart at Ex. 2196 (Appx8926-8931), which further confirmed that Shockwave's IVL system practiced the claims. CSI's assertion that Shockwave "did not rely on that exhibit" is wrong. Shockwave expressly cited Ex. 2196 in its Patent Owner Response as evidence the products practiced the claims. Appx678 ("As shown in the claim charts included at Ex. 2196, each of the IVL products (C2, M5 and S4) are covered by the claims of the '371 patent."). The Board's failure to consider all of Shockwave's proffered evidence of nexus at minimum requires a remand.

CSI also claims that Shockwave's counsel admitted at oral argument that its IVL device is not co-extensive with the claims of the '371 Patent. Not so. CSI fails to quote the entire statement of Shockwave's counsel, which explained that "the '371 Patent" was the "breakthrough" and therefore that the "fact that there are other patents … doesn't negate a showing of nexus." Appx1073. That is consistent with this Court's holding that "[w]e have never held that the existence of one or more unclaimed features, standing alone, means nexus may not be presumed." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1361 (Fed. Cir. 2021). Rather, "[t]he presumption analysis requires the fact finder to consider the unclaimed features of the stated products to determine their level of significance and their impact on the correspondence between the claim and the products." *Id.* The Board conducted no such analysis here.

### B. The Board Failed to Appropriately Consider the Substantial Objective Evidence of Nonobviousness

The Board acknowledged that Shockwave submitted "voluminous" evidence of objective indicia of nonobviousness to the Board. Shockwave Br. 55-59. This included industry praise from peer-reviewed medical publications explaining that IVL was "a transformational technology" and "unique among all technologies in its ability to modify calcium." Appx8054, Appx8067. It also included testimony from five cardiovascular surgeons (who have collectively performed tens of thousands of IVL surgeries) attesting that the innovative IVL treatment of the '371 Patent filled a

long-felt medical need and was "the first, and remains the only, effective treatment for medial calcified lesions." Appx8694-8695; *see also* Appx8758, Appx8769-8770, Appx8801-8803, Appx8871-8872. These facts were further supported by clinical studies showing higher success rates and lower rates of severe complications for IVL compared to existing procedures such as angioplasty and atherectomy. Appx7535-7536; Appx8031-8032; Appx8037. There was also meaningful evidence of commercial success showing sales of Shockwave's patented IVL embodiment had grown 339% year-over-year to approximately $40 million annually in 2019. Appx7556; Appx8883; Appx8670. Those sales have continued to grow and exceeded $730 million in 2023, nearly 18× growth since the IPR proceedings began.

As explained in Shockwave's opening brief, the Board failed to conduct "a reasoned, collective weighing of its evidence of secondary considerations" as required by this Court's precedent. Shockwave Br. 55 (citing *Volvo Penta of the Am., LLC v. Brunswick Corp.*, 81 F.4th 1202, 1213 (Fed. Cir. 2023)). CSI argues this case is different from *Volvo Penta*, but in fact it is substantively the same. In *Volvo Penta*, this Court vacated and remanded because the Board assigned vague weights to each category of objective indicia evidence, and then failed to consider their collective weight: "Even if [the Board's] assignment of weight to each individual factor was supported by substantial evidence ('some weight' for copying, industry praise, and commercial success; and 'very little weight' for skepticism, failure of others, and

long-felt but unsolved need), it stands to reason that these individual weights would sum to a greater weight. The Board does not discuss the summation of the factors at all other than to say, without explanation, that they collectively 'weigh[] somewhat in favor of nonobviousness.'" *Id.* at 1215.

The Board committed the exact same error here. It purported to assign vague weights to each of the categories of objective indicia evidence submitted by Shockwave, for example, "modest, but meaningful" weight to the clinician testimony of long-felt need, "little weight" to the statements of commercial success, "little probative weight" to the breakthrough device designation, and "some, but not great, weight" to the industry praise. Appx51, Appx56-57, Appx61. Yet the Board ultimately failed to consider the ***collective weight*** of all of this evidence together or explain how it impacted the obviousness determination overall. As in *Volvo Penta*, the Board merely set forth its conclusion in a single paragraph dismissing the evidence (without explanation) as "not warrant[ing] a conclusion that claim 1 remains patentable." Appx65.

