Nos. 23-1864, 23-1940

# United States Court of Appeals for the Federal Circuit

SHOCKWAVE MEDICAL, INC.,

*Appellant*,

v.

CARDIOVASCULAR SYSTEMS, INC.,

*Cross-Appellant*.

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,

*Intervenor*.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2019-00405; Administrative Patent Judges Richard Marschall, Avelyn Marie Ross, and Mitchell G. Weatherly.

## REPLY BRIEF OF CROSS-APPELLANT CARDIOVASCULAR SYSTEMS, INC.

S. Giri Pathmanaban
LATHAM & WATKINS LLP
300 Colorado Street
Suite 2400
Austin, TX 78701
(737) 910-7300

Gabriel K. Bell
Michael A. Morin
Jacob C. Vannette
Hannah Fan
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2201

May 31, 2024

*Counsel for Cross-Appellant Cardiovascular Systems, Inc.*

# CERTIFICATE OF INTEREST

**Case Numbers**: 23-1864, 23-1940

**Short Case Caption**: *Shockwave Medical, Inc. v. Cardiovascular Systems, Inc.*

**Filing Party/Entity**: Cardiovascular Systems, Inc., Cross-Appellant

I certify the following information and any attached sheets is accurate and complete to the best of my knowledge.

Date: May 31, 2024 Signature: */s/ Gabriel K. Bell*
Name: Gabriel K. Bell

1. **Represented Entities**. Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   Cardiovascular Systems, Inc.

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47.4(a)(3).

   Cardiovascular Systems, Inc., is wholly owned subsidiary of Abbott Cardiovascular Systems Inc.

   Abbott Cardiovascular Systems Inc. is a wholly owned subsidiary of Abbott Vascular, Inc.

   Abbott Vascular, Inc., is a wholly owned subsidiary of Abbott Laboratories, a publicly traded company.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Barnes & Thornburg LLP:** Mark C. Nelson, Juanita DeLoach, Jeffrey Stone

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   No.

   If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   None/Not Applicable.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

ARGUMENT ........ 4

I. CSI HAS STANDING TO CROSS-APPEAL ON CLAIM 5 ........ 4

II. THE BOARD ERRED IN UPHOLDING CLAIM 5 ........ 10

A. The Board Did Not Address CSI's Asserted Prior-Art Combination ........ 11

B. The Board Did Not Address CSI's Showing That Claim 5 Was An Obvious Design Choice ........ 15

C. The Court Should Reverse The Board's Claim 5 Determination ........ 21

CONCLUSION ........ 21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adidas AG v. Nike, Inc.*,
963 F.3d 1355 (Fed. Cir. 2020) ....................................................................9

*Allgenesis Biotherapeutics Inc. v. Cloudbreak Therapeutics, LLC*,
85 F.4th 1377 (Fed. Cir. 2023) .....................................................................8

*Amerigen Pharmaceuticals Ltd. v. UCB Pharma GmBH*,
913 F.3d 1076 (Fed. Cir. 2019) ....................................................................5

*CRFD Research, Inc. v. Matal*,
876 F.3d 1330 (Fed. Cir. 2017) ..............................................................16, 19

*Cygnus Therapeutics Systems v. ALZA Corp.*,
92 F.3d 1153 (Fed. Cir. 1996) ......................................................................8

*Fisher & Paykel Healthcare Ltd. v. ResMed Ltd.*,
789 F. App'x 877 (Fed. Cir. 2019)...................................................................7

*Fleming v. Cirrus Design Corp.*,
28 F.4th 1214 (Fed. Cir. 2022) ...........................................................3, 12, 15

*General Electric Co. v. Raytheon Technologies Corp.*,
983 F.3d 1334 (Fed. Cir. 2020) ....................................................2, 4, 8, 9, 10

*Janssen Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*,
97 F.4th 915 (Fed. Cir. 2024) ...............................................................3, 11, 12

*JTEKT Corp. v. GKN Automotive Ltd.*,
898 F.3d 1217 (Fed. Cir. 2020) ..................................................................6, 8

*KSR International Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)...............................................................................18, 19