CSI identifies no plausible basis to distinguish this case from *Volvo Penta*. CSI merely argues that the individual weights the Board assigned to the categories of objective indicia evidence were supported. CSI Br. 60. But in *Volvo Penta*, this Court found the Board's analysis insufficient based on its failure to consider the evidence in total, "***even if*** [the Board's] assignment of weight to each individual

factor was supported by substantial evidence." *Volvo Penta*, 81 F.4th at 1215. And here, the individual weights were not even supported by substantial evidence as described in Shockwave's opening brief. Shockwave Br. 56-58.

## VI. The Board Improperly Denied Additional Discovery

CSI's response on the issue of additional discovery ignores the core issue: that CSI's statements in its press release about IVL were the direct opposite of what it told the Board (and the Board accepted) in rejecting the objective indicia evidence. In the FWD, the Board rejected Shockwave's argument that its IVL invention expanded treatment to new patients because it "was the first, and remains the only, effective treatment for medial calcified lesions." Appx50. The Board's conclusion relied on the testimony of CSI's expert "that orbital atherectomy was a successful method of treating heavily calcified plaque that included medial plaque." Appx52; *see also* Appx52-53 (discounting industry praise that IVL "was more effective than '[a]therectomy and other plaque modification devices'"). This finding permeated the Board's discussion of the objective indicia evidence, and the Board stated in its "Conclusion" that it was largely discounting the objective indicia evidence because "whether IVL is more meaningfully effective than prior methods of treating arteries with complex coronary artery calcification remains an open question." Appx59.

The statements in CSI's 2022 press release directly contradicted CSI's earlier representations to the Board on this exact issue. By 2022, CSI no longer contended

that the effectiveness of IVL was an "open question," but rather emphasized that this technology had "been used successfully for many years." Appx10649. Even more critically, CSI's 2022 press release abandoned its earlier position that IVL was merely one of many equally successful methods. CSI instead averred that IVL would "enable CSI to offer products that effectively treat a broader range of calcific coronary lesions," "expand its treatable patient population" and "greatly expand patient access to care." Appx10649-10650. CSI went so far as to claim that its introduction of an IVL product would have the result of "***tripling*** CSI's total addressable market." *Id.* This contradicts the Board's dismissal of the evidence regarding IVL as "uncertain," Appx63, as do Shockwave's real world sales, which have grown over 18 times (to over $730 million annually) since the IPR began.

CSI advances two arguments as to why this press release is supposedly not inconsistent with what it previously told the Board. First, CSI argues that the press release is merely a "forward looking statement" and points to standard legal disclaimers at the end of the document. CSI Br. 66. However, this customary boilerplate does not change the substance of what CSI said. Second, CSI argues that the statements are supposedly not inconsistent because CSI was not discussing "Shockwave's IVL device or of IVL generally." CSI Br. 66. But CSI ignores that Shockwave was (and still is) ***the only IVL device on the market*** in the United States. Therefore CSI's statement that lithotripsy "has been used successfully for many

years" and has "more recently found application in treatment of calcified coronary and peripheral arteries" (Appx10649) can only be understood as referencing Shockwave.

Given the direct inconsistency in CSI's statements about IVL, it was clearly "in the interest of justice" for the Board to at least allow additional discovery so that its "open question" about the safety and efficacy of IVL could be definitively answered. The Board identified no sound reason for denying discovery, nor did it even mention the governing "interests of justice" standard. That is a clear abuse of discretion. *Ultratec, Inc. v. Captioncall, LLC*, 872 F.3d 1267, 1271-72 (Fed. Cir. 2017) (finding "no reasoned basis why it would not be in the interest of justice to consider sworn inconsistent testimony on the identical issue").

Further, the denial of discovery in this case was significant. The basis for nearly ***all*** of the Board's decision on obviousness (not just the objective indicia analysis) was that it credited CSI's expert and disregarded Shockwave's. Further discovery could have revealed that the statements from CSI's expert during the IPR proceedings (now its Chief Medical Officer) about the safety and efficacy of IVL were incorrect and that CSI itself did not believe them, thus calling into question the credibility of all of CSI's expert opinions.

## SUMMARY OF CROSS-APPEAL RESPONSE ARGUMENT

The Court should reject CSI's cross-appeal challenging the Board's finding that claim 5 is patentable over the prior art. CSI lacks standing to bring this cross-appeal as it does not have any concrete final design for a potentially infringing product—much less an actual product that is FDA-approved and commercially available today. And CSI does not identify ***any*** evidence that the additional elements of claim 5 were known or obvious in view of the prior art.