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007).......................................................................................9

**Page(s)**

*ModernaTx, Inc. v. Arbutus Biopharma Corp.*,
18 F.4th 1364 (Fed Cir. 2021) ....................................................................9

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012) ....................................................................11

*Provisur Technologies, Inc. v. Weber, Inc.*,
50 F.4th 117 (Fed. Cir. 2022) ....................................................................11, 18

*Uber Technologies, Inc. v. X One, Inc.*,
957 F.3d 1334 (Fed. Cir. 2020) ....................................................................18, 19

# INTRODUCTION

Dependent claim 5 adds nothing patentably distinct. The independent claim from which it depends (claim 1) recites that the catheter has a pair of electrodes located "within" the fluid-filled balloon to create a "shock wave within the balloon." Appx10; Appx200. The Board agreed with CSI that using such electrodes in the Levy/AAPA combination was obvious in light of Mantell, Uchiyama, or Willneff: "each of these three references describes using arcs between electrodes within a balloon to generate shockwaves." Appx30-31. The Board found claim 1 obvious based on "the combined teachings of Levy and any one of Mantell, Uchiyama, or Willneff along with the background knowledge reflected in the AAPA." Appx65.

In turn, claim 5 adds only that the electrodes are "adjacent to and outside of the guide wire lumen." Appx200. But that is the most natural location—indeed, the only viable location. Because the electrodes are within the fluid-filled balloon and the balloon is necessarily adjacent to and outside the guidewire lumen, the electrodes are adjacent to and outside the guidewire lumen. At minimum, that was an obvious design choice. Accordingly, CSI's petition argued that claim 5 was an obvious design choice based on the same combination of references as claim 1, including Uchiyama. Appx363-364. However, when it came to claim 5, the Board incorrectly examined Uchiyama in isolation and did not consider whether claim 5 represented a mere design choice. *See* Appx70. Claim 5 is just as obvious as claim 1.

In its response-reply brief, Shockwave contends that: (1) CSI lacks standing to cross-appeal the Board's determination upholding claim 5; and (2) the Board properly analyzed claim 5. *See* SW Resp.-Reply Br. 42-61. These arguments fail.

1. CSI has standing to pursue its cross-appeal. CSI Br. 68-71. When CSI cross-appealed, its IVL products were in essentially their final form and just months away from a design freeze. That design freeze has since occurred: CSI's products are now subject to design verification, and CSI expects to further pursue FDA approval in the coming months. This confirms that, by the time of CSI's cross-appeal, CSI had "concrete plans for future activity" that created "a substantial risk of future infringement." *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1341 (Fed. Cir. 2020) (citation omitted). Shockwave publicly admitted that it intends "to assert a claim of infringement" against, according to Shockwave, "any viable" IVL device. *Id.* (citation omitted); CSI Br. 70; ECF No. 20-2 at CSIAppx1. Shockwave also publicly stated that any such device must contain the elements of claim 5, so Shockwave will "certainly assert" a claim against "anyone" that commercializes an IVL device, as CSI intends to. CSI Br. 70; ECF No. 20-2 at CSIAppx1. Therefore, CSI has suffered an injury in fact.

Shockwave's attempts to argue otherwise fall short. Shockwave fixates on CSI's statements to the Board two years ago when CSI's product was in its early development stages. It faults CSI for not conceding infringement even though that

is not required for standing. Shockwave tries (and fails) to recast its own public statements to obscure its otherwise obvious intent: to assert an infringement claim against CSI as soon as CSI's device (or *any* viable IVL device) hits the market. The Court should find that CSI has standing to pursue its cross-appeal.

2. On the merits, the Board legally erred in upholding claim 5 because it (a) failed to consider CSI's asserted obviousness combination, opting instead to analyze a single reference in isolation rather than in context, and (b) ignored CSI's design-choice argument. CSI Br. 71-74. Shockwave repeats the Board's errors, insisting that Uchiyama, alone, does not disclose the elements of claim 5. Both Shockwave and the Board miss that the relevant inquiry is whether CSI's asserted *combination* renders claim 5 obvious. *See, e.g.*, *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 927-28 (Fed. Cir. 2024); *Fleming v. Cirrus Design Corp.*, 28 F.4th 1214, 1222 (Fed. Cir. 2022). As CSI has shown, it does. Shockwave then suggests that CSI never made its "finite number" design-choice argument to the Board. But CSI expressly argued before the Board that the electrodes' location was at most "a routine design choice." Appx364.