## CROSS-APPEAL RESPONSE ARGUMENT

### I. The Cross-Appeal Should Be Dismissed as CSI Lacks Standing

As an initial matter, CSI's argument regarding claim 5 should be dismissed because CSI lacks standing to cross-appeal.[5] Parties seeking relief before this Court bear the burden of establishing the existence of a "case or controversy" under Article III "at all times throughout the appeal." *ModernaTx, Inc. v. Arbutus BioPharma Corp*., 18 F.4th 1352, 1358 (Fed. Cir. 2021). The standing requirement applies with full force to a party bringing a cross-appeal. *See Knauf Insulation, Inc. v. Rockwool Int'l A/S*, 788 F. App'x 728, 735-37 (Fed. Cir. 2019).

The standing defect in CSI's cross-appeal is clear and unmistakable. CSI is not currently facing any suit for infringement of any claim of the '371 Patent. Nor

[5] Shockwave filed a motion to dismiss CSI's cross-appeal prior to merits briefing, and the Court denied it "without prejudice to the parties raising their arguments in their briefs." Dkt. 28.

has Shockwave ever threatened to bring such a suit against CSI. CSI admits it "has not commercialized an IVL system," and it has no product on the market that has been or could be accused of infringing the '371 Patent. Appx1334.

### A. CSI's Speculative Product Development Efforts Do Not Confer Standing

CSI's presents two arguments as to why it has standing, neither of which is persuasive.

First, CSI claims that it has standing because it is purportedly "developing an IVL device that will compete with Shockwave's." CSI Br. 69. CSI's claim that it may at some point in the future launch an IVL product with unspecified attributes is not sufficient to confer standing. This Court holds that where a party relies upon "potential infringement liability" as a basis for standing, but is "not currently engaging in infringing activity," that party must "establish that it has concrete plans for future activity that creates a substantial risk of future infringement or likely cause the patentee to assert a claim of infringement." *JTEKT Corp. v. GKN Auto. Ltd.*, 898 F.3d 1217, 1221 (Fed. Cir. 2018).

Here, both the evidence that CSI submitted in connection with the motion to dismiss and its representations to the Board confirm that its alleged development activities are not sufficiently concrete to confer standing. For example, at the time that CSI filed its cross-appeal:

product development

- CSI's product design was still not final ("[redacted]" was months away) and CSI acknowledged that further design changes "may occur." Dkt. 21-1 at 5, 12.
- CSI had not yet started testing on human patients. Dkt. 21-1 at 5.
- CSI had not received FDA authorization to begin clinical trials. Dkt. 21-1 at 7.
- CSI had not applied for FDA approval of any IVL device, much less received FDA approval, and does not even anticipate such approval is possible until 2025 or 2026 at the earliest. Dkt. 21-1 at 8; Dkt. 20-2, CSIAppx55.

These admitted facts are consistent with CSI's representations to the Board during the IPR proceedings that its IVL development was uncertain, stating that "someday" CSI "may" expand its offerings with an IVL device, but only "if the device is commercialized, achieves FDA approval, and is eventually sold." Appx1289. The Board accepted CSI's representations, finding that "Petitioner's IVL catheter is still in its nascent stages" and that "far too many uncertainties remain." Appx91-92.

On appeal, CSI tries to have things both ways by claiming it faces a definite risk of suit, yet asserting that the Board correctly discounted the product development statements in CSI's press release because they "involve risks and

uncertainties." CSI Br. 66. It cannot be the case that, for purposes of the denial of discovery, CSI's statements should be treated only as speculative, but that for CSI's cross-appeal, they should be regarded as concrete plans that confer standing.

In any event, this Court has consistently held that mere development activities, especially where there is no final design or product, are not sufficient to confer standing. For example, in *JTEKT*, petitioner there argued it had standing because it "began development on its own driveshaft concept in 2015" which it claimed created a "potential risk of infringement." 898 F.3d at 1221. However, other evidence reflected that this product design was not yet "finalized" and would "continue to evolve." *Id*. This Court found such circumstances insufficient to create Article III standing: "[B]ecause the product was not—and is not—yet finalized, JTEKT cannot definitively say whether or not it will infringe the '440 patent and the potential risk of infringement … is impossible to quantify at this time." *Id*.