Claim 5 is no less obvious than the many other Shockwave claims that the Board has found unpatentable (including ones this Court previously affirmed in other appeals from co-pending IPR proceedings). The Court should reverse the Board's conclusion on claim 5.

# ARGUMENT

## I. CSI HAS STANDING TO CROSS-APPEAL ON CLAIM 5

CSI has standing to pursue this appeal because it has engaged in activity and "has concrete plans for future activity" that create "a substantial risk of future infringement" or will "likely cause [Shockwave] to assert a claim of infringement." *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1341 (Fed. Cir. 2020) (citation omitted); *see* CSI Br. 68-69.

When it filed its cross-appeal, CSI's product was near a design freeze, only minor changes were expected, and clinical trials were to begin soon. CSI Br. 69; *see* ECF No. 21-2 ("Cambronne Decl.") ¶¶ 4-7, 11; ECF No. 21 at 4-6, 8 (Opp. Mot. Dismiss). Since then, CSI has achieved the anticipated design freeze and is now in the middle of design verification. CSI anticipates further pursuing FDA approval in the coming months. This progress, on its own, represents "activity that creates a substantial risk of future infringement." *Gen. Elec.*, 983 F.3d at 1341 (citation omitted). Moreover, Shockwave publicly vowed that it will assert claim 5 against competitors like CSI—saying first that "any viable … IVL device must contain" the claim's elements and second that Shockwave will "certainly" sue anyone who "tries to copy" its IVL approach—which, in its view, claim 5 necessarily covers. CSI Br. 70-71; ECF No. 20-2 at CSIAppx1, CSIAppx23. Therefore, CSI suffered an injury

in fact and has standing to appeal the Board's decision upholding claim 5. *Amerigen Pharms. Ltd. v. UCB Pharma GmBH*, 913 F.3d 1076, 1082 (Fed. Cir. 2019).

In arguing otherwise, Shockwave (1) points to outdated evidence, long predating the notice of appeal, of CSI's product development, (2) wrongly insists that CSI must show or concede infringement to establish standing, and (3) distorts Shockwave's own public statements, which unmistakably show that Shockwave intends to assert claim 5 at its earliest opportunity. *See* SW Resp.-Reply Br. 43-50.

First, Shockwave again relies on CSI's "representations to the Board." SW Resp.-Reply Br. 43. But those statements were over two years ago, well before the substantial product development that had occurred by the time CSI filed this cross-appeal—let alone the further important progress since. Shockwave then suggests that CSI's position to the Board—when product development was in its infancy—is inconsistent with its position on standing here—when the product is virtually finalized and subject to a design freeze. There is no inconsistency. Before the Board, CSI (accurately) explained that no further discovery was warranted because "CSI's unapproved, in-development IVL device … adds nothing to the secondary considerations analysis." Appx1293 (Opp. Mot. for Additional Discovery). The Board agreed. Then, by the time CSI filed its cross-appeal (over a year later), substantial product development had occurred and CSI had committed substantial

funds to bring its product to market. *See* CSI Br. 69; Cambronne Decl. ¶ 14. That is how product development works.

If anything, Shockwave—not CSI—is inconsistent. Before the Board, Shockwave sought additional discovery because, according to Shockwave, the existence of CSI's product (even at that nascent stage) was objective evidence that Shockwave's patent was non-obvious. *See* Appx10578-10582 (Feb. 22, 2022 Hrg. Tr.). Shockwave believed then that "it's certainly reasonable to infer [CSI's] product will be covered by the … patent." Appx10584-10585. But now, two years later, Shockwave contends that CSI's far-more-developed product is still not developed enough—and the threat of an infringement assertion is not potent enough—to support CSI's standing to cross-appeal. That does not make sense.