Similarly, in *Fisher & Paykel Healthcare Ltd. v. ResMed Ltd.*, 789 F. App'x 877, 878 (Fed. Cir. 2019), the appellant argued it had standing because it "continues to develop products that [the patentee] may at some future date allege infringe claims of the '556 patent." *Id.* at 878. This Court found this insufficient and dismissed the appeal, explaining petitioner had "not provided any, let alone sufficient, detail regarding features of its future products to enable us to determine that its activities create a substantial risk of future infringement." *Id*.

As in these cases, it remains entirely speculative whether CSI has concrete plans that create a substantial risk of future infringement. For example, CSI could change its design, the clinical trials could fail, the FDA could reject the device or require changes, and/or CSI could simply decide not to pursue the product. Indeed, this Court has found no standing even in cases where (unlike here) the products at issue did not require FDA approval and were already in "customer demonstrations." *See JTEKT*, 898 F.3d at 1221.

Further, it is CSI's burden to show not just that it is developing some IVL product, but that its product has "a substantial risk of future infringement" of the '371 Patent. *JTEKT*, 898 F.3d at 1221. This Court has repeatedly held that an IPR petitioner fails to meet its burden to prove standing where it does not provide "sufficient[] detail regarding features of its future products to enable us to determine that its activities create a substantial risk of future infringement." *Fisher*, 789 F. App'x at 878; *JTEKT*, 898 F.3d at 1221. CSI has submitted no such "detail[ed]" evidence here. The claims of the '371 Patent require an angioplasty catheter with specific characteristics, including for example a "guide wire lumen," a pair of electrodes, and (in claim 5) a specific configuration of electrodes "wherein the pair of electrodes is disposed adjacent to and outside of the guide wire lumen." Appx200. In connection with the motion to dismiss briefing, CSI submitted a few external, undated photographs of certain prototype components, which are primarily focused

on a so-called "console" unit rather than the "catheter" that is actually the subject of claims 1 and 5 of the '371 Patent. Dkt. 21-2, ¶ 6. Even the one photograph of the three catheter variants reveals little about their internal configuration and design. None of these photographs or CSI's other evidence discloses whether its catheters contain required claim elements such as the configuration of electrodes required by claim 5.

### B. Shockwave's Statements Do Not Manufacture Standing

Second, CSI argues that it has standing because Shockwave allegedly "publicly vowed to accuse CSI's product of infringement as soon as it launches." CSI Br. 69. CSI significantly misrepresents Shockwave's statements.

There are only two public statements by Shockwave that CSI cites, neither of which CSI quotes in full. The first is a statement made in July 2020 after the Board confirmed the validity of claim 5 of the '371 Patent, stating that "claim 5 describes a device that is delivered over a guidewire and generates shockwaves with electrodes inside of a balloon catheter. We believe that any viable, much less commercially viable, IVL device must contain these elements." Dkt. 20-2, CSIAppx1. This statement is not directed to any particular CSI product, nor could it be, as it was made over a year before CSI even announced its IVL aspirations. Dkt. 20-2, CSIAppx3. Indeed, after this purported statement by Shockwave, CSI advanced the claim that its planned IVL products would differ from Shockwave's products in

"substantial" ways. Dkt. 21-1 at 5. To the extent CSI suggests that Shockwave would file suit against a hypothetical future product without knowing its design or conducting an appropriate pre-filing investigation, this Court has previously rejected such speculative assertions as a basis for standing. *See General Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1342 n.1 (Fed. Cir. 2020) (declining to "infer" that patentee "will file a baseless infringement suit").

The second cited statement was made in December 2021 during an earnings call in response to an investor question. Although CSI characterizes the statement as a threat to assert the '371 Patent against CSI, the full statement says nothing of the sort and actually expresses the opposite sentiment: that Shockwave's preferred strategy is ***not*** to litigate but rather to compete in the marketplace:

> In terms of potential competition in the future … nothing has really changed from our perspective other than people have stated publicly that they intend to compete. While we are extremely bullish about our patent portfolio in the electrohydraulic lithotripsy arena, and we'll certainly assert that against anybody who tries to copy what we're doing. ***We are by no means sort of sitting back and waiting and intending to win through litigation***.
>
> That's sort of a foolish strategy and that doesn't do anything to make things better for our customers.

Dkt. 20-2, CSIAppx23. The statement makes no mention of CSI or the '371 Patent.