Shockwave's recited case law (SW Resp.-Reply Br. 45-46) is inapposite. In *JTEKT Corp. v. GKN Automotive Ltd.*, this Court dismissed an appeal of an IPR decision for lack of standing because the appellant had "expressly conceded that 'no product is yet finalized'" and "'[t]he concept will continue to evolve and may change until it is completely finalized.'" 898 F.3d 1217, 1221 (Fed. Cir. 2020) (alteration in original) (citations omitted). A patent engineer for the appellant expressly opined that it would be impossible to quantify the risk of infringement because the product was not yet finalized. *Id.* In contrast, here, the unrebutted evidence shows that, when CSI filed its cross-appeal, a "design freeze" was imminent. *See* Cambronne

Decl. ¶¶ 4-7, 11. In fact, the design freeze has since occurred, the product is undergoing design verification, and CSI expects to further pursue FDA approval in the coming months. In other words, unlike in *JTEKT*, CSI's product design and implementation were (and are) substantially final.

In *Fisher & Paykel Healthcare Ltd. v. ResMed Ltd.*, this Court dismissed the appeal for lack of standing because the appellant "ha[d] not provided any, let alone sufficient, detail regarding features of its future products to enable us to determine that its activities create a substantial risk of future infringement." 789 F. App'x 877, 878 (Fed. Cir. 2019). In contrast, CSI has provided significant details, including photographs, explaining and depicting the advanced status of its IVL product development. *See* CSI Br. 69; Cambronne Decl. ¶¶ 5-7. Moreover, after CSI attempted to resolve any future patent infringement disputes years ago, Shockwave refused to engage, instead publicly proclaiming that any viable IVL system would necessarily infringe claim 5. CSI Br. 69-70; *see* Cambronne Decl. ¶ 16; ECF No. 20-2 at CSIAppx1, CSIAppx23. Shockwave's message is unmistakable: CSI's "activities create a substantial risk" of a Shockwave infringement suit, unlike in *Fisher*. 789 F. App'x at 878.

In addition, Shockwave suggests that CSI lacks standing because CSI's device remains subject to clinical testing and has not yet received FDA approval. SW Resp.-Reply Br. 44-46. However, this Court has indicated that "plans to conduct

Phase III trials or seek FDA approval" could be sufficient to show Article III injury in fact. *Allgenesis Biotherapeutics Inc. v. Cloudbreak Therapeutics, LLC*, 85 F.4th 1377, 1380-81 (Fed. Cir. 2023) (footnote omitted). Here, CSI's substantial progress and investment in development along with plans for clinical testing and seeking FDA approval are enough.

Second, Shockwave's argument that CSI's evidence must disclose "whether its catheters contain required claim elements such as the configuration of electrodes required by claim 5" (SW Resp.-Reply Br. 47) is likewise unsupported. CSI does not have to admit infringement to establish standing. *See JTEKT*, 898 F.3d at 1221.[1] As this Court reiterated in *General Electric*, CSI has standing if its activities create "a substantial *risk* of future infringement" or will "*likely* cause [Shockwave] to assert a claim of infringement"—the test is not whether CSI *in fact* infringes. 983 F.3d at 1341 (emphasis added) (citation omitted). Here, as discussed, Shockwave publicly insisted that it would assert claim 5 against *any* viable IVL system. ECF No. 20-2 at CSIAppx1; *supra* at 4, 7.

Shockwave relies on a declaratory judgment case decided under the "reasonable apprehension of suit" test. SW Resp.-Reply Br. 48-49 (quoting *Cygnus Therapeutics Sys. v. ALZA Corp.*, 92 F.3d 1153 (Fed. Cir. 1996)). But the Supreme

[1] CSI provided photographs of its console and catheters not to show infringement but to show the advanced stage of product development. *See* CSI Br. 69.