This Court has previously rejected attempts to rely upon similar statements in a standing analysis. In *Cygnus Therapeutics Systems v. ALZA Corp.*, 92 F.3d 1153 (Fed. Cir. 1996), *overruled-in-part on other grounds*, 141 F.3d 1059, the declaratory

judgment plaintiff claimed a threat of litigation based on statements by patent owner's CEO at an investor conference that "a number of companies are developing products that are covered by our patents" and "we're not going to give them licenses and the patents are valid." *Id.* at 1156. This Court held that these generic public statements did not create a reasonable apprehension of litigation: "Nor do we believe that Mr. Gerstel's statement … was such as to give rise to a reasonable apprehension of suit …. [W]e find Mr. Gerstel's statement to be precisely what one would expect in the circumstances. It is difficult to imagine a businessman in Mr. Gerstel's position—when asked about his company's policy with respect to enforcement of its patents at a meeting attended by institutional investors—responding any differently than Mr. Gerstel did." *Id.* at 1160.

CSI's other arguments similarly do not show standing. For example, CSI claims that Shockwave refused to engage in settlement discussions in the IPRs. Shockwave disputes CSI's characterization of the settlement discussions, but it is also completely irrelevant to standing here. Any discussions at that time were related to validity disputes at issue in the IPRs. There is no evidence that CSI mentioned at the time that it was thinking of developing a possible future IVL product, much less that it disclosed the technical features of such a product.

Similarly, Shockwave never asserted to the Board that CSI's device "embodied" claim 5 of the '371 Patent. Shockwave could not have done so, because

Shockwave did not, and still does not, have any meaningful knowledge of CSI's proposed design. The inquiry before the Board was whether, under the *Garmin* test the Board applies in considering discovery, there was "more than a possibility" of useful information being discovered. During meet-and-confer, ***CSI*** suggested that discovery would not yield useful information because its product was somehow different from the '371 Patent. Appx10583-10584 ("So what we heard from counsel … [was] that -- the CSI product would be different in some way than the Shockwave product."). Shockwave responded that this representation should not merely be accepted and that there was at least a possibility the opposite was true, but that discovery was needed to assess this. Appx1242 ("The Board and Shockwave should not be required to simply accept as true any assertion by CSI that its product falls outside the scope of Shockwave's patent. Only the requested discovery will allow an independent assessment."). The Board denied the requested discovery, and no such assessment ever occurred.

## II. Alternatively, the Board's Finding of Patentability for Claim 5 is Supported by Substantial Evidence and Should Be Affirmed

Even if this Court concludes CSI has standing to cross-appeal, the Board's conclusion confirming claim 5 is patentable should be affirmed on the merits.

### A. Factual and Procedural Background

Claim 5 of the '371 Patent recites: "The catheter of claim 2, wherein the pair of electrodes is disposed adjacent to and outside of the guide wire lumen." Appx200.

CSI's Petition raised only a single argument as to claim 5, which was based on the "Uchiyama" reference. Specifically, CSI asserted that "Uchiyama further discloses a shockwave generator including a pair of electrodes (3) that are disposed radially spaced away from the lumen of tube (8)" and that it would allegedly have been "a routine design choice" to implement this. Appx363-364. Notably, claim 5 does not recite placing the electrodes "radially spaced away," but rather "adjacent to and outside of the guide wire lumen." Appx200. CSI did not assert that Uchiyama's electrodes were positioned as claim 5 requires, nor did it explain how its statement they were "disposed radially ***spaced away***" from the alleged lumen in Uchiyama could meet claim 5's requirement that the electrodes be "***adjacent to***" the guidewire lumen. The Petition did not rely upon any other purported disclosure for the additional limitations from claim 5 whether from another reference, from background knowledge, or from any other source.

In any event, subsequent proceedings before the Board showed that CSI's argument about the placement of the electrodes in Uchiyama was wrong. CSI's assertion that Uchiyama disclosed "a pair of electrodes (3) that are disposed radially spaced away from the lumen of tube (8)" was based on Fig. 1 of Uchiyama, which CSI initially claimed showed "a pair of electrodes (3) on a tube (8)." Appx352. However, the version of Uchiyama that CSI submitted with the Petition contained only a blurry version of Fig. 1 that did not clearly show the location of the electrodes:




Drawing1

Appx1786.