Court rejected that high bar for declaratory judgment standing in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Moreover, even the correct (lower) declaratory-judgment standard—requiring "immediacy and reality"—is irrelevant here. *See id.* As discussed, CSI has standing under *General Electric* because it "has concrete plans for future activity" that create "a substantial risk of future infringement" or will "likely cause [Shockwave] to assert a claim of infringement." 983 F.3d at 1341 (citation omitted). Shockwave's public promise to assert infringement against any viable IVL product confirms as much.

Third, Shockwave's attempts to downplay or reinterpret its clear public comments fall flat. Shockwave asserts that its threat to enforce claim 5 against "any viable" IVL device was not directed specifically at CSI. SW Resp.-Reply Br. 47. That is not credible. Shockwave made the statement right after the Board upheld claim 5 in the present IPR litigation *against CSI*. *See* CSI Br. 70. Then, during the rehearing proceedings, Shockwave asserted it was "reasonable" to conclude that its patent covers CSI's device. Appx10584-10585. Moreover, an appellant "need not face a specific threat of infringement litigation by the patentee to establish the requisite injury." *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1357 (Fed. Cir. 2020) (citation omitted). Thus, this Court has found standing in instances where the patent owner's public statements from three years earlier touted "the alleged extensive scope of its patent coverage over virtually all" relevant products. *ModernaTx, Inc.*

*v. Arbutus Biopharma Corp.*, 18 F.4th 1364, 1372 (Fed Cir. 2021). That principle applies here, too.

Shockwave then argues that another public statement suggests a preference *against* litigating. SW Resp.-Reply Br. 48 (citing ECF No. 20-2 at CSIAppx23). Not so. In that statement, Shockwave reiterates that it will "*certainly* assert" infringement against "*anybody*" that makes a viable IVL product, which claim 5 purportedly covers. ECF No. 20-2 at CSIAppx23 (emphasis added). Shockwave then states that Shockwave will do *more* than just litigate to stay competitive. *Id.* Shockwave's own public statements leave no doubt that it will "likely … assert a claim of infringement" against CSI. *Gen. Elec.*, 983 F.3d at 1341 (citation omitted).

Because CSI's activities create "a substantial risk of future infringement" and Shockwave's public statements show that it is likely "to assert a claim of infringement" against CSI, CSI has standing to cross-appeal the Board's patentability determination for claim 5. *See id.* (citation omitted).

## II. THE BOARD ERRED IN UPHOLDING CLAIM 5

On the merits, this Court should reverse the Board's determination that claim 5 is patentable. The Board made two legal errors in upholding claim 5: (a) the Board failed to consider the prior-art combination, instead addressing the Uchiyama reference in isolation; and (b) the Board failed to address the argument that the

electrodes' position (as recited in claim 5) was a mere design choice. CSI Br. 71-74. Shockwave's response brief echoes both errors. SW Resp.-Reply Br. 54-61.

### A. The Board Did Not Address CSI's Asserted Prior-Art Combination

The Board needed to, but did not, consider the prior art's combined teachings in evaluating CSI's petition. CSI Br. 71-73. To show that claim 5 was obvious, CSI's petition relied on "Levy as modified by AAPA in combination with Mantell or Uchiyama or Willneff." Appx363 (capitalization normalized). But the Board examined Uchiyama in isolation and concluded that it, alone, did not teach the claimed electrode configuration. Appx70 ("Petitioner has failed to prove that *Uchiyama*" teaches claim 5 (emphasis added)); *see* CSI Br. 71-73.

The Board's failure to consider the asserted combination as a whole is legal error. For example, in *Janssen Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*, this Court held that the district court employed an "erroneously rigid" obviousness analysis that "inflat[ed] the significance of minor variations between the prior art and the claims." 97 F.4th 915, 927-28 (Fed. Cir. 2024). In particular, "[i]nstead of considering the prior art in context or in *combination*," the district court improperly "tackle[d] the express statements of *each reference one-by-one*—identifying each difference or dissimilarity between an individual reference and the claims, but not fully assessing the teachings in toto." *Id.* (emphasis added); *see also Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 125 (Fed. Cir. 2022); *In re*

*Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012). The Board made the same mistake here. CSI Br. 71-73.