During the IPR proceedings, Shockwave obtained a clearer version of Uchiyama showing that the electrodes were not (as CSI had contended) "radially spaced away" or "on" "tube (8)." Appx822; Appx9946, Appx9948. As an initial matter, Uchiyama does not describe element (8) as a "tube," much less a guidewire lumen as claimed, but rather explains it is a "stopper ring (8)" that can be removed to replace a damaged balloon. Appx1784. The clear version of Uchiyama further shows that the electrodes are mounted on cables 4 (shown as blue lines) that run ***inside*** the "stopper ring 8." Appx822; Appx9946, Appx9948. The electrodes are not placed "on" stopper ring 8, nor are they "adjacent to and outside" stopper ring 8, but instead are positioned axially on the cables that run through the stopper ring:




*Id.*[6]

Upon being shown the clearer figure in deposition, CSI's expert Dr. Jensen admitted that the electrodes of Uchiyama are mounted axially on the blue cables. Appx10044 ("Q. In Exhibit 2240, do you -- would you agree that the electrodes are colored blue? A. At the distal end of this device that's inside the balloon, yes, those are the electrodes. … But yes, at least at the left-hand side of the device inside of the balloon, those are the electrodes, the blue markings here."). Shockwave also explained in its response that, as discussed above, the "lumen of tube (8)" in Uchiyama was not a guidewire lumen as claimed. Appx840-841.

The Board found that, "[b]ased on our review of Uchiyama, we agree with Patent Owner that Uchiyama fails to describe 'the pair of electrodes is disposed

[6] The blue markings were annotations added for purposes of questioning in Dr. Jensen's deposition. The right-hand image is an enlarged detail of the same figure.

adjacent to and outside of the guide wire lumen' as recited in claim 5." Appx68. First, regarding tube (8), the Board found that "'tube (8)' is not a lumen for a guidewire or even a lumen in a 'carrier.' Rather, stopper ring 8 is the device for holding balloon 7 to tube 1." Appx69. The Board further found, citing the clearer version of Uchiyama provided by Shockwave, that "Petitioner has not established that electrodes 3 are disposed both adjacent to and radially 'outside' stopper ring 8, as Uchiyama describes them as connected to electric cables 4 radially ***inside*** both tube 1 and stopper ring 8." Appx69-70. The Board therefore concluded that, "[b]ased on our review of Uchiyama, we find that Petitioner has failed to prove that Uchiyama describes a pair of electrodes that are both 'adjacent to and outside of the guidewire lumen' as required in claim 5. Petitioner identifies no other prior art that meets these limitations. Accordingly, we conclude that Petitioner has failed to demonstrate by a preponderance of evidence that claim 5 is unpatentable as obvious." Appx70.

### B. CSI's Sole Cited Basis for the Electrode Configuration of Claim 5 (Uchiyama) Admittedly Lacks This Element

On appeal, CSI does not dispute the Board's factual findings regarding Uchiyama, and concedes that the reference does not disclose the additional elements of claim 5 (i.e., a "pair of electrodes" that is "disposed adjacent to and outside of the guide wire lumen"). Appx200. Instead, CSI argues that "CSI's petition relied on Uchiyama in combination with other prior art as teaching claim 5's limitation" and that the Board allegedly failed to consider this "other prior art." CSI Br. 71-72.

CSI's argument has no support in the Petition. As discussed above, Uchiyama was the ***only*** reference that the Petition arguably contended disclosed the electrode configuration of claim 5. And even then, the Petition did not contend Uchiyama disclosed the actual electrode configuration of claim 5 ("adjacent to and outside of the guide wire lumen"), but rather a different placement that is not recited in claim 5 ("radially spaced away"). Appx363-364 (arguing that "Uchiyama further discloses a … pair of electrodes (3) that are disposed radially spaced away from the lumen of tube (8) . . . It would have been obvious to a POSITA to implement the features of Uchiyama to provide the pair of electrodes that are disposed radially spaced away from the lumen tube."). CSI did not present ***any*** alleged disclosure of the electrode configuration required by claim 5, nor did CSI mention any reference other than Uchiyama in its discussion of claim 5. *Id.*

Because CSI relied solely on Uchiyama as disclosing the additional elements of claim 5 and the Board found that Uchiyama does not in fact disclose those elements—a finding not contested on appeal—the Board correctly concluded that CSI had not proven its obviousness theory. It is axiomatic that obviousness requires every element of the claim to be satisfied with actual evidence. *See Personal Web Techs., Inc. v. Apple, Inc.*, 848 F.3d 987, 991-993 (Fed. Cir. 2017) (obviousness requires prior art disclose "all of the elements of the … patent claims at issue" and vacating obviousness determination where Board failed to show element was

disclosed); *PAR Pharm., Inc. v. TWI Pharms., Inc*., 773 F.3d 1186, 1194 (Fed. Cir. 2014) (obviousness requires proof that "all claimed limitations are disclosed in the prior art"). Here, Uchiyama is the only evidence that CSI's Petition even arguably identified as supplying the elements of claim 5, and CSI now admits that Uchiyama does not disclose those elements. The Board therefore correctly concluded that claim 5 was not obvious.