Shockwave echoes that mistake, arguing that "CSI relied solely on Uchiyama as disclosing the additional elements of claim 5." SW Resp.-Reply Br. 55-56. As discussed, that is incorrect. *See* CSI Br. 71-73; Appx362-364 (Pet.); Appx755 (Reply). Shockwave compounds its error by arguing that, because "Uchiyama [purportedly] does not in fact disclose those elements," "CSI had not proven its obviousness theory." SW Resp.-Reply Br. 55-56. However, a claim is obvious when "the proposed *combination*" of prior art teaches a skilled artisan how to arrive at the claimed invention, even if "the individual references" do not. *Fleming v. Cirrus Design Corp.*, 28 F.4th 1214, 1222 (Fed. Cir. 2022); *see also Janssen Pharms.*, 97 F.4th at 927-28. Here, even assuming arguendo that Uchiyama does not individually disclose claim 5's limitation, the *combination* renders it obvious.

Neither Shockwave nor the Board appropriately considered what CSI's proposed combination discloses. As CSI explained in its petition, Uchiyama discloses a pair of electrodes that generate shockwaves in the fluid of an inflated balloon. Appx358-359 (citing Appx1784 (Ex. 1005 at 298)). To generate shockwaves in the fluid, the electrodes must be *in the fluid*—so, in the combined Levy/AAPA/Uchiyama system, the electrodes *must* be disposed radially spaced away from the lumen of the tube, i.e., outside of the guidewire lumen. *See* CSI Br.

72; Appx363 (Pet.); Appx7359 (Jensen drawing); Appx7684 (Jensen Dep. 120:21-24) (testifying that "in order for the shockwave to be formed from the arc … [if a] spark is to be formed across two electrodes, you would want those electrodes to be exposed to the fluid that is contained within the inflatable body"). The Board did not consider this crucial point.

Shockwave further argues that CSI's petition "did not assert that Uchiyama's electrodes were positioned as claim 5 requires." SW Resp.-Reply Br. 51. This, again, misses the point. CSI's petition explained that claim 5 was obvious in view of the *combination* that included Uchiyama: "Levy as modified by AAPA in combination with Mantell or Uchiyama or Willneff." Appx363. As discussed, the Board did not properly consider that combination. *Supra* at 11; CSI Br. 71-73.

Moreover, CSI's petition properly explained why the combination, including Uchiyama, rendered claim 5 obvious. As to claim 1 (from which claim 5 depends), there was "no dispute" that angioplasty balloon catheters with a guidewire lumen extending through the balloon "were well known." Appx38. Indeed, Shockwave admitted (and illustrated) that point:



Appx10495 (Shockwave annotating Appx190 (Fig. 1)); *see* Appx22-23. CSI further argued—and the Board agreed—that a skilled artisan would have combined that well-known arrangement with Mantell, Uchiyama, or Willneff, each of which taught placing a pair of electrodes "within" the balloon to generate a shockwave, as required by claim 1. Appx357-362 (Pet.); Appx200 (cl. 1); Appx35, Appx38-41. Then, for claim 5, CSI relied on that same combination of references. Appx363-364 (Pet.). CSI explained that it would be obvious—"a routine design choice"—to locate the electrodes (as depicted in Uchiyama) adjacent to and outside (i.e., "radially spaced away from") the guidewire lumen. Appx363-364 (Pet.). In addition, Dr. Jensen depicted the combination with electrodes outside and adjacent to the lumen. Appx7359 (Jensen drawing); CSI Br. 71-72; *see also* Appx658 (POR) (rebutting CSI's argument for "[p]utting the electrodes on the outside of the guidewire lumen"). Therefore, CSI's petition properly argued that the combination made it obvious to position the electrodes as claim 5 requires.

Shockwave next suggests that Dr. Jensen initially misunderstood Uchiyama's design and later conceded that his opinion was wrong. SW Resp.-Reply Br. 56-57. That is incorrect. At his deposition, Dr. Jensen acknowledged Uchiyama's electrode placement and stated "I don't think that Uchiyama is limiting." Appx10044 (Jensen Dep. 40:3-4). Dr. Jensen never conceded that he had an incorrect understanding of

Uchiyama's teachings or that the annotated figure Shockwave's counsel showed him changed his opinions. *See* Appx10044.