Contrary to CSI's argument, there is no issue here of the Board failing to consider the overall "combination" in rejecting CSI's obviousness argument. The combination that CSI asserted was that a POSA would have taken Levy (and other references) for the base elements of claims 1 and 2, and then added to them Uchiyama's electrode configuration to supposedly create claim 5. However, because Uchiyama did not actually disclose the electrode configuration of claim 5, the Board correctly concluded that the proposed combination did not render claim 5 obvious. Appx67-70.

CSI's citation to a hand drawing by its expert Dr. Jensen (CSI Br. 72) does nothing to change this analysis. The cited drawing is from Dr. Jensen's first deposition, ***before*** Shockwave obtained and provided the clearer Uchiyama figure. As discussed above, Dr. Jensen subsequently admitted in his second deposition that Uchiyama's electrodes are not positioned "on" "tube (8)" as he had originally asserted. Dr. Jensen thus conceded that his original interpretation/drawing of

Uchiyama's design was incorrect. Appx10044. ***CSI omits all of this material information from its brief, instead misleadingly presenting only Dr. Jensen's original (inaccurate) opinion based on the blurry figure of Uchiyama***. In any event, the expert's drawing does not identify any disclosure of claim 5's electrode configuration in any actual prior art reference. Rather, it merely purports to illustrate the "Uchiyama electrodes." Appx7359. But the Board found Uchiyama does not actually disclose the electrode configuration of claim 5, and therefore the drawing fails to establish obviousness for the same reasons detailed above. And of course, Dr. Jensen's drawings in an IPR deposition do not themselves qualify as prior art.

### C. The Board Correctly Rejected CSI's "Design Choice" Argument

CSI also argues that the Board erred in rejecting a purported argument regarding "design choice." CSI Br. 73-74. However, CSI's argument was based entirely on the (mistaken) notion that Uchiyama disclosed claim 5's elements in the first place. A threshold requirement of a design choice obviousness rationale is that the configuration in question is known. *See Philip Morris Prod. S.A. v. Int'l Trade Comm'n*, 63 F.4th 1328, 1345 (Fed. Cir. 2023) (affirming claim was not obvious where challenger failed to show there "was a narrow list of known and available design choices"). Here, there was no evidence that the electrode configuration of claim 5 was known. Thus, the Board correctly concluded there was no "design

choice" to be had as Uchiyama did not disclose the claimed element, and CSI pointed to no other art disclosing such a thing.

In any event, this Court has made clear that "[m]erely stating that a particular placement of an element is a design choice does not make it obvious." *Polaris*, 882 F.3d at 1069 n.4. "Instead, [Petitioner] must explain why a person of ordinary skill in the art would have selected these components for combination in the manner claimed." *Id.*; *Fanduel Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1344 (Fed. Cir. 2020) ("simply calling the addition … 'an obvious design choice'" insufficient to establish obviousness). Here, there was no substantial evidence supporting CSI's design choice argument, because in addition to failing to prove the combination was known, CSI submitted no evidence or explanation as to why a person of skill would have combined the components as claimed.

The only evidence that CSI submitted as to its "design choice" theory was a single conclusory paragraph in its expert declaration stating that it "is also my opinion that it would have been obvious to a person of ordinary skill in the art to implement the features of Uchiyama to provide the pair of electrodes that are disposed radially spaced away from the lumen tube. Such an implementation is a routine design choice and well within the knowledge and know-how of the person of ordinary skill in the art." Appx1653. While this theory fails because (as the Board found) Uchiyama does not actually disclose electrodes "disposed radially spaced

away from the lumen tube" (and this is not even what the claim requires), CSI and its expert never argued that there were a limited number of design options, nor did they provide any explanation as to ***why*** a person of skill would have selected the particular electrode configuration of claim 5 as opposed to other available configurations. The mere assertion that the configuration of claim 5 was a "design choice," without explanation as to why that ***particular*** choice would be made, is insufficient to establish obviousness, as discussed above. The Board correctly rejected CSI's "design choice" rationale given the absence of any such evidence.