Because the Board did not consider what CSI's proposed *combination* taught and focused instead on Uchiyama's teachings in isolation, it failed to properly evaluate CSI's arguments. Its determination upholding claim 5 cannot stand.

### B. The Board Did Not Address CSI's Showing That Claim 5 Was An Obvious Design Choice

The Board also erred in disregarding CSI's argument that the claimed electrode configuration was a routine design choice that would have been obvious to a skilled artisan. CSI Br. 73-74. CSI's petition explained that the claimed electrode configuration was "a routine design choice and well within the knowledge and know-how of the POSITA." Appx363-364. But the Board did not address that point. *See* Appx69-70; CSI Br. 73-74. Shockwave seeks to excuse that error for four reasons, all of which are unavailing.

First, Shockwave argues that substantial evidence supports the Board's determination because CSI did not show that the claimed configuration was known in the art. SW Resp.-Reply Br. 57-58. But, again, the question is not whether the claimed configuration was known but whether it was *obvious*. *Fleming*, 28 F.4th at 1222. Where, as here, there are two predictable choices for electrode placement—inside or outside the guidewire lumen—a skilled artisan has a simple design choice

to arrive at the claimed invention, rendering it obvious. *See CRFD Rsch., Inc. v. Matal*, 876 F.3d 1330, 1347 (Fed. Cir. 2017).

CSI's petition showed that claim 5's recited electrode configuration was an obvious design choice, and it identified the motivation for placing the electrodes outside the guidewire lumen. CSI Br. 73-74; Appx364; *see also* Appx1596-1732 at Appx1653 (Jensen Decl. ¶ 132). The petition explained that the electrodes were *in* the fluid to create shockwaves; in view of Uchiyama's teachings, a skilled artisan would have placed them radially spaced away from the guidewire lumen that, in the Levy/AAPA combination, extended all the way through the balloon. Appx354-355 (explaining how the prior art rendered obvious a carrier having a guidewire lumen extending through the balloon). As Dr. Jensen illustrated, the obvious takeaway was that the electrodes would be adjacent to and outside the guidewire lumen:



Appx7359. The Board elsewhere correctly credited CSI's argument that a skilled artisan would have combined Levy, AAPA, and Uchiyama (Appx35-38, Appx43-47) but then erred in failing to assess the result of that combination for claim 5.

Second, Shockwave argues that "record evidence taught against CSI's alleged design choice" because, according to Shockwave, placing the electrodes as claimed, so close to the tissue, would risk damage to the tissue. SW Resp.-Reply Br. 59. But Shockwave made essentially the same argument before the Board in arguing against a motivation to combine on claim 1, Appx32-33, and the Board rejected it, Appx33-35 (discounting testimony that electrodes cannot be within 5 mm of soft tissue).

Dr. Jensen's testimony supports the Board's finding:

> Q. So the question is, would your proposed combined system pose a risk of harm to healthy tissue that would be unacceptable for use in a human?
>
> A. No, I mean, if the FDA had approved a device like this, the risk of harm would not be unacceptable.
>
> Q. What about Levy? Would Levy's system, as explained in Exhibit 1003, run a risk of harming healthy tissue?
>
> ….
>
> [A.] Levy is describing a challenge that Levy is providing a suggestion to overcome, but that doesn't mean that Levy's approach is unreasonable – unreasonably dangerous to use.

Appx7684-7685 (Jensen Dep. 121:14-21, 123:13-16).

Shockwave does not challenge the Board's finding, which applies with equal force to all claims and forecloses Shockwave's suggestion on appeal that damage concerns taught away from the obvious design choice claim 5 covers. *See Provisur Techs.*, 50 F.4th at 125-26.