If anything, the record evidence taught against CSI's alleged design choice. For example, Shockwave submitted evidence that a skilled artisan would not have been motivated to place the electrodes as claimed based on concerns at the time that it would risk damage to tissue. Appx658, Appx7520-7521 ("Dr. Jensen's proposed system puts the EHL electrodes within a couple millimeters of healthy tissue, in direct contravention of the knowledge in the art.").

CSI's argument that there are a "finite number of possible locations for electrodes—either inside or outside the lumen" (CSI Br. 73) is a new attorney argument on appeal, with no support in the record. CSI did not make this argument before the Board in its Petition or expert declaration, and it is therefore waived. *See Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1324 (Fed. Cir. 2020) ("Apple failed to raise these arguments below, and thus it has waived these arguments on

appeal."); *Netflix, Inc. v. DivX, LLC*, 84 F.4th 1371, 1377 (Fed. Cir. 2023) ("we have rejected, many times, post-hoc attempts on appeal to include additional, new arguments not contained in the petition"). Unsurprisingly, CSI cites nothing in the record supporting its "finite" locations argument.

Moreover, CSI's attempt to reduce the possible placement of the electrodes to a binary choice of "inside or outside the lumen" ignores the claim language. Claim 5 requires that "the pair of electrodes is disposed ***adjacent to <u>and</u> outside*** of the guide wire lumen." Appx200. CSI does not address the "adjacent to" requirement at all, much less explain or cite evidence as to why this would allegedly be a routine "design choice." Indeed, there are many possible placements of the electrode pair other than simply inside or outside of a guidewire lumen. For example, Figure 5 of the '371 Patent illustrates electrodes "displaced along the length of the balloon" with one electrode (44) advanced significantly further than the other (42):

FIG. 5




Appx191, Appx199.

CSI's argument that "in the Levy combination … the pair of electrodes must be outside the lumen" is equally wrong. CSI Br. 74. CSI did not raise this argument

before the Board, and it has no support in the record. Moreover, Levy itself ***does not even have electrodes.*** Rather, Levy uses "pulsed laser radiation" sent via "an optical fiber." Appx1735. Because Levy does not use electrodes, it naturally says nothing about the placement of electrodes (and CSI does not even attempt to identify any such disclosure). Nor does Levy have a "guidewire lumen." As discussed above, the Board relied on AAPA for the guidewire lumen element and did not find it disclosed in Levy. Appx38-41. Thus, even if CSI were found to have standing to present this untimely obviousness theory for claim 5 on appeal, it fails on the merits in virtually every possible way.

## CONCLUSION

For the foregoing reasons, Shockwave respectfully requests the Court (1) reverse or vacate the Board's decision that claims 1-4 and 6-17 are unpatentable, and (2) dismiss CSI's cross-appeal or, alternatively, affirm the Board's finding confirming claim 5 is patentable.

Dated: May 1, 2024

Respectfully submitted,

By: */s/ David C. McPhie*
David C. McPhie

David C. McPhie
Stephen M. Payne
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Phone: 949-760-0991

Michael R. Fleming
IRELL & MANELLA LLP
750 17th Street NW
Washington, D.C. 20006
Phone: 202-777-6500

W. Cook Alciati
GARDELLA GRACE P.A.
80 M Street SE, 1st Floor
Washington, D.C. 20003
Phone: 703-556-9600

*Counsel for Appellant Shockwave Medical, Inc.*

**CERTIFICATE OF COMPLIANCE**

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally-spaced typeface and includes 13,997 words, excluding those items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

Dated: May 1, 2024

Respectfully submitted,

By: */s/ David C. McPhie*
David C. McPhie

David C. McPhie
Stephen M. Payne
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Phone: 949-760-0991

Michael R. Fleming
IRELL & MANELLA LLP
750 17th Street NW
Washington, D.C. 20006
Phone: 202-777-6500

W. Cook Alciati
GARDELLA GRACE P.A.
80 M Street SE, 1st Floor
Washington, D.C. 20003
Phone: 703-556-9600

*Counsel for Appellant*
*Shockwave Medical, Inc.*