Third, Shockwave argues there are additional design choices, but the only alternative it offers is Figure 5 of the '371 patent. SW Resp.-Reply Br. 60. That figure depicts electrodes (42 and 44, colored blue below) offset longitudinally from one another, but they are still disposed "adjacent to and outside of the guide wire lumen" (colored red) as recited in claim 5:




Appx191 (annotated), Appx199 (4:60-62); *see* Appx200 (cl. 5). Unable to identify other possible design alternatives, Shockwave's argument underscores that claim 5 is an obvious design choice. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007); *Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1338 (Fed. Cir. 2020).

Fourth, and finally, Shockwave argues that CSI waived any argument that there were a "finite number" of locations for the electrodes. SW Resp.-Reply Br. 59. But CSI did contend that claim 5 was an obvious design choice, Appx364 (Pet.)—which is the same argument. In *KSR*, an obvious "design" choice was one among "a finite number of identified, predictable solutions" for the location of a particular feature. 550 U.S. at 420. In *Uber*, a skilled artisan that "would have two predictable choices" for when a feature occurred faced a "simple design choice." 957 F.3d at 1340 (quoting *CRFD Rsch.*, 876 F.3d at 1347). The finite possibilities for electrode placement here likewise present a simple design choice. The Board erred in failing to address that argument, and in any event the record lacks substantial evidence to show that electrode placement was anything other than a design choice.

Again, there was and is no dispute that angioplasty balloons were well known. Appx38. As noted above, such balloons include guidewire lumens extending through the balloon, as Shockwave admitted. *Supra* at 13-14. To arrive at the claimed invention, a skilled artisan needed only supply "an arc generator including a pair of electrodes, said electrodes being positioned *within* and *in non-touching relation* to the balloon." Appx200 (cl. 1) (emphasis added). The Board concluded that a skilled artisan would have been motivated to do just that—i.e., substituting Levy's laser with electrodes from, e.g., Uchiyama—and would have reasonably expected success in doing so. Appx38-41. Uchiyama discloses that the electrodes

must be within the fluid in the balloon to generate shockwaves that are transmitted to the lesion:




第 1 図

Appx69; *see* Appx1785 ("electric discharge sparks are generated inside of the balloon[7] by the pair of the electrodes[3]" and "the impact … is transmitted to the calculus S via the fluid inside of the balloon[7]").[2]

Therefore, Claim 5's recited electrode configuration—"adjacent to and outside of the guide wire lumen"—was an obvious design choice in the combination of Uchiyama's electrodes with Levy/AAPA. Appx363-364 (Pet.); *see* CSI Br. 73-74. Indeed, there are only two options for the electrodes: inside or outside the guidewire lumen. Only the latter makes sense in this combination because the fluid is within the balloon (i.e., outside the guidewire lumen) and the electrodes must be

---

[2] Uchiyama discloses the electrodes 3 (blue) near a fluid channel 6 within the balloon disposed in a body passageway, e.g., urinary duct. Appx1784-86.

in the fluid. The Board erred by failing to consider that obvious design choice for the electrodes' location.

### C. The Court Should Reverse The Board's Claim 5 Determination

As explained in CSI's cross-appeal brief, the Court should reverse rather than vacate the Board's decision on claim 5. CSI Br. 75. Having failed to respond to that argument, Shockwave has waived any argument to the contrary.

## CONCLUSION

The Court should reverse the Board's determination upholding claim 5.

Dated: May 31, 2024

Respectfully submitted,

*/s/ Gabriel K. Bell*

Gabriel K. Bell
Michael A. Morin
Jacob C. Vannette
Hannah Fan
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

S. Giri Pathmanaban
LATHAM & WATKINS LLP
300 Colorado Street
Suite 2400
Austin, TX 78701
(737) 910-7300

*Counsel for Cross-Appellant Cardiovascular Systems, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that the foregoing reply complies with the type-volume limitations in Federal Rule of Appellate Procedure 27(d)(2)(A). According to the word count feature of Microsoft Word, the reply contains 4,450 words, excluding the exempted parts under Federal Rule of Appellate Procedure 32(f). The reply has been prepared in a proportionally spaced typeface using Times New Roman in 14 point size.

Date: May 31, 2024

Respectfully submitted,

*/s/ Gabriel K. Bell*
Gabriel K. Bell